IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| and | ) | Civil Action No. 1-11-cv-06 (RAM/GWC) |
| | ) | |
| THE UNITED STATES VIRGIN ISLANDS, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| HOVENSA L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO ENTER THE FIRST MODIFICATION OF THE CONSENT DECREE

### INTRODUCTION

The United States, on behalf of the United States Environmental Protection Agency ("EPA"), and with the concurrence of Co-Plaintiff the United States Virgin Islands ("Virgin Islands"), on behalf of the Department of Planning and Natural Resources ("DPNR"), respectfully submits this Memorandum in support of its motion to enter the First Modification of the Consent Decree ("First Modification").   The First Modification was lodged with the Court on August 25, 2020 (ECF Doc. 12-1), and on August 31, 2020, the United States published notice of the lodging of the First Modification in the Federal Register soliciting comment from the public. 85 Fed. Reg. 5389 (Aug. 31, 2020).  The United States received one set of comments during the 30-day public comment period from Elizabeth Leigh Neville (referred to as "Commenter"), who requested that the First Modification be rejected as being "inappropriate, improper, and inadequate."  When lodging the First Modification, the United States reserved its rights to

1

withhold consent to entry if "public comments disclose facts or considerations" indicating that the First Modification is "inappropriate, improper, or inadequate." See 28 C.F.R. § 50.7(b). The submitted comments do not show that the First Modification is inappropriate, improper, or inadequate as the comments fail to identify anything in the agreement itself which violates the law or harms the public. Attached to this Memorandum are the First Modification as Attachment A and the comments as Attachment B. All parties to the First Modification have agreed to it and consent to its entry without further notice.

After the First Modification was lodged with the Court, the United States and Limetree Bay agreed to modify the date in Paragraph 79.a from March 30, 2021 to November 22, 2021. This modification is discussed in Part V, below. The United States requests that the Court enter the attached version of the First Modification of the Consent Decree as a final judgment by signing the document at page 95 and entering it as a final judgment.

## I.   BACKGROUND AND SUMMARY OF THE FIRST MODIFICATION

### A.   2011 Consent Decree between the United States, the Virgin Islands, and HOVENSA

On June 7, 2011, the Court entered a Consent Decree ("2011 Consent Decree" or "Decree") between the United States, the Virgin Islands, and HOVENSA, LLC ("HOVENSA") resolving claims concerning HOVENSA's petroleum Refinery in St. Croix. (ECF Doc. 6.) The 2011 Consent Decree is part of EPA's Petroleum Refinery Initiative ("Refinery Initiative"), an enforcement initiative targeting non-compliance with the Clean Air Act throughout the petroleum refining industry. Like other settlements under the Refinery Initiative, the 2011 Consent Decree resolved HOVENSA's potential liability under the relevant provisions of the Clean Air Act in exchange for HOVENSA's commitment to undertake a variety of activities directed at substantially reducing the emissions of key air pollutants from the Refinery.

2

The claims addressed in the 2011 Consent Decree included alleged violations of the prevention of significant deterioration provisions, the new source performance standards, the leak detection and repair provisions, and the benzene waste emissions control provisions of the Clean Air Act, ("CAA" or "Act"), 42 U.S.C. §§ 7401-7671. The 2011 Consent Decree required HOVENSA to: reduce nitrogen oxide ("NO$_x$") emissions and control sulfur dioxide ("SO$_2$"), particulate matter ("PM"), and carbon monoxide ("CO") emissions from the Refinery's fluid catalytic cracking unit; significantly reduce NO$_x$ emissions from the Refinery's heaters, boilers, generating turbines, and compressor engines through the installation of pollution control equipment; reduce SO$_2$ emissions by burning lower sulfur fuel oil and complying with fuel gas combustion requirements for heaters, boilers, flares, and sulfur recovery plants; comply with regulatory requirements for acid gas and hydrocarbon flaring, and implement a program to investigate and correct the causes of flaring incidents and take preventive action; create a preventive maintenance and operation plan for minimizing SO$_2$ emissions from the sulfur recovery plant; reduce emissions of volatile organic compounds ("VOCs") through stricter leak detection and repair ("LDAR") requirements and by replacing valves that are leaking above a specified level with low emissions valves or low emissions valve packing; and reduce emissions of benzene by improving management of benzene waste streams. In 2011, the estimated cost of complying with these injunctive relief requirements was more than $700 million. The 2011 Consent Decree also required HOVENSA to pay $5,375,000 in civil penalties and deposit $4,875,000 into an escrow account to be used to implement Territorial Supplemental Environmental Projects.

In January 2012, HOVENSA announced that it would idle refinery operations. At the time that the Refinery operations idled, most of the injunctive relief obligations required by the

Decree were not completed.  In 2015, HOVENSA announced that it would idle terminal operations.

On September 15, 2015, HOVENSA filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in the District Court of the U.S. Virgin Islands, Bankruptcy Division – St. Croix, Virgin Islands.  See, bankruptcy proceeding entitled *In re HOVENSA L.L.C..,* No. 1-15-10003-MFW.

B.    HOVENSA Bankruptcy

On December 1, 2015, the Bankruptcy Court entered an order approving the sale of certain refining and terminal assets to Limetree Bay Terminals, LLC pursuant to the terms of the Amended and Restated Asset Purchase Agreement.  ECF Doc. 528-1 in Case No. 1:15-bk-10003-MFW.  On January 4, 2016, the sale of the refinery and terminal assets to Limetree Bay Terminals, LLC closed.  Subsequent to the closing, Limetree Bay Terminals, LLC transferred certain refinery assets to Limetree Bay Refining, LLC.  As part of the bankruptcy, an Environmental Response Trust was established to, *inter alia*, assume certain Decree obligations that were not transferred to Limetree Bay Terminals, LLC or otherwise satisfied by HOVENSA.

Paragraph 7 of the 2011 Consent Decree requires HOVENSA to condition any transfer of ownership or operation of the refinery "upon the execution by the transferee of a modification to this Consent Decree, which makes the terms and conditions of this Consent Decree applicable to the transferee."  ECF Doc. No. 6, ¶ 7.

C.    Summary of the First Modification

The First Modification adds Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC (jointly, "Limetree Bay"), and the Environmental Response Trust ("ERT") as parties to the Decree and transfers uncompleted or ongoing Decree responsibilities to Limetree Bay and the

ERT, such that Limetree Bay and the ERT effectively step into the shoes of HOVENSA [First Modification ¶¶ 1 – 7] and HOVENSA is released from its Decree obligations and liabilities as of the date of entry of the First Modification [First Modification ¶ 8]. The First Modification also modifies the following deadlines and injunctive relief obligations to reflect the changed operational realities of the Refinery: (1) briefly extends the deadline for Limetree Bay to install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 3,663 tons per year ("tpy") of $NO_x$ emission reductions [First Modification ¶ 27]; (2) modifies the language to reflect the current configuration of the East Side sulfur recovery plant ("SRP") and extends the deadline for installing control technology to control the sulfur emissions from the East Side SRP and comply with New Source Performance Standards ("NSPS") Subparts A and Ja [First Modification ¶¶ 45 – 47]; (3) modifies the requirement to install and operate flare gas recovery systems ("FGRS") on certain flares in order to comply with NSPS Subpart Ja. Specifically, because the operational profile of the Refinery is now significantly different as compared to when the Decree was entered into in 2011, the First Modification conditions the installation of FGRS on the Refinery's flaring emission levels after restart (as defined in the First Modification); providing that FGRS is not required if flaring emissions remain below specified gas flow rates, but requiring Limetree Bay to install and operate FGRS if the specified gas flow rates are exceeded, thereby ensuring the expected emission reduction benefits that were required by the 2011 Consent Decree are obtained while taking into account the modified operating profile of the Refinery [First Modification ¶¶ 49, 50A – 50G, and 51]; (4) modifies Section V.P (Benzene Waste NESHAP Program) to reflect that HOVENSA selected the 6 BQ compliance option set forth in 40 C.F.R. § 61.342(e), and that Limetree Bay has agreed to redo the one-time review and verification of the Refinery's total

5

annual benzene ("TAB") report following restart [First Modification ¶¶ 77 – 98]; (5) modifies Section V.R (Leak Detection and Repair ("LDAR") Program) to make the terms consistent with the more recent LDAR regulations, including lower leak definitions (¶ 109), to ensure that a minimum of three audits will be conducted before the Decree is terminated (¶ 106), and updates the Valve Preventative Leak Maintenance Program (¶ 112) [First Modification ¶¶ 100 – 123] consistent with other recent Petroleum Refinery Initiative consent decrees; (6) modifies Section VIII.B (NSPS Applicability: Boilers and Generating Turbines) to extend the deadline for demonstrating compliance with NSPS Subparts A and GG at GT-4, GT-7 and GT-8, and to reflect that Limetree Bay has installed combustion liner systems on GT-7 and GT-8 to reduce $NO_x$ emissions, and to operate at lower maximum load limits on GT-4, GT-7, and GT-8 until Limetree Bay demonstrates compliance with NSPS Subparts A and GG [First Modification ¶ 136]; (7) modifies Section IX.A (Territorial Supplemental Environmental Project) by transferring HOVENSA's obligation to disburse monies for the Territorial Supplemental Environmental Project to the ERT [First Modification ¶ 137]; and, (8) modifies Section IX.B (Additional Work) to reflect that HOVENSA's remaining obligations for the VIWAPA Emissions Monitoring Assistance Program were transferred to the ERT [First Modification ¶ 140A].

## II.    STATUTORY AND REGULATORY FRAMEWORK

The CAA established a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1). Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality

standards") for certain air pollutants.   The primary NAAQS are to be adequate to protect the public health, and the secondary NAAQS are to be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

Section 110 of the Act, 42 U.S.C. § 7410, requires each State[1] to adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and maintenance of the NAAQS.  Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each State is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  These designations have been approved by EPA and are located at 40 C.F.R. Part 81.  An area that meets the NAAQS for a particular pollutant is classified as an "attainment" area; one that does not is classified as a "non-attainment" area.

A.     Prevention of Significant Deterioration / New Source Review

Part C of Title I of the Act, 42 U.S.C. §§ 7470-7479, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as attaining the NAAQS standards.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision-making process.  These provisions are referred to herein as the "PSD program."  Section 165(a) of the Act, 42 U.S.C. § 7475(a), prohibits the construction and subsequent operation of a major emitting facility in an area designated as attainment unless a

---

[1] The definition of State includes the Virgin Islands.  42 U.S.C. § 7602(d)

PSD permit has been issued.  Section 169(1) of the Act, 42 U.S.C. § 7479(1), includes within the definition of "major emitting facility" a petroleum refinery with the potential to emit 100 tpy or more of any air pollutant.  As set forth in EPA's implementing regulations at 40 C.F.R. § 52.21(k), the PSD program generally requires a person who wishes to construct or modify a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount.

As set forth at 40 C.F.R. § 52.21(i), any major emitting source in an attainment area that intends to construct a major modification must first obtain a PSD permit.  "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as meaning any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any criteria pollutant subject to regulation under the Act.  "Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i) in reference to a net emissions increase or the potential of a source to emit a criteria pollutant, at a rate of emission that would equal or exceed a specific level, *e.g.*: for ozone, 40 tpy of VOCs; for CO, 100 tpy; for $NO_x$, 40 tpy; for $SO_2$, 40 tpy, (hereinafter "criteria pollutants").  As set forth at 40 C.F.R. § 52.21(j), a new major stationary source or a major modification in an attainment area shall install and operate best available control technology ("BACT") for each pollutant subject to regulation under the Act that it would have the potential to emit in significant quantities.

Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, sets forth the requirements for those geographic areas that have not attained a particular NAAQS.  One such requirement is for States to have a preconstruction permitting program known as nonattainment New Source Review ("NSR").  Section 173 of the Act, 42 U.S.C. § 7503, requires that in order to obtain such a permit

8

the source must, among other things: (a) obtain federally enforceable emission offsets at least as great as the new source's emissions; (b) comply with the lowest achievable emission rate ("LAER") as defined in Section 171(3) of the Act, 42 U.S.C. § 7501(3); and (c) analyze alternative sites, sizes, production processes, and environmental control techniques for the proposed source and demonstrate that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

As set forth in 40 C.F.R. § 52.24, no major stationary source shall be constructed or modified in any non-attainment area as designated in 40 C.F.R. Part 81, Subpart C to which any SIP applies, if the emissions from such source will cause or contribute to concentrations of any pollutant for which a NAAQS is exceeded in such area, unless, as of the time of application for a permit for such construction, such plan meets the requirements of Part D, Title I, of the Act. A State may comply with Sections 172 and 173 of the Act by having its own non-attainment new source review regulations approved as part of its SIP by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.165.

B.     Flaring and New Source Performance Standards

Section 111 of the Act, 42 U.S.C. § 7411, requires EPA to promulgate NSPS for certain categories of new air pollution sources. Pursuant to Section 111(b), 42 U.S.C. § 7411(b), EPA promulgated general regulations applicable to all NSPS source categories. Those general regulations are set forth at 40 C.F.R. Part 60 Subpart A. EPA's NSPS regulations applicable to petroleum refineries, including requirements for implementing and utilizing good air pollution control practices at all times, are set forth at 40 C.F.R. Part 60 Subpart Ja. FCCU regenerators,

sulfur recovery plants, and flares are among the refinery process units subject to regulation under NSPS.

C.     Leak Detection and Repair

Section 112 of the CAA, 42 U.S.C. § 7412, requires EPA to promulgate emission standards for certain categories of sources of hazardous air pollutants ("National Emission Standards for Hazardous Air Pollutants" or "NESHAPs"). Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated national emission standards for equipment leaks (fugitive emission sources). Those regulations are set forth at 40 C.F.R. Part 61 Subpart J and Part 63 Subparts H and CC. Additional regulations addressing equipment leaks are located at 40 C.F.R. Part 60 Subparts VVa and GGGa. The focus of the LDAR program is the refinery-wide inventory of all possible leaking valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector; regular monitoring to identify leaks; and the repair of leaks as soon as they are identified.

D.     Benzene Waste NESHAP

In the 1990 amendments to the Act, Congress defined "hazardous air pollutant" and identified 189 pollutants under Section 112(b)(1) that would be subject to regulation. The Act requires EPA to establish emission standards for each pollutant in accordance with Section 112(d) of the CAA, 42 U.S.C. § 7412(d). In March 1990, EPA promulgated national emission standards applicable to benzene-containing waste streams. Benzene is a listed hazardous air pollutant and a known carcinogen. The benzene waste regulations are set forth at 40 C.F.R. Part 61 Subpart FF, "National Emission Standard for Benzene Waste Operations." Benzene is a naturally-occurring constituent of petroleum products and petroleum waste and is highly volatile. Benzene emissions can be detected anywhere in a refinery where a petroleum product or

10

petroleum waste are exposed to the ambient air.  Refineries are required to tabulate their total annual benzene emissions, or "TAB."  If the TAB is over 10 megagrams, the refinery is required to elect a control option that will require the control of all waste streams, or control of certain select waste streams.

### III.  STANDARD OF REVIEW FOR ENTRY OF CONSENT DECREES

"The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge."  SEC v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984) (quoting Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir. 1982), cert. denied sub num. Byrd v. Civil Serv. Comm'n, 459 U.S. 1217 (1983); accord United States v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir. 1986); United States v. Hooker Chem. & Plastics Corp., 776 F.2d 410, 411 (2nd Cir. 1985); United States v. Union Elec. Co., 132 F.3d 422, 430 (8th Cir. 1997).  Courts, however, exercise discretion within the framework of certain policy principles applicable to the settlement process.

A district court reviewing a consent decree must determine whether the proposed settlement fairly and reasonably resolves the controversy in a manner consistent with the public interest and applicable law. See United States v. Oregon, 913 F.2d 576, 580–81 (9th Cir. 1990); accord United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990) ("The relevant standard [is] . . . whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute.").  "Unless a Consent Decree is unfair, inadequate, or unreasonable, it ought to be approved."  Randolph, 736 F.2d at 529.  In reviewing a proposed consent decree, the reviewing court is to ascertain whether the decree is fair, adequate, and reasonable, Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977), as well as consistent with the objectives of the statute under which the action was brought, United States v. City of Miami, 664 F.2d 435, 441

(5th Cir. 1981) (Rubin, J., concurring).  "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy . . . ." *Id.* at 441 n.13.  These standards of review should be the same for an amendment to an already approved settlement.

The reviewing court's discretion should be exercised with deference to the "strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts." United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 280 (1st Cir. 2000).  Voluntary settlements of disputes are favored by the Courts.  See also, Pennwalt Corp. v. Plough, Inc., 676 F.2d 77, 80 (3d Cir. 1982); accord, United States v. Nicolet, Inc., No. 85-3060, 1989 WL 95555, at *2 (E.D. Pa. Aug. 15, 1989); Hooker Chemical, 776 F.2d at 411 (noting "well-established policy of encouraging settlements").

The reviewing court should accord deference to the judgment of the United States and its agencies in settling a matter.  The Supreme Court, in Sam Fox Publ'g Co. v. United States, 366 U.S. 683, 689 (1961), emphasized the importance of deference to the United States regarding settlement: "sound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . Consent Decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." The Circuit Courts have echoed this principle of deference to the United States.  A court reviewing a settlement "should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment."  Randolph, 736 F.2d at 529 (citing Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977), Officers for Justice, 688 F.2d at 625); see also, United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir. 1981) (concluding that the balancing of competing interests affected by a proposed Consent Decree

"must be left, in the first instance, to the direction of the Attorney General"). Courts should "refrain from second-guessing the Executive Branch." Cannons, 899 F.2d at 84. Judicial presumption in favor of voluntary settlement is "particularly strong where a Consent Decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." United States v. Akzo Coatings of Am. Inc., 949 F.2d 1409, 1436 (6th Cir. 1991). These negotiations often involve a "crew of sophisticated players, with sharply conflicting interests . . . ." Cannons, 899 F.2d at 84. Given that, the court "must look at the big picture, leaving interstitial details largely to the agency's informed judgment." Cannons, 899 F.2d at 94. In sum, while the court should not merely give its "rubberstamp approval," United States v. BP Exploration and Oil Co. 167 F. Supp. 2d 1045, 1050 (N.D. Ind. 2001), it should consider a consent decree against the strong public policy encouraging voluntary settlement, a policy that has "particular force" where the decree has been negotiated on behalf of an expert agency like EPA. Cannons, 899 F.2d at 84.

Thus, a reviewing court is not required to make the same in-depth analysis of a proposed settlement that it would be required to make in order to enter a judgment on the merits after trial:

> The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties.

Citizens for a Better Environ. 718 F.2d 1117, 1126 (D.C. Cir. 1983); accord Officers for Justice, 688 F.2d at 625. The relevant standard "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal . . . ." United States v. Kramer, 19 F. Supp. 2d 273, 280 (D.N.J. 1998) (quoting Cannons Eng'g Corp., 899 F.2d at 84); accord United States v. Southeastern Pa. Transp. Auth., 235 F.3d 817, 823 (3d. Cir. 2000) ("A court should approve a

proposed Consent Decree if it is fair, reasonable, and consistent with CERCLA's goals."). Thus, the court cannot "substitute its judgment for that of the parties nor conduct the type of detailed investigation required if the parties were actually trying the case." BP Exploration, 167 F. Supp. 2d at 1050. Nor should the court judge the proposed settlement "against a hypothetical or speculative measure of what might have been achieved by the negotiators." Officers for Justice, 688 F.2d at 625 (citations omitted). Ultimately, "[t]he court need only be satisfied that the decree represents a 'reasonable factual and legal determination.'" Oregon, 913 F.2d at 581 (quoting United States v. City of Miami, 664 F.2d 435, 441 (5th Cir. 1981) (en banc) (Rubin, J., concurring)).

Ensuring that the settlement is in the public interest is but one factor to be considered by the Court and does not alter the fundamental reasonableness standard or the policy of deference to the settling agency. Randolph, 736 F.2d at 529 (holding that the district court applied "too strict a standard" when it "closely scrutinize[d] the proposed decree to see if it was in the public's best interest"). Even where a Consent Decree affects the public interest or third parties, "the court need not require that the decree be 'in the public's best interest' if it is otherwise reasonable." Oregon, 913 F.2d at 581 (quoting Randolph, 736 F.2d at 529 (emphasis in original)). Nor must a consent decree "impose all the obligations authorized by law." Id.

The court's role in considering a proposed decree is a limited one: "The court may either approve or disapprove the settlement; it may not rewrite it." Harris v. Pernsley, 654 F. Supp. 1042, 1049 (E.D. Pa.), aff'd, 820 F.2d 592 (3d Cir. 1987); accord Jones & Laughlin Steel, 804 F.2d at 351 (stating that a court does not have the power to modify a consent decree; it may only accept or reject the terms to which the parties have agreed). Thus, the question to be resolved in reviewing the settlement, and the degree of scrutiny to be applied, are distinct from the merits of

the underlying action.

In sum, this Court's role in reviewing the proposed amendment to the Consent Decree is limited to approval or denial, based on an evaluation of the fairness and reasonableness of the settlement and its concordance with the applicable law. The Court must conduct this evaluation in the context of the strong public policy supporting settlement and bearing in mind the substantial deference due to EPA's and the Department of Justice's ("DOJs") interpretations of applicable environmental laws and regulations as well as to EPA's engineering and scientific determinations. See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843–44 (1984); American Paper Inst. v. U.S. EPA, 660 F.2d 954, 963 (4th Cir. 1981).

## IV.   THE FIRST MODIFICATION IS FAIR, REASONABLE, AND CONSISTENT WITH THE PUBIC INTEREST AND THE GOALS OF THE CLEAN AIR ACT

The First Modification satisfies the standard for approval of a settlement. The First Modification is fair, reasonable, and in accordance with the objectives of the Act because it resulted from complex, lengthy, and difficult arms-length negotiations; it fairly reflects the changing circumstances at the Refinery while preserving key environmental protections; and it is a reasonable compromise which is faithful to the goals of the statute and in the public interest. Accordingly, the First Modification should be entered as a final order of the Court.

The comments received contend that the First Modification should be rejected because it is "inappropriate, improper, and inadequate." The Commenter alleges that the First Modification does not meet the standard for consent decrees because:

> 1) It implies a false premise that the . . . Refinery did not shut down, when the Refinery should be considered a new major stationary source under the PSD rules and thus subject to the standards therein;

> 2) In order to effectively protect the public health and welfare of the people of the Virgin Islands, the cancer registry referenced therein must be

15

established and significant community research undertaken *before* (emphasis in original) the commencement of polluting activity contemplated;

    3) The compliance assessment and reporting protocols referenced therein allow Limetree to self-report, when this responsibility should properly be undertaken by EPA Region 2; and

    4) The Refinery activity contemplated by the Modification implicates and does not address serious concerns regarding federally-listed species and Sandy Point National Wildlife Refuge.

Attachment B at page 1. As discussed below, the first comment conflates the shutdown issue; the second comment seeks something that is beyond the scope of the Act; the third comment is inconsistent with the Act; and the fourth comment seeks something that is beyond the scope of the Act. The First Modification does not violate any statutory requirements and is protective of the environment.

    A.    <u>The Consent Decree is Procedurally and Substantively Fair.</u>

    1.    <u>Procedural Fairness</u>

This settlement is the result of a fair process. A settlement is procedurally fair if the negotiations that created it were non-collusive, open, and at arms-length. <u>See</u> <u>BP Exploration</u>, 167 F. Supp. 2d at 1051 (citing <u>Cannons</u>, 899 F.2d at 86). The settlement embodied in the First Modification is the product of extended, arms-length negotiations. The fairness of a consent decree must be evaluated in both procedural and substantive aspects. <u>See</u> <u>In Re Tutu Water Wells CERCLA Lit.</u>, 326 F.3d 201, 207 (3d Cir. 2003). To measure procedural fairness, a court should "look to the negotiation process and attempt to gauge its candor, openness and bargaining balance." <u>Id</u>. (quoting <u>Cannons</u>, 899 F.2d at 86). As noted by the court in <u>Rohm & Haas</u>:

Where a settlement is the product of informed, arms-length bargaining by the EPA, an agency with the technical expertise and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice...a presumption of validity attaches to that agreement.

U.S. v. Rohm & Haas Co., 721 F. Supp. 666, 681 (D.N.J. 1989) (citing City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988)).  An additional element of procedural fairness is provided by virtue of the United States having followed the protective procedures of 28 C.F.R. § 50.7 by seeking public comment.  The comments received do not challenge or question the procedural fairness.

The First Modification resulted from procedurally fair settlement negotiations.  The First Modification preserves nearly all of the provisions of the 2011 Consent Decree and, in fact, improves upon some by making them consistent with updated regulatory provisions (i.e., LDAR). The negotiations that led to the First Modification were conducted at arms-length and involved many discussions concerning both legal and technical issues.  All parties to those discussions were represented by informed legal counsel and technical representatives.  Where, as here, a proposed consent decree is "the product of good faith, arms-length negotiations" it is "presumptively valid."  See United States v. Oregon, 913 F.2d 576,581 (9th Cir. 1990).

2.   Substantive Fairness

In addition to being the result of a procedurally fair process, the First Modification's terms are substantively fair.  To determine whether a proposed settlement is substantively fair, courts look to factors such as the strength of the plaintiff's case versus the amount of the settlement offer, the likely complexity, length and expense of litigation, the amount of opposition to the settlement, the opinion of competent counsel, the stage of the proceeding, and the amount of discovery undertaken.  Great Neck Cap. App. Inv. Ptp. v. Pricewaterhousecoopers, 212 F.R.D. 400 at 409 (citing E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1980)); BP Exploration, 167 F. Supp. 2d at 1051-52.  Because these concepts do not lend themselves to "verifiable precision [,] [i]n environmental cases, EPA's expertise must be given 'the benefit of the doubt when weighing substantive fairness.'" Comunidades Unidas, 204 F.3d at 281 (quoting

Cannons, 899 F.2d at 88).  These terms also are not easily quantified in this instance because this is an amendment of an existing consent decree.

The First Modification is substantively fair because it preserves the vast majority of the requirements and obligations from the 2011 Consent Decree but also fairly addresses HOVENSA's bankruptcy, Limetree Bay's purchase of certain refining and terminal assets in the bankruptcy proceeding, the creation of the ERT, and the operational realities at the Refinery. The First Modification is the result of DOJ's, EPA's and DPNR's assessment of how to adapt to the change in ownership and the operational realties of the Refinery while effecting the environmental requirements and the public protections of the Decree. In short, it reflects the sound judgment of the environmental agencies tasked with protecting the environment and enforcing the environmental laws.

a.     First Comment:

*It implies a false premise that the Limetree Bay Terminals (formerly known as Hovensa and HOVIC) refinery (hereinafter Refinery) did not shut down, when the Refinery should be considered a new major stationary source under the Prevention of Significant Deterioration (PSD) rules and thus subject to the standards therein.*

The Commenter's first comment conflates a Decree issue and a permitting issue by mischaracterizing a Whereas clause in the First Modification.   (Attachment A at page 4).   The Whereas clause reads as follows:

WHEREAS, except to the extent set forth in the preceding WHEREAS clause, neither HOVENSA nor Limetree Bay has permanently Shutdown and surrendered permits for the Refinery or portions of the Refinery to satisfy the requirements of the Consent Decree in the manner provided in Paragraph 229 (Effect of Shutdown) of the Consent Decree.

Paragraph 229 of the Decree provides that the requirements of the Consent Decree can be satisfied by the permanent Shutdown of the Refinery **and** the surrender of all air permits for the Refinery.  (Attachment A, ¶ 229) (Emphasis added).  In addition to Paragraph 229, Paragraph 23

of the Decree identifies "Permanent unit shutdown **and** relinquishment of permit" as one of the qualifying controls that may be used to satisfy the $NO_x$ emission reductions required for heaters, boilers, generating turbines, and compressor engines in Paragraphs 24, 26, 27, and 28. (Attachment A, ¶ 23) (emphasis added).

This Whereas clause was included in the First Modification to make clear that neither HOVENSA nor Limetree Bay have availed themselves of the option to comply with the Decree through a permanent shutdown of part or all of the Refinery **and** surrendering air permits, as set forth in Paragraphs 23 and 229. The Whereas clause in question states only that neither HOVENSA nor Limetree Bay satisfied **both** conditions for invoking the compliance option involving permanent shutdown for units other than those described in the prior Whereas clause (i.e. those listed in Appendix N of the First Modification). Despite recognizing that the relevant permits were not surrendered and also acknowledging the intent of this Whereas clause, the Commenter uses the clause as a springboard to a lengthy discussion about a permitting process that is occurring outside of the Decree. (Attachment B, page 2, FN2). ("**The undersigned notes that this section** [of the comments] **applies to PSD analysis – not as to whether the terms of Section 229 of the Consent Decree have come to pass."** (Emphasis in original).

The Consent Decree was born of a 2011 judicial enforcement action against HOVENSA. In contrast, permitting is an adjudicative process before EPA or the State. EPA decisions and policies in the latter process are not relevant to, and indeed cannot be used to determine, the meaning of terms of the Consent Decree, which must be construed basically as a contract and its language examined within the four corners of the agreement. [2] *See United States v. ITT*

---

[2] Conversely, nothing in the proposed First Modification of the Consent Decree or the Motion to Enter should be read or interpreted as a statement on whether any refinery units were permanently shut down for the distinct purpose of determining the type of permits required to

*Continental Banking Co.*, 420 U.S. 223, 238 (1975) ("[A] consent decree or order is to be construed for enforcement purposes basically as a contract . . . ."); *United States v. Armor & Co.*, 402 U.S. 673, 682 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purpose of one of the parties to it."); *Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d. Cir. 1998); *Fox v. U.S. Dep't of Housing.* 680 F.2d 315, 319 (3d Cir. 1982).

The Whereas clause and more generally, the Decree has only a narrow, limited interaction with the permitting process. Apart from the one Whereas clause, the only other references to permitting contained in the Decree are provisions that make clear that Limetree Bay is required to: (1) incorporate emission limits set in the Decree into federally enforceable minor or major new source review permits (Attachment A, ¶ 12); (2) incorporate emission limits and standards into the Refinery's Title V permit (Attachment A, ¶ 126); and (3) to obtain required, federally enforceable permits for the construction of pollution control technology and the installation of equipment necessary to implement the requirements of the Decree (Attachment A, ¶ 127). While these requirements are implemented through permitting, permitting occurs in entirely separate processes from enforcement that encompass numerous requirements and decisions unrelated to the Decree and over which the Decree has no influence. Moreover, Paragraph 214 of the Decree specifically preserves the right of EPA and the Virgin Islands to impose stricter permitting requirements ("nothing in this Consent Decree shall be construed to prohibit or prevent the United States or the Virgin Islands from developing, implementing, and enforcing more stringent standards subsequent to the Date of Lodging through . . . the permit

---

restart these units. In accordance with Paragraph 214 of the Decree, except as expressly provided, nothing in the Decree relieves HOVENSA or Limetree Bay of its obligation to comply with other applicable federal and territorial laws, including those requiring air permits.

process"). The Commenter's concern about the underlying predicate of a permitting decision is not the subject of this judicial proceeding, which is focused on transferring to a new owner the existing obligations from a 2011 Consent Decree that resolved Clean Air Act violations that arose prior to entry of the Consent Decree and which were established well-before the events underlying the Commenter's concern, nor does it affect in any way the permitting process discussed by the Commenter. Given the substantive and procedural separation of this Decree and the permitting process, the Commenter's permitting concerns are misplaced and not relevant to the Court's consideration of the Motion to Enter the First Modification.

                    b.        Second Comment

*In order to effectively protect the public health and welfare of the people of the Virgin Islands, the cancer registry referenced therein must be established and significant community research undertaken before the commencement of polluting activity contemplated.*

        The Clean Air Act neither authorizes nor requires that a cancer registry be established or that it must be established before the Refinery can restart. However, as part of the 2011 Consent Decree, HOVENSA was required to establish and pay $4.875 million into an escrow account to fund Territorial Supplemental Environmental Projects ("TSEPs") to be implemented for the benefit of the Virgin Islands. (ECF Doc. No. 6, ¶ 137). HOVENSA established the escrow account and deposited the $4.875 million into that account on or about October 13, 2011. As part of the First Modification, Paragraph 137 is modified to provide DPNR the responsibility of developing and implementing the TSEPs. The First Modification identifies a cancer registry to be "among the potential projects" DPNR is considering. Ordering establishment of a cancer registry, however, is beyond the authority of the Act.

                    c.        Third Comment

*The compliance assessment and reporting protocols referenced therein allow for Limetree to self-report, when this responsibility should properly be undertaken by EPA Region 2.*

21

It is common practice for environmental regulators to require regulated entities to self-monitor and self-report. U.S. v. Chevron U.S.A., Inc., 380 F. Supp. 2d 1104, 1113 (N.D. Cal. 2005). And, if a report is falsified, the regulated entity is generally subject to both civil and criminal penalties. See Section 113 of the Act, 42 U.S.C. § 7413. The Act relies largely on a system of self-reporting, along with the use of inspections, in order to "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). Cf., United States v. Murphy Oil, 143 F. Supp. 1054, 1084 (W.D. Wisc. 2001).

Consistent with this approach, the Consent Decree requires that each report be certified by an officer responsible for overseeing implementation of the Consent Decree, as follows:

> "I certify under penalty of law that this information was prepared under my direction or supervision by personnel qualified to properly gather and evaluate the information submitted. Based on my directions and after reasonable inquiry of the person(s) directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete."

See, 2011 Consent Decree, ¶ 144. ECF Doc. 6, page 105. In addition, the Consent Decree includes stipulated penalties for failure to comply with Part X (Reporting and Recordkeeping). ECF Doc. 6, ¶ 171, page 117. Importantly, the monitoring and reporting required under both the Decree and applicable regulations are in addition to, and not in lieu of, oversight and inspection of the Refinery by EPA.

### d.    Fourth Comment

*The Refinery activity contemplated by the Modification implicates and does not address serious concerns regarding federally-listed species and Sandy Point National Wildlife Refuge.*

The Commenter failed to cite any authority to support the assertion that the First Modification must address endangered or threatened species or potential impacts to Sandy Point National Wildlife Refuge.

Under the Endangered Species Act of 1973, if any agency determines that a proposed action may affect an endangered or threatened species, the agency must formally consult with the relevant federal fish and wildlife agency, depending on the species that are protected in the area of the proposed action. The Endangered Species Act of 1973, Section 7(a)(2), 16 U.S.C.A. § 1536(a)(2). However, courts have held, as a matter of law, that a consent decree is not an agency action that triggers the Section 7 consultation requirement. U.S. v. Pacific Gas & Elec., 776 F. Supp. 2d 1007, 1023 (N.D. Cal. 2011). For this reason, the First Modification is not required to address endangered or threatened species or potential impacts to Sandy Point National Wildlife Refuge.

* * *

After carefully considering all of the Commenter's comments and after a thorough evaluation of the issues raised in those comments, the United States has concluded that none of the comments warrants either a change to the settlement terms or the wholesale rejection of the First Modification.

The 2011 Consent Decree provides for the reduction in air emissions in the Virgin Islands. The First Modification requires Limetree Bay and the ERT to step into HOVENSA's shoes in order to implement those reductions. For Limetree Bay, this means making sure that the Refinery achieves stringent emissions limits and implements other enhancements that will provide tangible benefits to the health and welfare of the residents of the Virgin Islands through the reduction of $NO_x$ and $SO_2$ emissions from the Refinery. Thus, the First Modification is substantively fair.

B.   <u>The Decree is Reasonable, Adequate and Consistent with the Goals of the Act</u>

In determining whether a decree is "reasonable, adequate, and consistent with the goals of the governing statute," courts have evaluated the following factors: "(1) the nature and extent of potential hazards; (2) the availability and likelihood of alternatives to the Consent Decree, (3) whether the Decree is technically adequate to accomplish the goal of cleaning the environment; (4) the extent to which the Consent Decree furthers the goals of the statutes which form the basis of the litigation; (5) the extent to which the Court's approval of the Consent Decree is in the public interest; and (6) whether the Consent Decree reflects the relative strengths and weakness of the Government's case against the Defendants." <u>BP Exploration</u>, 167 F. Supp. 2d at 1053 (citing <u>Akzo</u>, 949 F.2d at 1436; <u>Cannons</u>, 899 F.2d at 89–90).

Though not all of these factors are appropriate for discussion here, they all militate in favor of approving the First Modification, which should be considered reasonable and adequate for many of the same reasons discussed above with respect to substantive fairness. The impetus for the First Modification was the HOVENSA bankruptcy, Limetree Bay's purchase of certain refining and terminal assets, and the creation of the ERT. The resulting transfer of ownership and other interests in the Refinery triggered the requirement for a modification pursuant to Paragraph 7 of the 2011 Consent Decree. ECF Doc. 6, page 7.

The First Modification maintains the specific, tailored relief called for in the 2011 Consent Decree including the requirements to reduce $NO_x$ emissions and control $SO_2$, PM, and CO emissions from the Refinery's fluid catalytic cracking unit; significantly reduce $NO_x$ emissions from the heaters, boilers, generating turbines, and compressor engines; reduce $SO_2$ emissions by burning lower sulfur fuel oil and complying with fuel gas combustion requirements for heaters, boilers, flares, and sulfur recovery plants; comply with regulatory requirements for

24

acid gas and hydrocarbon flaring, and implement a program to investigate the causes of flaring incidents and take preventive action; create a preventive maintenance and operation plan for minimizing $SO_2$ emissions from the sulfur recovery plant; reduce emissions of VOCs through stricter LDAR requirements and by replacing valves that are leaking above a specified level with low emissions valves or low emissions valve packing; and reduce emissions of benzene by improving management of benzene waste streams. In recognition of the changed operational realities of the Refinery, the First Modification modifies some of the deadlines and injunctive relief obligations. However, many of those extensions will have little to no impact given that the obligations will be complied with before the relevant equipment resumes operation (see ¶¶ 27 and 45), the modification requires mitigation if it results in additional emissions (see ¶ 50A), or includes interim compliance measures (see ¶ 136). It is for these reasons that the United States believes on balance that the First Modification reasonably and adequately addresses Clean Air Act requirements and is protective of the public.

One of the primary purposes of the Clean Air Act is to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare. 42 U.S.C. § 7401(b)(1). As discussed above, the First Modification retains the 2011 Consent Decree's obligations to reduce $NO_x$ and $SO_2$ emission from the Refinery and the requirements to control VOC emissions and benzene emissions from the Refinery. The First Modification also provides Limetree Bay with some flexibility to ensure that it is able to restart (as defined in the First Modification) in compliance with the terms of the Decree while also ensuring that the restart maintains the benefits of the 2011 Consent Decree.

When evaluating whether a consent decree is in the public interest, "[t]he court should bear in mind the flexibility of the public interest inquiry: the court's function is not to determine

whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." <u>United States v. Microsoft Corp.</u>, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (internal quotations omitted); <u>U.S. v. Oregon</u>, 913 F.2d at 581 ("[T]he court need not require that the decree be 'in the public's *best* interest' if it is otherwise reasonable.") (quoting <u>Randolph</u>, 736 F.2d at 529 (emphasis in original)).   While the First Modification reflects a compromise based on the technical and legal judgment of the United States, the relief afforded by this settlement provides real benefits to the citizens in the Virgin Islands and real progress toward the Clean Air Act goals of enhancing air quality and promoting public health and welfare. Thus, the First Modification clearly meets the <u>Microsoft</u> and <u>Oregon</u> standards.

## V.    NON-MATERIAL MODIFICATION TO PARAGRAPH 79.a

Paragraph 79.a of the First Modification as lodged with the Court on August 25, 2020 (ECF Doc. 12-1, page 27), requires that Limetree Bay "shall complete a review and verification of the Refinery TAB [total annual benzene] and its compliance with the Benzene Waste NESHAP" by March 30, 2021. This date was set in the belief that the Refinery would restart during the fourth quarter of 2020. If the Refinery had restarted in that time frame, it would have provided sufficient operational data to ensure for a complete review and verification of the Refinery's TAB.

Due to the delay in the Refinery restart, the United States and Limetree Bay have agreed to change the deadline for completion of the review and verification from March 30, 2021 to November 22, 2021. Paragraph 228 of the Decree provides, in part, that "non-material modifications include . . . modifications to schedules that do not extend the date for compliance with emissions limitations following the installation of control equipment, provided such

changes are agreed upon in writing between the United States and HOVENSA [Limetree Bay]." This compliance date does not involve the installation of control equipment or emissions limitations. Because this date change does not involve the installation of control equipment or emissions limitations it is a non-material modification. Attachment C to this Memorandum is the executed Second Modification of the Consent Decree documenting the United States' and Limetree Bay's agreement to this non-material modification.

## CONCLUSION

As explained above, the First Modification is fair, adequate and reasonable, and consistent with the goals of the Clean Air Act. Since the public comments submitted on the First Modification do not provide a basis for the United States to withhold its consent to the settlement, and because changing the deadline for completion of the review and verification from March 30, 2021 to November 22, 2021 is a non-material modification that does not warrant additional notice and comment, the United States requests that this Court approve the First Modification by executing page 95 of Attachment A, and enter it as an order of this Court.

Dated: April 8, 2021

Respectfully Submitted,

JEAN E. WILLIAMS
Acting Assistant Attorney General

/s/ Myles E. Flint, II
MYLES E. FLINT, II
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044-7611

GRETCHEN C.F. SHAPPERT
United States Attorney
United States Virgin Islands
Federal Building and U.S. Courthouse
5500 Veterans Drive, Room 260
St. Thomas, USVI 00802

OF COUNSEL:

FLAIRE MILLS
Assistant Regional Counsel
United States Environmental Protection Agency
Region 2
290 Broadway
New York, New York 10007-1866