"Environmental Liabilities" means all Liabilities (including the costs of any Remedial Action) arising in connection with or in any way relating to the Business (as currently or formerly conducted), the Purchased Assets or any property currently or formerly owned, leased or operated in connection with the Business (as currently or formerly conducted) or the Purchased Assets (including the activities and operations conducted by anyone thereon, offsite disposal therefrom and Hazardous Materials migrating thereto or therefrom), that in each case arise under or relate to any Environmental Law, Environmental Permit or a Hazardous Material, including Liabilities arising from any Third Party claims for personal injury, death, or property damage caused by an actual or alleged release of, or exposure to, a Hazardous Material.

"Environmental Permits" means all environmental, health and safety permits, licenses, registrations, and approvals and authorizations from Governmental Entities.

"EPA" means the United States Environmental Protection Agency.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Account" means the account created by the Escrow Agent in which the Good Faith Deposit Amount was deposited pursuant to Section 3.2.

"Escrow Agent" means B. Riley Advisory Services or, if B. Riley Advisory Services is unable or unwilling to act as the Escrow Agent, such other Person as is mutually agreed upon by Purchaser and Sellers.

"Escrow Agreement" means that certain Escrow Agreement, dated as of [_____ __], 2021, by and among Purchaser, Sellers and the Escrow Agent, as may thereafter be amended from time to time in accordance with the terms thereof.

"Event" means any action, omission, state of facts, condition, occurrence, result, circumstance, event, effect, development or change.

"Excluded Assets" is defined in Section 1.3.

"Excluded Furniture and Equipment" is defined in Section 1.3(p).

"Excluded Intellectual Property" is defined in Section 1.3(k).

"Excluded IT Assets" is defined in Section 1.3(l).

"Excluded Liabilities" is defined in Section 2.1.

"Excluded Permits" is defined in Section 1.3(r).

"Excluded Real Property" means all real property owned by a Seller, other than the Purchased Real Property.

"Files and Records" means all current and historical information, data, databases, reports, plans, schedules, correspondence, files, documents, books and other records and information,

including (a) customer, vendor, supplier, contractor and service provider lists and records, (b) sales, pricing and performance data and records generated from completed or active transactions (including billing, payment and dispute histories, credit information and similar data), (c) business plans, financial statements, corporate, Tax, human resource, legal, regulatory and financial data and records, (d) operating and production records, quality control records, market research reports, technical documentation (drawings, specifications, process instructions, statistics, functional requirements, operating instructions, manual, etc.) and user documentation (installation guides, manuals, training material working paper, etc.), (e) employment and personnel records, (f) all of the plant diagrams and drawings, equipment diagrams and drawings, equipment manuals, "as built" books, operating manuals, maintenance histories and records, civil engineering drawings, PFDs, PI&Ds and other such technical documents relating to the Sellers Facilities and (g) regulatory filings, documents or other information relating to any Proceeding, in each case with respect to clauses (a) through (g), of Sellers, whether in paper, electronic, digital or other form or medium, and that relate primarily to the Business, or the Purchased Assets; *provided*, that Files and Records shall not include (i) any files, documents, books or other records to the extent relating to any existing or anticipated Tax litigations or disputes (to the extent that such litigation or disputes are, or are related to any, Excluded Liabilities hereunder), (ii) any information which, if transferred to Purchaser or its Affiliates, would reasonably be expected to violate any applicable Law or Order or the terms of any Contract and (iii) any items described in clauses (a) through (g) that relate primarily to any Excluded Assets or any Excluded Liabilities.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is and remains in full force and effect, has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, re-argument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, re-argument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Furniture and Equipment" means all furniture, furnishings, equipment, vehicles, machinery, cranes, forklifts, tools, truck racks, fixtures, consumables and other tangible personal property owned by a Seller, including artwork, desks, chairs, tables, miscellaneous office furnishings, copiers, scanners, printers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and supplies.

"GAAP" means United States generally accepted accounting principles, applied in a manner consistent with the preparation of the Financial Statements.

"Good Faith Deposit Amount" means $3,000,000.00, which amount is to be deposited with the Escrow Agent in accordance with the terms of this Agreement and held and released pursuant to the terms and subject to the conditions set forth in this Agreement and the Escrow Agreement.

"Governmental Entity" means any multinational, United States or non-United States, federal, state, territory, provincial or local court (including, for the avoidance of doubt, the Bankruptcy Court), arbitral tribunal, administrative agency, legislature or commission or other governmental, quasi-governmental or regulatory agency or authority (including any bureau, division or department thereof) or any securities exchange.

"Hazardous Materials" means all explosive or radioactive substances or wastes, and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Improvements" means any and all buildings, structures, fixtures or other improvements owned by or leased to a Seller that are attached or affixed to the Business Real Property (including all construction and work-in-progress), including above ground and underground piping and storage tanks, canopies, signage, terminals, fixtures, pumps and appurtenances, equipment, personal property of a permanent nature and other similar facilities; *provided, however*, that the Excluded Furniture and Equipment shall not be considered "Improvements".

"Indebtedness" of any Person means (a) any obligations or indebtedness (i) for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, (iii) for the deferred purchase price of property or service, (iv) for the reimbursement of any obligor on any letter of credit, banker's acceptance, guarantee or similar credit transaction (but only to the extent drawn upon or if there has been a demand made for reimbursement thereunder) and (v) under any commodity, swap, derivative, currency, interest rate, call, hedge or similar agreement, (b) any obligations of any kind referred to in the foregoing clause (a) above guaranteed or secured, directly or indirectly, in any manner by such Person (including by a Lien on the assets or properties of such Person whether or not such obligations are assumed) ,and (c) any accrued and unpaid principal, interest, premiums, penalties, pre-payment penalties, fees, expenses, "make-whole" or similar payments, indemnities and breakage costs owing by such Person with respect to any indebtedness of a type described in clauses (a) or (b); provided, that Indebtedness of any Seller shall not include accounts payable to trade creditors or accrued expenses, in each case, arising in the ordinary course of business of any Seller.

"Information Technology" means all computers, computer systems, servers, workstations, databases, and software programs.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade dress, and all registrations and applications for the same, (c) Internet domain names, (d) registered and unregistered copyrights and applications for the same, and (e) trade secrets.

"IRS" means the United States Internal Revenue Service.

"Knowledge of Sellers" means the actual knowledge of Sellers, without giving effect to imputed knowledge or giving rise to any duty to investigate.

"Law" means any statute, law, ordinance, ruling, policy, rule or regulation of any Governmental Entity and all judicial or administrative interpretations thereof and any common law doctrine.

"Liabilities" means any and all Indebtedness, Taxes, losses, charges, debts, damages, obligations, payments, costs and expenses, bonds, indemnities, liabilities and obligations of any nature, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability, regardless of whether such claim, debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such claim, debt, obligation, duty or liability is immediately due and payable.

"Liens" means any liens (as defined in Section 101(37) of the Bankruptcy Code), debts (as defined in Section 101(12) of the Bankruptcy Code), security interests, Claims, easements, mortgages, charges, indentures, deeds of trust, rights of way, encroachments, or any other encumbrances and other restrictions or limitations on ownership or use of real or personal property or irregularities in title thereto.

"Loss" or "Losses" means, without duplication, any and all Liabilities, judgments, awards, losses, costs or damages, including reasonable fees and expenses of attorneys, accountants and other professional advisors.

"Material Adverse Effect" means a material adverse effect on the business or financial condition of the Business, taken as a whole, provided that the foregoing shall not include any event, circumstance, change, occurrence, fact or effect resulting from or relating to (A) changes in economic conditions generally or in any region in which Sellers or the Business operate, (B) changes in United States or global financial markets in general, (C) changes, occurrences or developments in or related to the general industry or industries (or portions thereof) in which Sellers or the Business operate or are materially related thereto, (D) changes in law, GAAP or any authoritative interpretations thereof, (E) any action taken or failed to be taken by Sellers or any of their Affiliates or representatives at the request of Purchaser or that is required or contemplated by this Agreement, (F) a failure to meet Sellers' projections, or any changes in the prices or availability of raw materials used in the Business, (G) the identity of, or any action taken by, Purchaser or any of its Affiliates or representatives, (H) the Bankruptcy Cases, (I) the announcement and performance of this Agreement and the other transactions contemplated by this Agreement, including termination of, reduction in or similar negative impact on relationships,

contractual or otherwise, with any customers, suppliers, distributors, partners, officers or employees of the Business, (J) any actions required under this Agreement to obtain any approval or authorization required under applicable antitrust or competition laws for the consummation of the transactions contemplated by this Agreement, (K) acts of war (whether or not declared), armed hostilities, sabotage or terrorism occurring after the date of this Agreement or the continuation, escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement, or (L) earthquakes, hurricanes, floods, or other natural disasters.

"Material Contracts" is defined in Section 4.7(b).

"NRI Consignment Agreement" means that certain Master Consignment Agreement dated as of March 9, 2021 by and between Limetree Bay Refining, LLC and NRI Industrial Sales LLC.

"NRI Receivables" means any and all amounts payable to Sellers under the NRA Consignment Agreement.

"Order" means any judgment, order, injunction, decree, writ, permit or license issued or entered by or with any Governmental Entity or any arbitrator, whether preliminary, interlocutory or final, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Parts Inventory" means the inventories of supplies, maintenance and capital spares, joints, valves, parts and tools owned by a Seller as of the Closing that are (x) stored in the warehouses located on the Business Real Property or (y) used primarily in connection with the Business.

"Party" and "Parties" are defined in the Introduction to this Agreement.

"Permits" means all licenses, permits, registrations and approvals from or with a Governmental Entity other than the Environmental Permits.

"Person" means and include an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a Governmental Entity.

"Petition Date" is defined in Recital B of this Agreement.

"Plant Closing Act" shall mean the Virgin Islands Code Title 24, § 471- 478 (1957).

"Post-Closing Litigation Liabilities" means all Liabilities arising from a new event Proceeding first commenced after the Closing by a Third Party against Purchaser, a Seller or any of their respective Affiliates, in respect of the Business, or the Purchased Assets that is based on any Event first existing, arising or occurring following the Closing; *provided*, that the Parties agree and acknowledge that Post-Closing Litigation Liabilities shall not include any Environmental Liabilities, which are separately addressed in this Agreement.

"Post-Closing Period" means all taxable years or other taxable periods that begin after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning on the day after the Closing Date.

"Pre-Closing Period" means all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on the Closing Date.

"Prepetition Secured Parties" shall have the meaning ascribed to such term in the Bid Procedures Order.

"Proceeding" means any claim, demand, action, arbitration, audit, hearing, investigation, litigation, suit or other proceeding (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Third Party (including any Governmental Entity).

"Property Taxes" means all real property Taxes, personal property Taxes and other similar ad valorem Taxes, in each case, that are imposed with respect to the Purchased Assets.

"Purchase" is defined in Recital C of this Agreement.

"Purchase Price" means Thirty Million US Dollars ($30,000,000.00).

"Purchased Assets" is defined in Section 1.1.

"Purchased Real Property" is defined in Section 1.2(b).

"Purchaser" is defined in the Introduction to this Agreement.

"Real Property" means the Purchased Real Property and the Excluded Real Property.

"Real Property Leases" is defined in Section 1.2(d).

"Remedial Action" means any action to investigate, abate, clean up, remove or remediate (or words of similar import), or conduct remedial or corrective actions, including sampling and/or monitoring activities, with respect to Hazardous Materials in the environment.

"Representatives" of any Person means such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors, financing sources or other Persons acting on behalf of such Person.

"Returns" means all returns, statements, forms, reports and other similar documentation relating to Taxes, including any schedules, exhibits and other attachments thereto and any amendments thereof.

"Sale Motion" means Debtor's Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures, (II) Approving the Sale of Assets, and (III) Granting Related Relief filed by Sellers in the Bankruptcy Court on July 26, 2021 (Docket No. 191).

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement, containing the findings and conclusions set forth in Section 6.11, and authorizing and directing Sellers to consummate the transactions contemplated by this Agreement (including, but not limited to, the assumption and assignment of the Business Contracts and Real Property Leases) under Sections 105, 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Sellers and Purchaser in their respective sole discretion.

"Seller" and "Sellers" are defined in the Introduction to this Agreement.

"Seller Access Indemnitees" is defined in Section 6.1(b).

"Sellers Disclosure Letter" is defined in Article IV.

"Seller Facilities" means the facilities and related equipment owned by a Seller located on the Business Real Property, including all Improvements related thereto; provided, that, for the avoidance of doubt, the Seller Facilities shall not include any Excluded Assets.

"Stalking Horse Bid" shall have the meaning ascribed to such term in the Bid Procedures Order.

"Stalking Horse Bidder" shall have the meaning ascribed to such term in the Bid Procedures Order.

"Taxes" means (a) all taxes, however denominated, and all like charges, levies, duties, imposts, unclaimed property, escheat obligations or other assessments, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, Transaction Taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date and (b) any transferee, successor or other liability in respect of Taxes of another (whether by contract or otherwise) and any liability in respect of any Taxes as a result of any company being a member of any "affiliated group" as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign Tax law.

"Termination Date" is defined in Section 9.1(d).

"Third Party" means any Person other than the Parties and their respective Affiliates (including, for the avoidance of doubt, any Governmental Entity).

"Transaction Documents" means the Escrow Agreement.

"Transfer Taxes" is defined in Section 6.8.

"Update Schedule" is defined in Section 6.6(a).

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101, et seq.

"Winning Bid" shall have the meaning ascribed to such term in the Bid Procedures Order.

"Winning Bidder" shall have the meaning ascribed to such term in the Bid Procedures Order.

**EXHIBIT A**
**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

# SCHEDULE 1.1(G)[1]
## BUSINESS PERMITS

---

[1] SCHEDULES REMOVED PENDING COMPLETION/FINAL AGREEMENT.

**SCHEDULE 1.2(A)**
**BUSINESS CONTRACTS**

v.2

**SCHEDULE 1.2(B)**
<u>**PURCHASED REAL PROPERTY**</u>

**SCHEDULE 1.2(D)**
**REAL PROPERTY LEASES**

**SCHEDULE 1.2(G)**
**BUSINESS PERMITS**

SCHEDULE 1.2(g) - 1

## SCHEDULE 1.3(K)
## EXCLUDED INTELLECTUAL PROPERTY

SCHEDULE 1.3(k) - 1

## SCHEDULE 1.3(L)
## <u>EXCLUDED IT ASSETS</u>

SCHEDULE 1.3(l) - 1

**SCHEDULE 1.3(P)**
**EXCLUDED FURNITURE AND EQUIPMENT**

SCHEDULE 1.3(p) - 1

**SCHEDULE 1.3(R)**
**EXCLUDED PERMITS**

## SCHEDULE 3.4
## ASSIGNMENT, TRANSFER AND CONVEYANCE INSTRUMENTS

**SCHEDULE 6.2**
<u>**CONDUCT PRIOR TO THE CLOSING DATE**</u>

SCHEDULE 6.2 - 1

**SELLERS' DISCLOSURE LETTER**

v.2

**FLINT EXHIBIT 4**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| **LIMETREE BAY SERVICES, LLC,** *et al.*,[1] | **CASE NO.: 21-32351 (DRJ)** |
| Debtors. | (Jointly Administered) |

### NOTICE OF DESIGNATION OF WINNING BID AND BACK-UP BID

**PLEASE TAKE NOTICE** that pursuant to the *Order Granting Debtors' Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* and bidding procedures appended thereto as Appendix A (as amended, the "**Bidding Procedures**") [Doc. No. 392],[2] the Debtors hereby designate the Winning Bid and Back-up Bid following the conclusion of the Auction, as follows:

1. Winning Bid. The Debtors hereby designated West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP, jointly, as the Winning Bidder. Per the terms of the Winning Bid, as more fully stated on the record during the Auction, the Winning Bidder shall acquire substantially all assets of the Debtors' estates, including all real property of the Debtors, for the sum of $62 million, which sale shall close on or before January 21, 2022.

2. Back-up Bid. The Debtors hereby designated St. Croix Energy, LLLP as the Back-up Bidder. Per the terms of the Back-up Bid, as more fully stated on the record during the Auction, the Back-up Bidder shall acquire substantially all assets of the Debtors'

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Bid Procedures.

estates, including all real property of the Debtors, for the sum of $57 million, which

sale shall close on or before January 26, 2022, in the event the Winning Bidder fails to

close the transaction proposed in the Winning Bid on or before January 21, 2022.

The Debtors, Winning Bidder, and Back-up Bidder are working to finalize the transactional

documents to reflect the terms of their respective final bids at Auction.  The Debtors shall file

executed transaction documents and proposed sale order related to the Winning Bid as soon as

possible, but in no event later than the commencement of the Sale Hearing.

[*Signature Page Follows*]

Dated: December 18, 2021

**BAKER & HOSTETLER LLP**

*/s/ Elizabeth A. Green*

**Elizabeth A. Green, Esq.**
Fed ID No.: 903144
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407.649.4000
Facsimile: 407.841.0168
Email: egreen@bakerlaw.com

**Jorian L. Rose, Esq.**
*Admitted Pro Hac Vice*
N.Y. Reg. No. 2901783
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
Email: jrose@bakerlaw.com

**Michael T. Delaney, Esq.**
*Admitted Pro Hac Vice*
OH Bar No. 99790
Key Tower, 127 Public Sq.
Suite 2000
Cleveland, OH 44114
Telephone: 216.621.0200
Facsimile: 216.696.0740
Email: mdelaney@bakerlaw.com

*Counsel for the Debtors and Debtors in
Possession*

## Certificate of Service

**I HEREBY CERTIFY** that on December 18, 2021, a true copy of the foregoing was filed with the Court using the CM/ECF System, which will provide notice of such filing to all parties requesting such service.

*/s/ Elizabeth A. Green*
Elizabeth A. Green

**FLINT EXHIBIT 5**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-32351 |
| **Limetree Bay Services, LLC,** *et al.*, | § | |
| | § | **Chapter 11** |
| Debtors. | § | |

### Limited Objection by the United States to Sale of Assets
### (Related to Doc. No. 191)

The United States makes this limited objection to the proposed sale.

### Summary

The United States wants to ensure that no one after the sale argues that an order from this Court in any way limits applicable environmental law.

### Background

The United States, through EPA, is charged with regulatory responsibility to oversee the protection of public health and the environment under several environmental statutes, including the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, Oil Pollution Act, 33 U.S.C. §§ 2701 *et seq.*, Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.*, Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*, and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*

On January 26, 2011, the United States filed suit against HOVENSA, L.L.C., seeking relief related to the refinery now owned by the Debtors. On June 7, 2011, the Court entered a Consent Decree which provided, among other things, that it would

1

bind successor owners of the refinery.  Exhibit A, p. 11.  The United States submitted a modification of the Consent Decree to the Court on August 25, 2020, Exhibit B, and the Court has set a hearing on December 29, 2021, to consider entry.

The United States filed suit against debtor Limetree Bay Refining LLC and non-debtor Limetree Bay Terminals LLC on July 12, 2021, seeking injunctive relief under the Clean Air Act that includes requiring the refinery to eliminate any imminent and substantial endangerment to human health, welfare, and the environment prior to restart of refinery operations.  Case No. 1:21-cv-264, District Court of the Virgin Islands.  The United States filed suit because the Limetree Bay refinery had, on more than one occasion, released hydrogen sulfide and sulfur dioxide into the air in sufficient amounts to affect the surrounding community.  On at least one occasion, the refinery released flare rainout—oil particles small enough to travel by air—which fell in drinking water cisterns and vegetable gardens.

Also on July 12, 2021, the United States, Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC, filed a joint stipulation.  Exhibit C.

On July 12, 2021, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  [Doc. No. 1].  On July 26, 2021, they moved to sell substantially all of their assets.  [Doc. No. 191].  The Debtors have since conducted an auction and declared (a) West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP, jointly as the winning bidder, and (b) St. Croix Energy, LLLP, as the backup bidder.  [Doc. No. 948].

## Limited Objection

The United States makes this limited objection to the proposed sale. The United States wants to ensure that this Court's order is not later construed to limit the application of nonbankruptcy law with respect to health and safety issues.

### A.     Applicable Authority

It is well-established that anyone who owns or operates property acquired from a debtor must comply with environmental law. No one is entitled to ignore hazards or disregard laws that protect the public and the environment. *See, e.g., Ohio v. Kovacs*, 469 U.S. 274, 285 (1985) ("[A]nyone in possession of [a] site . . . must comply with . . . environmental laws . . . Plainly that person . . . may not maintain a nuisance, pollute the waters . . . [,] or refuse to remove the source of such conditions."); *In re General Motors Corp.*, 407 B.R. 463, 508 (S.D.N.Y. 2009) (a free and clear purchaser "would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation as of that time, any such remediation would be the buyer's responsibility") (Gerber, J.); *cf. In re CMC Heartland Partners*, 966 F.2d 1143 (7th Cir. 1992) (a reorganized debtor that owns property that was contaminated prior to confirmation is liable to EPA as the present owner of the property).

A purchaser is subject to the same compliance obligations as all other owners of property. The law does not put a purchaser in a privileged position, by freeing it from obligations with which all other owners must comply. If a purchaser could contend that it is somehow exempt from obligations that apply to all other owners,

the public would be placed at risk. A purchaser cannot evade its environmental obligations, including with respect to hazards that exist even at the outset of its ownership. *See General Motors*, 407 B.R. at 508.

Thus, for example, if a purchaser owns or operates a contaminated facility, it must protect the public from hazards as required by law – regardless of whether the hazardous conditions derive in whole or part from actions of debtors. And, if a purchaser owns or operates equipment or a facility that has a defective condition, it is responsible to prevent and may have liability for the consequences of, for example, an explosion or release, notwithstanding that the explosion or release may have derived in whole or part from a defective condition caused prior to purchase.

Section 363(f) of the Bankruptcy Code, 11 U.S.C. § 363(f), does not allow purchasers to acquire a debtor's property free and clear of the obligation to comply with environmental law. Rather, section 363(f) permits property to be sold free and clear of an entity's "interest in such property"[1] only if at least one of the following five conditions is satisfied:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

---

[1] Moreover, future obligations to comply with environmental requirements are not interests that can be released in a section 363 sale. *See In re CMC Heartland Partners*, 966 F.2d 1143, 1147 (7th Cir. 1992) ("a statutory obligation attached to current ownership of the land survives bankruptcy"); *United States v Apex Oil Co.*, 579 F.3d 734, 737 (7th Cir. 2009); *In re Torwico Electronics, Inc.*, 8 F.3d 146, 151 (3d Cir. 1993); *Pension Benefit Guaranty Corp. v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009); *In re Grumman Olson Industries*, 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011); *In re General Motors Corp.*, 407 B.R. 463, 508 (S.D.N.Y. 2009).

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

None of these conditions is satisfied with respect to compliance obligations of an owner under environmental law. The United States does not consent to a transfer free and clear of such obligations (condition 2), the obligations are not a lien (condition 3), and the obligations of owners under environmental law are not in dispute (condition 4). Similarly, "applicable nonbankruptcy law" (condition 1) does not permit a sale free and clear of an owner's obligations under environmental law. Finally, the United States cannot be "compelled . . . to accept a money satisfaction" (condition 5) in lieu of the purchaser's compliance with environmental law. No provision of environmental law allows an owner to force the United States to accept money instead of action to protect the public. Likewise, bankruptcy law does not require the United States to elect a monetary remedy over compliance. *See In re Mark IV Indus., Inc.*, 438 B.R. 46, 470 (Bankr. S.D.N.Y. 2010), *aff'd*, 459 B.R. 173, 186 (S.D.N.Y. 2011) (the Bankruptcy Code does not require a governmental agency entitled to an equitable remedy to select a suboptimal remedy of money damages, citing *In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993)); *see also Gouveia v. Tazbir*, 37 F.3d 295, 299 (7th Cir. 1994) (a debtor could not force neighboring landowners to accept money in lieu of equitable relief). In sum, bankruptcy law cannot be used to place a buyer in a position above the law, leaving the public at risk without the protection of health and safety requirements. *See, e.g., Zerand-Bernal, Inc. v. Cox*, 23 F.3d 159, 163 (7th Cir. 1994)

("[N]o one believes . . . that a bankruptcy court enjoys a blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale [or] . . . immunize such buyer from all state and federal laws that might reduce the value of the assets bought from the bankrupt.").

## B.   United States Concerns

The United States believes it is near an agreement concerning sale order language with West Indies Petroleum, but it also does not believe it will reach an agreement by the sale objection deadline.  In the event the parties cannot reach an agreement before a sale hearing, then the United States requests that the Court make clear in a sale order that any obligations in the Consent Decree, as modified, and in the joint stipulation presented to the District Court for the Virgin Islands in the 2021 lawsuit are not adversely impacted by an order from this Court.

Dated:  December 19, 2021.

Respectfully submitted,

JENNIFER B. LOWERY,
Acting United States Attorney

By:     *s/ Richard A. Kincheloe*
Richard A. Kincheloe
Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
Texas Bar No. 24068107
S.D. Tex. ID No. 1132346
1000 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9422
Facsimile: (713) 718-3033
Email:  Richard.Kincheloe@usdoj.gov
**Attorney for the United States**

## Certificate of Service

The undersigned certifies that he served a true and correct copy of the foregoing Objection on the parties receiving ECF notification in this case on December 19, 2021, by ECF notice.

 *s/ Richard A. Kincheloe*
Richard A. Kincheloe
Assistant United States Attorney

**FLINT EXHIBIT 6**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                          § CASE NO. 21-32351-11
                                § JOINTLY ADMINISTERED
LIMETREE BAY SERVICES           § HOUSTON, TEXAS
LLC, ET AL,                     § TUESDAY,
                                § DECEMBER 21, 2021
              DEBTORS.          § 10:00 A.M. TO 5:45 P.M.


<u>SALE HEARING</u>


BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE



APPEARANCES:                    SEE NEXT PAGE




<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    interest in West Indies Petroleum Limited, a Jamaica

2    corporation.  Correct?

3    A    Yes, sir.

4    Q    And does West Indies Petroleum Limited, a Saint Lucia

5    company, have any cash currently on its balance sheet?

6    A    It may have cash, correctly, in -- on its balance sheet.

7    I mean we -- you know, it may have cash in accounts, but the

8    funding came from the founding shareholders of West Indies

9    Petroleum.

10   Q    And let's please be careful.  It was the founding

11   shareholders of West Indies Petroleum Limited, Saint Lucia.

12   Correct?

13   A    Okay.  The directors, the current directors of West

14   Indies Petroleum, Saint Lucia.

15   Q    Okay.  And can you please name for me the current

16   directors of Saint -- West Indies Petroleum Limited, Saint

17   Lucia?

18   A    Gordon Shirley, Tarik Felix and myself.

19   Q    Okay.  And how much of the purchase price of $762

20   million are the three of you providing in connection with

21   closing the proposed transaction?

22   A    Approximately 70 percent.

23   Q    And who's providing the other percent?

24   A    Mr. Dave Roberts, sir.

25   Q    And has Dave Roberts ever been disclosed to this Court

**FLINT EXHIBIT 7**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-32351 |
| **Limetree Bay Services, LLC,** *et al.*, | § | |
| | § | Chapter 11 |
| Debtors. | § | |

## United States' Objection to Confirmation
### (Related to Doc. No. 1252 and 1273)

The United States objects to confirmation.

## Summary

The debtors are not entitled to a discharge. The plan uses different words, but the result is a discharge—plus additional relief. This violates the Bankruptcy Code. For this and other reasons, the Court should deny confirmation.

## Background

The United States, through EPA, is charged with regulatory responsibility to oversee the protection of public health and the environment under several environmental statutes, including the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, Oil Pollution Act, 33 U.S.C. §§ 2701 *et seq.*, Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.*, Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*, and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*

On January 26, 2011, the United States and the United States Virgin Islands filed suit against HOVENSA, L.L.C., pursuant to the CAA and the Virgin Islands Air Pollution Control Act, 12 V.I.C. § 201 et seq. for alleged environmental violations at

1

what was then HOVENSA's petroleum refinery located in St. Croix, USVI. Case No. 1-11-cv-00006, District Court of the Virgin Islands. The complaint sought relief related to the refinery that Limetree Bay Refining, LLC later owned until January 21, 2022. [Doc. No. 1112]. On June 7, 2011, the District Court entered a Consent Decree resolving the claims alleged in the complaint and providing, among other things, that it would bind successor owners of the refinery. On December 30, 2021, the District Court entered an agreed upon modification of the Consent Decree that, among other things, added debtor Limetree Bay Refining, LLC as a party to the Consent Decree.

The United States filed suit against debtor Limetree Bay Refining LLC and non-debtor Limetree Bay Terminals LLC on July 12, 2021, seeking injunctive relief under the CAA that includes requiring the refinery to eliminate any imminent and substantial endangerment to public health, welfare, and the environment prior to restart of refinery operations. Case No. 1:21-cv-264, District Court of the Virgin Islands. The United States filed suit because the Limetree Bay refinery had, on more than one occasion, released hydrogen sulfide and sulfur dioxide into the air in sufficient amounts to affect the surrounding community. On at least one occasion, the refinery released flare rainout—oil particles small enough to travel by air—which fell in drinking water cisterns and vegetable gardens.

Also on July 12, 2021, the United States, Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC, filed a joint stipulation. [Doc. 2, Case No. 1:21-cv-264].

On July 12, 2021, the debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The debtors sold substantially all of their assets to West Indies Petroleum Ltd. and Port Hamilton Refining and Transportation, LLLP, in a sale that closed on January 21, 2022. The debtors are no longer operating.

On April 6, 2022, the Court conditionally approved the debtors' combined plan and disclosure statement. [Doc. No. 1261]. The solicitation version appears at [Doc. No. 1273].[1] Among other things, the plan provides that:

(a) "[T]he Debtors shall not receive a discharge pursuant to Bankruptcy Code section 1141(d)(3)." [Doc. No. 1273-1, p. 74].

(b) All "Persons," as defined in 11 U.S.C. § 101(41), are enjoined from pursuing the debtors and numerous non-debtors for certain things. *Id.*

(c) Numerous parties are exculpated through the Effective Date—which only happens when at least $10 million is available after paying DIP Obligations—for various liabilities. [Doc. No. 1273-1, pp. 22 (defining "Effective Date"), 68 (conditions precedent for the Effective Date, including requirement of at least $10 million in "Available Sale Proceeds"); 17 (defining "Available Sale Proceeds"), and 30 (defining "Sale Proceeds").

(d) Only $4.8 million is available for non-professional administrative expenses. [Doc. No. 1273-1, pp. 16 & 47].

---

[1] This objection cites the page numbers imposed by ECF at the top of each page.

(e)    The "Priority Escrow Amount," the dollar amount of which is unclear from the plan, is the sole source to pay priority tax claims. [Doc. No. 1273-1, pp. 47-49].

## Objection

The United States objects to confirmation of the debtors' plan.

## I.    No Discharge

Limetree commits that the Debtors will not receive a "discharge." [Doc. No. 1273-1, p. 74]. At the same time, Limetree proposes to give the debtors the same protection as a discharge—if not greater—just with different words. That result contravenes the Bankruptcy Code and violates 11 U.S.C. § 1129(a)(1).

### A.    A discharge is an injunction

A discharge enjoins the collection of any debt against the debtor for which the debtor is liable. 11 U.S.C. § 524(a)(2).

Section 1141(d)(3) states that confirmation does not provide a discharge if:

(a)    The plan provides for liquidating "all or substantially all" of the debtors' assets;

(b)    "[T]he debtor does not engage in business after consummation of the plan;" and

(c)    The debtor is not an individual.

Limetree's plan satisfies all three elements. It provides for the liquidation of the debtors' remaining assets. [Doc. No. 1273-1, pp. 53-54]. Although Limetree proposes to issue new equity in Limetree Bay Refining, LLC—while still putting its remaining

assets into the Liquidating Trust—that business will not operate.  [Doc. No. 1273-1, p. 54] (creating Liquidating Trust); [Doc. No. 1273-1, p. 25] (defining "Liquidating Trust Assets to include "all other Assets of the Debtors"); [Doc. No. 1273-1, p. 21 (defining "Debtors" to include Limetree Bay Refining, LLC).  Instead, the debtors are using it as a vehicle without assets or operations for West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP, to try to somehow obtain benefits from existing permits.  [Doc. No. 1276]; [Doc. No. 1273-1, p. 54] (discussing purpose of transferring permits); [Doc. No. 1273-1, p. 30] (defining "Transition Refinery Entity," identifying purpose).  Finally, none of the debtors are individuals.  Because the plan satisfies all three elements of § 1141(d)(3), the debtors are not entitled to a discharge under the Bankruptcy Code.

### B.      Equivalent to a discharge

Although the debtors avoid the word "discharge," the plan contravenes 11 U.S.C. § 1141(d)(3) by giving the debtors a discharge.  A bankruptcy court has no equitable power to contravene the Bankruptcy Code.

The Supreme Court's decision in *Law v. Siegel*, 571 U.S. 415 (2014) applies.  The debtor Law misrepresented equity in an exempt home, and the trustee Siegel incurred administrative expenses litigating the fraud.  Siegel's expenses exceeded $500,000, and the court surcharged the home as a sanction.  *Id.* at 419-20.  Law appealed.

The Supreme Court noted that bankruptcy courts possess (a) statutory authority, and (b) inherent powers.  But the Court noted that inherent powers did not

empower courts to "contravene specific statutory provisions." *Id.* at 420-21. Even 11 U.S.C. § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." *Id.* at 421 (quoting 2 Collier on Bankruptcy ¶ 105.01[2], p. 105-6 (16th ed. 2013)). Instead, "'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." *Id.* (quoting *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

Section 522(k) makes exempt property "not liable for payment of any administrative expense." Law exempted the home, yet the bankruptcy court surcharged to pay Siegel's administrative expense. *Id.* at 422. Despite "Law's egregious misconduct" and the resultant "heavy financial burden" on Siegel, the Supreme Court reversed. "[I]t is not for courts to alter the balance struck by [] statute." *Id.* at 427 (citing *Guidry v. Sheet Metal Workers Nat. Pension Funds*, 493 U.S. 365 (1990)).

Limetree asks the Court to alter the balance in 11 U.S.C. § 1141(d)(3). The plan broadly enjoins "all Persons" from commencing or continuing any action against any debtor to collect a debt. [Doc. No. 1273-1, p. 74]. This is what a discharge provides under 11 U.S.C. § 524(a)(2). Although the plan states that the debtors "shall not receive a discharge," the plan still gives the debtors the benefit of a discharge— just without using the word "discharge." This result turns 11 U.S.C. § 1141(d)(3) on its head.

But the plan actually gives greater protections than a discharge. Instead of only protecting debtors, the plan injunction protects "the Debtors, the Committee or its members, the Released Parties, the Liquidating Trust or the Liquidating Trustee or their respective predecessors, successors, and assigns, current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors" etc. [Doc. No. 1273-1, p. 74]. Instead of only enjoining collection of debts, the plan injunction covers "any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy . . . ." [Doc. No. 1273-1, p. 74]. And the plan defines "cause of action" much more broadly than "debt" under the Bankruptcy Code, capturing all "causes of action"—which is not limited to those seeking monetary recovery. [Doc. No. 1273-1, p. 18]; 11 U.S.C. § 101(12).

Admittedly, there is an argument that Article XIV(E) only applies to Releasing Parties, but the plan language is ambiguous. The first paragraph of Article XIV(E) enjoins a number of acts, then it ends with the qualifier "released or to be released pursuant to the Plan or the Plan Confirmation Order." But what does this clause qualify? Does it only qualify "remedy" immediately preceding it? Does it qualify the full list from "any suit" through and including "remedy?" And does this clause capture everything to be released under Article XIV(B) and apply it to "all Persons" in accordance with the beginning of Article XIV(E)? Or does reference to the release provision also incorporate the limitation of "Releasing Parties" only, making it not actually applicable to "all Persons?" This ambiguity leaves open for subsequent litigation the scope of what is enjoined against whom—an unacceptable outcome.

In *Law v. Siegel*, the Supreme Court held that no amount of equity justified contravening 11 U.S.C. 522(k); *see also In re Hidalgo County Emergency Service Foundation*, 962 F.3d 838 (5th Cir. 2020) ("extreme facts" and allegedly unwise policy decision did not justify contravening 15 U.S.C. § 634(b)(1)). The debtors may cite equities to justify this injunction language, but that is not a basis to contravene a statute. The plan contravenes 11 U.S.C. § 1141(d)(3), and the Court should deny confirmation.

## C.     The Governments' rights against the Transition Refinery Entity should be preserved

The United States objects to any discharge or release of the Transition Refinery Entity for liabilities under any applicable permit. Nothing in the bankruptcy code provides for any discharge or release of such future liabilities and, as already noted, discharges are not permissible in liquidations.

## II.     No Third-Party Release

The United States has not voted to accept the plan, making it not a "Releasing Party." [Doc. No. 1273-1, p. 30]. But to leave no doubt, the United States objects to releasing either the debtors or non-debtor third parties.[2]

Non-consensual non-debtor releases are not permitted in the Fifth Circuit. *In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009).[3] The Fifth Circuit interprets

---

[2] The United States attempted to submit an opt out of the third-party release without voting, but BMC's website would not permit this. The website required an accepting or rejecting vote on the plan before submitting an opt out, preventing the United States from submitting an opt out.

[3] Citing *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993); *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995);

such releases as contradicting the effect of a bankruptcy discharge, specifically 11 U.S.C. § 524(e). *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589-590 (5th Cir. 2008).

## III. No Exculpation

The exculpation provision is also improper. [Doc. No. 1273-1, p. 72]. The Fifth Circuit does not permit non-consensual exculpations. *Pacific Lumber*, 584 F.3d at 252-53.[4]

The plan's exculpation provision protects the debtors, certain professionals, officers and directors, and certain creditors. [Doc. No. 1273-1, p. 22] (defining "Exculpated Parties"). It covers all "causes of action" "related in any way to the Debtors" from the petition date through the effective date, carving out only gross negligence, fraud, or willful misconduct. [Doc. No. 1273-1, p. 22] (defining "Exculpation Timeframe"]; *see also* [Doc. No. 1273-1, pp. 22 & 68] (defining "Effective Date"). Because the plan effective date occurs after confirmation, this language protects future conduct by officers, directors, and professionals.

The plan exculpation provision is not permissible under *Pacific Lumber*, and the United States objects to it.

## IV. Payment of Administrative Claims

A plan proponent bears the burden of proof on all elements of 11 U.S.C. § 1129(a) by a preponderance of the evidence. *Matter of Briscoe Enterprises, Ltd., II,*

---

[4] The United States does not oppose relief consistent with 11 U.S.C. § 1103(c)—*i.e.*, recognizing qualified immunity for actions by committee members within the scope of their duties. *Pacific Lumber*, 584 F.3d at 253. But committee members are not entitled to more.

994 F.2d 1160, 1165 (5th Cir. 1993). Unless the holder of an administrative expense has agreed otherwise, a plan must provide for full payment of all administrative expenses on the effective date. 11 U.S.C. § 1129(a)(9)(A).

Shortly after filing this objection, the United States anticipates filing an application for allowance of an administrative expense by EPA in excess of $880,000. If the debtors do not show that they can pay all administrative claims by the effective date, then the Court should deny confirmation.

## V.  Priority Tax Claims

A plan proponent must also show that it will pay all priority tax claims within five years of the petition date. 11 U.S.C. § 1129(a)(9)(C).

The Internal Revenue Service has filed proofs of claim against the debtors, although they contain estimates. [Case No. 21-32352, Claim No. 2-1] (estimated priority claim of $45,549.81); [Case No. 21-32355, Claim No. 4-1] (estimated priority claim of $2,000); [Case No. 21-32356, Claim No. 3-1] (estimated priority claim of $14,000); [Case No. 21-32351, Claim No. 10-2] (estimated priority claim of $7,000). The Court should not confirm the plan unless the debtors show that the plan satisfies 11 U.S.C. § 1129(a)(9)(C).

## VI.  Transfer of Permits

The plan appears to be "forbidden by law." 11 U.S.C. § 1129(a)(3). It provides for the transfer of permits from the debtors to Limetree Bay Refining, reorganized as the Transition Refinery Entity, but it does not condition the transfer on compliance with applicable nonbankruptcy law. [Doc. No. 1273-1, pp. 11, 30 & 54]. It is difficult

10

to identify the applicable nonbankruptcy law because the text of the plan does not identify the permits to be transferred, but the Court should not approve any transfer of a permit without compliance with applicable nonbankruptcy law. Otherwise, the plan violates 11 U.S.C. § 1129(a)(3) and should not be confirmed. 7 Collier's on Bankruptcy ¶ 1129.02[3][b][ii] (16th ed. 2019 (plan that would violate non-bankruptcy regulatory law would be "forbidden by law" and would preclude confirmation even if no provision of title 11 was violated); In re Cajun Electric Power Co-op, Inc., 150 F.3d 503, 519 (5th Cir. 1998) (Plan may not propose "independent illegality"); In re Koebl, 751 F.2d 137, 139 (2d Cir. 1984); In re Appalachian Fuels, LLC, 521 B.R. 779, 805 (Bankr. E.D. Ky. 2014) (Plan should not have been confirmed without provision for compliance with reclamation requirements of debtor's mining permits); In re Rent-Rite Superkegs West Ltd., 484 B.R. 799, 809 (Bankr. D. Colo. 2012) (plan would be forbidden by law when a significant portion of income would be derived from illegal activity); In re Eagle-Picher Holdings, Inc., 345 B.R. 860, 861 (Bankr. S.D. Ohio 2006) (debtor has burden of proof to demonstrate that plan for addressing contaminated properties complies with non-bankruptcy law). This Court lacks authority to make decisions on who meets requirements for permits under laws protecting public health and safety.

Moreover, insofar as environmental permits issued under the Clean Air Act are concerned, the power to amend such permits (including to reflect transfers of ownership) is held by the relevant permitting authority, not the permit holder. 40 C.F.R. 70.7(d)(1)(iv); Order Denying Petition for Objection to Permit, In the Matter

of Noranda Alumina, LLC, Petition No. VI-2011-04, at 6-7 (Dec. 14, 2012) (addressing amendment of Prevention of Significant Deterioration [PSD] permits).  The permit holder needs to request that the relevant issuing authority amend a permit to reflect a change in ownership.  In addition, under the PSD permit program, permits are to be held by owners or operators of facilities.  42 U.S.C. 7475(a)(3); 40 C.F.R. 52.21(b)(9); 40 C.F.R. 124.41  (definition of "owner or operator"). In this case, the Transition Refinery Entity does not own the refinery and will not be the entity that operates the refinery.

## VII.  Setoff

The plan should not interfere with the United States' setoff rights.

The Fifth Circuit has held that a discharge in bankruptcy "does not bar a creditor from asserting its right to setoff."  *I.R.S. v. Luongo (Matter of Luongo)*, 259 F.3d 323, 333 (5th Cir. 2001);[5] *but see United States v. Continental Airlines (In re Continental Airlines)*, 134 F.3d 536, 540 (3d Cir. 1998).  To the contrary, the Fifth Circuit has expressly interpreted § 553 as preserving setoff rights "notwithstanding § 524(a)'s post-discharge bar."  *Luongo*, 259 F.3d at 333.

The three requirements to "establish a valid right to setoff under § 553" are:

(1) a debt owed by the creditor to the debtor which arose prior to the commencement of the bankruptcy case;

(2) a claim of the creditor against the debtor which arose prior to the commencement of the bankruptcy case; and

---

[5] *See also U.S. v. Munson*, 248 B.R. 343, 345 (C.D. Ill. 2000) (discussing circuit split but concluding that setoff rights survived discharge); *In re Bare*, 284 B.R. 870, 873-74 (Bankr. N.D. Ill. 2002) (adopting *Munson*); *In re Ronnie Dowdy, Inc.*, 314 B.R. 182, 188 (Bankr. E.D. Ark. 2004) (concluding that setoff rights survived discharge, but also discussing possibility that creditor waived setoff rights); *In re Davidovich*, 901 F.2d 1533, 1539 (10th Cir. 1990) (setoff rights survive discharge).

(3) the debt and claim must be mutual obligations.

*Luongo*, 259 F.3d at 334 (citing *Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1035 (5th Cir. 1987)).  Importantly, none of these three elements require a party to assert the setoff rights in a bankruptcy case.  *Id.* (discussing preservation of setoff rights without conditioning setoff rights on the filing of a proof of claim); *but see Continental Airlines*, 134 F.3d at 542 (refusing to allow setoff when party did not timely file proof of claim asserting setoff rights).[6]

The United States objects to the plan to ensure that its setoff rights survive confirmation.

## VIII.  Insurance

The United States objects to any impairment of its equitable rights to insurance proceeds for liabilities of debtors under environmental laws.  See In re OGA Charters, LLC, 901 F.3d 599, 604 (5th Cir. 2018) (proceeds under liability policies may not be pocketed by the estate regardless of whether the legal interest, as opposed to the equitable interest, in the proceeds is found to be property of the estate); In re Allied Products Corp., 288 B.R. 533 (Bankr. N.D. Ill. 2003); 3 Collier's on Bankruptcy¶ 362.03 (16th ed. 2019) (policy proceeds "are not available to all creditors . . . but may be available to a class of creditors whose claims are covered by insurance").

---

[6] *See also In re Mangia Pizza Investments, LP*, 480 B.R. 669, 689 (Bankr. W.D. Tex. 2012) (citing *Continental Airlines* in *dicta* discussing a creditor wanting to preserve setoff rights).

## Conclusion

The United States requests that the Court deny confirmation.

Dated: May 3, 2022.

Respectfully submitted,

JENNIFER B. LOWERY,
United States Attorney

By: _s/ Richard A. Kincheloe_
   Richard A. Kincheloe
   Assistant United States Attorney
   United States Attorney's Office
   Southern District of Texas
   Texas Bar No. 24068107
   S.D. Tex. ID No. 1132346
   1000 Louisiana St., Suite 2300
   Houston, Texas 77002
   Telephone: (713) 567-9422
   Facsimile: (713) 718-3033
   Email: Richard.Kincheloe@usdoj.gov
   **Attorney for the United States**

## Certificate of Service

The undersigned certifies that he served a true and correct copy of the foregoing Objection on the parties receiving ECF notification in this case on May 3, 2022, by ECF notice.

   _s/ Richard A. Kincheloe_
   Richard A. Kincheloe
   Assistant United States Attorney

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-32351 |
| Limetree Bay Services, LLC, *et al.*, | § | |
| | § | Chapter 11 |
| Debtors. | § | |

### ORDER

The Court has considered the debtors' plan, the objection by the United States, any evidence presented, and any arguments of counsel. The Court finds that the debtors have failed to carry their burden under 11 U.S.C. § 1129 and that confirmation should be denied. It is therefore

**ORDERED THAT** confirmation of the debtors' plan is in all things denied.

ZZZZ

**FLINT EXHIBIT 8**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 20, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

---

In re:

**LIMETREE BAY SERVICES, LLC, *et al.*,**[1]

Debtors.

---

CHAPTER 11

CASE NO.: 21-32351 (DRJ)

(Jointly Administered)

---

### ORDER APPROVING DISCLOSURE STATEMENT ON A FINAL BASIS
### AND CONFIRMING CHAPTER 11 PLAN OF LIQUIDATION OF
### LIMETREE BAY SERVICES, LLC AND AFFILIATED DEBTORS

On May 18, 2022, the above-referenced court (the "Bankruptcy Court") held a hearing ("Confirmation Hearing") to consider the final approval and confirmation of the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Limetree Bay Services, LLC and Affiliated Debtors* (as amended, supplemented, or otherwise modified, the "Combined Plan and Disclosure Statement," "Disclosure Statement," or "Plan," as applicable),[2] proposed by the Debtors in these Chapter 11 Cases.

On March 18, 2022, the Debtors filed their initial Combined Plan and Disclosure Statement in the Chapter 11 Cases.

On March 22, 2022, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan, (III) Approving the Form of Various Ballots and Notices in Connection therewith; and (IV) Approving the Scheduling*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] The Debtors filed an amended version of the Plan at Doc. No. 1413-1. Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Plan.

distribution of all Available Sale Proceeds, in an amount no less than $10 million on the Effective Date, as provided in Art. I.C. of the Plan.

29.     <u>Prepetition Term Secured Debt Claims.</u> For purposes of Plan distributions, (i) the Prepetition Term Secured Debt Claims against the Debtors shall be Allowed in the amount of $815,754,152.25; and (ii) such Allowed Claims shall be the "Allowed Prepetition Term Secured Debt Claims" in Class 3 as provided in Section I.C. and Section VII.A.3 of the Plan.

30.     <u>Payment of Fees and Expenses of the Prepetition Revolver Agent, Prepetition Term Agent and Ad Hoc Term Lender Group</u>. On the Effective Date, the Debtors shall pay all accrued and unpaid reasonable and documented fees and expenses of the Prepetition Revolver Agent,  the Prepetition Term Agent and the Ad Hoc Term Lender Group incurred in connection with the Chapter 11 Cases, including the reasonable and documented fees and expenses of Cleary Gottlieb Steen & Hamilton LLP, Akin Gump Strauss Hauer & Feld LLP and Perella Weinberg Partners LP, excluding any success or transaction fees, in each case subject to the Approved Budget (as defined in the Final DIP Order) and Cash Collateral Budget (as defined under the Cash Collateral Stipulation), their respective engagement letters, and the Cash Collateral Stipulation, and as otherwise agreed by such advisors and the Prepetition Revolver Agent.

31.     <u>Transition Refinery Entity</u>. Nothing in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents, or this Confirmation Order releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that the Transition Refinery Entity or that any other Person or Entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order.  Nothing in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents, or this Confirmation Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration,

(d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under applicable nonbankruptcy law including but not limited to police or regulatory law. Nothing in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents or this Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order. Furthermore, notwithstanding anything in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents or this Confirmation Order to the contrary, nothing in this Order or the Plan shall modify (a) the Consent Decree as modified by the First Modification and Second Modification in United States and the *United States Virgin Islands v. HOVENSA L.L.C.*, Civ. No. 1:11-cv-00006, in the United States District Court of the Virgin Islands, St. Croix Division (the "Consent Decree"), or (b) the Joint Stipulation in *United States v. Limetree Bay Refining, LLC, and Limetree Bay Terminals, LLC*, Civ. No. 1:21-cv-00264 (the "Joint Stipulation") (as each may be amended with the mutual consent of the parties). The Transition Refinery Entity shall be fully bound by all provisions of the Consent Decree and the Joint Stipulation and shall cooperate in the substitution of the Transition Refinery Entity as a named defendant in both cases. Nothing in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents, or this Confirmation Order (a) prevents the U.S. Environmental Protection Agency or other agency from issuing any order or taking other action under applicable nonbankruptcy law, or (b) modifies the Consent Decree, the Joint Stipulation, or any other applicable environmental, health and safety, or police and regulatory law. Notwithstanding anything in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents, or this Confirmation Order to the contrary, nothing in this Order or the Plan, including without limitation the Purchaser's receipt and ownership of the New Interests, shall modify the

49

Sale Order or the protections in the Sale Order in favor of Purchaser and governmental units; for the avoidance of doubt, the New Interests shall be issued to Purchaser in furtherance of the transactions contemplated by the Sale Order and shall be afforded the same protections as those set forth in the Sale Order in favor of Purchaser and governmental units. For the avoidance of doubt, the New Interests shall be issued as limited liability company membership interests rather than stock.

32.     Nothing in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents or this Confirmation Order shall impair or release any right, if any, of the United States with respect to any proceeds of any environmental insurance policy of the Debtors.

33.     Nothing in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents, or this Confirmation Order shall alter or impair the United States' right to setoff, which is fully preserved.

34.     <u>Reservation of Rights</u>.  Prior to the Effective Date, the filing of the Plan, any statement or provision contained herein or the taking of any action by the Debtors or the Prepetition Agents with respect to this Plan shall not be or shall not be deemed to be an admission or waiver of any rights of the Debtors or the Prepetition Agents of any kind, including with respect to the Holders of Claims or Equity Interests or as to any treatment or classification of any contract or lease.

35.     <u>Notice of Effective Date</u>. On or before five (5) Business Days after the occurrence of the Effective Date, the Debtors shall file on the docket of the Chapter 11 Cases a notice of the entry of the Confirmation Order, the occurrence of the Effective Date, and such other matters as required under the Liquidating Trust Agreement, as the Debtors deem appropriate or as may be ordered by the Bankruptcy Court.