IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, and )<br>THE UNITED STATES VIRGIN ISLANDS, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>HOVENSA L.L.C. )<br>)<br>Defendants. ) | Civ. No. 1:11-cv-00006 (RAM/EAH) |

**DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF UNITED STATES'
REPLY TO PORT HAMILTON'S OPPOSITION TO MOTION TO SUBSTITURE**

I, Myles E. Flint, II, declare as follows:

1. I am a Senior Counsel with the Environmental Enforcement Section of the United States Department of Justice.

2. Exhibit A to this Declaration is a true and correct copy of an August 10, 2023 letter from Fermin Rodriguez, of Port Hamilton, to Robert Buettner, of EPA, without attachments.

3. Exhibit B to this Declaration is a true and correct copy of an August 18, 2022 letter from Corinne Snow to the Department of Justice, EPA, and others.

4. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*s/ Myles E. Flint, II*

1

**Flint Declaration Exhibit A**

# PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

August 10, 2023

*Via Electronic Mail*
Robert Buettner, Chief
Air Compliance Branch
U.S. Environmental Protection Agency
Region 2
290 Broadway – 21st Floor
New York, New York 10007
Buettner.Robert@epa.gov

      Re:    Response of Port Hamilton Refining and Transportation, LLLP
                to EPA Information Request CAA-02-2023-1424

Dear Mr. Buettner:

Port Hamilton Refining and Transportation, LLLP ("Port Hamilton" or "the Company") provides this response to the information request CAA-02-2023-1424 submitted to us by Dore LaPosta of EPA on July 5, 2023 ("Information Request" or "Request"). EPA's Request seeks information pertaining to a flare gas recovery system (FGRS) for the St. Croix Refinery ("Refinery").

Port Hamilton notes the following specific and general objections to the Information Request submitted by EPA:

General Objections

Although Port Hamilton has made and is making diligent efforts to comply with the Information Request, in order to preserve its rights, Port Hamilton hereby provides the following general objections to the Information Request for the reasons set forth below. The General Objections pertain to this response as well as any future or supplemental responses to this request CAA-02-2023-1424. Port Hamilton reserves its rights to file supplemental objections throughout its efforts to respond to the Information Request.

1. Port Hamilton objects to each request in the Information Request to the extent it seeks information outside the scope of EPA's authority pursuant to Section 114 of the Clean Air Act, 42 U.S.C. § 7414.

    a. EPA's Information Request exceeds its authority under Section 114 of the Clean Air Act because:

        i. EPA seeks information on an FGRS that is not required at the refinery under the terms of the consent decree between HOVENSA and the United States;

**1 ESTATE HOPE ▪ CHRISTIANSTED, VI 00820**

      ii. Even if there is a requirement for an FGRS in the consent decree, Port Hamilton is not yet a party to the consent decree because Port Hamilton and the United States have not been able to agree on appropriate modifications to the decree; and

      iii. Even if there is a requirement for an FGRS in the consent decree, that requirement is only imposed upon "party defendants," and Port Hamilton is not required to become a party defendant to the consent decree.

    b. EPA's Information Request seeks documents that were never generated, particularly after EPA attempted to prohibit Port Hamilton from resuming operations at the Refinery without first obtaining a new permit under the Prevention of Significant Deterioration provisions of the Clean Air Act.

2. Port Hamilton objects to each request in the Information Request to the extent EPA seeks information not relevant to the purpose stated in the Information Request, 42 U.S.C. § 7414.

3. Port Hamilton objects to each request in the Information Request to the extent that, through that Information Request, EPA imposes an undue burden on the Company, 42 U.S.C. § 7414.

4. Port Hamilton objects to the Information Request to the extent that EPA requests Port Hamilton to divulge information protected by the attorney-client privilege, the work-product doctrine, or other available privilege or protection. The Clean Air Act does not require a party to divulge such information in response to information requests.

5. Port Hamilton objects to providing information that it has previously provided to EPA including, by way of example and not by way of limitation, weekly progress reports submitted in 2022.

6. Port Hamilton objects to any request in the Information Request that is vague, ambiguous, overbroad, or too indefinite to be capable of reasonable interpretation and response.

7. Port Hamilton objects to each request in the Information Request to the extent that it calls for the Company to make legal conclusions concerning the Clean Air Act provisions.

8. Port Hamilton objects to each request in the Information Request to the extent it seeks confidential business information.

9. Port Hamilton objects to each request in the Information Request to the extent it requires Port Hamilton to develop or create information and/or documents that do not otherwise exist or that Port Hamilton is not otherwise required to create and/or maintain.

10. Port Hamilton objects to each request in the Information Request to the extent it seeks information not kept in the ordinary course of Port Hamilton's business or not kept in the form requested by EPA in the ordinary course of Port Hamilton's business. Requiring Port Hamilton to produce information in a form or manner not kept by the Company is unduly burdensome and beyond the scope of Section 114.

11. Port Hamilton objects to each request in the Information Request to the extent it seeks information not in the possession, custody or control of Port Hamilton.

Notwithstanding and without waiving these Objections, and subject to them, Port Hamilton has prepared this response based upon the information available to it.

Where the Information Request is vague, ambiguous, overbroad, unduly burdensome, or beyond the scope of EPA's authority pursuant to Section 114, Port Hamilton is making appropriate and reasonable efforts to provide responsive information based on its interpretation and understanding of the Requests. To the extent that information produced herein is not required by law or is outside of the scope that EPA has the authority to request, that information is voluntarily submitted. Port Hamilton waives no rights to protection of information that it voluntarily submits. Port Hamilton reserves the right to supplement this response as additional responsive information becomes available.

Port Hamilton considers all documents produced pursuant to this response and any future responses and stamped "Confidential Business Information" to be confidential business information or trade secrets (collectively referred to as "CBI") and, therefore, protected from release to third parties pursuant to 5 U.S.C. § 552(b)(4) and 40 C.F.R. Part 2. Port Hamilton is concerned with protecting its CBI and requests that EPA provide Port Hamilton with the required notice and follow the required procedures prior to releasing any of this information to any third party so that Port Hamilton can timely avail itself of all federal and state laws that protect the Company's CBI.

Port Hamilton's Response to EPA's Information Request

For ease of reference, each item in the Information Request is reprinted in ***bold italics*** below, followed by PPG's response to each particular item. Each of the item-specific responses provided in Section I below are also subject to the General Objections set forth above.

1. ***Recent PHRT Weekly Activity Reports note that PHRT has been working with Becht Engineering and Richard Engineering to design and develop the Flare Gas Recovery System ("FGRS"). Describe in detail how much work has been completed towards designing and installing the FGRS at the Facility to date. Provide a detailed current schedule for the design, construction, installation, and operation of the FGRS, as well as any previous draft schedules and the reasons for any significant changes.***

Response: There is no current schedule for the design, construction, installation, or operation of an FGRS. The full extent of the work that was completed towards the design for FGRS at the refinery was to estimate the capacity of any FGRS based only on the flaring events while the

3

refinery was owned and operated by Limetree Bay. Port Hamilton worked with Becht Engineering between February 2022 and August 2022 on the design basis for a flare gas system, but it did not prepare or have Becht prepare a schedule for the full design or other steps necessary to design and install an FGRS. Port Hamilton is under no obligation to undertake steps towards an FGRS pursuant to the regulations, a consent decree or order, or any other requirement.

2. *Submit all documents related to the design (including but not limited to sizing), construction, installation, and operation of the FGRS not already submitted in response to question 1, including but not limited to the following:*

    a. *Provide copies of all preliminary design reports, and other documents, generated by Becht Engineering that show the design parameters (including sizing parameters) that were considered for the FGRS.*

    Response: Subject to the General Objections and incorporating the Response to Request No. 1 by reference, Port Hamilton uploaded responsive documents to a Sharefile site, a link for which has been shared with EPA. Documents responsive to this request include those bates stamped PHRT-0001 to PHRT-00003, PHRT-0006 to PHRT-0014, PHRT-00019 to PHRT-00020, PHRT-00058 to PHRT-00065, PHRT-00067, PHRT-00084 to PHRT-00253. Port Hamilton is including with this response documents it received from Limetree Bay Refining, but PHRT does not adopt, accept, or agree with this information by virtue of providing it to EPA.

    b. *Provide copies of all Richard Engineering reports and other documents related to front-end loading ("FEL") and detailed engineering and design packages. If no final report is completed yet, describe the delay in completing this task and state the date when the final report is expected.*

    Response: Port Hamilton had preliminary discussions with Richard Engineering related to an FGRS. Because Port Hamilton has not continued to work on the design of an FGRS, no final report was prepared, nor has Port Hamilton asked Richard Engineering to prepare a final report. Subject to the General Objections and incorporating the Response to Request No. 1 by reference, Port Hamilton uploaded responsive documents to a Sharefile site, a link for which has been shared with EPA. Documents responsive to this request include those bates stamped PHRT-00068 to PHRT-00083.

    c. *Provide copies of any other engineering reports generated by WIPL/PHRT/TRE or its contractors related to design parameters, engineering packages, and/or design packages.*

    Response: Subject to the General Objections and incorporating the Response to Request No. 1 by reference, Port Hamilton has not prepared, nor directed any contractors to prepare, any reports responsive to this request.

4

3. **Provide a detailed estimate of the total construction cost for the FGRS, including but not limited to engineering, materials, fabrication, and labor costs.**

    Port Hamilton has not prepared an estimate for the actual construction cost for an FGRS. Subject to the General Objections and incorporating the Response to Request No. 1 by reference, Port Hamilton directs EPA to the presentation provided by Becht Engineering, which is bates stamped PHRT-00060 to PHRT-00065, and the brochure from Richard Engineering, which is bates stamped PHRT-00068 to PHRT-00083. The Becht Engineering presentation contains order-of-magnitude cost estimates, and the Richard Engineering brochure contains the cost of FGRS installed at other facilities. These may be of interest, although Port Hamilton has not evaluated the projects and their associated costs listed in this information and does not express an opinion regarding the applicability of this information to Port Hamilton's refinery. Port Hamilton also directs EPA to the budget worksheet it prepared related to the design and engineering of a FGRS, which is bates stamped PHRT-00015 to PHRT-00018. All of these documents have been uploaded to a Sharefile site, a link for which has been shared with EPA.

4. **Provide an estimate of the annual operating costs to operate the FGRS, including but not limited to utilities, supplemental fuel, and labor costs.**

    Subject to the General Objections and incorporating the Response to Request No. 1 by reference, Port Hamilton has not prepared an estimate that is responsive to this request.

Based on information and belief formed after reasonable inquiry, the statements and information in this Initial Response and the documents provided herewith are true, accurate, and complete.

Please let me know if you have any questions or if you need to discuss any of this further.

Sincerely,

Fermin Rodriguez
Vice President and Plant Manager


cc (with attachments):

Harish Patel
Patel.Harish@epa.gov

Alex Rivera
Rivera.Alex@epa.gov

5

**Flint Declaration Exhibit B**

# Vinson&Elkins

Corinne Snow  csnow@velaw.com
Tel +1.212.237.0157  Fax +1.917.879.8998

**VIA CERTIFIED MAIL AND ELECTRONIC MAIL**

EES Case Management Unit
Environment & Natural Resource Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
DJ# 90-5-2-1-08229/1

Director-Air Enforcement Division
Office of Civil Enforcement, U.S. EPA
c/o Matrix New Work Engineering, Inc.
26 Columbia Turnpike, Suite 200
Florham Park, NJ 07932-2213

U.S. EPA Region 2
Office of Regional Counsel
290 Broadway
New York, NY 10007

Director-Air Enforcement Division
Office of Civil Enforcement (2242A)
Office of Enforcement & Compliance Assurance
U.S. EPA
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20044

Director, Enforcement and Compliance
Assurance Division
U.S. EPA – Region 2
290 Broadway – 21st Floor
New York, NY 10007-1866

Director, Caribbean Env. Protection Division
U.S. EPA – Region 2
City View Plaza II – Suite 7000
#48 Rd. 165 km 1.2
Guaynabo, PR 00968-8069

Director, Division of Environmental Protection
Virgin Islands Department of Planning & Natural Resources
45 Estate Mars Hill
Frederiksted, St. Croix, U.S. Virgin Islands
00840-4474

**Re: Notice of Force Majeure Event, Consent Decree, Case No. 1:11:cv-00006 (D.V.I.)**

To Whom It May Concern:

This letter constitutes notice of a force majeure event pursuant to Paragraphs 181 and 182 of the Consent Decree between Limetree Bay Refining, LLC ("LBR"), Limetree Bay Terminals, LLC ("LBT")[1], the United States Environmental Protection Agency ("EPA") and Virgin Islands Department of Planning & Natural Resources ("DPNR"). LBT submits this force majeure notice in accordance with Paragraph 182 of the Consent Decree. As described further below, the specific force majeure event triggering this letter was LBT's semi-annual progress report submission under

---

[1] LBT is now doing business as Ocean Point Terminals. The ownership of LBT and its assets has not changed and this letter will continue to refer to the entity as LBT to avoid confusion.

Vinson & Elkins LLP Attorneys at Law
Austin Dallas Dubai Houston London Los Angeles New York
Richmond Riyadh San Francisco Tokyo Washington

The Grace Building, 1114 Avenue of the Americas, 32nd Floor
New York, NY 10036-7708
Tel +1.212.237.0000  Fax +1.212.237.0100  velaw.com

**V&E**

Part X of the Consent Decree sent on August 1, 2022, as well as other reports which include BWON and LDAR information required by the Consent Decree due on the same day.

**Background**

In 2011 HOVENSA L.L.C. ("HOVENSA"), the previous owner of the refinery and terminal, entered into a consent decree with the U.S. and EPA to resolve alleged violations of the Clean Air Act in *United States and the United States Virgin Islands v. HOVENSA L.L.C.*, 1:11-cv-00006, (D.V.I.) (the "Consent Decree"). HOVENSA later idled the refinery and terminal operations and filed for bankruptcy in 2015. The bankruptcy court approved the sale of certain refining and terminal assets to LBT, and the sale of such assets closed on January 4, 2016. In connection with the sale, LBT agreed to assume HOVENSA's liabilities under the Consent Decree and become a party to the Consent Decree, subject to some limited exceptions.

On November 30, 2018, LBT transferred some of the HOVENSA petroleum refining assets subject to the Consent Decree to a separate but related entity, LBR. LBT and LBR also had shared ownership interests in certain utility systems, such as generating turbines which are subject to certain affirmative relief requirements under the Consent Decree.

On December 30, 2021, the United States District Court for the District of the Virgin Islands (the "District Court") entered the First Modification of the Consent Decree ("First Modification"). *United States and the United States Virgin Islands v. HOVENSA L.L.C.*, 1:11-cv-00006, Dkt. No. 42 (D.V.I. Dec. 30, 2021). Once LBR and LBT became parties to the Consent Decree through the entry of the First Modification, that triggered the automatic entry of a non-material, Second Modification of the Consent Decree ("Second Modification").

On May 12, 2021, while the First Modification was pending before the District Court, LBR idled refining operations. On June 11, 2021, LBR and LBT notified EPA and DPNR of a force majeure event, including the idling of refinery operations on May 13, 2021, and EPA's subsequent issuance of an emergency shutdown order under Section 303 of the Clean Air Act. As described in that June 11 letter, "The continued cessation of refinery operations will necessarily impact [LBR and LBT's] ability to meet certain deadlines under the Consent Decree to perform testing and demonstrate compliance with monitoring requirements." The refinery shutdown constituted a force majeure event preventing compliance with a number of obligations under the Consent Decree including continuous emissions monitoring ("CEMS") and compliance demonstrations under Paragraph 45a, Paragraphs 34-35, Paragraph 133, and Appendix L (including Section V.J (BWON) and V.K (LDAR)).

On July 12, 2021, LBR and its debtor affiliates—but not LBT—filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") in jointly administered cases captioned *In Re Limetree Bay Services et al.*, 21-32351 (Bankr. S.D.TX.). On

V&E

January 19, 2022, LBT notified EPA and DPNR of a second force majeure event relating to this bankruptcy and the continued shut down of refinery operations. As LBT explained in that notice:

> Not only do refinery operations remain shuttered as the result of the voluntary idling and EPA's Section 303 Order, but LBR also filed for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Texas on July 12, 2021. As was the case with the original compliance deadline of March 2020, incorporating incomplete or non-operating refinery data into a TAB report by November 22, 2021, would not have yielded meaningful results that could be used to demonstrate LBR's compliance with Paragraph 79a of the modified Consent Decree. Moreover, as a result of the refinery shutdown, LBR lacked the human and financial resources to complete this project. Accordingly, LBR cannot comply with the terms of the Second Modification and hereby notifies EPA and DPNR of a force majeure event. LBR anticipates that this delay in compliance with Paragraph 79a will persist for as long as refinery operations remain shut down, and until after a period of restart occurs.

On January 21, 2022, substantially all of LBR's assets, including most of the HOVENSA assets subject to the Consent Decree and LBR's interests in the shared utilities, were sold in a bankruptcy auction with approval from the Bankruptcy Court to an unrelated third party, Port Hamilton Refining and Transportation, LLLP ("PHRT"). *In re: Limetree Bay Services LLC et al.*, No. 21-32351, Dkt. 977 (Jan. 21, 2022 Bankr. S.D. Tex.) (the "Sale Order"). Concerns raised by EPA and/or DPNR regarding the Consent Decree and regulatory obligations were resolved with language that was included in the Sale Order. The Bankruptcy Court subsequently approved the Chapter 11 Plan of Liquidation of LBR and its debtor affiliates (the "Chapter 11 Plan"). *In re: Limetree Bay Services LLC et al.*, No. 21-32351, Dkt. 1454 (May 20, 2022 Bankr. S.D. Tex.). Among other things, the Chapter 11 Plan reorganized LBR as the Transition Refinery Entity and transferred 100% of the equity ownership in Transition Refinery Entity to PHRT.

The Bankruptcy Court order confirming the Chapter 11 Plan (the "Confirmation Order") specifically notes that "nothing in this Order or the Plan shall modify [] the Consent Decree as modified by the First Modification and Second Modification. . . ." Confirmation Order ¶ 31. Further, the Confirmation Order provides that "[t]he retention of permits by the Transition Refinery Entity and use of such permits remains subject to compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in the Plan, Plan Supplement, Administrative Claim Settlements, Plan Documents, or this Confirmation Order imposes any obligation of the Purchaser, Transition Refinery Entity, or the Debtors to comply with applicable regulatory or governmental laws or authorities on the Terminal Entities." Confirmation Order ¶ 16. Concerns raised by the EPA and/or DPNR with respect to the Chapter 11 Plan were resolved with language that was included in the Confirmation Order. Among the issues raised by the EPA and/or DPRN and resolved in the Sale Order and Chapter 11 Plan were Transition Refinery Entity and PHRT's obligations with regard to the Consent Decree, which are discussed below.



August 18, 2022   Page 4

Critically, the Sale Order required that PHRT "must become a party to" the Consent Decree. *See In Re Limetree Bay Services et al.*, 21-32351, Dkt. No. 977 (Bankr. S.D.T.X. Dec. 21, 2021) ¶ 11. As of the date of this notice, PHRT is not a party to the Consent Decree. The Chapter 11 Plan also provides that the Transition Refinery Entity that PHRT owns "shall be fully bound by all provisions of the Consent Decree" and "shall cooperate in the substitution of the Transition Refinery Entity as a named defendant." *In re: Limetree Bay Services LLC et al.*, No. 21-32351, Dkt. 1454 (May 20, 2022 Bankr. S.D. Tex.) ¶ 31. As of the date of this notice, the Transition Refinery Entity has not been substituted as a named defendant to the Consent Decree.

Following the sale, LBT expected that PHRT would promptly comply with the Sale Order, including by becoming party to the Consent Decree. In July and August of 2022, LBT prepared and submitted several reports to EPA and DPNR as required under the Consent Decree, including for equipment that is now owned, controlled, and operated by PHRT. Because PHRT was not a party to the Consent Decree and has no obligation to submit reports or information under the Consent Decree, LBT had to rely on PHRT's voluntary provision of information related to PHRT's equipment in order to submit reports required under the Consent Decree. LBT has no ability to verify or certify information provided by PHRT, as the information does not pertain to equipment owned or operated by LBT and LBT has no corporate authority or control over PHRT.

Even if PHRT becomes a party to the Consent Decree, LBT will still have no ability to take actions with respect to PHRT-owned equipment to maintain compliance with the Consent Decree provisions relating to such equipment or to obtain and verify information relating to PHRT-owned or PHRT-operated equipment in order to submit reports in a fashion that allows certification by LBT in the form required by the Consent Decree. Specifically, under Paragraph 144 of the Consent Decree, LBT is required to make the following certification for its semi-annual reports:

> I certify under penalty of law that this information was prepared under my direction or supervision by personnel qualified to properly gather and evaluate the information submitted. Based on my directions and after reasonable inquiry of the person(s) directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.

LBT cannot certify that information provided by PHRT "was prepared under my direction or supervision." Nor can LBT certify that information provided by PHRT was prepared "by personnel qualified to properly gather and evaluate the information submitted." The person gathering such information is *not* an employee or a contractor subject to the direction of LBT. And LBT has a limited ability to make "a reasonable inquiry of the person(s) directly responsible for gathering the information" because it does not manage or have the ability to oversee the work of the person who gathered the information.

This unique situation could not have been predicted at the time that the Consent Decree was originally entered, or at the time that the parties agreed to the First Modification. The change in

**V&E**

August 18, 2022   Page 5

ownership of assets subject to the Consent Decree calls for a broader modification to the Consent Decree so that the proper parties are held individually responsible for the operations that they now own, operate, and control. This broader modification would be consistent with the approach taken in the First Modification to the Consent Decree where the parties divided certain provisions in the Consent Decree between LBT, LBR, and the Environmental Response Trust ("ERT"). *See* First Modification ¶ 5.

LBT recognizes that it will take more time to negotiate such a modification between PHRT, the Transition Refinery Entity, LBT, EPA, and DPNR. Until appropriate modifications are made to the Consent Decree to reflect the new ownership and operations of the previously unified facility subject to the Consent Decree, LBT is providing notice of a force majeure event. While LBT will continue to take all reasonable steps to comply with the Consent Decree, it cannot ensure compliance as to the provisions further detailed below that relate to refinery assets.

**Notice of Force Majeure Event**

Paragraph 181 of the Consent Decree defines a force majeure event as "an event that has been or will be caused by circumstances beyond the control" of LBR and LBT, "that delays compliance with any provision of this Consent Decree or causes any violation of any provision of this Consent Decree despite [LBR's and LBT's] best efforts to fulfill the obligation."

As described above, an unaffiliated third party that is not party to the Consent Decree as modified currently owns and operates equipment subject to the Consent Decree. LBT does not have an ownership interest or operational control over this equipment and therefore is not currently able to fulfill the Consent Decree requirements as they relate to equipment owned by PHRT. The sale of these assets to PHRT was beyond LBT's control. LBT does not have the ability to obtain and verify information in a fashion that allows certification by LBT of information and equipment under the control of PHRT in the form required by the Consent Decree. Nor does it have requisite ownership or operational control over most of the assets owned by PHRT in order to be able to comply other Consent Decree requirements, such as the affirmative relief requirements in most of Part V.

Paragraph 182 of the Consent Decree requires LBT to provide notice of an event that occurs or fails to occur that may delay compliance with or otherwise cause a violation of any obligation under the Consent Decree within 20 business days of the date it first knew, or by exercise or reasonable due diligence should have known, that the event caused or may cause such delay or violation.

LBT did not previously provide notice of a third force majeure event related to this sale because it believed that PHRT would fulfill its obligations under the Bankruptcy Court's order, move to become party to the Consent Decree, comply with its obligations under the Consent Decree, and engage with LBT and the government to make necessary modifications to the Consent Decree to



August 18, 2022  Page 6

reflect the new ownership of equipment subject to its requirements. As part of that process, the Consent Decree requirements could be divided between the appropriate owners of the assets subject to the Consent Decree. Thus far, the parties have not been able to reach an agreement regarding any modification to the Consent Decree. Alternatively, LBT believed that PHRT would enter into a formal, written agreement with LBT, one aspect of which could have been to provide necessary access to equipment and information to fulfill some (but not all) of the Consent Decree obligations. No agreement was reached prior to the due date of the semi-annual report despite discussions between the parties to reach an agreement. Providing notice regarding the course of these negotiations could have potentially stalled or chilled discussions, and LBT remained optimistic that an agreement might be reached without causing any delay or violation in fulfilling Consent Decree obligations.

In the course of preparing the July and August 2022 submissions due under the Consent Decree, LBT had to rely on PHRT's voluntary decision to provide information which LBT does not have the ability to independently verify. LBT cannot be certain that PHRT will agree to provide information in the future or otherwise fulfill obligations under the Consent Decree as they relate to PHRT's equipment. As a result, LBT now knows that an event that "may cause" a delay or violation has occurred. While LBT remains hopeful that PHRT will fulfil its obligations to become party to the Consent Decree as required under the Sale Order, and cooperate in proposing appropriate further modifications to the Consent Decree, the fact that the Consent Decree has not been appropriately modified to reflect the updated ownership constitutes a force majeure event.

As required by Paragraph 182, LBT provides the following description of the length of the delay or violation and its measures to prevent or minimize the delay or violation: LBT has and will continue to attempt to work with PHRT to obtain the information necessary to fulfill reporting obligations under the Consent Decree and will continue to discuss PHRT's obligations to join the Consent Decree, cooperate in further modifications to the Consent Decree, and undertake the obligations related to its equipment detailed in the Consent Decree. LBT anticipates the length of any delay or violation will persist as long as PHRT is not a party to the Consent Decree and the Consent Decree has not been modified to reflect the updated ownership.

This third force majeure event applies to the obligations in the Consent Decree as modified, for assets currently owned, operated, and controlled by PHRT, as well as the certification requirements under Paragraph 144 associated with such equipment and reporting, as outlined below:



August 18, 2022   Page 7

| Compliance Obligations In Consent Decree Part, Section or Paragraphs | Title | Entity Responsible for Compliance as Owner or Operator | |
|---|---|---|---|
| | | LBT | PHRT |
| V.A | Control of NOx Emissions from the FCCU | | X |
| V.B | Control of SO2 Emissions from the FCCU | | X |
| V.C | Control of PM Emissions from the FCCU | | X |
| V.D | Control of CO Emissions from the FCCU | | X |
| V.E | NSPS Subparts A and J Applicability to the FCCU Catalyst Regenerator | | X |
| V.F | NOx Emission Reductions from Heaters, Boilers, Generating Turbines, and Compressor Engines | N/A (Met) | N/A (Met) |
| V.G | SO2 Emissions Reductions from, and NSPS Applicability to, Heaters, Boilers and Generating Turbines | Partial, only as to NSPS compliance for co-owned turbines | X |
| V.H | Sulfur in Fuel Restrictions for Oil Burning | Partial, only as to compliance for co-owned turbines | X |
| V.I | Sulfur Recovery Plants | | X |
| V.J | Flaring Devices-NSPS Applicability | | X |
| V.K | Control of Acid Gas Flaring Incidents and Tail Gas Incidents | | X |
| V.L | Control of Hydrocarbon Flaring Incidents | | X |
| V.M | Stipulated Penalties Under This Section | | X |
| V.N | Certification | N/A | N/A |
| V.O | CERCLA/EPCRA | | X |
| V.P | Benzene Waste NESHAP Program | Partial, as to Terminal and co-owned Equipment | Partial, as to Refinery and co-owned Equipment |
| V.Q | NSPS QQQ | N/A (Met) | N/A (Met) |
| V.R | Leak Detection and Repair ("LDAR") Program | Partial, as to Terminal and co-owned Equipment | Partial, as to Refinery and co-owned Equipment |
| VI. | Permitting | Partial, as to co-owned Turbines only | X |
| VIII.A | Delayed Coker Unit | | X |
| P.135 | Applicability of NSPS D to boilers | | X |
| P.136 | Applicability of NSPS GG to turbines 1-9 | X (co-owned, not shut down) | X (co-owned, not shut down) |
| IX. | Territorial SEP | N/A | N/A |



August 18, 2022   Page 8

In addition, to the best of LBT's knowledge, refinery operations remain shut down with no restart expected in the near term. As a result, the first two force majeure events remain ongoing. If you have any questions or would like to discuss this issue further, please do not hesitate to contact me at your convenience.

Sincerely,

*Corinne V Snow*

Corinne Snow