IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES VIRGIN ISLANDS, | ) | Civil Action No. 1-11-cv-06 (RAM/EAH) |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| HOVENSA L.L.C., WEST INDIES PETROLEUM LIMITED, PORT HAMILTON REFINING AND TRANSPORTATION, LLLP, TRANSITION REFINERY ENTITY LLC and LIMETREE BAY TERMINALS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**UNITES STATES' OPPOSITION TO PORT HAMILTON'S MOTION
TO CLARIFY THE CONSENT DECREE**

Plaintiff the United States, by and through its undersigned attorney, respectfully files this response to *Port Hamilton's Motion to Clarify the Consent Decree* (Motion). ECF 96.

**I.      Preliminary Statement**

On June 7, 2011, this Court approved and entered the Consent Decree between the United States, the United States Virgin Islands, and HOVENSA L.L.C. ECF 6. The Consent Decree mandated that a Flare Gas Recovery System (FGRS) be installed on the FCCU Low Pressure Flare (FCCU Flare) by June 7, 2018. ECF 6, ¶¶ 49, 50, and Appendix D. The First Modification of the Consent Decree (First Modification), *inter alia*, relaxed the FGRS mandate to provide Limetree Bay Refining, LLC (LBR) 1) the opportunity to demonstrate that it could comply with the Consent Decree and the Clean Air Act without the FGRS, and 2) time to install the FGRS if the demonstration failed. ECF 41, ¶ 50B.a.i. As described below, LBR's demonstration failed.

Port Hamilton's argument about the timing of the lodging and approval of the First Modification is a red herring because when they (and West Indies Petroleum Limited) purchased the Refinery in the LBR bankruptcy, Port Hamilton knew full well 1) that they would be governed by the First Modification, 2) that the enforcement of the FGRS mandate in the First Modification would take into account the post-lodging activities occurring prior to the effective date, and 3) that if the First Modification does not govern on this issue, then Port Hamilton is bound by the original Consent Decree which clearly requires installation of the FGRS. Regardless of whether it is the First Modification that governs or the original Consent Decree that governs, the FGRS must be installed and operational before Port Hamilton restarts the Refinery.

As explained below, the Consent Decree, the First Modification, the information contained in the LBR bankruptcy Data Room (including EPA's September 24, 2021 letter to All Potential Buyers), and the Sale Order all made clear to Port Hamilton (and West Indies) that they had a post-sale obligation to install FGRS on the FCCU Flare prior to restarting the Refinery.

Despite titling its Motion as one seeking clarity, Port Hamilton's Motion is a motion for relief under F.R.C.P. 60(b). Port Hamilton has neither alleged nor met the standard for such relief. Port Hamilton's Motion should be denied.

## II.    Factual and Procedural Background

The limited factual background set forth in Port Hamilton's Motion is woefully incomplete and includes inaccuracies.

### a.    The Consent Decree and HOVENSA Bankruptcy

The Consent Decree resolves HOVENSA's alleged pre-2011 violations of the Clean Air Act (CAA or the Act). ECF 6. Among the violations alleged in the Complaint (ECF 1, ¶¶ 74 – 80), and resolved by the Consent Decree, are violations of the New Source Performance Standards (NSPS) for petroleum refineries codified in 40 C.F.R. Part 60, Subpart J. Specifically, the Consent Decree

requires that the FCCU Flare (later designated Flare 8 by LBR)(hereinafter, FCCU Flare and Flare 8 will be used interchangeably) be subject to the requirements of NSPS Subparts J and Ja, and comply with NSPS Subpart Ja (40 C.F.R. Part 60, Subpart Ja) by installing an FGRS on Flare 8 by June 7, 2018. ECF 6, ¶¶ 49, 50, and Appendix D.

As a stand-alone flare, Flare 8 is a safety device used to burn off excess gasses to prevent the dangerous buildup of pressure in Refinery equipment. Flare 8 is also an air pollution control device that destroys volatile hazardous air pollutants, volatile organic compounds, methane, and hydrogen sulfide ($H_2S$). The burning of excess gasses in Flare 8 results in the emissions of air pollutants, including carbon dioxide ($CO_2$), sulfur dioxide ($SO_2$), and $H_2S$, into the environment. The purpose of the FGRS required under the Consent Decree is to recapture and repurpose the excess gasses as a fuel to produce usable energy, thus reducing emissions from the flare and ensuring compliance with emission limits that apply at the flare. This also enables the Refinery to use less of other fuels at the Refinery, resulting in reductions in the amount of $CO_2$, $SO_2$, $H_2S$, and other air pollutants being emitted into the environment from the Refinery. (Declaration of Patrick Foley, ¶¶ 7 - 8).

Paragraph 7 of the Consent Decree required HOVENSA to condition any transfer of ownership or operation of or other interest in the refinery on making the terms of the Consent Decree applicable to the transferee. ECF 6, p. 7.

While the Consent Decree recognizes that it will not take effect until the Date of Entry, it includes a paragraph addressing HOVENSA's post-lodging, pre-entry obligations, and their enforceability. Paragraph 221 provides, in part:

> *Post-Lodging, Pre-Entry Obligations. Obligations of HOVENSA under this Consent Decree to perform duties after the Date of Lodging but prior to the Date of Entry shall be legally enforceable only on or after the Date of Entry.*

ECF 6, p. 141.

In January 2012, HOVENSA announced that it would idle Refinery operations. At that time,

most of the injunctive relief obligations required by the Consent Decree had not been implemented.
In September 2015, HOVENSA filed for bankruptcy under chapter 11 of title 11 of the United
States Code in the District Court of the U.S. Virgin Islands, Bankruptcy Division – St. Croix, Virgin
Islands. (Case No. 15-10003-MFW).

On December 1, 2015, the bankruptcy court entered an Order (HOVENSA Sale Order)
approving, *inter alia*, the sale of HOVENSA's assets to Limetree Bay Terminals, LLC (LBT). (Case
No. 15-100003, ECF 394). Contrary to Port Hamilton's assertion that HOVENSA and LBT entered
into an Asset Purchase Agreement in 2016 (ECF 97, p. 3), the HOVENSA Sale Order states the
following:

> *Limetree Bay Holdings, LLC or its permitted designee (the "__Buyer__") having
> been selected as the Successful Bidder; and upon the Buyer, the Debtor, and Hess
> Oil Virgin Islands Corp. ("__HOVIC__") having entered into that certain
> Amended and Restated Asset Purchase Agreement in substantially the form
> attached hereto as __Exhibit A__, . . .*

(Emphasis in original) (Case No. 15-10003, ECF 394, p.  2). HOVENSA and LBT agreed to the
Asset Purchase Agreement (LBT APA) (to which the United States was not a party) prior to the
issuance of the HOVENSA Sale Order in 2015.

On January 6, 2016, a notice of closing was filed and an executed copy of the LBT APA was
attached. (Case No. 15-10003, ECF Doc. 528). Section 7.4(c) of the LBT APA discusses options for
addressing the Consent Decree subject to the Plaintiffs' and this Court's approval. The options
discussed were: 1) attempt to terminate without modification, 2) negotiate a limited Consent Decree
Modification, or 3) execute "a modification of the Consent Decree pursuant to which [LBT] shall
assume the terms, conditions, obligations, and liabilities of [HOVENSA] under the Consent
Decree." (Case No. 15-10003, ECF 528-1, p. 59). Because most of the injunctive relief obligations
required by the Consent Decree had not been implemented, the United States required that the
Consent Decree be addressed under the third option. The First Modification is the result.

b.      Limetree Bay

i.      Virgin Islands Operating Agreement

On December 1, 2015, LBT entered into an Operating Agreement with the U.S. Virgin

Islands. (Operating Agreement, attached as Ex. 1 to Declaration of Myles E. Flint, II (hereinafter

Flint Dec.)). The Virgin Islands' legislature ratified the Operating Agreement on December 29, 2015.

(December 30, 2015, letter, attached as Ex. 2 of Flint Dec.).

The Operating Agreement requires LBT to, *inter alia*, operate the Terminal portion of the

facility, and evaluate, for not less than eighteen months, the prospects of a Refinery Restart. The

refinery evaluation period requirement is set out in Section 6.4(A) of the Operating Agreement. (Ex.

1 of Flint Dec. at p. 31). On or before April 24, 2018, LBT notified the Virgin Islands of the intent

to restart the Refinery Operations. ECF 42, p. 4. At the time, the Consent Decree's mandated June

7, 2018, deadline for the installation of FGRS on the FCCU Flare was less than two months away.

ii.      Creation of Limetree Bay Refining, LLC

After informing the Virgin Islands of its intent to restart, an affiliate of LBT formed LBR. *Id.*

In July 2018, LBT entered into an Amended Restated Terminal Operating Agreement with the

Virgin Islands, and LBR entered into a Refinery Operating Agreement (RAO) with the Virgin

Islands. (Bill No. 32-0246 with excerpts from Appendix A and B, attached as Ex. 3 of Flint Dec.).

As part of the RAO, LBR agreed to "use commercially reasonable efforts to . . . add [itself] as a

named party defendant to the . . . Consent Decree and modify the . . . Consent Decree to restart

Refinery Operations." (Flint Ex. 3, Appendix B, § 4.1(B), p. 27). On November 30, 2018, LBT

executed a Bill of Sale transferring in whole or in part certain Refinery assets that are subject to the

requirements of the Consent Decree to LBR. (Bill of Sale, attached as Ex. 4 of Flint Dec.).

c.      The First Modification

The First Modification, *inter alia*, transfers HOVENSA's obligations under the Consent

Decree to LBT and LBR and modifies some of the Consent Decree's deadlines and injunctive relief obligations.

> i.      <u>Transfer Obligation</u>

To make the terms and conditions applicable to LBR, Paragraphs 1 and 5.a of the First Modification state as follows:

> *1.      The terms and conditions of the Consent Decree are applicable to Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and their respective successors or assigns, except as otherwise specifically set forth herein.*
> *5.      In accordance with Paragraph 1-4 of the First Modification, effective upon the Date of Entry of the First Modification:*
> *a.      Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC shall be substituted for HOVENSA as the Defendant for all provisions of the Consent Decree, including all rights, liabilities and obligations of HOVENSA, except as set forth in this First Modification.*

ECF 42, pp. 6-7. The effect of these provisions, combined with Paragraph 7 of the Consent Decree, required LBR to condition any transfer of the Refinery on the execution by the transferee of a modification of the Consent Decree, "which makes the terms and conditions of this Consent Decree applicable to the transferee."

> ii.      <u>FGRS Obligation</u>

As stated in the *Memorandum in Support of the Motion to Enter the First Modification* (ECF 22), the First Modification:

> *modifies the requirement to install and operate flare gas recovery systems ("FGRS") on certain flares in order to comply with NSPS Subpart Ja. Specifically, because the operational profile of the Refinery is now significantly different as compared to when the Decree was entered into in 2011, the First Modification conditions the installation of FGRS on the Refinery's flaring emission levels after restart (as defined in the First Modification); providing that FGRS is not required if flaring emissions remain below specified gas flow rates, but requiring Limetree Bay to install and operate FGRS if the specified gas flow rates are exceeded, thereby ensuring the expected emission reduction benefits that were required by the 2011 Consent Decree are obtained while taking into account the modified operating profile of the Refinery [First Modification ¶¶ 49, 50A–50G, and 51];*

ECF 22, p. 5. The change in "operational profile" relates to the fact that when the Consent Decree

was entered, HOVENSA was processing 525,000 barrels of crude oil per day (bpd). LBR's restart

goal was 210,000 bpd. (LBR bankruptcy filing in the U.S. Bankruptcy Court for the Southern

District of Texas, Case No. 21-32351, ECF 8, p. 9). Paragraph 50B.a.i of the First Modification sets

gas flow rate thresholds for Flare 8 during the first year after restart[1]:

> a.    *First Year of Operation: Gas Quantity. The requirements of this Subparagraph 50B.a apply only during the one-year period beginning on the date of Restart of the flare.*
>
> i.    *FCCU Low Pressure Flare. If, during the first or second six-month successive non-overlapping block period during the first year after Restart of the FCCU Low Pressure Flare, greater than an average of 1,500,000 standard cubic feet per day (scfd) combined flow of all gases, other than hydrogen from initial reformer restart, is sent to the FCCU Low Pressure Flare (and any flare interconnected with the FCCU Low Pressure Flare), as measured by the flare flow meter, then by not later than two years from the end of the six-month period in which the gas quantity is exceeded and the report is due under Paragraph 50C.b, Limetree Bay shall install and operate a flare gas recovery system for the FCCU Low Pressure Flare."*

ECF 42, p. 16. Paragraph 50B gave LBR the opportunity to demonstrate that it could operate the

Refinery without the need to install FGRS. However, it also made clear that if LBR exceeds the gas

flow rate threshold, as specified in Paragraph 50B.a.i, during the first year of operation, then FGRS

must be installed on the FCCU Flare. Once the obligation is triggered, Paragraph 50B.a.i provides

two years for the installation and operation of the FGRS. *Id.*

### iii.    Post-Lodging, Pre-Entry Obligations

As discussed above in § II.a, Paragraph 221 of the Consent Decree addresses post-lodging,

pre-entry obligations for the original Consent Decree. The First Modification modified the pertinent

part of Paragraph 221 as follows:

---

[1] The First Modification adds definitions KKK and UUU. ECF 41, pp. 11 – 12. Definition UUU defines "Restart" as it relates to the FCCU Flare to mean "(2) the resumption of operation of an Idled Unit. For a fuel gas combustion device or flare, resumption of operation means combusting Fuel Gas." ECF 42, p. 11 – 12. Definition KKK defines "Idled Unit" as it relates to the FCCU Flare to mean "(1) an emissions unit to which a requirement of the Consent Decree applies (including, but not limited to, … Flaring Devices, …) for which no part was operated between June 1, 2012 and at least June 1, 2019, and that is listed in Appendix K ("List of Idled Units")." The FCCU Flare is listed in Appendix K. ECF 42, p. K-3.

> *Post-Lodging, Pre-entry Obligations. Obligations of Limetree Bay under this Consent Decree to perform duties after the Date of Lodging of the First Modification but prior to the Date of Entry of the First Modification shall be legally enforceable only on or after the Date of Entry of the First Modification.*

ECF 42, p. 87. The First Modification was lodged with the Court on August 25, 2020. ECF 12. At that time, the parties to the Consent Decree and the First Modification, knew that the First Modification would not be entered before LBR restarted Refinery operations. Pursuant to Paragraph 221 of the First Modification, the parties also knew that obligations relating to LBR's post-lodging, pre-entry restart would become enforceable upon the Date of Entry of the First Modification and would take into account what occurred between lodging and entry.

This approach with post-lodging, pre-entry obligations is prevalent in consent decrees resolving environmental enforcement actions with the United States. The alternative of requiring a defendant to stand still until a consent decree is entered at some future unknown date creates too much uncertainty. The approach is also consistent with the Supreme Court's view that a "consent decree embodies an agreement of the parties and is in some respects contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). Clearly, the parties to the First Modification understood that the post-lodging activities that LBR intended to undertake, and any post-entry obligations flowing from those activities, would become enforceable at entry.

    iv.    <u>Court Approval of the First Modification</u>

The United States initially filed the *Motion to Enter the First Modification* and the *Memorandum in Support* on April 8, 2021. ECF 19. On April 26, 2021, the clerk of court entered a docket entry notifying that the filing needed to be corrected by filing the memorandum separately. On April 26, 2021, the *Motion to Enter the First Modification* (ECF 21) and the *Memorandum in Support* (ECF 22) were filed separately. On August 31, 2021, the United States filed an unopposed *Motion for a Hearing on the*

*Motion to Enter the First Modification.* ECF 23.[2] That motion updated the Court about events that had

occurred at the Refinery (discussed in § II.d below) after the *Motion to Enter the First Modification* was

filed and expressed that entry of the First Modification would help the bidders in the LBR

bankruptcy (discussed in § II.e below) "understand what is required" under the First Modification.

*Id.*, pp. 4-5. The United States' *Motion for a Hearing* (ECF 23) was granted on November 24, 2021.

ECF 27.[3] After the hearing on the *Motion to Enter*, the Court entered the First Modification on

December 30, 2021. ECF 42.

        d.     <u>Limetree Bay Refinery Operation</u>

LBR restarted Flare 8 on September 15, 2020. (LBR April 13, 2021 letter, attached as Ex. 5

to Flint Dec.). In the first six-month period after restart, running from September 15, 2020 to March

14, 2021, the amount of gas LBR sent to Flare 8 exceeded the gas flow rate threshold set in

Paragraph 50B.a.i.[4] *Id.* Pursuant to 50C.b of the First Modification, in an April 13, 2021 letter, LBR

notified EPA and the Virgin Islands Department of Planning and Natural Resources (DPNR) that it

exceeded the gas flow rate threshold specified in 50B.a.i. LBR's demonstration failed. Thus,

pursuant to Paragraph 50B.a.i, LBR had until March 14, 2023, to install and operate the FGRS. *Id.*

LBR's notification letter shows that the parties to the First Modification clearly understood the

FGRS obligations contained in Paragraph 50B, and that the FGRS obligations were enforceable.

In addition to failing the demonstration, LBR's operations between December 2020 and

May 2021 resulted in at least six significant air emissions events, including emissions from Flare 8.

On May 14, 2021, after determining that the Refinery operations presented an imminent and

---

[2] On September 1, 2021, the United States filed a proposed Order. ECF 24.

[3] The hearing on the *Motion to Enter* was subsequently rescheduled for December 30, 2021. ECF 29 and 38.

[4] Port Hamilton asserts that "[a]ccording to EPA, Limetree Bay Refining's restart of FCCU Flare in February through May 2021 exceeded the specified emissions levels . . .." ECF 97, p. 5. The basis for this assertion unclear. Despite Port Hamilton citing to "Exhibit A" (identified as a January 10, 2024 letter from Myles Flint to Matthew Morrison), Exhibit A was not included with Port Hamilton's filing and the United States objects to its inclusion. While acknowledging the letter's existence, the letter is labeled "*Confidential Settlement Communication Subject to FRE 408*" and should not be submitted to the Court.

substantial endangerment to public health or, welfare, or the environment, EPA issued an administrative order to LBT and LBR under Section 303 (303 Order) of the CAA, 42. U.S.C. § 7603, requiring the Refinery to, *inter alia*, temporarily cease operations. (303 Order, attached as Ex. 6 to Flint Dec.).

The six significant air emissions events included multiple instances when the gasses sent to Flare 8 contained $H_2S$ "in excess of the 162 ppmv [parts per million by volume] determined hourly on a 3-hr rolling basis" limit set by NSPS Subpart Ja, 40 C.F.R. § 60.103a(h). *Id.*, ¶¶ 27, 46, 49, 51. In some of those instances the $H_2S$ concentrations measured at Flare 8 were "orders of magnitude above the limit of 162 ppm," including at least one instance when the gas sent to Flare 8 contained $H_2S$ in excess of 91,000 ppm. *Id.*, 49, 51. $H_2S$ is a flammable, colorless gas that smells like rotten eggs. *Id.*, ¶ 47. Exposure to $H_2S$ at low levels may cause irritation to the eyes, nose, or throat and exposure to very high concentrations has been observed to cause respiratory distress or arrest. *Id.*

On June 12, 2021, the United States filed a complaint under Section 303 (303 Complaint) against LBT and LBR in the District Court of the United States Virgin Islands. (Case No. 1:12-cv-00264, ECF 1). On that same day, LBR and related entities (but not LBT) filed for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas. (Case No. 21-32354, jointly administered with Case No. 21-32351). LBR's initial filings stated that "[s]ince acquiring the Refinery, Debtors have invested approximately $4.1 billion in repairing, refurbishing and modernizing the Refinery …." (Case No. 21-32351, ECF 8, p. 3).

e.    Limetree Bay Bankruptcy

On August 11, 2021, the bankruptcy court issued an order approving the bid and sale procedures for the sale of substantially all of Debtors' assets. (Case No. 21-32351, ECF 392). As part of that order, Debtors were required to establish a digital data room (Data Room) for "maintaining

and providing Potential Bidders access to information regarding the Debtors and the Assets for purposes of conducting due diligence." (Case No. 21-32351, ECF 392, p. 21).

A September 24, 2021 letter from EPA Region 2 to All Potential Buyers of Limetree Bay Refinery was placed in the Data Room. (September 24, 2021 letter, attached as Ex. 7 of Flint Dec.). The EPA letter provided a common base of environmental information about the Refinery for all potential bidders to minimize the risk of misunderstanding or surprise. *Id.*, p. 1. The letter discusses the Consent Decree and the First Modification. *Id.*, pp. 2 – 4. The discussion of the First Modification begins with the following passage:

> *On August 25, 2020, the United States lodged the proposed First Modification of the Consent Decree with the Court. The first modification was subject to a thirty day public comment period. After reviewing and responding to public comments, the United States filed a motion to enter the First Modification of the Consent Decree on April 26, 2021. The motion to enter is still pending before the court.*

*Id.*, p. 3. The letter then generally explains the modification including the following explanation about the FGRS modification:

> *[The First Modification] (3) modifies the requirement to install and operate flare gas recovery systems ("FGRS") on certain flares in order to comply with NSPS Subpart Ja and potentially requires Limetree Bay to perform mitigation projects if emissions exceed a specified level. Specifically, because the operational profile of the refinery is now significantly different as compared to when the consent decree was entered into in 2011, the First Modification conditions the installation of FGRS on the refinery's flaring emission levels after restart (as defined in the First Modification); providing that FGRS is not required if flaring emissions remain below specified gas flow rates, but requiring Limetree Bay to install and operate FGRS if the specified gas flow rates are exceeded [2], thereby ensuring the expected emission reduction benefits that were required by the 2011 consent decree are obtained while taking into account the modified operating profile of the refinery;*

*Id.*, p. 3. The footnote 2 in this passage references LBR's April 13, 2021 letter (discussed in § II.d above) "acknowledging that it had exceeded the specified gas flow rates." Footnote 2 states that FGRS must be installed and in operation on Flare 8 by March 14, 2023. *Id.*, 3.

i.       Bankruptcy Auction

The initial bankruptcy auction for the sale of the debtors' assets occurred on November 18, 2021, and a winning bidder was selected. (Case No. 21-32351, ECF 829). On December 6, 2021, Debtors filed an *Emergency Motion* seeking to reopen the auction to allow West Indies Petroleum Limited (West Indies) to participate. (Case No. 21-32351, ECF 862.) The *Emergency Motion* states that West Indies "delivered a fully-executed asset purchase agreement" that was included as Exhibit D of the *Emergency Motion*.[5] (Case No. 21-32351, ECF 862 pp. 3-4, with Exhibit D, ECF 862-4 through 862-6, attached as Ex. 8 of Flint Dec.). The bankruptcy court approved the *Emergency Motion,* and the auction was reopened on December 17, 2021. (Case No. 21-32351, ECF 913.)

After the conclusion of the reopened auction, "West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP, jointly," with a bid of $62 million were designated the winning bidder. (Case No. 21-32351, ECF 948, attached as Ex. 9 of Flint Dec.). On December 19, 2021, the United States filed a Limited Objection to the Sale. (Case No. 21-32351, ECF 950, attached as Ex. 10 of Flint Dec.). The Limited Objection "requests that the Court make clear in the sale order that any obligations in the Consent Decree, as modified . . . are not adversely impacted by an order from this court." *Id.*, p. 6.

ii.       Sale Hearing and Sale Order

The Sale Hearing occurred on December 21, 2021 and the bankruptcy court subsequently issued the Sale Order authorizing the sale. (Case No. 21-32351, ECF 977, attached as Ex. 11 to Flint Dec.). Language resolving the United States' Limited Objection is found in Paragraphs 10 and 11 of the Sale Order. (*Id.*, pp. 21 - 22). Those paragraphs state:

> 10.       Nothing in this Order or the APA releases, nullifies,
> precludes or enjoins the enforcement of any police or regulatory
> liability to a governmental unit that any entity would be subject to as

---

[5] Port Hamilton's assertion (ECF 97, p. 6) that "[t]he Sale Order was followed by an Asset Purchase Agreement between Limetree Bay Refining and Port Hamilton" is incorrect.

the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

11.    Furthermore, notwithstanding anything in this Order or in the APA to the contrary, **the Purchaser must become a party to (i) the Consent Decree as modified by the First Modification and Second Modification in** *United States and the United States Virgin Islands v. HOVENSA, L.L.C.*, **Civ. No. 1:21-cv-00264**, in the United States District Court of the Virgin Islands, St. Croix Division (the "Consent Decree"), and . . . (**as each may be amended with the mutual consent of the parties**); *provided*, that Purchaser shall not become liable for any obligations, other than air monitoring obligations, under such Consent Decree or Joint Stipulation that do not relate to property or units purchased or to be operated by Purchaser pursuant to this Sale Order by reason of so becoming a party to such Consent Decree or Joint Stipulation. Nothing in this Order or the Sale Agreement (a) prevents the U.S. Environmental Protection Agency or other agency from issuing any order or taking other action under applicable nonbankruptcy law, or (b) modifies the Consent Decree, the Joint Stipulation, or any other applicable environmental, health and safety, or police and regulatory law.

(emphasis added) *Id.* The sale of Debtors' assets closed on January 21, 2022. (Case No. 21-32351, ECF 1112). As noted in § II.c.iv above, the First Modification was entered by this Court before the sale to Port Hamilton (and West Indies) closed.

f.    Port Hamilton's Actions After the Sale Are Inconsistent With its Argument

Port Hamilton's actions for the first seventeen months after acquiring ownership of the Refinery made it clear that it understood the obligation to install FGRS applied to the Refinery.

i.    Hired Engineering Contractors to Design FGRS

Within a month of the closing, Port Hamilton hired Becht Engineering and Richard Engineering. (February 23, 2022 letter, p. 3, attached as Ex. 12 of Flint Dec.). Becht Engineering was

hired to develop the process engineering design for the FGRS. Richard Engineering was hired to develop the mechanical design for the FGRS.

  ii.  <u>Submitted Weekly Reports to the United States that Included Progress Notes on FGRS</u>

  As part of the *United States v. Limetree Bay Terminals, et al.*, Case No. 1:21-cv-264, Port Hamilton was required to submit weekly reports to EPA. From February 21, 2022 to May 23, 2022, the weekly reports noted under the heading "Flare Gas Recovery System": process engineering data was being put together to establish the process design for the front-end loading and detailed engineering; Becht Engineering and Richard Engineering were under contract. Additionally, the weekly report for June 6, 2022 noted that a call would be scheduled with EPA to review the FGRS process design basis. The weekly report for June 27, 2022 was revised to reflect that a meeting was held with the United States to address the FGRS design. This note remained in each weekly report until April 24, 2023. (Weekly Reports for February 21, May 30, June 6, 2022, June 27, 2022, and April 24, 2023, attached as Ex. 13 of Flint Dec.).

  iii.  <u>Admission Before the Third Circuit Court of Appeals</u>

  In a brief filed on April 19, 2023 in the Third Circuit in the case titled *Port Hamilton Refining and Transportation, LLLP v. United States Environmental Protection Agency*, Case No. 23-1094, involving review of a final agency action, Port Hamilton admitted the following regarding the Consent Decree:

> *To the extent that there are outstanding obligations under the Consent Decree that would apply to Port Hamilton once it becomes a party to the Decree, Port Hamilton understands that any pre-start conditions in the Consent Decree must be satisfied before it resumes implementation of its phased restart plan.*

(Case No. 23-1094, ECF 62, p. 31).

  iv.  <u>Port Hamilton Reverses Course</u>

  Seventeen months after Port Hamilton and West Indies became the owner of the Refinery, Port Hamilton changed its position regarding the obligation to install FGRS. See *Motion for Informal*

*Status Conference*. ECF 54 and 55. In a *Motion for Informal Status Conference* filed in this case, Port Hamilton alleged for the first time that "[t]here is no obligation to install a flare gas recovery system." ECF 55, p. 11. In Denying the *Motion for Informal Status Conference*, the Magistrate Judge noted that Port Hamilton

> *delves into a number of complex issues related to its interpretation of numerous documents from numerous courts as it seeks to negotiate the terms of its entry, or not, into this now 12-year-old case, and its various obligations under those documents. Needless to say, the United States' interpretation of those documents significantly differs from Port Hamilton's.*

ECF 65, p. 5. Port Hamilton's present Motion again delves into this issue in another attempt to obtain relief to which it is not entitled.

## III.    ARGUMENT

Port Hamilton's Motion asks the Court to make far-reaching, factual and legal determinations about numerous documents. It seeks to alter or amend the Consent Decree and First Modification "to afford Port Hamilton the same two-year period in which to install a flare gas recovery system." ECF 97 at p. 2. However, neither the Consent Decree nor First Modification provides for such a delay. Clearly, this Motion does more than seek "to explain or clarify something ambiguous or vague." *U.S. v. Phillip Morris USA Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011). Viewed "in the context of this case as a whole," Port Hamilton's Motion is "seeking relief from judgment or order under [F.R.C.P.] Rule 60(b)." *Id.* Rule 60(b) does not provide "that an order may be rescinded or modified merely because it is no longer convenient for a party to comply with the consent order." *Democratic Nat. Committee v. Republican Nat. Committee*, 673 F.3d 192, 202 (3rd Cir. 2012).

a.    <u>Federal Rule of Civil Procedure 60(b)</u>

Under FRCP 60(b), "Relief from a Final Judgment, Order, or Proceeding" may be granted for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could
> not have been discovered in time to move for a new trial under Rule
> 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is based
> on an earlier judgment that has been reversed or vacated; or applying
> it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

F.R.C.P. 60(b). None of the reasons set forth in F.R.C.P 60(b)(1) – (4) apply. Under 60(b)(5), the

Supreme Court has determined that relief is appropriate "when the party seeking relief from an

injunction or consent decree can show 'a significant change either in factual conditions or in law.'"

*Agostini v. Felton,* 521 U.S. 203, 215, 117 S.Ct. 1997 (quoting *Rufo v. Inmates of Suffolk County Jail*, 502

U.S. 367, 384, 112 S. Ct. 748 (1992)). Port Hamilton's Motion fails to allege, let alone demonstrate, a

change in fact or law. This relegates Port Hamilton to the "any other reason that justifies relief"

standard under 60(b)(6).

        i.    <u>F.R.C.P. 60(b)(6)</u>

    While the language in 60(b)(6) "any other reason that justifies relief" may appear to provide

the Court with great leeway, the Supreme Court has held that relief under this section can only be

justified in extraordinary circumstances. *Phillip Morris,* 793 F. Supp. 2d at 170 (citing *Ackermann v.*

*United States,* 340 U.S. 193, 199–202, (1950); and *Agostini,* 521 U.S. at 239, (1997)). In *Salazar v.*

*District of Columbia,* 633 F.3d 1110, 1120 (D.C.Cir. 2011), the D.C. Circuit Court of Appeals held that

60(b)(6) "'should only be used sparingly' and may not 'be employed simply to rescue a litigant from

strategic choices that later turn out to be improvident.'" (quoting *Kramer v. Gates*, 481 F.3d 788, 792

(D.C.Cir. 2007)).

    "A court in equity cannot rely on a simple formula but must evaluate a number of potentially

competing considerations to determine whether to modify or vacate an injunction entered by

consent or otherwise." *Building and Const. Trades Council of Philadelphia and Vicinity, AFL-CIO v. N.L.R.B.*, 64 F. 3d 880, 888 (3rd Cir. 1995). After noting that "[d]ifferent considerations may have greater or lesser prominence in different cases," the 3rd Circuit determined that "equity demands a flexible response to the unique conditions of each case." *Id.* The 3rd Circuit then identified "the factors that generally should be considered in deciding whether to modify an injunction." *Id.* The factors include:

> *the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; the length of time since entry of the injunction; whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; and the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction. Central to the court's consideration will be whether the modification is sought because changed conditions unforeseen by the parties have made compliance substantially more onerous or have made the decree unworkable… On the other hand, the fact that the party is now subject to a contempt sanction for violation of the decree in addition to the statutory punishment is not generally a factor to be considered. NLRB v. General Motors, 179 F.2d 221, 222 (2d Cir.1950).*

*Id.* In assessing the factors to determine if Port Hamilton is entitled to the requested relief, the Court "must balance the hardship to the party subject to the injunction against the benefits to be obtained from maintaining the injunction." *Id.*

        ii.    <u>Port Hamilton Fails to Meet the F.R.C.P 60(b)(6) Standard</u>

Port Hamilton's alleges "undue hardship" at having to install the FGRS prior to restart. When viewed in the context of this entire case, Port Hamilton cannot demonstrate the extraordinary circumstances necessary to obtain relief under 60(b)(6).

Port Hamilton (and West Indies) made a number of strategic decisions before the sale of the Refinery closed on January 21, 2022. First, Port Hamilton (and West Indies) made a strategic decision to have the Debtor's seek the *Emergency Motion* to reopen the LBR Auction. Before the *Emergency Motion* was filed, Port Hamilton (and West Indies) knew the following:

- The existence of the original Consent Decree and its June 7, 2018 FGRS mandate,

- That LBR had invested $4.1 billion in the Refinery since 2016,
- The existence of the First Modification of the Consent Decree,
- That the First Modification was lodged on August 25, 2020,
- That Flare 8 was restarted on September 15, 2020,
- That the U.S. filed the *Motion to Enter* the First Modification in April 2021,
- That on April 13, 2021, LBR notified EPA and DPNR that the demonstration failed,
- That the deadline for installing the FGRS was March 14, 2023,
- That EPA had issued the CAA 303 Order directing the Refinery to stop operating temporarily,
- That the CAA 303 Order noted instances when $H_2S$ was combusted in Flare 8 at orders of magnitude above the 162 ppm limit set by NSPS Subpart Ja, and
- EPA's September 24, 2021 letter provided a common base of environmental information to minimize the risk of misunderstanding or surprise.

Second, during the reopened LBR Auction, Port Hamilton (and West Indies) made a strategic decision to submit the $62 million bid that was declared the winning bid.

Third, on January 21, 2022, Port Hamilton (and West Indies) made a strategic decision to close on the sale. Before closing the sale on January 21, 2022, Port Hamilton (and West Indies) learned the following:

- The United States submitted a limited objection to the Sale Order,
- That because of the Limited Objection, Paragraphs 10 and 11 were added to the Sale Order and that, *inter alia*:
    - Paragraph 10 makes clear that the obligations in the Consent Decree, as modified, were not adversely impacted by any order of the bankruptcy court,
    - Paragraph 11 requires the Purchaser to become a party to the Consent Decree as modified by the First Modification and Second Modification,
    - Paragraph 11 allows for, but does not require, amendments with mutual consent,
- The Sale Order, including Paragraphs 10 and 11, was issued by the bankruptcy court on December 21, 2021, and

- The First Modification was entered by this Court on December 30, 2021.

It is uncontroverted that Port Hamilton (and West Indies) knew full well 1) that they would be governed by the First Modification and its obligation and deadline for installing FGRS prior to restart, and 2) that the enforcement of the FGRS mandate in the First Modification would take into account the post-lodging activities occurring prior to the effective date. Port Hamilton is now looking for a loophole that will allow it to restart the Refinery without installation of the FGRS as required by the First Modification and the original Consent Decree. However, if the First Modification does not govern on the FGRS issue, then logically it would be governed by the original Consent Decree.

Port Hamilton's Motion asks the Court to grant relief because Port Hamilton's strategic decisions do not look as promising with the benefit of hindsight. Port Hamilton's basis for the request is that "it would be inappropriate and inequitable not to afford Port Hamilton the same two-year period in which to install a flare gas recovery system" (ECF 97, p.2). The reality is that to date, Port Hamilton has had more than two years, in fact it has had a total of 26 months, to install the FGRS.

The impact of granting the relief that Port Hamilton seeks would unravel a compliance obligation to protect public health and safety included in the original Consent Decree to resolve HOVENSA's pre-2011 violations of the CAA. The CAA established a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote public health and welfare and the productive capacity of its population. (Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1)). As discussed above in § II.a, the Consent Decree requires the installation of FGRS on Flare 8 as part of the resolution of Claim 4 (ECF 1, ¶ 74 – 80) of the Complaint. That requirement was modified, by the mutual agreement of the parties and approved by the Court, in the First Modification. As a result of LBR's failed demonstration and exceedance of the gas flow rate threshold as specified in

Paragraph 50B.a.i of the First Modification, the deadline for installation and operation of the FGRS was March 14, 2023. Granting Port Hamilton's request and allowing it to operate the Refinery without the installation of FGRS would result in higher emissions to the detriment of public health and welfare. Port Hamilton's Motion fails to demonstrate why public health and welfare should suffer as a result of Port Hamilton's strategic decisions.

## IV.  CONCLUSION

Port Hamilton (and West Indies) made strategic decisions to purchase a refinery, that LBR invested $4.1 billion into over a five-year period, for $62 million. Those decisions were made with the full understanding of the FGRS obligation under the Consent Decree and the First Modification, with the full understanding that LBR had triggered the requirement to install the FGRS, and the full understanding that the FGRS was required to be installed by March 14, 2023. Despite 1) taking initial steps (including hiring engineers to develop the design basis and the mechanical design for the FGRS) to comply with the FGRS obligation; 2) making representations to the United States from February 2022 through April 2023 that the FGRS design work continued; and 3) having 26 months (and counting) to design and install an FGRS, Port Hamilton's Motion argues that the company is under no obligation to install the FGRS and that requiring it to install the FGRS prior to restart would be inappropriate and inequitable. The primary purpose of the Consent Decree to protect public health and safety from excess air emissions would not be served by a delay in the requirement for installation of the FGRS. The Motion fails to demonstrate "extraordinary circumstances" necessary for relief under F.R.C.P. 60(b)(6).

For the foregoing reasons, the Court should deny Port Hamilton's Motion, and issue an Order directing Port Hamilton to comply with the First Modification by installing the FGRS prior to restart.

Respectfully submitted,

20

FOR THE UNITED STATES OF AMERICA
TODD KIM
Assistant Attorney General
Environment and Natural Resources Division


*s/ Myles E. Flint, II*
Myles E. Flint, II
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice - P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-307-1859
myles.flint@usdoj.gov


OF COUNSEL:
Teresa Dykes
Senior Attorney
U.S. Environmental Protection
Office of Enforcement and Compliance Assurance
1200 Pennsylvania Ave. NW (2242A)
Washington, DC 20460

Sara Froikin
Sara Amri
Assistant Regional Counsels
U.S. Environmental Protection Agency, Region 2
290 Broadway, 16th Floor
New York, NY 10007

## CERTIFICAT OF SERVICE

The undersigned certifies that on April 12, 2024, he filed the UNITES STATES'
OPPOSITION TO PORT HAMILTON'S MOTION TO CLARIFY THE CONSENT DECREE
electronically with the Clerk of Court using the CM/ECF system, which will send notifications of
this filing to all who have made appearances.

<u>/s/ Myles E. Flint, II</u>