IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES VIRGIN ISLANDS, | ) | Civil Action No. 1-11-cv-06 (RAM/EAH) |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| HOVENSA L.L.C., WEST INDIES PETROLEUM LIMITED, PORT HAMILTON REFINING AND TRANSPORTATION, LLLP, TRANSITION REFINERY ENTITY LLC and LIMETREE BAY TERMINALS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
<u>MOTION TO CLARIFY THE CONSENT DECREE</u>**

I, Myles E. Flint, II, declare as follows:

1.      I am a Senior Counsel with the Environmental Enforcement Section of the United States Department of Justice.

2.      Exhibit 1 to this Declaration includes true and correct copies of pages 1 – 6, 31 – 32, and signature pages from of the *December 1, 2015 Operating Agreement By and Among the Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC.*

3.      Exhibit 2 to this Declaration is a true and correct copy of the cover page for *Bill No. 31-0283 of the Thirty-First Legislature of the Virgin Islands* – an Act ratifying the Agreement titled Operating Agreement By and Among the Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC, dated December 1, 2015.

4.      Exhibit 3 to this Declaration includes a true and correct copy of *Bill No. 32-0246 of*

1

the *Thirty-Second Legislature of the Virgin Islands*, and true and correct copies of the cover page and pages i - iv of *Appendix A, the Amended and Restated Terminal Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Terminals, LLC* dated July 2, 2018, and true and correct copies of the cover page and pages 1 –6 and 26 – 27 of *Appendix B, Refinery Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Refining, LLC.* dated July 2, 2018.

5.     Exhibit 4 to this Declaration is a true and correct copy of the November 30, 2018 *Bill of Sale* between Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC.

6.     Exhibit 5 to this Declaration is a true and correct copy of an April 13, 2021 letter from Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC to multiple recipients at the U.S. EPA and the Virgin Islands DPNR.

7.     Exhibit 6 to this Declaration is a true and correct copy of the *Clean Air Act Emergency Order* the U.S. EPA issued to Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC under Section 303 of the Clean Air Act, 42 U.S.C. § 7603 on May 14, 2021.

8.     Exhibit 7 to this Declaration is a true and correct copy of EPA Region 2's September 24, 2021 letter to All Potential Buyers of Limetree Bay Refinery.

9.     Exhibit 8 to this Declaration is a true and correct copy of *Debtors' Emergency Motion to (1) Reopen Auction Pursuant to Bidding Procedures, (II) Approve Schedule and Procedures for Continued Auction, and (III) Grant Related Relief*, with excerpts from Exhibit D, Case No. 21-32351, ECF Doc. 862 and 862-4.

10.     Exhibit 9 to this Declaration is a true and correct copy of the *Notice of Designation of Winning Bid and Back-up Bid*, Case No. 21-32351, ECF Doc. 948.

11.     Exhibit 10 to this Declaration is a true and correct copy of the *Limited Objection by the United States to Sale of Assets (Related to Doc. No. 191)*, without exhibits, Case No. 21-32351, ECF Doc. 950.

12.      Exhibit 11 to this Declaration includes true and correct copies of pages 1, 20 - 22, and 37 of the *Order I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, And Interests, (II) Authorizing the Debtors to Perform Under the Asset Purchase Agreement, (III) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief*, Case No. 21-32351, ECF Doc. 977.

13.      Exhibit 12 to this Declaration is a redacted, true and correct copy of Port a February 23, 2022 letter from Port Hamilton's counsel to the United States. The letter is redacted because Port Hamilton indicated that the letter contains confidential business information.

14.      Exhibit 13 to this Declaration includes true and correct copies of Port Hamilton's Weekly Reports from February 21, May 30, June 6, and June 27, 2022, and April 24, 2023.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*s/ Myles E. Flint, II*

EXHIBIT 1

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

# OPERATING AGREEMENT

## BY AND AMONG

## THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS

## AND

## LIMETREE BAY TERMINALS, LLC

### December 1, 2015

**TABLE OF CONTENTS**

ARTICLE 1 DEFINITIONS AND CONSTRUCTION ...............................................................10

    Section 1.1.   Definitions...........................................................................................10

    Section 1.2.   Agreement Components.......................................................................19

    Section 1.3.   Agreement Interpretation....................................................................20

ARTICLE 2 TERM OF AGREEMENT..................................................................................20

    Section 2.1.   Effective Date .....................................................................................20

    Section 2.2.   Initial Term .........................................................................................21

    Section 2.3.   Extension of Term...............................................................................21

    Section 2.4.   End of Term ........................................................................................21

ARTICLE 3 CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE
          CLOSING............................................................................................21

    Section 3.1.   Time and Place of Closing..................................................................21

    Section 3.2.   Conditions to Closing. ........................................................................21

    Section 3.3.   Closing Deliveries...............................................................................23

    Section 3.4.   Termination Before Closing ................................................................24

ARTICLE 4 COMMENCEMENT OF OPERATIONS ................................................................25

    Section 4.1.   Permits ................................................................................................25

    Section 4.2.   Operations Commencement.................................................................26

ARTICLE 5 OPERATION OF THE TERMINAL; EXPANSION.................................................27

    Section 5.1.   Independent Operation and Non-Interference ....................................27

    Section 5.2.   Terminal Operations ...........................................................................28

    Section 5.3.   Expansion and Enhancement of Facilities..........................................28

ARTICLE 6 ADDITIONAL OPERATING PROVISIONS...........................................................28

2

Section 6.1.    Operation of the Fuel Loading Rack ........................................................... 28

Section 6.2.    Navigational Access ............................................................................... 29

Section 6.3.    Submerged Lands .................................................................................. 30

Section 6.4.    Refinery Obligations. .............................................................................. 31

Section 6.5.    Land And Housing Transfer. .................................................................... 33

Section 6.6.    Bitumen Tank And Storage. ..................................................................... 33

ARTICLE 7 EMPLOYMENT ............................................................................................ 33

Section 7.1.    Minimum Commitment ........................................................................... 33

Section 7.2.    Residency Requirement .......................................................................... 34

Section 7.3.    Non-Discrimination. ............................................................................... 34

Section 7.4.    Training and Continuing Education ........................................................... 34

ARTICLE 8 FINANCIAL OBLIGATIONS OF TERMINAL OPERATOR ............................... 35

Section 8.1.    Closing Payment and Related Payments ..................................................... 35

Section 8.2.    Annual Payment. ................................................................................... 35

Section 8.3.    Adjusted Variable Payment. ..................................................................... 36

Section 8.4.    Charitable Commitments. ........................................................................ 37

Section 8.5.    Financial Assurance. .............................................................................. 37

Section 8.6.    Government Carried Interest in Terminal Operator ....................................... 37

Section 8.7.    Capital Expenditures. ............................................................................. 38

ARTICLE 9 SECURITY INTEREST ................................................................................. 38

Section 9.1.    Payments Secured By Lien. ...................................................................... 38

Section 9.2.    All Necessary Actions ............................................................................. 39

Section 9.3.    No Encumbrances. .................................................................................. 39

ARTICLE 10 INSURANCE .............................................................................................. 40




Section 10.1. General Insurance ................................................................................40

Section 10.2. Additional Insurance ............................................................................40

ARTICLE 11 TAX AND FEE EXEMPTIONS ................................................................42

Section 11.1. Scope of Exemption ..............................................................................42

Section 11.2. Exemptions ...........................................................................................42

Section 11.3. Limitations on Exemption .....................................................................43

Section 11.4. Tax Return Filings ................................................................................44

Section 11.5. No Adverse Actions ..............................................................................44

ARTICLE 12 REPRESENTATIONS AND WARRANTIES ...........................................44

Section 12.1. Government Representations .................................................................44

Section 12.2. Terminal Operator Representations .......................................................45

ARTICLE 13 COVENANTS OF TERMINAL OPERATOR ...........................................46

Section 13.1. Environmental .......................................................................................46

Section 13.2. Consents and Approvals .......................................................................48

Section 13.3. Indemnification .....................................................................................48

ARTICLE 14 GOVERNMENT COVENANTS ..............................................................49

Section 14.1. Assistance with Permits ........................................................................49

Section 14.2. Consents and Approvals .......................................................................49

Section 14.3. Beneficial Use .......................................................................................49

Section 14.4. Other Legislation ..................................................................................50

Section 14.5. Change in Law ......................................................................................50

Section 14.6. Other Benefits .......................................................................................50

Section 14.7. No Additional Cost to Terminal Operator .............................................50

Section 14.8. Zoning; Legal Descriptions ...................................................................51

4




ARTICLE 15 REPORTING, AUDIT AND INSPECTION ...........................................................51

    Section 15.1.  Reporting............................................................................................................51

    Section 15.2.  Annual Audit......................................................................................................51

    Section 15.3.  Inspection...........................................................................................................52

ARTICLE 16 DEFAULT AND TERMINATION .......................................................................52

    Section 16.1.  Payment Default.................................................................................................52

    Section 16.2.  Operating Default; Liquidated Damages. ..........................................................53

    Section 16.3.  Termination........................................................................................................53

    Section 16.4.  Rights and Remedies Cumulative .....................................................................54

ARTICLE 17 CONFIDENTIALITY ...........................................................................................54

    Section 17.1.  Confidentiality ...................................................................................................54

ARTICLE 18 FORCE MAJEURE ..............................................................................................56

    Section 18.1.  Force Majeure Events ........................................................................................56

    Section 18.2.  Burden of Proof..................................................................................................56

    Section 18.3.  Excused Performance.........................................................................................56

    Section 18.4.  Applicability .......................................................................................................57

ARTICLE 19 MISCELLANEOUS ..............................................................................................57

    Section 19.1.  Notices, Requests and Communications............................................................57

    Section 19.2.  Assignment. .......................................................................................................59

    Section 19.3.  Governing Law ...................................................................................................60

    Section 19.4.  Dispute Resolution.............................................................................................61

    Section 19.5.  Commercial Act. ................................................................................................61

    Section 19.6.  Limitation on Liability.......................................................................................62

    Section 19.7.  Entire Agreement; Subsequent Amendments ....................................................62

Section 19.8.   Severability of Provisions ........................................................................62

Section 19.9.   Payment Terms and Interest Calculation ...................................................62

Section 19.10. Public Announcements .............................................................................63

Section 19.11. Parties in Interest.....................................................................................63

Section 19.12. Waiver.....................................................................................................63

Section 19.13. Performance Extended to Next Business Day ...........................................63

Section 19.14. Negotiation and Preparation Costs............................................................63

Section 19.15. Further Assurances...................................................................................63

Section 19.16. Counterparts.............................................................................................64

(3)    at Closing, the Government agrees that HOVIC and HOVENSA shall be released from their obligations, and shall release the Government from any obligations of the Government, under the 1976 Contract as regards the Submerged Lands;

(4)    at Closing, Terminal Operator shall be substituted for HOVIC and HOVENSA, and HOVIC shall be released, and shall release the Government, under the 1998 Letter Agreement as regards the Submerged Lands;

(5)    as regards the Submerged Lands, the Submerged Land Lease as of Closing shall be extended through October 16, 2036,  and the Government shall allow Terminal Operator to continue to use Submerged Lands Permit No. 3, Submerged Lands Permit No. 23, Submerged Lands Permit No. 52, and Submerged Lands Permit No. 167, for an aggregate rental payment of one hundred fifty thousand Dollars ($150,000) annually which payment shall, beginning in the third (3rd) year after Closing, be annually adjusted for inflation on the basis of the percentage change in the Consumer Price Index every three (3) years; and

(6)    as regards the Submerged Lands, Terminal Operator shall have the right to extend the term of the Submerged Land Lease for additional terms co-terminous with this Agreement.

(B)    For the avoidance of doubt, except as otherwise contemplated by this Agreement, the Parties acknowledge that the releases effected by Section 6.3(A) are not intended to release HOVENSA or HOVIC from any environmental contamination of the property previously covered by the Submerged Land Lease and the permits set forth in Section 6.3(A) that occurred before the Closing Date, whether now known or hereafter discovered, and that Terminal Operator is not required to assume any of such unreleased obligations of HOVENSA or HOVIC or to assume liability for property previously covered by the Submerged Land Lease and the permits set forth in Section 6.3(A) not identified as the Terminal Site or the Refinery Site in Appendix A.

(C)    Notwithstanding the provisions of Section 6.3(A) above, the term of the Submerged Land Lease and the use rights granted to Terminal Operator, including those granted under Permit No. 3, Permit No. 23, Permit No. 52, and Permit No. 167, to use or occupy any Submerged Lands or other lands shall not extend beyond the Term of this Agreement.

Section 6.4.    **Refinery Obligations**.  Following the Effective Date, Terminal Operator shall undertake the following with respect to the Refinery and such other parts of the Oil Refinery and Related Facilities as are not necessary for the operation of the Terminal:

(A)    **Refinery Evaluation Period**.  For a period of not less than eighteen (18) months following the Effective Date (the "*Refinery Evaluation Period*"), Terminal Operator shall evaluate the prospects of a Refinery Restart, and shall take all commercially reasonable measures to facilitate such Refinery Restart.  In no event shall the Refinery Evaluation Period exceed three (3) years following the Effective Date.  If Terminal Operator would be subject to

31




material liability under the Clean Air Act Consent Decree notwithstanding Terminal Operator and the Government's efforts pursuant to Section 4.2(A), the Refinery Evaluation Period shall, at the option of Terminal Operator, be terminated for all or a subset of the Refinery prior to the end of such eighteen-month period within ten (10) days of a written notice by Terminal Operator of termination of such Refinery Evaluation Period, to minimize any such liability.

(B)   **Refinery Deconstruction**. If, by the end of the Refinery Evaluation Period, no Refinery Restart has occurred or is planned to occur, Terminal Operator shall, within three (3) years of the end of such period, upon the Government's request in writing to so deconstruct, (or at such earlier date as Terminal Operator may choose in the event that Terminal Operator would be liable for any fines, penalties or sanctions under the Clean Air Act Consent Decree), undertake and complete the deconstruction of such parts of the above-grade Oil Refinery and Related Facilities as Terminal Operator determines, acting reasonably, are unutilized and not necessary for the operation of the Terminal (the "*Refinery Deconstruction*"), subject to the following:

(1)   The Refinery Deconstruction shall be developed and implemented by Terminal Operator and shall include decommissioning and dismantling the Refinery using commercially reasonable precautions for the protection of human health or the environment (including, but not limited to, all precautions required by Applicable Law) and in each case consistent with continued industrial use of the Refinery Site, including any remaining above-grade structures, fixtures, equipment, and machinery comprised by the Refinery, and removing such above-grade structures, fixtures, equipment, and machinery from the Site, except for (i) any portions of the Refinery necessary to the Terminal, and (ii) subject to Applicable Law, any portions of the Oil Refinery and Related Facilities identified in writing by the Government on a schedule to be provided to Terminal Operator by the Government not less than sixty (60) days after the end of the Refinery Evaluation Period.

(2)   The Refinery Deconstruction shall be conducted at Terminal Operator's sole expense. To the extent the Refinery Deconstruction results in proceeds from the sale of structures, fixtures, equipment, or machinery, Terminal Operator shall retain the first five million Dollars ($5,000,000) of net proceeds, and shall pay promptly to the Government 50% of any net proceeds in excess of five million Dollars ($5,000,000).

(3)   Terminal Operator will assume no liability for the remediation of any environmental contamination that (a) occurred prior to the Closing Date or (b) is discovered in connection with the Refinery Deconstruction.

(C)   **Purchase Option.** Following Refinery Deconstruction, to the extent Terminal Operator does not own any portion of the real property on which the Refinery Deconstruction occurred, the Government acknowledges that Terminal Operator or an Affiliate thereof shall have an option to purchase from HOVENSA (or the successor in interest thereto) all or a portion of such property for the purpose of expanding the Terminal, conducting refining or other processing operations, or other related commercial endeavors. The exercise price of such option to purchase shall be one Dollar ($1) per acre.

32



IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

GOVERNMENT OF THE U.S. VIRGIN ISLANDS

By: _____

Name: Kenneth E. Mapp
Title:    Governor of the U.S. Virgin Islands

ATTESTED:

By: _____

Name: Osbert E. Potter
Title:  Lieutenant Governor of the U.S. Virgin Islands

Approved for Legal Sufficiency:

By: _____

Name: Claude Walker
Title:  Attorney General of the U.S. Virgin Islands

**LIMETREE BAY TERMINALS, LLC**

Witnesses:

By:

Name: John F Erhard

Title: Manager

2

EXHIBIT 2

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

# BILL NO. 31-0283

# THIRTY-FIRST LEGISLATURE OF THE VIRGIN ISLANDS

## Regular Session

## 2015

An Act ratifying the Agreement titled Operating Agreement By and Among The Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC, dated December 1, 2015

---0---

*Be it enacted by the Legislature of the Virgin Islands:*

  **SECTION 1**.  The Legislature of the Virgin Islands ratifies and approves the agreement titled Operating Agreement By and Among The Government of The Virgin Islands and Limetree Bay Terminals, LLC, dated December 1, 2015, attached as Appendix and made a part of this Act.

  Thus passed by the Legislature of the Virgin Islands on December 29, 2015.

  Witness our Hands and Seal of the Legislature of the Virgin Islands this 30Th Day of December, AD, 2015.

Neville James
President

Myron D. Jackson
Legislative Secretary

EXHIBIT 3

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

# ACT NO. 8072

## BILL NO. 32-0246

## THIRTY-SECOND LEGISLATURE OF THE VIRGIN ISLANDS

## Special Session

## 2018

An Act ratifying the agreement known as the Amended and Restated Terminal Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Terminals, LLC and the agreement known as the Refinery Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Refining, LLC, in each case dated July 2, 2018

---0---

*Be it enacted by the Legislature of the Virgin Islands:*

**SECTION 1.**  The Legislature of the Virgin Islands ratifies the agreement titled "Amended and Restated Terminal Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Terminals, LLC," dated July 2, 2018, attached as Appendix A and made a part of this act.

**SECTION 2.**  The Legislature of the Virgin Islands ratifies the agreement titled "Refinery Operating Agreement by and among the Government of the Virgin Islands and Limetree Bay Refining, LLC," dated July 2, 2018, attached as Appendix B and made a part of this act.

Thus passed by the Legislature of the Virgin Islands on July 26, 2018.

2

Witness our Hands and Seal of the Legislature of the Virgin Islands this 27th Day of July, A.D., 2018.



Myron D. Jackson
President

Jean A. Forde
Legislative Secretary



**Bill No. 32-0246 is hereby approved.**

**Witness my hand and the seal of the Government of the United States Virgin Islands at Charlotte Amalie, St. Thomas, this 30th day of July, 2018 A.D.**

**Kenneth E. Mapp**
**Governor**

# APPENDIX A

**Amended and Restated Terminal Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Terminals, LLC**

*Execution Copy*

AMENDED AND RESTATED TERMINAL OPERATING AGREEMENT

BY AND AMONG

THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS

AND

LIMETREE BAY TERMINALS, LLC

July 2, 2018

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND CONSTRUCTION ........................................................... 4

    Section 1.1.    Definitions ................................................................................ 4
    Section 1.2.    Agreement Components ......................................................... 15
    Section 1.3.    Agreement Interpretation ...................................................... 16

ARTICLE 2 TERM OF AGREEMENT ............................................................................. 16

    Section 2.1.    Effective Date ........................................................................ 16
    Section 2.2.    Initial Term ............................................................................ 16
    Section 2.3.    Extension of Term ................................................................. 16
    Section 2.4.    End of Term ........................................................................... 17

ARTICLE 3 CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE
CLOSING ................................................................................................................. 17

    Section 3.1.    Time and Place of Closing .................................................... 17
    Section 3.2.    Conditions to Closing ........................................................... 17
    Section 3.3.    Closing Deliveries ................................................................. 18
    Section 3.4.    Termination Before Closing .................................................. 19

ARTICLE 4 COMMENCEMENT OF OPERATIONS ....................................................... 20

    Section 4.1.    Permits .................................................................................. 20
    Section 4.2.    Operations Commencement ................................................... 21

ARTICLE 5 OPERATION OF THE TERMINAL; EXPANSION ...................................... 22

    Section 5.1.    Independent Operation and Non-Interference ...................... 22
    Section 5.2.    Terminal Operations ............................................................. 22
    Section 5.3.    Expansion and Enhancement of Facilities ............................ 23

ARTICLE 6 ADDITIONAL OPERATING PROVISIONS ................................................. 23

    Section 6.1.    Operation of the Fuel Loading Rack ..................................... 23
    Section 6.2.    Navigational Access .............................................................. 24
    Section 6.3.    Submerged Lands .................................................................. 25
    Section 6.4.    Certain Obligations ............................................................... 27
    Section 6.5.    Land And Housing Transfer .................................................. 27
    Section 6.6.    Bitumen Tank And Storage ................................................... 28

ARTICLE 7 EMPLOYMENT ......................................................................................... 28

    Section 7.1.    Minimum Commitment ......................................................... 28
    Section 7.2.    Residency Requirement ......................................................... 29
    Section 7.3.    Non-Discrimination .............................................................. 29
    Section 7.4.    Training and Continuing Education ....................................... 29

ARTICLE 8 FINANCIAL OBLIGATIONS OF TERMINAL OPERATOR ....................... 29

Section 8.1.    Closing Payments and Related Payments ........................................... 29
Section 8.2.    Annual Payment ...................................................................................... 30
Section 8.3.    Adjusted Variable Payment .................................................................... 31
Section 8.4.    Charitable Commitments......................................................................... 31
Section 8.5.    Financial Assurance ................................................................................ 31
Section 8.6.    Government Carried Interest in Terminal Operator................................ 32
Section 8.7.    Capital Expenditures............................................................................... 33

ARTICLE 9 SECURITY INTEREST ........................................................................... 33

Section 9.1.    Payments Secured By Lien..................................................................... 33
Section 9.2.    All Necessary Actions ............................................................................ 34
Section 9.3.    No Encumbrances.................................................................................... 35

ARTICLE 10 INSURANCE ........................................................................................... 35

Section 10.1.    General Insurance .................................................................................. 35
Section 10.2.    Additional Insurance ............................................................................. 35

ARTICLE 11 TAX AND FEE EXEMPTIONS .............................................................. 37

Section 11.1    Scope of Exemption ............................................................................... 37
Section 11.2.    Exemptions ............................................................................................ 37
Section 11.3.    Limitations on Exemption ..................................................................... 39
Section 11.4.    Tax Return Filings ................................................................................. 40
Section 11.5.    No Adverse Actions ............................................................................... 40

ARTICLE 12 REPRESENTATIONS AND WARRANTIES......................................... 40

Section 12.1.    Government Representations.................................................................. 40
Section 12.2.    Terminal Operator Representations ....................................................... 41

ARTICLE 13 COVENANTS OF TERMINAL OPERATOR......................................... 42

Section 13.1    Environmental ......................................................................................... 42
Section 13.2    Consents and Approvals ......................................................................... 44
Section 13.3.    Indemnification ..................................................................................... 44
Section 13.4.    Intercompany Agreements ..................................................................... 45

ARTICLE 14 GOVERNMENT COVENANTS ............................................................. 45

Section 14.1    Assistance with Permits .......................................................................... 45
Section 14.2.    Consents and Approvals ........................................................................ 46
Section 14.3.    Beneficial Use ....................................................................................... 46
Section 14.4.    Other Legislation ................................................................................... 46
Section 14.5.    Change in Law........................................................................................ 47
Section 14.6.    Other Benefits........................................................................................ 47
Section 14.7.    No Additional Cost to Terminal Operator.............................................. 47
Section 14.8.    Zoning; Legal Descriptions ................................................................... 47
Section 14.9.    Sale/Lease of Certain Real Estate .......................................................... 48
Section 14.10.    Security ................................................................................................ 48

ARTICLE 15 REPORTING, AUDIT AND INSPECTION ................................................... 48

    Section 15.1.   Reporting ................................................................................... 48
    Section 15.2.   Annual Audit .............................................................................. 49
    Section 15.3.   Inspection .................................................................................. 49

ARTICLE 16 DEFAULT AND TERMINATION ........................................................... 50

    Section 16.1.   Payment Default ........................................................................ 50
    Section 16.2.   Operating Default; Liquidated Damages ...................................... 50
    Section 16.3.   Termination ................................................................................ 50
    Section 16.4.   Rights and Remedies Cumulative ................................................ 52

ARTICLE 17 CONFIDENTIALITY ............................................................................ 52

    Section 17.1.   Confidentiality ........................................................................... 52

ARTICLE 18 FORCE MAJEURE ............................................................................... 53

    Section 18.1.   Force Majeure Events ................................................................ 53
    Section 18.2.   Burden of Proof ......................................................................... 53
    Section 18.3.   Excused Performance ................................................................. 54
    Section 18.4.   Applicability .............................................................................. 54

ARTICLE 19 MISCELLANEOUS .............................................................................. 54

    Section 19.1.   Notices, Requests and Communications ...................................... 54
    Section 19.2.   Assignment ................................................................................ 56
    Section 19.3.   Governing Law .......................................................................... 57
    Section 19.4.   Dispute Resolution ..................................................................... 57
    Section 19.5.   Commercial Act ......................................................................... 58
    Section 19.6.   Limitation on Liability ............................................................... 59
    Section 19.7.   Entire Agreement; Subsequent Amendments ............................... 59
    Section 19.8.   Severability of Provisions .......................................................... 59
    Section 19.9.   Payment Terms and Interest Calculation ..................................... 59
    Section 19.10.  Public Announcements ............................................................... 59
    Section 19.11.  Parties in Interest ....................................................................... 60
    Section 19.12.  Waiver ....................................................................................... 60
    Section 19.13.  Performance Extended to Next Business Day ............................... 60
    Section 19.14.  Negotiation and Preparation Costs ............................................. 60
    Section 19.15.  Further Assurances ..................................................................... 60
    Section 19.16.  Counterparts .............................................................................. 60
    Section 19.17.  Amendment and Restatement ...................................................... 60

_____/_____

# APPENDIX B

**Refinery Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Refining, LLC**

*Execution Copy*

# REFINERY OPERATING AGREEMENT

## BY AND AMONG

## THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS

## AND

## LIMETREE BAY REFINING, LLC

July 2, 2018

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND CONSTRUCTION ................................................. 9

    Section 1.1.    Definitions ......................................................................................... 9

    Section 1.2.    Agreement Components ................................................................... 21

    Section 1.3.    Agreement Interpretation ............................................................... 21

ARTICLE 2 TERM OF AGREEMENT ..................................................................... 22

    Section 2.1.    Effective Date .................................................................................. 22

    Section 2.2.    Initial Term ...................................................................................... 22

    Section 2.3.    Extension of Term ........................................................................... 22

    Section 2.4.    End of Term ..................................................................................... 22

ARTICLE  3  CLOSING;  CLOSING  CONDITIONS;  TERMINATION  BEFORE
    CLOSING ............................................................................................................. 22

    Section 3.1.    Time and Place of Closing .............................................................. 22

    Section 3.2.    Conditions to Closing ..................................................................... 23

    Section 3.3.    Closing Deliveries .......................................................................... 24

    Section 3.4.    Termination Before Closing ........................................................... 25

ARTICLE 4 REFINERY PERMITS ........................................................................... 26

    Section 4.1.    Permits ............................................................................................. 26

ARTICLE 5 OPERATION OF THE REFINERY ....................................................... 28

    Section 5.1.    Independent Operation and Non-Interference ............................... 28

    Section 5.2.    Refinery Operations ........................................................................ 29

ARTICLE 6 ADDITIONAL OPERATING PROVISIONS ........................................ 29

    Section 6.1.    [RESERVED] ................................................................................... 29

Section 6.2.    [RESERVED] ............................................................... 29

Section 6.3.    Submerged Lands ....................................................... 29

Section 6.4.    Refinery Obligations ................................................ 31

ARTICLE 7 EMPLOYMENT ...................................................................... 33

Section 7.1.    Minimum Commitment ............................................... 33

Section 7.2.    Resident Employment ............................................... 34

Section 7.3.    Hiring Preferences ................................................... 34

Section 7.4.    Non-Discrimination ................................................... 34

Section 7.5.    Training and Continuing Education ....................... 35

ARTICLE 8 FINANCIAL OBLIGATIONS OF REFINERY OPERATOR ............... 35

Section 8.1.    Closing Payment and Related Payments. .............. 35

Section 8.2.    Quarterly Refinery Payment ................................... 35

Section 8.3.    Payment Recalibration ............................................ 39

Section 8.4.    Charitable Commitments .......................................... 40

Section 8.5.    Financial Assurance ................................................ 40

Section 8.6.    Government Carried Interest in Refinery Operator ............... 40

Section 8.7.    Fuel Oil Pricing ....................................................... 41

ARTICLE 9 SECURITY INTEREST ......................................................... 41

Section 9.1.    Payments Secured By Lien ..................................... 41

Section 9.2.    All Necessary Actions ............................................ 43

Section 9.3.    No Encumbrances ..................................................... 43

ARTICLE 10 INSURANCE ...................................................................... 43

Section 10.1.   General Insurance ................................................... 43

Section 10.2.   Insurance Requirements ......................................... 44

3

ARTICLE 11 TAX AND FEE EXEMPTIONS ......................................................... 46

    Section 11.1.  Scope of Exemption ............................................................... 46

    Section 11.2.  Exemptions .......................................................................... 46

    Section 11.3.  Limitations on Exemption ..................................................... 48

    Section 11.4.  Tax Return Filings ............................................................... 48

    Section 11.5.  No Adverse Actions .............................................................. 48

ARTICLE 12 REPRESENTATIONS AND WARRANTIES ....................................... 49

    Section 12.1.  Government Representations ................................................... 49

    Section 12.2.  Refinery Operator Representations .......................................... 50

ARTICLE 13 COVENANTS OF REFINERY OPERATOR ....................................... 51

    Section 13.1.  Environmental ...................................................................... 51

    Section 13.2.  Consents and Approvals ........................................................ 53

    Section 13.3.  Indemnification .................................................................... 53

    Section 13.4.  Intercompany Agreements ..................................................... 54

ARTICLE 14 GOVERNMENT COVENANTS ...................................................... 54

    Section 14.1.  Assistance with Permits ......................................................... 54

    Section 14.2.  Consents and Approvals ........................................................ 55

    Section 14.3.  Beneficial Use ...................................................................... 55

    Section 14.4.  Other Legislation .................................................................. 56

    Section 14.5.  Change in Law ...................................................................... 56

    Section 14.6.  Other Benefits ...................................................................... 56

    Section 14.7.  No Additional Cost to Refinery Operator ................................. 57

    Section 14.8.  Zoning; Legal Descriptions .................................................... 57

    Section 14.9.  Security ............................................................................... 57

ARTICLE 15 REPORTING, AUDIT AND INSPECTION ........................................................ 58

    Section 15.1.  Reporting ............................................................................... 58

    Section 15.2.  Annual Audit ........................................................................ 58

    Section 15.3.  Inspection ............................................................................. 58

ARTICLE 16 DEFAULT AND TERMINATION ................................................................... 59

    Section 16.1.  Payment Default ................................................................... 59

    Section 16.2.  RESERVED .......................................................................... 59

    Section 16.3.  Termination .......................................................................... 59

    Section 16.4.  Rights and Remedies Cumulative .......................................... 61

ARTICLE 17 CONFIDENTIALITY ..................................................................................... 61

    Section 17.1.  Confidentiality ..................................................................... 61

ARTICLE 18 FORCE MAJEURE ........................................................................................ 62

    Section 18.1.  Force Majeure Events ........................................................... 62

    Section 18.2.  Burden of Proof ................................................................... 63

    Section 18.3.  Excused Performance ........................................................... 63

    Section 18.4.  Applicability ........................................................................ 64

ARTICLE 19 MISCELLANEOUS ........................................................................................ 64

    Section 19.1.  Notices, Requests and Communications ................................. 64

    Section 19.2.  Assignment .......................................................................... 65

    Section 19.3.  Governing Law ..................................................................... 67

    Section 19.4.  Dispute Resolution ............................................................... 67

    Section 19.5.  Commercial Act .................................................................... 68

    Section 19.6.  Limitation on Liability ......................................................... 68

    Section 19.7.  Entire Agreement; Subsequent Amendments ......................... 69

Section 19.8.  Severability of Provisions.................................................................. 69

Section 19.9.  Payment Terms and Interest Calculation................................................. 69

Section 19.10. Public Announcements...................................................................... 69

Section 19.11. Parties in Interest............................................................................ 69

Section 19.12. Waiver ........................................................................................ 70

Section 19.13. Performance Extended to Next Business Day ........................................... 70

Section 19.14. Negotiation and Preparation Costs........................................................ 70

Section 19.15. Further Assurances.......................................................................... 70

Section 19.16. Counterparts................................................................................. 70

(2)    By Refinery Operator, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of the Government contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) the other party shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing; or

(3)    By the Government, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of Refinery Operator contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) Refinery Operator shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing.

(B)    **Effect of Termination.**  If (i) this Agreement is terminated pursuant to Section 3.4(A) or (ii) the Closing does not occur by the date provided in the proviso of Section 3.1(A), this Agreement shall become void and of no further force or effect, and the Original Terminal Operating Agreement shall remain in full force and effect unless otherwise terminated in accordance with its terms.

## ARTICLE 4
## REFINERY PERMITS

Section 4.1.    **Permits**.

(A)    Refinery Operator shall use commercially reasonable efforts to (i) obtain all current federal, territorial, and local Authorizations that are currently held by or issued to Terminal Operator, and any necessary modification(s) thereof, including but not limited to those under Environmental Laws, required to restart and maintain Refinery Operations as contemplated by the Agreement as soon as commercially reasonable and (ii) thereafter maintain such Authorizations.  Refinery Operator shall use commercially reasonable efforts to obtain and maintain any other federal, territorial, and local Authorizations, and any necessary modification(s) thereof, including but not limited to those under Environmental Laws, in each case which, as of any date of determination, are necessary to be obtained by or on behalf of Refinery Operator at such time in light of the then current stage of development, construction

and/or operation of the Refinery to enable restart and maintain Refinery Operations in accordance with this Agreement as soon as commercially reasonable. The Government shall use commercially reasonable efforts to assist Refinery Operator in obtaining all such Authorizations. Notwithstanding the foregoing, the Parties shall cooperate with each other and use commercially reasonable efforts to support, and shall not interfere with or delay, any effort by the other Party or any other party to obtain and maintain all necessary federal, territorial, and local Authorizations, and necessary modification(s) thereof, including but not limited to those under Environmental Laws, to enable the Refinery Restart as soon as commercially reasonable.

(B)     Refinery Operator shall use commercially reasonable efforts to obtain and maintain all necessary approvals in order to restart Refinery Operations as soon as commercially reasonable, including approvals from the U.S. Department of Justice (**"USDOJ"**), the U.S. Environmental Protection Agency (**"EPA"**), the U.S. Virgin Islands Department of Planning and Natural Resources (**"DPNR"**), and the District Court for the District of the U.S. Virgin Islands (**"District Court"**) to, among other things, add Refinery Operator as a named party defendant to the Clean Air Act Consent Decree and modify the Clean Air Act Consent Decree to restart Refinery Operations. Such efforts with regard to the Consent Decree shall include, but not be limited to, (i) working with the Government (and, if applicable, third parties) and negotiating with USDOJ, EPA, and DPNR the terms and conditions of one or more filings to add Refinery Operator as a named party defendant to the Clean Air Act Consent Decree and to so modify the Clean Air Act Consent Decree (and any proposed order(s) modifying the Clean Air Act Consent Decree), (ii) cooperating with USDOJ, EPA, and DPNR and taking such actions necessary to finalize and lodge with the District Court such filings and proposed orders, (iii) cooperating with and assisting as reasonably necessary USDOJ, EPA, and DPNR in responding to any public comments, and (iv) filing of any papers, provision of testimony, participating in any public meetings or hearings or court proceedings, or taking other actions reasonably necessary to support and seek District Court approval and entry of such modification. To the extent the Government is not directly involved in any aspect of Refinery Operator's efforts pursuant to this Section 4.1(B), Refinery Operator shall timely inform the Government of the status and outcome of such efforts.

(C)     Notwithstanding any other provision in this Agreement, the Government hereby acknowledges and agrees that Refinery Operator may surrender all or part of existing permits under the Clean Air Act for the Refinery in order to achieve (i) compliance with the Clean Air Act Consent Decree, provided that Refinery Operator shall use commercially reasonable efforts to achieve compliance that do not require surrender of the permit or part thereof or (ii) to the extent done in conjunction with the permanent shut down of the portions of the Refinery for which such permits or parts thereof are surrendered.

(D)     The Government shall cooperate with and assist Refinery Operator and Terminal Operator (if added as a party to the Clean Air Act Consent Decree) with respect to a modification to the Clean Air Act Consent Decree to toll or exempt Refinery Operator and Terminal Operator from fines, penalties and liabilities thereunder prior to the Closing or that

27

EXHIBIT 4

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

*Execution Version*

## BILL OF SALE

**This BILL OF SALE** (this "Bill of Sale") is made as of November 30, 2018, by and between Limetree Bay Terminals, LLC ("Seller") and Limetree Bay Refining, LLC ("Buyer").

**WHEREAS**, Seller has agreed to sell, convey, transfer, assign and deliver to Buyer all of the Purchased Assets (as defined below), and Buyer has agreed to purchase the Purchased Assets from Seller.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, it is hereby agreed that:

1.       Definitions.  When used in this Bill of Sale, the following terms shall have the respective meanings specified therefor below:

"Contract" shall mean any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement, contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

"Lien" shall mean any liens, debts, security interests, claims, easements, mortgages, charges, indentures, deeds of trust, rights of way, encroachments, or any other encumbrances and other restrictions or limitations on ownership or use of real or personal property or irregularities in title thereto.

"Material Adverse Effect" shall mean any action, omission, state of facts, condition, occurrence, result, circumstance, event, effect, development or change that, individually or in the aggregate, (a) has had or would reasonably be expected to have a material adverse effect on the condition of the Purchased Assets, taken as a whole or (b) prevents or materially delays, or would reasonably be expected to prevent or materially delay, the consummation of the Transactions.

"Permitted Lien" shall mean (a) statutory Liens or other Liens arising in the ordinary course of business of Seller (including by operation of law) securing payments not yet due, including mechanics', carriers', workmen's, repairmen's, materialmens' and maritime Liens, (b) Liens with respect to (i) zoning, building code or planning restrictions or regulations, servitudes, permits, licenses, surface leases, ground leases to utilities, municipal agreements, railway siding agreements and other similar rights, easements for streets, alleys, highways, telephone lines, gas pipelines, power lines and railways, and other easements and rights of way of public record on, over, or in respect of any such real property and (ii) encroachments and other matters that would be shown in an accurate survey or physical inspection of such real property, and (c) Liens arising pursuant to any permit.

"Purchased Assets" shall mean the Refinery Site (as defined in the Refinery Operating Agreement) and the Refinery (as defined in the Refinery Operating Agreement) (including the undivided interests in Shared Services Systems (as defined in the Refinery Operating Agreement)).

"Refinery Operating Agreement" shall mean that certain Refinery Operating Agreement, dated July 2, 2018, by and among the Government of the U.S. Virgin Islands and Limetree Bay Refining, LLC.

"Shared Services Systems Agreement" shall mean that certain Shared Services Systems Agreement, dated on or around the date hereof, by and between Seller and Buyer.

"Terminal Operating Agreement" shall mean shall mean that certain Amended and Restated Terminal Operating Agreement, dated July 2, 2018, by and among the Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC.

2.    Effectiveness.  The terms of this Bill of Sale shall become effective immediately when this Bill of Sale has been executed and delivered by each of Buyer and Seller on the date hereof (the "Effective Time").

3.    Transfer of Assets.  Effective as of the Effective Time, in consideration of One Dollar ($1.00), the receipt and sufficiency of which is hereby acknowledged, Seller hereby sells, conveys, transfers, assigns and delivers to Buyer all of Seller's right, title and interest in, to and under the Purchased Assets, and Buyer hereby purchases such Purchased Assets and accepts such conveyance, transfer, assignment and delivery.

4.    Representations and Warranties of Seller.  Seller hereby represents and warrants to Buyer, as of the date hereof and as of the Effective Time, as follows:

(a) Existence and Power.  Seller (a) is a limited liability company, duly organized, validly existing and in good standing under the laws of the U.S. Virgin Islands, (b) is duly qualified under the laws of, or is licensed to do business as a foreign company or a limited liability company in good standing in, each jurisdiction in which such qualification or license is required to own, lease or license the Purchased Assets, except where the failure to so qualify would not have a Material Adverse Effect and (c) has all necessary limited liability company power and authority required to own, lease or license (as applicable) the Purchased Assets.

(b) Authorization; Binding Effect.  The execution and delivery by Seller of this Bill of Sale has been duly authorized by all necessary action on the part of Seller.  No other proceedings on the part of Seller is necessary to approve the consummation of the transactions contemplated by this Bill of Sale (the "Transactions").  This Bill of Sale is a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

(c) Contravention.  Neither the execution, delivery and performance of this Bill of Sale, nor the consummation of the Transactions will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of Seller's organizational documents, (b) conflict with, violate or breach any law by which Seller, or any of the Purchased Assets may be bound or affected, (c) result in or require the creation or imposition

2

of any Lien (other than Permitted Liens) on any of the Purchased Assets or (d) conflict with, breach or result in a default under, any material Contract to which Seller is a party or by which it or any of the Purchased Assets, may be bound or affected, except in the case of this clause (d) as would not have a Material Adverse Effect.

(d) <u>Title to Purchased Assets</u>.  Except for Permitted Liens, Seller has good and marketable title to, or in the case of property held under lease, a valid and enforceable right to use, all of the Purchased Assets.

5.      <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller, as of the date hereof and as of the Effective Time, as follows:

(a) <u>Existence and Power</u>.  Buyer (a) is a limited liability company, duly organized, validly existing and in good standing under the laws of the U.S. Virgin Islands, and (b) has all necessary corporate power to execute and deliver this Bill of Sale and to consummate the Transactions.

(b) <u>Authorization; Binding Effect</u>.  The execution and delivery by Buyer of this Bill of Sale has been duly authorized by all necessary action on the part of Buyer.  This Bill of Sale is a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

(c) <u>Contravention</u>.  Neither the execution, delivery and performance of this Bill of Sale, nor the consummation of the Transactions will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of Buyer's organizational documents, (b) conflict with, violate or breach any Law by which Buyer, or any of or any of its assets or properties may be bound or affected or (c) conflict with, breach or result in a default under, any material Contract to which it is a party or by which Buyer or any of its assets or properties, may be bound or affected.

6.      <u>Successors and Assigns</u>.  No assignment of this Bill of Sale or of any rights or obligations hereunder may be made by Seller or Buyer, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other party hereto and any attempted assignment without the required consents shall be null and void and without any legal effect.  This Bill of Sale shall be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns.

7.      <u>Further Assurances</u>.  Subject to the terms and conditions herein provided, following the Effective Time, Seller shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, and take such additional actions as Buyer may reasonably request to vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets.

8.      <u>Transition Assistance</u>.  Notwithstanding anything herein to the contrary, from the Effective Time until the third (3rd) anniversary of the Closing Date, Seller hereby agrees that it will, at Buyer's expense, use commercially reasonable efforts, consistent with the Shared Services Systems Agreement, to (a) cooperate with Buyer to cause a smooth transition of the ownership and operation of the Purchased Assets from the Seller to Buyer and (b) maintain and monitor on a periodic basis existing telephone numbers, voicemail and email addresses and shall respond promptly with respect to any information requested.

9.      <u>Counterparts</u>.  This Bill of Sale may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.     <u>Amendments; Waiver</u>.  This Bill of Sale may be amended, supplemented or modified in whole or in part if, but only if, such amendment, supplement or modification is in writing and is signed by each party and specific reference to this Bill of Sale is made.  Any provision of this Bill of Sale may be waived if, but only if, such waiver is in writing and is signed by the party or parties against whom enforcement of any such waiver is sought and specific reference to this Bill of Sale is made.  The waiver by any party hereto of a breach of any provision of this Bill of Sale shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.     <u>Severability</u>.  If any provision of this Bill of Sale is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Bill of Sale shall remain in full force and effect.  The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Bill of Sale, they shall take any actions necessary to render the remaining provisions of this Bill of Sale valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Bill of Sale to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties to the greatest extent legally permissible.

12.     <u>Interpretation</u>.  As used in this Bill of Sale, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Bill of Sale (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Bill of Sale will refer to this Bill of Sale as a whole and not to any particular provision of this Bill of Sale and (b) article, section, subsection, schedule and exhibit references are references with respect to this Bill of Sale unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation."  The headings in this Bill of Sale are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Bill of Sale.

13.    <u>No Third-Party Rights</u>.    This Bill of Sale is not intended, and will not be construed, to create any rights in any parties other than the parties hereto, and no person may assert any rights as third-party beneficiary hereunder.

14.    <u>Enforcement</u>.    The parties hereby acknowledge and agree that the provisions of this Bill of Sale are of a special and unique nature, the loss of which cannot be accurately compensated for in damages by an action at law, and that the breach or threatened breach of the provisions of this Bill of Sale would cause Buyer, on the one hand, or Seller on the other hand, as the case may be, irreparable harm and that money damages would not be an adequate remedy for any breach or threatened breach of the provisions of this Bill of Sale by Seller, on the one hand, or Buyer, on the other hand, as the case may be.  Therefore, the parties hereto agree that Buyer, on the one hand, or Seller, on the other hand, as the case may be, shall be entitled to equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond or other security or any similar requirement or proving actual damages) to prevent breaches or threatened breaches of this Bill of Sale and to specifically enforce the terms and provisions of this Bill of Sale, this being in addition to any other remedy to which Buyer or Seller, as the case may be, are or may be entitled at law or in equity under this Bill of Sale.

15.    <u>Governing Law; Jurisdiction</u>.

(a)    This Bill of Sale and any other document or instrument delivered pursuant hereto, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Bill of Sale, or the negotiation, execution or performance of this Bill of Sale (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Bill of Sale or as an inducement to enter into this Bill of Sale), shall be governed by and construed in accordance with the laws of the State of New York without regard or reference to the conflict of laws principles of any jurisdiction.

(b)    For purposes of this Bill of Sale or the transactions contemplated hereby and any disputes between any of the parties hereto arising out of or related to this Bill of Sale, each of the Parties hereto irrevocably submits and consents to, and waives any objection to, the exclusive jurisdiction of the United States District Court for the Southern District of New York, or if that court does not have subject matter jurisdiction, to the exclusive jurisdiction of the Supreme Court of the State of New York, New York County.

(c)    To the extent that any party hereto has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, each such party hereby irrevocably (i) waives such immunity in respect of its obligations with respect to this Bill of Sale and (ii) submits to the personal jurisdiction of each court described in <u>Section 15(b)</u>.

(d)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*SIGNATURE PAGES FOLLOW*

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed by their respective officers thereunto duly authorized as of the date first above written.

**Seller:**

LIMETREE BAY TERMINALS, LLC

By: _____

    Name: Darius Sweet

    Title:   Chief Executive Officer

**Buyer**:

LIMETREE BAY REFINING, LLC

By: _____

Name: Brian Lever

Title:   President

[Signature Page to Bill of Sale].

EXHIBIT 5

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE



April 13, 2021

**BY MAIL**

Director, Division of Environmental
Protection
Virgin Islands Department of Planning and
Natural Resources
45 Estate Mars Hill
Frederiksted, St. Croix, U.S. Virgin Islands
00840-4474

**BY ELECTRONIC MAIL**

Honorable Jean-Pierre L. Oriol
Commissioner
Division of Environmental Protection
4607 Tutu Park Mall
Charles Turnbull Regional Library
St. Thomas VI 00802
U.S. Virgin Islands

Director
Air Enforcement Division
Office of Civil Enforcement (2242A)
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20044

Director
Air Enforcement Division
Office of Civil Enforcement
c/o Matrix New World Engineering, Inc.
26 Columbia Turnpike, Suite 200
Florham Park, NJ 07932-2213

Director
Enforcement and Compliance Assistance
Division
U.S. EPA Region 2
290 Broadway, 21st Floor
New York, NY 10007-1866

United States Environmental Protection
Agency
Region 2
Office of Regional Counsel
290 Broadway
New York, NY 10007

Director, Caribbean Environmental
Protection Division
U.S. EPA Region 2
City View Plaza II, Suite 7000
#48 Rd. 165 km 1.2
Guaynabo, PR 00968-8069

jp.oriol@dpnr.vi.gov
foley.patrick@epa.gov
patel.harish@epa.gov
jmack@matrixneworld.com

**1 ESTATE HOPE ▪ CHRISTIANSTED, VI 00820 ▪ TEL: 340-692-3000**

April 13, 2021
Page 2

**Re:    Recordkeeping and Reporting for First Year of Operations**

To Whom It May Concern:

Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC (collectively "Limetree") are submitting this report in accordance with Subparagraphs 50C.b and 50B.b.iii. of the First Modification of the Consent Decree (Civil Action No. 1:11-CV-00006).

Restart of the FCCU Low Pressure Flare occurred on September 15, 2020, and the first six-month period ended on March 14, 2021. Flare 3 has not been restarted. The following information is being submitted within 30 days of the end of the first six-month block period after Restart of the FCCU Low Pressure Flare in accordance with Subparagraph 50C.b.

- **Subparagraph 50C.b.i.**: The quantity of all gases in scfd sent to each flare for the period covering the six-month block period preceding the date of the report, on both a cumulative and per-day basis.

  *See* Attachment A under the heading "VG FLOWT" for the cumulative and per-day flow data for the FCCU Low Pressure Flare. No gases were sent to Flare 3.

- **Subparagraph 50C.b.ii.**: The quantity of hydrogen from initial reformer restart combusted in the FCCU Low Pressure Flare on both a cumulative and per-day basis.

  *See* Attachment A under the heading "PLT4FLWH."

  Limetree operates a flow meter on the FCCU Low Pressure Flare to measure the flow of vent gas to the flare ("vent gas flow meter") and a flow meter on the #4 Platformer recycle gas stream to the flare ("Plat 4 flow meter"), which is used in conjunction with lab analysis to quantify the hydrogen flow to the FCCU Low Pressure Flare from Plat 4. High hydrogen levels in the vent gas lowered the molecular weight of the vent gas causing inconsistent readings from the vent gas flow meter. This impact was confirmed by the manufacturer of the flow meter.

  During time periods when vent gas flow meter data were inconsistent, an engineering estimation procedure was used to determine the vent gas flow by relying on measurements from the Plat 4 flow meter, lab analysis of the stream composition from the reformer to the FCCU Low Pressure Flare, and the hydrogen content of the vent gas measured by the mass spectrometer at the vent gas header to the flare. This estimation procedure is used to address inaccuracies in the vent

April 13, 2021
Page 3

gas flow meter during non-routine operations (e.g., during initial reformer restart) and reflects a more conservative estimation of vent gas flow than using raw, measured values from the vent gas flow meter.

- **Subparagraph 50.C.b.iv.**: Notification of whether the total gas quantity specified in Subparagraph 50B.a.i or a.ii has been exceeded.

  The total gas quantity specified in Subparagraph 50B.a.i was exceeded due to the flow of gases from startup, shutdown, malfunction events occurring during the restart. As you know, the restart has taken longer than expected due to unanticipated circumstances beyond Limetree's control and, at this time, Limetree does not have any operational data from a period of normal operations upon which to base the design of flare gas recovery ("FGR"). Limetree is therefore currently evaluating whether it will be possible to design, install, and begin operating FGR within two years.

In accordance with Subparagraph 50B.b.iii, Limetree is also providing notice that it exercised the option to shift 50,000 scfd from the FCCU Low Pressure Flare to Flare 3 on March 14, 2021. Limetree elected to do so because it triggered the obligation to install FGR on the FCCU Low Pressure Flare, which will result in a substantial reduction in flow to the FCCU Low Pressure Flare, but has not yet restarted Flare 3. Accordingly, the average gas quantity for Flare 3 in Subparagraph 50B.b.ii changes from 250,000 scfd to 300,000 scfd combined flow of all gases.

I certify under penalty of law that this information was prepared under my direction or supervision by personnel qualified to properly gather and evaluate the information submitted. Based on my directions and after reasonable inquiry of the person(s) directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.

Please do not hesitate to contact Craig Miller by phone (340-692-3612) or email (CTmiller@lbenergy.com) with questions regarding this report.

Very truly yours,

Jeffrey Rinker
CEO, Limetree Bay Ventures

cc:   Verline Marcellin (via electronic mail)
      Austin Callwood (via electronic mail)
      David Molloy, Esq. (via electronic mail)

April 13, 2021
Page 4

Ryan Biggs (via electronic mail)
Craig Miller (via electronic mail)
Catherine Elizee (via electronic mail)
LeAnn Johnson Koch, Esq. (via electronic mail)

# Attachment A

# Average Data

Plant: LIMETREE BAY REFINERY
Interval: 1 Day
Type: Block
Report Period: 09/15/2020 00:00 Through 03/14/2021 23:59
Time Online Criteria: 1 minute(s)

| Source | | FLARE08 | | |
|---|---|---|---|---|
| Parameter | | PLT4FLWH | VG_FLOWT | Combined flow of all gases other than |
| Unit | | (SCF) | (SCF) | hydrogen from initial reformer restart (SCF) |

| | | | | |
|---|---|---|---|---|
| 09/15/20 | 00:00 | 0.0 I | 204,324.8 | 204,324.8 |
| 09/16/20 | 00:00 | 0.0 I | 803,484.4 | 803,484.4 |
| 09/17/20 | 00:00 | 0.0 I | 294,529.3 | 294,529.3 |
| 09/18/20 | 00:00 | 0.0 I | 339,260.5 | 339,260.5 |
| 09/19/20 | 00:00 | 0.0 I | 356,689.1 | 356,689.1 |
| 09/20/20 | 00:00 | 0.0 I | 279,396.3 | 279,396.3 |
| 09/21/20 | 00:00 | 0.0 I | 356,492.1 | 356,492.1 |
| 09/22/20 | 00:00 | 0.0 I | 577,754.4 | 577,754.4 |
| 09/23/20 | 00:00 | 0.0 I | 1,019,828.3 | 1,019,828.3 |
| 09/24/20 | 00:00 | 0.0 I | 795,268.5 | 795,268.5 |
| 09/25/20 | 00:00 | 0.0 I | 404,863.6 | 404,863.6 |
| 09/26/20 | 00:00 | 0.0 I | 304,435.5 | 304,435.5 |
| 09/27/20 | 00:00 | 0.0 I | 265,829.3 | 265,829.3 |
| 09/28/20 | 00:00 | 0.0 I | 290,402.3 | 290,402.3 |
| 09/29/20 | 00:00 | 0.0 I | 597,228.8 | 597,228.8 |
| 09/30/20 | 00:00 | 0.0 I | 870,782.6 | 870,782.6 |
| 10/01/20 | 00:00 | 0.0 I | 1,247,712.5 | 1,247,712.5 |
| 10/02/20 | 00:00 | 0.0 I | 1,228,732.4 | 1,228,732.4 |
| 10/03/20 | 00:00 | 0.0 I | 1,166,817.7 | 1,166,817.7 |
| 10/04/20 | 00:00 | 0.0 I | 1,005,906.2 | 1,005,906.2 |
| 10/05/20 | 00:00 | 0.0 I | 871,674.6 | 871,674.6 |
| 10/06/20 | 00:00 | 0.0 I | 927,401.4 | 927,401.4 |
| 10/07/20 | 00:00 | 0.0 I | 567,773.0 | 567,773.0 |
| 10/08/20 | 00:00 | 0.0 I | 650,318.0 | 650,318.0 |
| 10/09/20 | 00:00 | 0.0 I | 907,167.5 | 907,167.5 |
| 10/10/20 | 00:00 | 0.0 I | 412,231.1 | 412,231.1 |
| 10/11/20 | 00:00 | 0.0 I | 1,769,340.1 | 1,769,340.1 |
| 10/12/20 | 00:00 | 0.0 I | 1,714,072.0 | 1,714,072.0 |
| 10/13/20 | 00:00 | 0.0 I | 699,679.8 | 699,679.8 |
| 10/14/20 | 00:00 | 0.0 I | 494,973.0 | 494,973.0 |
| 10/15/20 | 00:00 | 0.0 I | 552,158.8 | 552,158.8 |
| 10/16/20 | 00:00 | 0.0 I | 630,960.4 | 630,960.4 |
| 10/17/20 | 00:00 | 0.0 I | 781,345.3 | 781,345.3 |
| 10/18/20 | 00:00 | 0.0 I | 969,654.6 | 969,654.6 |
| 10/19/20 | 00:00 | 0.0 I | 736,136.5 | 736,136.5 |
| 10/20/20 | 00:00 | 0.0 I | 764,372.6 | 764,372.6 |
| 10/21/20 | 00:00 | 0.0 I | 828,165.2 | 828,165.2 |

**F = Unit Offline**
E = Exceedance
**M = Maintenance**                    **C = Calibration**
**T = Out Of Control**                 S = Substituted
                                        * = Suspect

# Average Data

Plant: LIMETREE BAY REFINERY
Interval: 1 Day
Type: Block
Report Period: 09/15/2020 00:00 Through 03/14/2021 23:59
Time Online Criteria: 1 minute(s)

| | | | | |
|---|---|---|---|---|
| 10/22/20 | 00:00 | 0.0 I | 1,425,996.0 | 1,425,996.0 |
| 10/23/20 | 00:00 | 0.0 I | 3,552,618.8 | 3,552,618.8 |
| 10/24/20 | 00:00 | 0.0 I | 1,119,871.2 | 1,119,871.2 |
| 10/25/20 | 00:00 | 0.0 I | 943,547.4 | 943,547.4 |
| 10/26/20 | 00:00 | 0.0 I | 1,194,493.2 | 1,194,493.2 |
| 10/27/20 | 00:00 | 0.0 I | 824,303.6 | 824,303.6 |
| 10/28/20 | 00:00 | 0.0 I | 643,756.9 | 643,756.9 |
| 10/29/20 | 00:00 | 0.0 I | 967,151.6 | 967,151.6 |
| 10/30/20 | 00:00 | 0.0 I | 811,892.9 | 811,892.9 |
| 10/31/20 | 00:00 | 0.0 I | 655,491.6 | 655,491.6 |
| 11/01/20 | 00:00 | 0.0 I | 792,466.2 | 792,466.2 |
| 11/02/20 | 00:00 | 0.0 I | 723,824.1 | 723,824.1 |
| 11/03/20 | 00:00 | 0.0 I | 1,223,283.4 | 1,223,283.4 |
| 11/04/20 | 00:00 | 0.0 I | 638,356.1 | 638,356.1 |
| 11/05/20 | 00:00 | 0.0 I | 907,407.5 | 907,407.5 |
| 11/06/20 | 00:00 | 0.0 I | 1,091,241.2 | 1,091,241.2 |
| 11/07/20 | 00:00 | 0.0 I | 908,742.4 | 908,742.4 |
| 11/08/20 | 00:00 | 0.0 I | 1,423,492.7 | 1,423,492.7 |
| 11/09/20 | 00:00 | 0.0 I | 446,893.9 | 446,893.9 |
| 11/10/20 | 00:00 | 0.0 I | 449,088.1 | 449,088.1 |
| 11/11/20 | 00:00 | 0.0 I | 918,386.8 | 918,386.8 |
| 11/12/20 | 00:00 | 0.0 I | 815,199.8 | 815,199.8 |
| 11/13/20 | 00:00 | 0.0 I | 828,442.3 | 828,442.3 |
| 11/14/20 | 00:00 | 0.0 I | 579,787.9 | 579,787.9 |
| 11/15/20 | 00:00 | 0.0 I | 504,310.5 | 504,310.5 |
| 11/16/20 | 00:00 | 0.0 I | 958,818.2 | 958,818.2 |
| 11/17/20 | 00:00 | 0.0 I | 1,180,299.6 | 1,180,299.6 |
| 11/18/20 | 00:00 | 0.0 I | 835,320.5 | 835,320.5 |
| 11/19/20 | 00:00 | 0.0 I | 433,428.7 | 433,428.7 |
| 11/20/20 | 00:00 | 0.0 I | 876,216.4 | 876,216.4 |
| 11/21/20 | 00:00 | 219,188.7 | 926,819.6 | 707,630.9 |
| 11/22/20 | 00:00 | 121,854.8 | 974,284.7 | 852,429.9 |
| 11/23/20 | 00:00 | 3,875,279.3 | 4,585,264.1 | 709,984.8 |
| 11/24/20 | 00:00 | 825,017.0 | 2,394,144.0 | 1,569,127.0 |
| 11/25/20 | 00:00 | 94,429.8 | 1,856,374.9 | 1,761,945.1 |
| 11/26/20 | 00:00 | 3,512,698.1 | 4,618,504.4 | 1,105,806.3 |
| 11/27/20 | 00:00 | 22,970,072.6 | 25,589,700.2 | 2,619,627.6 |
| 11/28/20 | 00:00 | 23,369,348.1 | 26,675,122.6 | 3,305,774.5 |
| 11/29/20 | 00:00 | 11,694,513.6 | 13,997,749.1 | 2,303,235.5 |
| 11/30/20 | 00:00 | 178.2 | 1,122,991.4 | 1,122,813.2 |
| 12/01/20 | 00:00 | 0.0 I | 760,165.4 | 760,165.4 |

**F = Unit Offline**
E = Exceedance
M = Maintenance                          **C = Calibration**
T = Out Of Control                       S = Substituted
                                         * = Suspect

Report Generated: 03/26/21 17:32

# Average Data

Plant: LIMETREE BAY REFINERY
Interval: 1 Day
Type: Block
Report Period: 09/15/2020 00:00 Through 03/14/2021 23:59
Time Online Criteria: 1 minute(s)

| | | | | |
|---|---|---|---|---|
| 12/02/20 | 00:00 | 79,556.0 | 806,986.6 | 727,430.6 |
| 12/03/20 | 00:00 | 92,639.0 | 704,938.3 | 612,299.3 |
| 12/04/20 | 00:00 | 0.0 I | 593,953.0 | 593,953.0 |
| 12/05/20 | 00:00 | 24,206.1 | 841,743.5 | 817,537.4 |
| 12/06/20 | 00:00 | 50,894.7 | 1,263,667.7 | 1,212,773.0 |
| 12/07/20 | 00:00 | 0.0 I | 4,787,572.6 | 4,787,572.6 |
| 12/08/20 | 00:00 | 346,086.8 | 2,015,781.7 | 1,669,694.9 |
| 12/09/20 | 00:00 | 64,838.8 | 1,482,061.1 | 1,417,222.3 |
| 12/10/20 | 00:00 | 150.3 | 1,326,994.7 | 1,326,844.4 |
| 12/11/20 | 00:00 | 0.0 I | 1,033,605.2 | 1,033,605.2 |
| 12/12/20 | 00:00 | 0.0 I | 863,427.5 | 863,427.5 |
| 12/13/20 | 00:00 | 0.0 I | 909,083.0 | 909,083.0 |
| 12/14/20 | 00:00 | 0.0 I | 557,301.6 | 557,301.6 |
| 12/15/20 | 00:00 | 714,118.8 | 1,569,613.3 | 855,494.5 |
| 12/16/20 | 00:00 | 512,553.1 | 2,617,564.1 | 2,105,011.0 |
| 12/17/20 | 00:00 | 0.0 I | 1,027,947.0 | 1,027,947.0 |
| 12/18/20 | 00:00 | 1,874,220.6 | 3,425,929.9 | 1,551,709.3 |
| 12/19/20 | 00:00 | 827,565.5 | 3,091,583.5 | 2,264,018.0 |
| 12/20/20 | 00:00 | 1,166,094.9 | 2,623,965.6 | 1,457,870.7 |
| 12/21/20 | 00:00 | 13,407,424.5 | 17,697,014.8 | 4,289,590.3 |
| 12/22/20 | 00:00 | 19,665,242.1 | 22,280,938.0 | 2,615,695.9 |
| 12/23/20 | 00:00 | 9,933,637.3 | 11,648,373.1 | 1,714,735.8 |
| 12/24/20 | 00:00 | 20,497,637.7 | 22,563,901.0 | 2,066,263.3 |
| 12/25/20 | 00:00 | 19,398,493.3 | 21,726,672.5 | 2,328,179.2 |
| 12/26/20 | 00:00 | 22,529,644.2 | 25,399,990.3 | 2,870,346.1 |
| 12/27/20 | 00:00 | 21,954,387.2 | 25,180,441.3 | 3,226,054.1 |
| 12/28/20 | 00:00 | 10,548,970.3 | 14,142,455.4 | 3,593,485.1 |
| 12/29/20 | 00:00 | 6,288,421.0 | 11,947,850.9 | 5,659,429.9 |
| 12/30/20 | 00:00 | 14,848,147.0 | 16,801,915.6 | 1,953,768.6 |
| 12/31/20 | 00:00 | 10,296,859.7 | 12,530,691.9 | 2,233,832.2 |
| 01/01/21 | 00:00 | 5,534,158.2 | 7,882,118.3 | 2,347,960.1 |
| 01/02/21 | 00:00 | 0.0 I | 3,652,322.8 | 3,652,322.8 |
| 01/03/21 | 00:00 | 0.0 I | 3,616,894.8 | 3,616,894.8 |
| 01/04/21 | 00:00 | 0.0 I | 2,440,644.4 | 2,440,644.4 |
| 01/05/21 | 00:00 | 3,229,646.1 | 5,930,320.9 | 2,700,674.8 |
| 01/06/21 | 00:00 | 6,246,734.9 | 7,911,926.9 | 1,665,192.0 |
| 01/07/21 | 00:00 | 4,068,215.7 | 7,115,210.0 | 3,046,994.3 |
| 01/08/21 | 00:00 | 4,465,365.3 | 6,581,814.0 | 2,116,448.7 |
| 01/09/21 | 00:00 | 6,671,729.1 | 10,870,496.9 | 4,198,767.8 |
| 01/10/21 | 00:00 | 7,180,781.3 | 12,547,231.5 | 5,366,450.2 |
| 01/11/21 | 00:00 | 9,820,586.4 | 14,467,579.1 | 4,646,992.7 |

**F = Unit Offline**
E = Exceedance
**M = Maintenance**          **C = Calibration**
**T = Out Of Control**        S = Substituted
                              * = Suspect

Report Generated: 03/26/21 17:32

# Average Data

Plant: LIMETREE BAY REFINERY
Interval: 1 Day
Type: Block
Report Period: 09/15/2020 00:00 Through 03/14/2021 23:59
Time Online Criteria: 1 minute(s)

| | | | | |
|---|---|---|---|---|
| 01/12/21 | 00:00 | 19,442,288.3 | 26,044,104.4 | 6,601,816.1 |
| 01/13/21 | 00:00 | 18,873,392.1 | 25,833,508.8 | 6,960,116.7 |
| 01/14/21 | 00:00 | 22,485,643.5 | 30,190,411.0 | 7,704,767.5 |
| 01/15/21 | 00:00 | 20,345,126.9 | 26,543,605.2 | 6,198,478.3 |
| 01/16/21 | 00:00 | 15,042,923.3 | 19,034,668.6 | 3,991,745.3 |
| 01/17/21 | 00:00 | 12,756,381.9 | 15,851,556.8 | 3,095,174.9 |
| 01/18/21 | 00:00 | 17,230,279.6 | 22,394,329.6 | 5,164,050.0 |
| 01/19/21 | 00:00 | 17,460,099.4 | 24,308,108.2 | 6,848,008.8 |
| 01/20/21 | 00:00 | 20,587,685.4 | 28,803,501.8 | 8,215,816.4 |
| 01/21/21 | 00:00 | 21,529,426.7 | 29,114,839.6 | 7,585,412.9 |
| 01/22/21 | 00:00 | 15,216,934.8 | 21,941,309.3 | 6,724,374.5 |
| 01/23/21 | 00:00 | 17,151,747.1 | 25,529,689.1 | 8,377,942.0 |
| 01/24/21 | 00:00 | 19,062,726.1 | 24,681,713.7 | 5,618,987.6 |
| 01/25/21 | 00:00 | 19,502,991.2 | 30,314,680.5 | 10,811,689.3 |
| 01/26/21 | 00:00 | 15,733,514.4 | 20,235,147.5 | 4,501,633.1 |
| 01/27/21 | 00:00 | 20,573,801.0 | 27,987,382.1 | 7,413,581.1 |
| 01/28/21 | 00:00 | 9,590,501.0 | 13,700,210.9 | 4,109,709.9 |
| 01/29/21 | 00:00 | 5,721,467.0 | 8,070,566.0 | 2,349,099.0 |
| 01/30/21 | 00:00 | 8,905,504.8 | 11,863,360.9 | 2,957,856.1 |
| 01/31/21 | 00:00 | 15,819,845.3 | 20,270,672.5 | 4,450,827.2 |
| 02/01/21 | 00:00 | 8,410,874.8 | 18,151,987.0 | 9,741,112.2 |
| 02/02/21 | 00:00 | 23,770,821.4 | 28,168,085.0 | 4,397,263.6 |
| 02/03/21 | 00:00 | 15,328,814.7 | 19,964,375.5 | 4,635,560.8 |
| 02/04/21 | 00:00 | 23,284,278.3 | 27,479,313.8 | 4,195,035.5 |
| 02/05/21 | 00:00 | 18,836,561.8 | 22,701,443.4 | 3,864,881.6 |
| 02/06/21 | 00:00 | 14,138,149.2 | 16,983,926.0 | 2,845,776.8 |
| 02/07/21 | 00:00 | 9,398,953.1 | 11,333,723.2 | 1,934,770.1 |
| 02/08/21 | 00:00 | 9,693,542.9 | 11,506,119.8 | 1,812,576.9 |
| 02/09/21 | 00:00 | 7,779,722.1 | 10,790,243.0 | 3,010,520.9 |
| 02/10/21 | 00:00 | 9,851,616.0 | 11,845,905.5 | 1,994,289.5 |
| 02/11/21 | 00:00 | 8,097,428.1 | 9,707,148.5 | 1,609,720.4 |
| 02/12/21 | 00:00 | 9,213,436.0 | 11,244,896.4 | 2,031,460.4 |
| 02/13/21 | 00:00 | 10,245,700.7 | 12,118,927.9 | 1,873,227.2 |
| 02/14/21 | 00:00 | 11,410,512.0 | 13,180,837.7 | 1,770,325.7 |
| 02/15/21 | 00:00 | 15,867,341.8 | 17,834,614.7 | 1,967,272.9 |
| 02/16/21 | 00:00 | 16,002,730.6 | 18,646,443.0 | 2,643,712.4 |
| 02/17/21 | 00:00 | 9,189,343.8 | 11,036,414.7 | 1,847,070.9 |
| 02/18/21 | 00:00 | 9,786,702.2 | 11,538,586.6 | 1,751,884.4 |
| 02/19/21 | 00:00 | 8,880,669.0 | 10,323,609.0 | 1,442,940.0 |
| 02/20/21 | 00:00 | 13,715,714.7 | 15,490,319.3 | 1,774,604.6 |
| 02/21/21 | 00:00 | 14,214,914.6 | 15,779,108.7 | 1,564,194.1 |

**F = Unit Offline**
E = Exceedance
**M = Maintenance**                          **C = Calibration**
**T = Out Of Control**                        S = Substituted
                                              * = Suspect
Report Generated: 03/26/21 17:32

# Average Data

Plant: LIMETREE BAY REFINERY
Interval: 1 Day
Type: Block
Report Period: 09/15/2020 00:00 Through 03/14/2021 23:59
Time Online Criteria: 1 minute(s)

| | | | | |
|---|---|---|---|---|
| 02/22/21 | 00:00 | 15,223,328.5 | 16,953,131.5 | 1,729,803.0 |
| 02/23/21 | 00:00 | 12,643,052.7 | 15,575,676.2 | 2,932,623.5 |
| 02/24/21 | 00:00 | 11,642,432.4 | 14,163,328.1 | 2,520,895.7 |
| 02/25/21 | 00:00 | 11,326,546.5 | 14,124,720.0 | 2,798,173.5 |
| 02/26/21 | 00:00 | 3,860,297.1 | 7,523,290.1 | 3,662,993.0 |
| 02/27/21 | 00:00 | 2,813,064.7 | 7,309,517.9 | 4,496,453.2 |
| 02/28/21 | 00:00 | 8,162,042.8 | 10,247,399.9 | 2,085,357.1 |
| 03/01/21 | 00:00 | 12,973,704.7 | 15,133,675.5 | 2,159,970.8 |
| 03/02/21 | 00:00 | 7,684,985.6 | 9,737,110.7 | 2,052,125.1 |
| 03/03/21 | 00:00 | 7,974,496.4 | 10,807,327.0 | 2,832,830.6 |
| 03/04/21 | 00:00 | 5,280,419.9 | 8,749,313.4 | 3,468,893.5 |
| 03/05/21 | 00:00 | 4,521,660.5 | 8,173,257.5 | 3,651,597.0 |
| 03/06/21 | 00:00 | 4,763,535.6 | 8,926,499.5 | 4,162,963.9 |
| 03/07/21 | 00:00 | 4,810,771.1 | 11,153,915.7 | 6,343,144.6 |
| 03/08/21 | 00:00 | 8,772,370.6 | 10,861,790.1 | 2,089,419.5 |
| 03/09/21 | 00:00 | 6,764,448.8 | 8,901,437.6 | 2,136,988.8 |
| 03/10/21 | 00:00 | 3,870,908.9 | 9,522,463.8 | 5,651,554.9 |
| 03/11/21 | 00:00 | 3,565,297.8 | 8,039,458.2 | 4,474,160.4 |
| 03/12/21 | 00:00 | 4,180,893.8 | 10,329,937.7 | 6,149,043.9 |
| 03/13/21 | 00:00 | 8,333,675.5 | 10,253,510.1 | 1,919,834.6 |
| 03/14/21 | 00:00 | 9,068,473.5 | 10,892,809.8 | 1,824,336.3 |

| | | | |
|---|---|---|---|
| Average | 10,169,010.7 | 8,073,270.2 | 2,286,485.1 |
| Minimum | 150.3 | 204,324.8 | |
| Maximum | 23,770,821.4 | 30,314,680.5 | |
| Summation | 1,047,408,101.1 | 1,461,261,902.2 | |
| Geometric Mean | 4,845,275.6 | 3,326,091.4 | |
| | | | |
| Included Data Points | 103 | 181 | |
| Total number of Data Points | 181 | 181 | |

**F = Unit Offline**
**E = Exceedance**
**M = Maintenance**                    **C = Calibration**
**T = Out Of Control**                **S = Substituted**
**\* = Suspect**

EXHIBIT 6

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## REGION 2

|  |  |
|---|---|
| In the matter of | ) |
|  | ) |
| **Limetree Bay Terminals, LLC** | ) |
|  | ) |
| 1 Estate Hope | ) |
| Christiansted, Virgin Islands 00820 | ) |
|  | ) |
| And | ) |
|  | ) |
| **Limetree Bay Refining, LLC** | ) |
|  | ) |
| 1 Estate Hope | ) |
| Christiansted, Virgin Islands 00820 | ) |
|  | ) |
| Respondents. | ) |
|  | ) |
| Proceeding under Section 303 of | ) |
| the Clean Air Act, 42 U.S.C. § 7603 | ) |

**CLEAN AIR ACT
EMERGENCY ORDER
CAA-02-2021-1003**

## STATEMENT OF AUTHORITY

This emergency order ("Order") is issued to Limetree Bay Terminals, LLC ("LBT") and

Limetree Bay Refining, LLC ("LBR") (collectively, "Limetree" or "Respondents") pursuant to

the authority granted to the Administrator of the United States Environmental Protection Agency

("EPA") by Section 303 of the Clean Air Act ("CAA'" or "the Act"), 42 U.S.C. § 7603, to

protect public health or welfare, or the environment.  The authority to issue this Order has been

delegated by the Administrator of EPA to the Regional Administrator for EPA Region 2, and

redelegated to the Director of the Caribbean Environmental Protection Division, by Delegation

No. 7-49.  This Order is issued by the Director of the Caribbean Environmental Protection

Division, of EPA Region 2.

Section 303 of the Act provides that:

[T]he Administrator, upon receipt of evidence that a pollution source or

1

combination of sources (including moving sources) is presenting an imminent and substantial endangerment to public health or welfare, or the environment, may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary.  If it is not practicable to assure prompt protection of public health or welfare or the environment by commencement of such a civil action, the Administrator may issue such orders as may be necessary to protect public health or welfare or the environment.  Prior to taking any action under this section, the Administrator shall consult with appropriate State and local authorities and attempt to confirm the accuracy of the information on which the action proposed to be taken is based.  Any order issued by the Administrator under this section shall be effective upon issuance and shall remain in effect for a period of not more than 60 days, unless the Administrator brings an action pursuant to the first sentence of this section before the expiration of that period.  Whenever the Administrator brings such an action within the 60-day period, such order shall remain in effect for an additional 14 days or for such longer period as may be authorized by the court in which such action is brought.

## **PARTIES BOUND**

1.      This Order applies to and is binding upon the Respondents, their officers, directors, employees, agents, trustees, receivers, successors, assigns, and all other persons, including but not limited to firms, corporations, limited liability companies, subsidiaries, contractors, consultants, and lessees acting under or on behalf of Respondents in connection with the implementation of this Order.

2.      Respondents shall be responsible and liable for conducting the activities specified pursuant to this Order, regardless of who performs the activities.  Respondents shall be liable for the conduct of employees, agents, contractors, consultants, or lessees to satisfy the requirements of this Order.

3.      No change in the ownership of the facility affected by this Order or the ownership or corporate status of Respondents shall in any way alter, diminish, or otherwise affect the responsibilities of Respondents under this Order.  Respondents shall provide a copy of this Order to any successor(s) during the pendency of this Order.

## FINDINGS OF FACT

The Director of the Caribbean Environmental Protection Division in EPA Region 2 makes the following Findings of Fact:

4.     Prior to issuing this Order, EPA consulted with representatives of the Virgin Islands Department of Planning and Natural Resources ("DPNR") as required by Section 303 of the Act.

5.     This Order concerns a facility located at 1 Estate Hope in Christiansted, Virgin Islands ("Facility").  The Facility includes a marine loading terminal (including storage capacity) and an integrated petroleum refinery ("Refinery" or "Refinery Operations").  The Facility is located on approximately 1,500 acres on the south central coast of St. Croix, U.S. Virgin Islands ("USVI").

6.     Limetree Bay Terminals, LLC is a corporation that owns and/or operates some or all of the Facility.  LBT is registered to do business in the U.S. Virgin Islands.

7.     The Facility operates under a number of air permits, such as Prevention of Significant Deterioration ("PSD") and CAA Title V operating permits.  LBT is named as the owner and/or operator of the Facility and responsible for Facility Clean Air Act compliance obligations, including for its Refinery Operations, in multiple air permits.

8.     The Facility's Title V operating permit is permit number STX-TV-003-10 (the "Title V Permit"), and it is currently issued to "Limetree Bay Terminals LLC."  The Title V Permit covers the Facility's Refinery Operations, among others.

9. The Facility also operates under three PSD permits (the "PSD Permits") that were amended on November 5, 2018 to reflect the transfer of ownership of the Facility from HOVENSA, LLC to "Limetree Bay Terminals, LLC." Some or all of these PSD permits encompass Refinery Operations.

10. Limetree Bay Refining, LLC is a corporation that owns and/or operates some or all of the Facility, including its Refinery Operations. LBR is registered to do business in the U.S. Virgin Islands.

11. On its website, Limetree describes LBR as "executing a project to refurbish and restart its St. Croix, USVI, deep conversion [petroleum] refinery" with peak processing capacity of 650,000 barrels of petroleum feedstock per day.

12. On July 30, 2018, the Legislature of the Virgin Islands approved an agreement with LBR titled "Refinery Operating Agreement by and among the Government of the Virgin Islands and Limetree Bay Refining, LLC," dated July 2, 2018.

13. According to the Limetree Title V Permit, the Facility was originally owned and/or operated by Hess Oil Virgin Islands Corporation ("HOVIC"). Facility operations began in 1965. On October 30, 1998, Amerada Hess Corporation, the parent company of HOVIC, and Petroleos de Venezuela, S.A. ("PDVSA") formed a new corporation, HOVENSA L.L.C. ("HOVENSA"), which acquired ownership and operational control of the St. Croix Refinery formerly known as HOVIC. Limetree and/or its corporate parent or associated business entities acquired the Facility in 2016.

14. Petroleum refineries separate crude oil into a wide array of petroleum products through a series of physical and chemical separation techniques. These techniques include fractionation, cracking, hydrotreating, combination/blending processes, and manufacturing and transport.

4

15.    Limetree has described the Facility's refining operations as being conducted in the East Refinery, which includes crude units, a vacuum unit, a delayed coker unit ("DCU"), platformers, hydrotreaters, fluid catalytic cracking ("FCC"), an alkylation complex, an ultra-low sulfur gasoline unit, and a sulfolane complex. The East Refinery was developed in the 1970s, with the FCC added in 1993 and the DCU built in 2002. LBR Refinery Operations also include two flares (Flare #3 and Flare #8), two sulfur recovery units, one incinerator and a power generation complex.

16.    According to Limetree, LBR started conducting activities to restart the operation of the Refinery in 2018. Among the units that Limetree has since restarted were the following: crude units #5 and #6 (limited capacity), vacuum unit #3, par-isom unit, platformer unit, sulfur recovery units, east incinerator, DCU, hydro-treating units (6, 7, and 9), reverse osmosis water plant, and gas turbines (GT-8, GT-9, GT-10, GT-11, and GT-13).

17.    The Facility is located on the island of St. Croix. St. Croix is an island in the Caribbean Sea that is approximately 22 miles long (east to west) and 7 miles wide (north to south). As of the 2010 United States Census, the population of St. Croix was 50,601. The island of St. Croix is divided into nine subdistricts (population): East End (2,453), Anna's Hope Village (4,041), Christiansted (2,626), Sion Farm (13,003), Southcentral (8,049), Northcentral (4,977), Northwest (4,863), Southwest (7,498) and Frederiksted (3,091). The Facility is located on the southern shore of St. Croix, near the middle of the island east to west, within the Southcentral subdistrict.

18.    According to EPA review of the National Weather Service data for February through May 2021 for St. Croix's Henry E. Rohlsen Airport meteorological station, the prevailing wind blows from the east and east-southeast to the west and west-

5

northwest. Wind direction prevalence indicates that communities located within Southcentral, Southwest, Frederiksted, Northwest, and portions of Northcentral are located downwind of the Facility. Among such communities are the following: Clifton Hill, Profit Hills, Kingshill, University of Virgin Islands Campus, Hannah's Rest, Frederiksted, Estate Northside, Smithfield, Upper Bethlehem, Mars Hill, Estate Carlton, Golden Grove, Grove Place, Negro Bay, Williams Delight, Whim, Sandy Point, La Grange, and Prosperity. Many residents live and work in these communities.

**The Limetree Refinery**

19.     Refineries in general emit a whole host of pollutants, ranging from nitrous oxides ("$NO_X$"), sulfur dioxide ("$SO_2$"), and carbon monoxide ("CO") to volatile organic compounds ("VOC"), hydrogen sulfide ("$H_2S$"), and particulate matter "(PM"). $NO_x$, $SO_2$, and CO are typically emitted from combustion sources such as heaters, boilers and gas turbines. The VOCs contain light hydrocarbons. During start up, any VOCs are usually conveyed to a flare to be combusted.

20.     The Refinery Operations separate crude oil into various components. Light ends (refinery fuel gas ("RFG")) are sent to the Facility's fuel gas system ("East Fuel Gas System"), while naphtha, jet fuel, kerosene, and No. 2 oil are further processed to remove sulfur. The $H_2S$ gas generated from the desulfurization process is sent to the sulfur recovery plant to be treated by two sulfur recovery units.

21.     RFG is a mixture of $H_2S$ and other gases that is used to supply fuel to the various process heaters at the Refinery. This RFG collection and distribution system is referred to as the East Fuel Gas System. $H_2S$ is removed from the Refinery fuel gas system using amine scrubbers. The gas that enters amine unit is high in $H_2S$, and is then processed in a sulfur recovery unit to convert $H_2S$ into elemental sulfur.

6

22.     LBR uses a flare known as Flare #8 to combust excess Refinery gas that contains a mix of $H_2S$, $CO_2$, and other gases such as hydrocarbons.

23.     Emissions from flaring may include carbon particles (soot), unburned hydrocarbons, CO, partially burned and altered hydrocarbons, NOx and, if sulfur containing material such as hydrogen sulfide is flared, $SO_2$.

24.     Sulfur compounds going to a flare are converted to $SO_2$ when burned, though flare efficiency is not 100%.  The amount of $SO_2$ emitted depends directly on the quantity of sulfur in the flared gases.

25.     The Refinery has a flare header system that collects and routes gases from process units, ancillary equipment, and the fuel gas system from locations throughout the Refinery to Flare #8. The Flare #8 header system collects gases from numerous areas of the Refinery, including but not limited to the amine units (Nos. 4, 5, 6 and 7), the sulfur recovery units (Nos. 3 and 4), the Coker Unit, and the East Fuel Gas System.[1]

26.     Flare #8 is a steam assisted flare 230 feet above grade.  Gas enters the flare for burning up through 41 staged burner tips.

27.     Flare #8 is subject to an $H_2S$ concentration limit specified in 40 C.F.R. § 60.103a(h) (162 parts per million ("ppm")) determined hourly on a 3-hr rolling average basis), as well as total sulfur ("TS") root-cause analysis requirements and monitoring requirements specified in 40 C.F.R. § 60.103a(c), and operating limits specified in 40 C.F.R. § 63.670.

---

[1] The full list of areas that send gas to Flare #8 includes crude unit No. 5; liquified propane gas ("LPG") treater No. 1; utility area No. 3 (Boilers 6, 7, 8, and 9); powerhouse No. 2 (Gas Turbines); utility area No. 3 (Boiler 10); crude unit No. 6; lean oil absorber/disulfide oil recovery; LPG treater No. 2; amine units (No. 4, 5, 6 and 7); high pressure fuel gas treater; gas recovery unit No. 2; LPG fractionation unit No. 3; deisopentanizer/IC5 Sweetener; vacuum unit No. 3; distillate desulfurizers (No. 6, 7 and 9); platformer & hydrobon No. 3; platformer No. 4; dimersol; flare system (East); benzene stripper (East); sour water strippers (No. 3 and 4); sulfur recovery units (No. 3 and 4); tail gas treating unit; sour water stripper No. 5; flares – low and high pressures; coker unit; coker nitrogen system; west interconnects; East Fuel Gas System; hydrogen tie-ins (east); and butane and propane system.

28.     Flare #8 has a maximum vent gas flow rate of 1,500,000 lb/hr, and is not equipped with a Flare Gas Recovery System ("FGRS").

29.     The Flare #8 header is equipped with monitoring instruments to measure volumetric flow, hydrogen sulfide content, total sulfur content, and vent gas composition, to demonstrate compliance with CAA requirements at 40 C.F.R. Part 60, Subpart Ja and 40 C.F.R. Part 63, Subpart CC.  The monitoring instrumentation also measures certain other Flare #8 vent gas constituents.

30.     The Facility's Title V permit, citing 40 C.F.R. § 60.104(a)(1), bars combustion in various locations at the Facility of fuel gas that contains hydrogen sulfide in excess of 0.1 gr/dscf.  Two of these locations include Flare #8 and the East Fuel Gas System.

**Refinery Restart**

31.     On February 1, 2021, EIG Global Energy Partners ("EIG"), a controlling investor in Limetree Bay Ventures, LLC[2], announced that the Refinery had successfully resumed operations and begun production and commercial sales of refined products.

32.     According to a recent statement from LBT and LBR, "Limetree Bay Refining, LLC, restarted [Refinery] operations in February 2021, and is capable of processing around 200,000 barrels per day.  Key restart work at the site began in 2018, including the 62,000 barrels per day modern, delayed Coker unit, extensive desulfurization capacity, and a reformer unit to produce clean, low-sulfur transportation fuels that will meet International Marine Organization ("IMO") standards required under

---

[2] Limetree's website describes Limetree Bay Ventures, LLC, as "a large-scale energy complex strategically located in St. Croix, U.S. Virgin Islands. The complex consists of Limetree Bay Refining, a refinery with peak processing capacity of 650 thousand barrels of petroleum feedstock per day, and Limetree Bay Terminal, a 34-million-barrel crude and petroleum products storage and marine terminal facility serving the refinery and third-party customers."

international law in 2020. The restart project provided much needed economic development in the U.S.V.I. and created more than 4,000 construction jobs at its peak and more than 600 full-time jobs currently."

33.     Since February 1, 2021, at least four incidents have occurred at the Facility that have each had an immediate and significant health impact on multiple downwind communities.

**February 4, 2021 Incident**

34.     On February 4, a mixture of oil and water, in the form of an oily mist, was emitted as air emissions from Flare #8 at the Facility (the "Feb. 4 Incident"). These emissions included liquid droplets of oil.

35.     In a letter sent from Limetree to DPNR on March 3, 2021, Limetree explained the cause of the Feb. 4 Incident as follows ("Limetree 3/3/21 Letter"):

> "On February 4, 2021, the Coker unit was shut down for repairs. Operations was preparing to quench and open coke drum D-8504 as part of the normal shut down process. At approximately 02:30hrs, the Coker Drum D-8504 was being prepared to start the procedure for water quenching. The quench water control valve was 100% open, resulting in a large quantity of water entering the drum. The water evaporated quickly after contacting the hot coke. . . . [T]he pressure safety valves opened to relieve pressure . . . A mixture of oil and water vapor was sent to the containment system, exceeding its capacity and ultimately exiting through the No.8 flare."

36.     The Limetree 3/3/21 letter further explains the immediate impact of the Feb. 4 Incident on the surrounding community, stating:

> "Around 14:30 hrs, calls were received by the Limetree Command Center from residents in the Clifton Hill area complaining of oil droplets on their vehicles and homes. Thereafter, Limetree immediately activated its Incident Command Response to address the impact on the community. . . . Complainants were contacted and told to disconnect their cisterns from the roof spouts if possible. A total of 11 complaints were received on February 4, 2021. On February 5, 2021, Limetree teams were dispatched to follow-up with residents in person and confirmed the presence of oil droplets on cars and homes. Plans were put in place to clean residents' cars and roofs. Additional complaints were made in following

days."

37.     Limetree was aware of the impact this event had on the surrounding community, and paid for various cleaning and decontamination work and provided bottled water to the community.  In a March 3, 2021 press release, Limetree stated, "Limetree's environmental team was able to field verify the area impacted by the release, which was determined to be the Clifton Hill community."

38.     As of March 16, 2021, Limetree had reported to EPA that the Feb. 4 Incident resulted in 193 residences with potential contamination and 148 roofs and 245 cars that required cleaning.  Samples were taken from 163 cisterns, and at the time the results of 135 of those samples had been received.  70 of those 135 cisterns were identified as contaminated.  At the time, 65 had been reportedly cleaned.

39.     Many in the community nearby the Facility rely on cisterns for their household water use.  A March 21, 2021 news article explained that, "Ever since the refinery contaminated St. Croix's groundwater [under HOVENSA's prior operation], cisterns have become a necessity on the island—catching rain to provide water for residents to drink, wash with or . . . irrigate their vegetable gardens."

40.     Residents also reported that the Feb. 4 Incident resulted in the oily mixture depositing on their vegetable gardens.  One resident said that she and her husband ate only from their garden, but that the Feb. 4, 2021 Incident "destroyed all our foods" and "[e]verything was dead."

41.     In an April 29, 2021 meeting with EPA officials, another resident living in the impacted Clifton Hill area explained that he collected water from his roof in a cistern, for filtration for drinking water and for his sheep.  The Feb. 4 Incident resulted in oil on his roof and in his cistern.  Limetree cleaned his cistern 2-3 weeks after the Feb. 4

10

Incident, but did not conduct follow-up sampling.  Limetree provided bottled water, but

he is concerned about the incident's impact on his plants and the produce he grows in his

garden.

42.     During an April 30, 2021, site visit to the Facility by staff from EPA and

DPNR, Limetree representatives said that Limetree believes that the release was a mist

with heavy oil in it, and acknowledged that the mist reached areas in Clifton Hill.  When

asked, Limetree representative said that the droplets passed through a lit flare flame,

though they did not believe that flaming droplets of oil had been recorded.

43.     Emissions of oil droplets from a flare is called "flare rainout."  Flare

rainout can create both environmental and physical safety hazards.  Oil contamination of

soil and water bodies creates environmental and public health hazards.  While there is no

evidence that "flaming rain" occurred during the Feb. 4 Incident, flare rainout can also

result in physical and safety hazards such as "flaming rain" where the oil droplets ignite

as they pass through the flare flame and rain down while on fire in the refinery and

nearby neighborhoods, creating sources of ignition for vapors in the refinery and igniting

combustible materials and starting fires inside the refinery and in adjacent

neighborhoods.  Because of these concerns, flare systems are designed with process

vessels called "knockout drums."  Knockout drums are vessels whose function is to

remove or "knockout" large liquid droplets from the gas sent to the flare.

44.     Knockout drums are sized for expected maximum load of liquid droplets.

When that capacity is exceeded, the liquid droplets pass through the knockout drum and

can cause flare rainout and flaming rain.  The rainout during the February 4, 2021

Incident may indicate the Flare #8 knockout drum(s) were not designed with sufficient

11

capacity to prevent liquid carryover to the flare. This type of event is not common for a refinery startup.

**Refinery Operating Pause**

45.     In early April, the Refinery stopped operations for a period of time due to undisclosed operational issues. LBR stated in a letter to EPA that the "refinery is shut down while we make operational adjustments."

**Late April 2021 Incident**

46.     After Refinery operations restarted, on April 19, 20, 21, 22, and 23, 2021, Limetree reported to DPNR exceedances of the 162 ppm emission standard for $H_2S$ concentrations measured at the flare header for Flare #8 at the Facility.

47.     According to the Agency for Toxic Substances and Disease Registry ("ATSDR") $H_2S$ is a flammable, colorless gas that smells like rotten eggs. People can usually smell $H_2S$ at low concentrations in air when $H_2S$ concentrations are in the range of from 0.0005 to 0.3 ppm. Exposure to low concentrations of $H_2S$ may cause irritation to the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to very high concentrations of $H_2S$.

48.     According to ATSDR, $SO_2$ is a colorless gas with a pungent odor (often described as the smell of a struck match). Exposure to very high levels of $SO_2$ can be life threatening. Exposure to 100 ppm of $SO_2$ is considered immediately dangerous to life and health. Burning of the nose and throat, breathing difficulties, and severe airway obstructions may occur.

49.     Between April 19 and April 22, 2021, hydrogen sulfide concentrations measured at the Flare #8 flare header rose to orders of magnitude above the limit of 162

12

ppm based on a 3-hr rolling average. High hydrogen sulfide readings on each of those four days, measured between 5 AM on April 19 and 5 PM on April 22, rose as high as 31,546.5, 39,475.7, 2,272.4, and 4,046.5 ppm, respectively (on a 3-hr rolling average basis).

50.     Limetree has explained the exceedances on April 19-22, 2021 as follows:

"On April 19th, the Coker unit was starting up and off gases generated were vented to the flare until the wet gas compressor was successfully brought online. The wet gas compressor was brought online around 1:34 AM on April 20th and the $H_2S$ in the flare decreased as startup progressed. Since the $H_2S$ level did not decrease below the emission limit once startup of the wet gas compressor was complete, Operations immediately began their search for another source of the $H_2S$ by methodically isolating each unit's battery flare valves. On April 21st, Operations discovered a malfunctioning pressure safety valve (PSV) on the low-pressure flash drum (D-4603) at the No. 6 Distillate Desulfurizer Unit (DD6). The PSV was taken out of service for maintenance."

51.     Limetree continued to measure high levels of hydrogen sulfide in excess of the 162 ppm limit at the flare header for Flare #8 at the Facility during the evening of April 22 and into April 23, 2021. Hydrogen sulfide readings rose throughout the evening on April 22, and peaked at a three-hour average of 91,649.0 ppm around 11 AM on April 23 – over 565 times higher than the concentration limit of 162 ppm.

52.     Limetree has explained the exceedances on these days as follows:

"At approximately 4:45 AM on April 23, 2021, the No. 4 Sulfur Recovery Unit (4SRU) tripped due to both "fire-eye" flame scanners not detecting a flame. At about 5:29 AM, the 4SRU was re-lit and at 7:07 AM the Clean Acid Gas (CAG) control valve at 4SRU started to slowly open but not quick enough to alleviate the pressure in the CAG header. Due to the backpressure in the CAG header, a pressure safety valve (PSV) at the No. 5 Amine Regeneration Unit (5ARU) relieved to the No. 8 Flare. The $SO_2$ generated from the combustion of the $H_2S$ in the flare header caused odors which impacted our neighbors. Further investigation showed that there was another malfunctioning PSV at the No. 6 Distillate Desulfurizer Unit (DD6), contributing to the elevated $H_2S$ before the 4SRU trip event. The PSV was taken out of service for maintenance."

13

H2S production units were shut down or placed on circulation to reduce the load on the

amine regeneration system and the sulfur recovery plant.  Limetree shut down 5ARU

because the PSV continued to leak to the flare even below the PSV setpoint.  Limetree

stated that one of its corrective actions included responding to odor complaints.

53.     Two days later, on April 25, Limetree once again exceeded the 162 ppm

limit for H2S at Flare #8 from 3 to 11 p.m.  That day, Limetree also exceeded that limit at

the East Fuel Gas System from 1-10 PM.  The maximum 3-hour average concentrations

for H2S that day were 842.4 ppm at Flare #8 and 629 ppm at the East Fuel Gas System.

54.     Limetree has explained these exceedances as follows:

"On April 25, 2021 the No. 3 and No. 4 Sulfur Recovery Units got contaminated
with hydrocarbon carryover via the acid gas.  Operations blocked in the acid gas
header to the sulfur recovery units (SRUs) which overloaded the No. 4 Amine
Regeneration unit (4ARU) preventing it from properly removing the H2S in the
fuel gas.  The No. 5 Amine Regeneration unit was not operational at the time.
Soon after, the 4ARU reboilers overpressured and relieved to the flare."

55.     As a result of the "noxious" odor created by the Refinery's emissions, on

April 23, 2021, the Virgin Islands Department of Education ("VIDOE") closed in-person

instruction at three schools.  In its press announcement, it stated that "[s]tudents and staff

have reported feelings of nausea due to the smell, which was detected on April 22[,

2021]."

56.     A Reuters news article also reported the April 23, 2021, closing of a St.

Croix community coronavirus vaccination center due to the odor.

57.     On April 23, 2021, DPNR issued a press release advising the community

of "a foul, gaseous smell permeating throughout the Frederiksted area for the past few

days."  DPNR notes that it has been receiving citizen complaints, and that it "has

discovered that the Limetree Bay Refinery is experiencing an exceedance of Hydrogen

sulfide." DPNR advised that people with respiratory ailments such as allergies, lung disease, and asthma should consider taking protective actions, including staying indoors or relocating to less affected areas of the island.

58.     On April 24, 2021, the Virgin Island Department of Health ("VIDOH") issued a press release alerting St. Croix residents to potential health effects from the Facility's Refinery emissions.  It noted Limetree's confirmation of elevated hydrogen sulfide concentrations from Flare #8 and said that a "foul, gaseous smell, which can smell similar to rotten eggs, has permeated throughout the Frederiksted area for the past few days."  It explained the potential health effects of breathing hydrogen sulfide, and encouraged residents to report symptoms such as headaches, nausea, and symptoms of a respiratory nature to their healthcare providers.

59.     On April 24, 2021, Limetree issued a press release denying any release of hydrogen sulfide occurred from April 22 to 23, 2021.  Limetree claimed that the incident involved only an unusually high level of sulfur dioxide emissions, and that the odor of sulfur dioxide (similar to a struck match) can be smelled in amounts far below the level normally considered dangerous to health.

60.     During an April 30, 2021, site visit to the Facility by staff from EPA and DPNR ("April Site Visit"), Limetree staff explained that the April 23, 2021 incident was related to the main sulfur recovery unit #4's fire eye detecting a lack of flame, and thus diverting the acid gas to the flare rather than treating it.  The flare itself had a flame burning at the time that would have burned the hydrogen sulfide, producing sulfur dioxide.

61.     During the April Site Visit, Limetree staff said that, although the Facility's Refinery Operations have two sulfur recovery units (SRUs Nos. 3 and 4), one (No. 3) was

out of service when the April 23, 2021 event occurred.  The out of service unit was thus unable to act as a backup when the operating unit (No. 4) malfunctioned.

62.     During the April Site Visit, EPA and DPNR were escorted by Limetree representatives to several areas of the Refinery, including the east part of the Facility where Flare #8 is located.   Based on conversation with Limetree staff  and EPA observation at the Facility, EPA staff learned that due to the significant elevation of Flare #8, the emissions from Flare #8 are often not measurable, nor are odors and other impacts from Flare #8's emissions detectable by olfaction on the grounds within the Facility's Refinery.  Rather, emissions plumes from Flare #8 downwash at (i.e. lowers to) ground level well beyond the Facility's fenceline.

63.     During the April Site Visit, DPNR staff noted that several residents provided very specific descriptions of odors and other impacts resulting from the April 23rd incident's emissions, and those odor characteristics and other impacts were consistent with both $H_2S$ and $SO_2$ being released.

64.     During the April Site Visit, EPA staff asked Limetree representatives if the Refinery was using a Sulfix$^{TM}$ $H_2S$ scavenger system to reduce the levels of $H_2S$ at the Flare #8 header.  Limetree representatives confirmed that the Refinery is using a Sulfix$^{TM}$ $H_2S$ scavenger system, and explained that it consists of the injection of an additive in several points of the Flare #8 header to absorb and recover some of the $H_2S$ in the gas that is conveyed through the Flare #8 header.  Limetree representatives informed EPA staff that although the $H_2S$ scavenger system was in operation during the Late April 2021 Incident, the system was not designed to manage the gas flow and $H_2S$ concentrations that were generated during the Incident.  According to Limetree

16

representatives, the system is designed to manage flow into the Sulfix$^{TM}$ system up to 1 million standard cubic feet (scf) and concentrations of no more than 1000 ppm of $H_2S$.

65.     During the April Site Visit, Limetree staff acknowledged that the Facility does not have any $SO_2$ monitor to measure concentrations of $SO_2$ entering the atmosphere from Flare #8 post-flaring.  Limetree believes the April 23, 2021 event only emitted $SO_2$ but does not know how much $SO_2$ was emitted.

66.     Limetree also does not conduct any fenceline monitoring for $SO_2$ or $H_2S$; it only conducts fenceline monitoring for benzene.  Limetree's predecessor, HOVENSA, operated five $SO_2$ monitors near the perimeter of the Facility, but those monitors have not been operated since 2013, after HOVENSA stopped operating the Facility's Refinery. Limetree has not restarted those $SO_2$ monitors.  On April 30, 2021, EPA issued a Notice of Violation ("NOV") to Limetree for its failure to operate the five $SO_2$ monitors.

67.     As indicated in EPA's AP-42 Chapter 13.5 (Industrial Flares), sulfur compounds contained in a flare gas stream are converted to $SO_2$ when burned.  The amount of $SO_2$ emitted depends directly on the quantity of sulfur in the flared gases.  The quantity of sulfur compounds and hydrocarbon emissions generated relate to the degree of combustion and the unit destruction efficiency.  The degree of combustion depends largely on the rate and extent of fuel-air mixing and on the flame temperature achieved and maintained.  A flare does not provide 100% destruction efficiency, so any changes in the degree of combustion, such as a sudden increase of flow and $H_2S$ concentrations such as the one reported on April 23, 2021, can trigger the release of unburned sulfur compounds such as $H_2S$, as well as hydrocarbons, and an increase in $SO_2$ emissions.

68.     Modeling of the Late April Incident by an expert EPA contractor showed that concentrations of sulfur dioxide exceed the Acute Exposure Guideline Level-1

17

(AEGL-1) for S at ground level. Above AEGL-1 level, asthmatics are at risk of bronchoconstriction, which results in increased airway resistance. The expert determined that subsequently exposed individuals in the community were faced with imminent and substantial danger to their health. The "notable discomfort, irritation, or certain asymptomatic non-sensory effects" associated with AEGL-1 exposure is consistent with citizen complaints received surrounding the Late April Event for the No. 8 Flare. Modeled 1-hour concentrations of SO2 also exceeded the lower bound of the taste threshold, and modeled 1-hour concentrations of H2S exceeded the odor threshold assuming a 98% conversion of H2S to SO2 associated with a well-operating flare (i.e., good combustion mechanics).

**May 5, 6, and 7, 2021 Incident ("First May Incident")**

69.     On May 5, 2021, community members began calling EPA to report that an odor was emitting from the Facility. They described the odor as "sulfur," "gassy," "burnt eggs," and "rotten." On May 6, 2021, community members continued to report odor emitting from the Facility. At 7:08 PM est, a citizen caller reported that the odor was continuing and described the fumes as "noxious." The caller also stated that the "materials in the air were causing health problems" for community members, including "head ache, sore throat, ear ache, nausea, and lips and tongue tingling."

70.     In an article published on May 7, 2021, the Washington Post reported that roughly 100 members of the community had contacted the Virgin Islands Territorial Emergency Management Agency ("VITEMA") describing a gaseous odor emitting from the Facility.

71.     Initially, on May 5, 2021, Limetree issued a statement on Facebook denying that there were any problems at the Facility. Having received "several

18

community complaints of a strong odor," Limetree stated in its Facebook post that

Facility personnel had conducted a preliminary investigation, and Limetree had

concluded that "units are operating normally, and there is no activity that would result in

an odor."

72. On May 5, 2021, Limetree environmental personnel reported to DPNR

and EPA that the Facility had exceeded the $H_2S$ limit at Flare #8 at approximately 9 PM

est on May 5. At the time the email notification was sent to DPNR and EPA at 10:12 PM

est, Limetree environmental personnel stated that $H_2S$ was back below the limit.

73. On May 6, 2021, at 12:45 pm, Limetree issued another statement

acknowledging that releases were occurring at the Facility. The statement read:

> "Limetree Bay has become aware of an odor affecting areas west of the facility. We are conducting maintenance activity at the Coker unit, which has resulted in light hydrocarbon odors. We will continue to monitor the situation, but there is the potential for additional odors while maintenance continues. We apologize for any impacts this may have caused the community. Thank you."

74. On May 6, 2021, around 11 AM est, an EPA On Scene Coordinator

("OSC"), was driving towards the Facility in order to investigate the source of odor

complaints on May 5, 2021. The OSC submitted the following summary of his

experience:

> While driving to the facilities, I intermittently had my car windows slightly open but at the time of this experience, my car windows were rolled up, with A/C circulating internally. I noticed an odor and pulled over. I rolled down my car window down to ask a worker on the side of the road what location I was at? What facility was he working at? The worker informed me it was "Container Port. I was surprised how unaffected the workers were by the odor. As if there was nothing different going on. They had no respiratory protection at all. I immediately closed my window and pulled away driving north. I determined that I was slightly west of the Limetree facility. The odor I briefly encountered was overwhelming and nauseating. I normally am suited up with respiratory protection and other [personal protective equipment] prior to being exposed to something like this. It was unexpected. The smell was gasoline-like in nature, but it was stronger than gasoline. I have experience inspecting refineries and other facilities, as well as general life experience mowing lawns and pumping gasoline, and I am familiar [with]

19

what gasoline smells like and what many other substances emitted by refineries smell like. This odor was stronger, more pungent than others I have encountered. The odor was overwhelming and felt as if I would be sick. I sent an email to EPA Region 02 [Regional Emergency Operations Center (REOC)] with a Google maps screenshot to my location. The REOC was receiving multiple calls from the National Response Center regarding similar odor complaints. The DPNR Environmental Director also contacted me with similar odor complaints. I then planned to visit those two locations which were described as Whim Estates and Mars Hill. As I drove away, even with the A/C on and recirculating air, I continued to smell the odor. I did not detect any orders [sic] in the towns that I investigated which were on the southwest side of the island. I did feel sick throughout the afternoon. It was obvious[] to me the odor was emitting from Limetree and not the asphalt plant(s). I could tell due to my location, the wind direction at the time, and other factors. When I returned to the hotel, the woman at the front desk referenced the facility restarting the coker plant and said that it was the source of the smell. Throughout the afternoon, my head felt 'cloudy' and [I] needed to shower because I felt 'contaminated.'"

75. As a result of the odor, the Virgin Islands Department of Education closed three schools on May 6, 2021. Due to concerns of continuing odor releases, the school closures remained in effect through May 7, 2021.

76. Also as a result of the odor, the VI Bureau of Motor Vehicles ("VIBMV") closed early on May 6, 2021 and remained closed on May 7, 2021. The VIBMV stated that, "[t]his closure is necessary because the employees at the BMV are affected by the strong unpleasant, gas like odor, in the atmosphere surrounding the BMV."

77. On May 7, 2021, VI Governor Albert Bryan activated the VI National Guard and the VITEMA to address continuing reports of odor and heightened concern from the community. The Director of the VI Department of Health ("VIDOH") stated during the same briefing that at least three members of the community had sought medical attention at an area hospital for headaches and nausea allegedly caused by the continuing odors. VIDOH then advised residents with respiratory ailments to avoid going outside or to temporarily relocate to areas of the island that were less affected by the odors.

78. On May 7, 2021, Limetree environmental personnel reported to EPA that the Facility had exceeded the $H_2S$ limit at Flare #8 at approximately 11 PM EST on May 7, 2021. Limetree environmental personnel stated in the email that "there was an instrumentation/communications error that caused a short spike." The notification did not indicate the extent of the exceedance.

**May 12, 2021 Incident ("Second May Incident")**

79. On May 12, 2021 at approximately 5:30 PM, Limetree reported to EPA that around 3:15 PM EST a flaring incident occurred at the Refinery when the pressure in the coker drum rose, causing fire or flames. At the time, Limetree was still unsure what specifically caused the flaring incident. Limetree reported that during its investigation of the fire, Limetree discovered that liquid droplets of oil were on the road west of the Facility. Limetree contacted VITEMA, and VITEMA had or was going to close the road. Liquid droplets of oil had also been reported on properties in the Enfield Green neighborhood.

80. Photographs and video of the Second May Incident show a large flame coming off Flare #8, with a large trailing plume of visible emissions extending a long distance.

81. At 4:15 PM on May 12, 2021, VITEMA issued an alert stating the following: "Limetree Bay Emergency Response Teams are responding to a fire onsite. DPNR has deployed the Virgin Islands Nation Guard for air quality monitoring and the VI Fire Service is standing by to support."

82. At 6:55 PM on May 12, 2021, Limetree emailed EPA to report the following: "We exceeded the 162 ppm $H_2S$ limit in the flare header (3-hr average) starting on the hour of 3 to 4pm. We will follow up with a letter."

21

83.     At 7:12 PM on May 12, 2021, Limetree sent EPA the following information by email: "At 6pm we exceeded the Reportable Quantity (RQ) of 500lbs of $SO_2$ in a 24hr period from a flaring event at Flare #8.  Limetree issued a statement on social media and is preparing a press release.  We temporarily suspended production in response to the incident."  In a subsequent email, Limetree clarified that it "temporarily suspended production on all process units."

84.     At 8:50 PM on May 12, 2021, Limetree staff told EPA staff by phone that Limetree was stopping production after such a "big" incident.  This would not be a full shutdown of the Refinery, but Limetree would stop production.  Limetree would run some units on circulation and the utilities/wastewater would still be in operation.  The Limetree staff was not sure how long production would be suspended.

85.     At 7:10 PM on May 12, 2021, an EPA employee currently deployed to St. Croix emailed colleagues and informed them that, "[t]here is oil on my windshield."

86.     During the evening of May 12, 2021, a Reuters news article reported the following:  "'The troubled Limetree Bay refinery in St. Croix will temporarily suspend production activities until further notice after a flaring incident dropped oil on a nearby neighborhood', the company said on Wednesday.  The company urged residents in the nearby Enfield Green community not to consume the water following the incident.  'Water distribution will be established for affected communities,' the company said in a statement, adding that processing units will be brought to a 'safe, stable condition.'"

87.     During a call with EPA staff on the morning of May 13, 2021, Limetree staff said that at that time no oil was being added to the Refinery system.  The shutdown of production will take a couple of days.  The oil from the incident that was deposited on roads and neighborhoods to the west of the Facility or elsewhere was a heavy oil like

22

pitch oil, and not crude oil. Limetree was, at this time, still using some pumps in generating electricity and running wastewater treatment operations.

88. Later in the morning on May 13, 2021, around 11:40 AM, Limetree staff clarified to EPA staff that all process units at the Refinery are shut down with the exception of the platformer, which supplies hydrogen to the desulfurization unit and is needed during the ramping down process. As soon as the Refinery is completely "ramped down", that unit will be shut down too. Limetree staff stated that they expected this to be completed by the end of the day on May 13, 2021.

89. The May 12, 2021 Incident resulted in flare rainout from Flare #8, and was likely caused by overloading the flare knockout drum with liquid droplets that reportedly originated from a process upset at the coker unit. As discussed in paragraph 44 above, this type of event – let alone two such events in a few months – is not common for a refinery startup.

90. Flare #8 has been the only flare in service at the Refinery, and refinery process units rely on it as a safeguard for process safety and environmental protection. Based on photos of the Second May Incident, it appears that Flare #8's flare tip, flare riser, and/or associated components were likely damaged in the Second May Incident. Due to the potential for release of uncombusted hydrocarbons and hydrogen sulfide, oil droplet rainout, and/or "burning rain", the refining process units that rely on Flare 8 may not be able to operate safely until Flare 8 is repaired and its capacity and fitness-for-service evaluated.

**Limetree Environmental Staffing**

91.     During the April Site Visit, Limetree representatives stated that Limetree

has a single Environmental Department, known as the Health, Safety, and

Environmental ("HSE") Department, serving the entire Facility, including the Refinery

and marine loading terminal operations.  In addition to managing environmental

compliance at the Facility, the HSE department also oversees safety and implementation

of COVID-19-related procedures.  The entire HSE department consists of 5 employees.

Limetree representatives noted they did have consultant support.

92.     A Refinery of this size and complexity would be expected to have 10-20

full time onsite staff in its health, safety and environment department.

93.      On April 1, 2021, EPA issued a Clean Air Act § 114 information request

to Limetree that provided Limetree with 30 days to respond.  In an April 7, 2021 letter

from LBR, LBR expressed that, "this is a very intense time for the [environmental,

health, and safety] team in terms of work load in general."  In large part given the heavy

workload on its environmental, health, and safety staff, LBR requested that it be given

an extra 180 days to respond to the information request, an amount of time far exceeding

any extension typically provided by the EPA.

94.     On April 19, 2021, Limetree replaced its Refinery General Manager.

**Health and Welfare Risks of Hydrogen Sulfide, Sulfur Dioxide, and Fuel Oils**

95.     According to an April 24, 2021, DPNR advisory regarding the Late April

2021 incident, DNPR warned:

> "Exposure to low concentrations of hydrogen sulfide may cause irritation to
> the eyes, nose, or throat.  It may also cause difficulty in breathing for some
> asthmatics.  Respiratory distress or arrest has been observed in people
> exposed to very high concentrations of hydrogen sulfide.

> Exposure to low concentrations of hydrogen sulfide may cause headaches, poor memory, tiredness, and balance problems. Brief exposures to high concentrations of hydrogen sulfide can cause loss of consciousness. In most cases, the person appears to regain consciousness without any other effects. However, in some individuals, there may be permanent or long-term effects such as headaches, poor attention span, poor memory, and poor motor function.
>
> Individuals with respiratory ailments such as allergies, lung disease, or asthma should consider taking protective actions such as staying indoors or temporarily relocating to areas less affected."

This language echoes the information provided by ATSDR in its "TOXFAQ" and "Public Health Statement" (a summary about a hazardous substance taken from its ATSDR Toxicological Profile) documents for hydrogen sulfide.

96. ATSDR's "TOXFAQ" for hydrogen sulfide further notes that "[s]tudies in humans suggest that the respiratory tract and nervous system are the most sensitive targets of hydrogen sulfide toxicity."

97. According to ATSDR's "TOXFAQ" for hydrogen sulfide, while there is very little information on possible health problems in children who have been exposed to hydrogen sulfide, exposed children probably will experience effects similar to those experienced by exposed adults. Whether children are more sensitive to hydrogen sulfide exposure than adults is not known.

98. ATSDR's "Public Health Statement" on hydrogen sulfide further specifies that you can have respiratory and neurological effects if you are exposed to higher concentrations of hydrogen sulfide, at least 100 times higher than typical environmental levels. The ATSDR Public Health Statement elsewhere says that, "[h]ydrogen sulfide air concentrations from natural sources range between 0.00011 and 0.00033 ppm. In urban areas, the air concentrations are generally less than 0.001 ppm."

25

99.     ATSDR's "Public Health Statement" on hydrogen sulfide notes that, "If you are exposed to very high concentrations of hydrogen sulfide, you may have severe problems breathing even if you do not have a pre-existing respiratory condition.  You could lose consciousness if you are briefly exposed to very high concentrations (more than 1 million times higher than the amount typically found in the environment).  If this happens, you may regain consciousness without any other effects.  However, some people may have longer lasting effects such as headaches, poor attention span, poor memory, and poor motor function."

100.     ATSDR has also said that hydrogen sulfide can remain in the air from 1 to 42 days, depending on the season.

101.     Breathing high levels of $SO_2$ can cause immediate health impacts.  Short-term exposures to $SO_2$ can harm the human respiratory system and make breathing difficult.  People with asthma, particularly children, are sensitive to these effects of $SO_2$. $SO_2$ emissions that lead to high concentrations of $SO_2$ in the air generally also lead to the formation of other sulfur oxides ("SOx").  SOx can react with other compounds in the atmosphere to form small particles.  These particles contribute to particulate matter (PM) pollution.  Small particles may penetrate deeply into the lungs and in sufficient quantity can contribute to health problems.

102.     According to ATSDR's "Public Health Statement" on sulfur dioxide:

"Short-term exposures to high levels of sulfur dioxide can be life-threatening. Exposure to 100 parts of sulfur dioxide per million parts of air (ppm) is considered immediately dangerous to life and health.  Previously healthy nonsmoking miners who breathed sulfur dioxide released as a result of an explosion in an underground copper mine developed burning of the nose and throat, breathing difficulties, and severe airway obstructions.  Longterm exposure to persistent levels of sulfur dioxide can also affect your health.  Lung function changes have been observed in some workers exposed to 0.4–3.0 ppm sulfur dioxide for 20 years or more.   However, these workers were also exposed to

26

other chemicals, making it difficult to attribute their health effects to sulfur dioxide exposure alone. Additionally, exercising asthmatics are sensitive to the respiratory effects of low concentrations (0.25 ppm) of sulfur dioxide. . . .

Most of the effects of sulfur dioxide exposure that occur in adults (i.e., difficulty breathing, changes in the ability to breathe as deeply or take in as much air per breath, and burning of the nose and throat) are also of potential concern in children, but it is unknown whether children are more vulnerable to exposure. Children may be exposed to more sulfur dioxide than adults because they breathe more air for their body weight than adults do. Children also exercise more frequently than adults. Exercise increases breathing rate. This increase results in both a greater amount of sulfur dioxide in the lungs and enhanced effects on the lungs. . . .

Long-term studies surveying large numbers of children have indicated possible associations between sulfur dioxide pollution and respiratory symptoms or reduced breathing ability. Children who have breathed sulfur dioxide pollution may develop more breathing problems as they get older, may make more emergency room visits for treatment of wheezing fits, and may get more respiratory illnesses than is typical for children. However, studies like these are unable to provide conclusive evidence about sulfur dioxide's effects on children's health because many other pollutants are also present in the air. . . .

It is known that exercising asthmatics are sensitive to low concentrations of sulfur dioxide. Therefore, increased susceptibility is expected in children with asthma, but it is not known whether asthmatic children are more sensitive than asthmatic adults. Additionally, asthma occurs most often in African Americans, children between the ages of 8 and 11, and people living in cities. For unknown reasons, the death rates associated with asthma are also higher in non-Caucasian people. Therefore, it is expected that asthmatic, African American children living in urban areas have increased sensitivity to sulfur dioxide."

103.    The Center for Disease Control's ATSDR has developed a "ToxFAQ"

document (a fact sheet that answers the most frequently asked questions about a

contaminant and its health effects) for fuel oils. This document describes "fuels oils" as

"a variety of yellowish to light brown liquid mixtures that come from crude petroleum.

Some chemicals found in fuel oils may evaporate easily, while others may more easily

dissolve in water. Fuel oils are produced by different petroleum refining processes,

depending on their intended uses." The document notes that, "[d]rinking or breathing

fuel oils may cause nausea or nervous system effects," although it also notes that, "[l]ittle

information is available about the health effects that may be caused by fuel oils."  It says that "Breathing some fuel oils for short periods may cause nausea, eye irritation, increased blood pressure, headache, light-headedness, loss of appetite, poor coordination, and difficulty concentrating.  Breathing diesel fuel vapors for long periods may cause kidney damage and lower your blood's ability to clot."

104.    According to an expert EPA contractor, for the oil droplets released during two events, ". . . the oil [released during the Feb. 4 Incident and the Second May Incident] is likely composed of a mixture of petroleum hydrocarbons. Potential exposures include inhalation of volatile components, dermal contact with the residues, and ingestion of or contact with impacted water. Human health impacts depend on the specific petroleum constituents in a particular media or matrix, but total petroleum hydrocarbons as well as individual constituents have been associated with a variety of adverse health impacts. Skin and eye irritation, for example, are associated with short-term exposures to different hydrocarbon fractions. Longer term oral exposures to the semi-volatile fractions such as polyaromatic hydrocarbons (PAHs) have shown liver effects to be a common endpoint. Dermal contact with some PAHs have been shown to elicit skin hypersensitivity reactions. Some oil constituents have been classified as known or possible carcinogens.

> The expert EPA contractor found that: "The information available to date indicates that the incidents which occurred at the Limetree Bay Terminals and Refining facility present an imminent and substantial endangerment to both public health and welfare. This conclusion is based on multiple lines of evidence that demonstrate that the facility has already placed the health and welfare of the nearby community at risk. Additionally, the repeated nature of the flare failures coupled with the events associated with the release of noxious sulfur compounds and other potential hazardous air pollutants elevates the degree of harm."

The expert EPA contractor noted that, in addition to the impacts on physical health, the repeated incidents emitting oil droplets in a short time period have resulted in fear and anxiety about the next possible event and the severity of that event. The frequency of Limetree flare incidents raises the concern that events could continue to escalate and result in an even more significant or catastrophic incident, which could lead to injury or loss of life. The contractor also notes that improper maintenance or process safety management of flare systems has historically caused serious harm to people (killing or injuring workers and people living and working off site) and the environment, as well as damage and loss to property.

## CONCLUSIONS OF LAW

EPA concludes the following:

105.    Respondent LBT is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), against whom an Emergency Order may be issued under Section 303 of the Act, 42 U.S.C. § 7603.

106.    Respondent LBR is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), against whom an Emergency Order may be issued under Section 303 of the Act, 42 U.S.C. § 7603.

107.    In its current state, the Facility is a "pollution source" or "combination of sources" within the meaning of Section 303 of the Act, 42 U.S.C. § 7603.

108.    The Feb. 4, 2021 Incident's emissions of an "oily mist," consisting in part of heavy oil, including a mixture of many heavy organic compounds; the Late April Incident emissions of $H_2S$ and/or $SO_2$; the First May Incident's emissions of light hydrocarbons and/or volatile organic compounds; and the Second May Incident's

29

emissions of heavy oil droplets, particulate matter, and visible emissions are all "air pollutants" within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603.

109.    Respondents are "causing or contributing" to the emission of air pollutants within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603, by continuing to operate the Facility's Refinery Operations in the current manner.

110.    EPA is in receipt of evidence that, in less than four months, the air emissions from the Facility's Refinery Operations have, on at least four occasions, harmed the public health, welfare or the environment, as described *supra* at Paragraphs 33-90, and 95-104.

111.    EPA is in receipt of evidence that the Refinery, if allowed to continue to operate as it is currently operated, presents an imminent and substantial endangerment to the public health or welfare or the environment.

112.    Issuance of this Order is necessary to assure prompt protection of public health or welfare or the environment because it is not practicable to wait for the commencement of a civil action in United States District Court to assure prompt protection from additional air emissions events.

113.    The Director of the Caribbean Environmental Protection Division has found that the Refinery's current operations, as described above, if allowed to continue, are presenting an imminent and substantial endangerment to public health or welfare or the environment, and it is therefore appropriate for the issuance of an Order under Section 303 of the Act, 42 U.S.C. § 7603.

114.    The Director of the Caribbean Environmental Protection Division is vested with the authority of the Administrator under Section 303 of the Act, 42 U.S.C. § 7603.

## ORDER

115.    Based on the foregoing, and pursuant to Section 303 of the Act, 42 U.S.C. § 7603, in order to abate or prevent an imminent and substantial endangerment to public health or welfare or the environment, the Director of the Caribbean Environmental Protection Division hereby orders Respondents, their agents, employees, successors, and assigns, to address the endangerment posed by frequent incidents at the Refinery that have endangered public health and welfare, as follows:

a.  Within one (1) business day of receipt of this Order, Respondents shall submit to EPA in writing a statement explaining whether Respondents intends to and is able to comply with this Order.

b.  Upon receipt of this Order, Respondents shall ensure all Refinery Operations cease until the termination of this Order in accordance with paragraph 125 unless, based on the auditor reports and Respondents' implementation plan, EPA determines, in consultation with VIDPNR, that operations can resume before the expiration of the Order.

c.  Respondents shall notify EPA electronically, in accordance with paragraph 116, as soon as possible once Refinery operations have ceased.

d.   Respondents shall retain, at their expense, independent third party auditors ("Auditors") consistent with the requirements set forth below. The Auditors shall be retained to conduct one or more comprehensive

audits ("Audits"), to be completed by the earlier of 30 days after EPA's approval of a list of auditors for a given Audit Category pursuant to subparagraph (f) of this paragraph or 42 days after issuance of this Order. The Audits shall include a review of the items specified in subparagraphs (i) and (j) of this paragraph. Respondents shall require that the Auditors act independently and objectively when performing all activities. Respondents shall provide the Auditors with full access to the Facility and provide or otherwise make available any necessary personnel, documents, and Facility environmental, health, and safety training to fully perform all audit activities.

e.  Within 7 days of this Order's issuance, Respondents shall submit to EPA the name and qualifications of at least three (3) proposed Auditors (the "Proposed Auditors") in each Audit Category discussed in subparagraphs (h), (i) and (j) of this paragraph – and more if necessary to provide competency in all of an Audit Category's scope – that Respondents certify meet the following conditions:

  i.  A Proposed Auditor for the Environmental Compliance Audit has demonstrated experience in audits for compliance with Clean Air Act regulations and has completed at least a bachelors degree in science or engineering.

  ii.  A Proposed Auditor for the Process Unit Audit has demonstrated experience in refinery process operation and optimization and has completed at least a bachelors degree in chemical or mechanical engineering.

iii.   The Proposed Auditor and its personnel have not conducted research, development, design, construction, financial, engineering, legal, consulting nor other advisory services for Respondents or any other entity associated with the Refinery within the last three years.  However, a Proposed Auditor with personnel who, before working for the audit firm, conducted research, development, design, construction, or consulting services for Respondents (as an employee or contractor) may meet the requirements of independence by ensuring such personnel do not participate on, manage, or advise the audit team;

iv.   The Proposed Auditor was not involved in efforts since 2016 to restart or operate the Facility.

v.   The Proposed Auditor and its personnel will not provide any other commercial, business, or voluntary services to Respondents for a period of at least three years following the Proposed Auditor's submittal of the final Audit Report.

vi.   Respondents will not provide future employment to any of the Proposed Auditor's personnel who managed, conducted, or otherwise participated in the Audit for a period of at least three (3) years following the Proposed Auditor's submittal of its final Audit Report.

f.   EPA will notify Respondents in writing whether it approves of any of the three (3) proposed Auditors in each Audit Category.  Within 7

days of EPA approval, Respondents shall retain one or more of the

EPA-approved Proposed Auditors for each Audit Category, who shall

then become the Auditor(s) for that Audit Category, to perform the

audit activities set forth in subparagraphs (i) and (j) of this paragraph

of this Order.  Respondents shall ensure that all audit personnel who

conduct or otherwise participate in audit activities shall certify that

they satisfy the conditions set forth in subparagraph (e) of this

paragraph above before receiving any payment from Respondents.

    i.   If EPA rejects all three of the Proposed Auditors proposed for

an Audit Category, within 48 hours of receipt of EPA's

rejection notification, Respondents shall submit to EPA for

approval another three (3) Proposed Auditors that meet the

qualifications set forth in subparagraph (e) of this paragraph.

EPA will review the proposed replacements in accordance

with this subparagraph (f).

g.  Each Auditor shall commence auditing onsite within 5 days of

contracting.

h.  The Audit Categories shall include Category A (Environmental

Compliance Audit) and Category B (Process Unit Audit).

i.  <u>Audit Category A: Environmental Compliance Audit</u>.  Respondents

shall ensure that the contract with the Auditor(s) retained to perform

the Environmental Compliance Audit explicitly requires the

Auditor(s) to perform the activities specified in this paragraph and its

subparagraphs.  However, the contents of the Audit shall not be

34

limited to the below items if the Auditor determines that additional evaluation should be conducted to prevent emissions or incidents that could endanger public health or welfare or the environment.

i. An evaluation of staffing within the environmental, health and safety program at the Refinery including staffing levels and whether staff have proper academic background, experience, and training to ensure the Refinery operates within required environmental, health, and safety limits and avoids situations or condition that endanger public health or welfare or the environment;

ii. A review of CAA compliance at the Refinery since February 2021, with a summary of all non-compliance and recommended steps to prevent future noncompliance, including at a minimum:

1. Exceedances of NSPS Subpart J and Ja and permit $H_2S$ limits at Flare #8 and the East Mix Drum and Coker Mix Drum Fuel Gas Systems;

2. Compliance with all NSPS Subpart Ja requirements for flare incidents that exceed the 500 pound per day threshold;

3. Compliance with the obligations of the Flare Management Plan submitted pursuant to NSPS Subpart Ja and NESHAP Subpart CC; and

    4.   An evaluation of compliance for releases at the coker unit with particular emphasis on the miscellaneous process vent requirements of NESHAP Subpart CC and the coker steam vent requirements of NESHAP Subpart CC.

j.    <u>Audit Category B: Process Area Audits</u>.  Respondents shall retain one or more Auditors, as necessary to ensure the Auditors have the requisite expertise to perform the activities in this paragraph and its subparagraphs.  Respondents shall ensure that its contract with each Auditor retained to perform Process Area Audits explicitly requires the Auditor to perform the activities specified in this paragraph and its subparagraphs.  However, the contents of the Audit shall not be limited to the below items if an Auditor determines that additional evaluation should be conducted to prevent emissions or incidents that could endanger public health or welfare or the environment.

    1.   Flare system audit.

        a.   An evaluation of the condition of the tip on Flare #8;

        b.   Capacity of the knockout pot to handle liquids loading to prevent flare rainout;

        c.   Capacity of flare #3 to serve as backup to Flare #8;

36

d. Other damage already incurred by and to the flare system due to high liquid loading or other causes;

e. Review of procedures that can be implemented to avoid and minimize the impact of future flaring events, including:

    i. Operation of redundant amine treatment units and redundant SRU trains operated in hot standby; and

    ii. Sulfur shedding practices;

f. A review of whether and how installation of a flare gas recovery system to eliminate or minimize Flare #8 non-compliance can be expedited; and

g. An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

2. Coker audit.

a. Releases to Flare #8, particularly high liquid loading that has occurred, what caused them,

and physical changes and operating changes to prevent them from happening in the future;

b. Releases since February 2021 of volatile organics directly to the atmosphere from the coker unit, and particularly from the steam vent prior to decoking, what caused them, and physical changes and operational changes to prevent such releases from happening again in the future; and

c. An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

3. Amine/Sulfur Recovery Unit (SRU).

a. Acid gas flaring events at Flare #8, particularly including hydrocarbon carryover from the amine units to the SRUs, what caused them, and physical changes and operational changes to prevent them from happening again in the future;

        b.  Review of procedures that can be implemented to avoid and minimize the impact of future acid gas flaring events, including:

           i.  Operation of redundant amine treatment units and redundant SRU trains operated in standby; and

           ii.  Sulfur shedding practices; and

        c.  An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

k.  Respondents shall ensure that its contract with each Auditor requires that the Auditor shall simultaneously submit an audit report ("Audit Report") to Respondents, EPA (at the contacts listed in paragraph 116 below), and VIDPNR (at the contacts listed in paragraph 117). Concurrently, Respondents shall represent that the Audit Report submittal meets the following requirements:

        i.  Respondents shall ensure that the Auditor does not share any draft or preliminary audit findings or reports with Respondents in any format (electronic, paper, or verbal).

        ii.  Respondents shall conduct no post-audit oral or written communications with the Auditor except to request, for the

purposes of the audit, additional audit-related data or

information.  EPA and VIDPNR shall be simultaneously

copied (at the contacts listed in paragraphs 116 and 117

below) on any such communication.

iii.   Respondents shall ensure that the Auditor does not share its

audit conclusions with Respondents until the Auditor submits

its Audit Report(s) to EPA and VIDPNR.

iv.   The Audit Report shall include all findings, conclusions,

monitoring results, and other observations of the Auditor.

v.   The Auditor shall provide EPA and VIDPNR with copies of

all documents reviewed and identify all Facility personnel

interviewed in support of the Audit Report.

vi.   Respondents shall require the Auditor to include in the final

Audit Report, submitted to EPA and VIDPNR pursuant to this

Order, a certification that the Auditor has remained in

compliance with all of the conditions set forth in subparagraph

(e) of this paragraph, above.

l.   Within 56 days of the issuance of this Order, Respondents shall submit to

EPA a detailed plan that addresses all findings, conclusions, and observations

set forth in each Audit Report, with an expeditious schedule for

implementation of all corrective measures ("the Plan").

i.   Respondents shall also describe each completed or proposed action to

correct each deficiency identified in each Audit Report submitted to

EPA, including the date(s) that such corrections occurred or are

scheduled to occur. The Plan shall provide for the implementation of each Auditor's recommendations in each Audit Report or provide a detailed explanation for why an Auditor's given recommendation is impracticable.

ii. The Plan shall ensure that the Refinery operates in a manner that complies with environmental statutory, regulatory and permit requirements such that said operation does not present an imminent and substantial endangerment to public health or welfare or the environment, and the Plan shall include adequate measures to protect the health and welfare of residents living near the Facility.

iii. The Plan shall be submitted to EPA, for EPA review, comment, and approval, or approval with modifications.

m. Upon commencing operation of any Refinery process unit following the ceasing of Refinery Operations required in subparagraph (b) of this paragraph, Respondents shall electronically notify EPA as soon as possible but no later than 24 hours after commencement.

116. Note: Respondents shall submit all notices, schedules, work plans, analyses, certifications and documentation required by this Order by email to:

Robert Buettner, Chief
Air Compliance Branch
Enforcement and Compliance Assurance Division
buettner.robert@epa.gov

And

Nancy Rodríguez, Chief
Multimedia Permits and Compliance Branch
Caribbean Environmental Protection Division
U.S. Environmental Protection Agency, Region 2

rodriguez.nancy@epa.gov

And

Harish Patel, Team Leader
Air Compliance Branch
Enforcement and Compliance Assurance Division
Patel.harish@epa.gov

And

Patrick Foley, Senior Environmental Engineer
Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Foley.patrick@epa.gov

And

Liliana Villatora, Chief, Air Branch
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
villatora.liliana@epa.gov

And

Sara Froikin, Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
froikin.sara@epa.gov

117.    Note: Whenever submittal to VIDPNR is required in paragraph 115,

Respondents shall submit all notices, schedules, work plans, analyses, certifications and

documentation required by this Order by email to:

Verline Marcellin, Air Program Supervisor
Virgin Island Department of Planning and Natural Resources
verline.marcellin@dpnr.vi.gov

And

Jean-Pierre Oriol, Commissioner
Virgin Island Department of Planning and Natural Resources
jp.oriol@dpnr.vi.gov

42

## ACCESS

118.    Respondents shall allow EPA and its authorized representatives and contractors to enter and freely move about all areas subject to this Order, using equipment to gather information, for the purposes of inspecting conditions, activities, records, and contracts related to the presence of emissions in the Facility and other CAA compliance concerns and operation of the Refinery.  Respondents shall allow EPA and its authorized representatives to enter the areas subject to this Order to inspect and copy all records, files, photographs, documents, sampling and monitoring data, and other writings related to carrying out this Order.

119.    Nothing in this Order is intended to limit, affect or otherwise constrain EPA's rights of access to property and records pursuant to applicable law.

## RESERVATION OF RIGHTS

120.    EPA reserves the right to take any necessary action to enforce this Order, including obtaining injunctive relief or civil or criminal penalties, in accordance with Section 113 of the CAA, 42 U.S.C. § 7413.

121.    Be advised that issuance of this Order does not preclude EPA from electing to pursue any other remedies or sanctions authorized by law that are available to address these and other violations.  This Order does not resolve Respondents' liability for past violations of the Act or for any violations that continue from the date of this Order up to the date of compliance.  At any time after the issuance of this Order, EPA may take any or all of the following actions: issue a further order requiring compliance with the Act; issue an administrative penalty order for up to $48,762 per day for each violation; or bring a civil or criminal action seeking an injunction and penalties.  See Sections 113(a)-

43

(d) of the CAA, 42 U.S.C. §§ 7413(a)-(d); 40 C.F.R. Part 19; and 85 Fed. Reg. 83818

(December 20, 2020) (raising CAA penalties to $48,762 for violations occurring after

Nov. 2, 2015 and assessed on or after Dec. 23, 2020).

122.    Nothing in this Order shall limit the power and authority of EPA to take,

direct or order all action necessary to protect public health or welfare or the environment

to prevent, abate or minimize an imminent and substantial endangerment resulting from

the continued operation of the Refinery as it is currently operated.  Further, nothing in

this Order shall be construed to prevent EPA from seeking legal or equitable relief to

enforce the terms of this Order, or from taking other legal or equitable action as EPA

deems appropriate and necessary, pursuant to the CAA, and any other applicable law.

Nothing herein shall be construed to prevent EPA from requiring Respondents to perform

further actions pursuant to the CAA or other applicable law.

123.    Neither EPA nor the United States, by the issuance of this Order, assumes

any liability for any acts or omissions by Respondents or Respondents' employees,

agents, contractors or consultants engaged to carry out any action or activity pursuant to

this Order; nor shall EPA or the United States be held as a party to any contract entered

into by Respondents or Respondents' employees, agents, contractors or consultants

engaged to carry out the requirements of this Order.

## EFFECTIVE DATE

124.    This Order is effective immediately upon issuance by EPA. Although this

Order is effective immediately, Respondents may contact EPA to confer about

compliance with the Order by contacting Sara Froikin, Esq. of EPA at 212-637-3263.

125.    This Order shall be effective for a period of not more than 60 days unless the United States files a civil action in the appropriate United States district court pursuant to Section 303 of the Act, 42 U.S.C. § 7603.

CARMEN
GUERRERO
PEREZ

Digitally signed by CARMEN
GUERRERO PEREZ
Date: 2021.05.14 12:43:00
-04'00'

May 14, 2021

_____                         _____

Carmen R. Guerrero, Director                                         Date
Caribbean Environmental Protection Division
United States Environmental Protection Agency, Region 2

45

EXHIBIT 7

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

September 24, 2021

**_Via_ Electronic Mail**
All Potential Buyers of Limetree Bay Refinery
c/o Elizabeth A. Green
egreen@bakerlaw.com

Re:    Environmental information about the Limetree Bay Refinery; _In re Limetree Bay Services, LLC, et al._, Case No. 21-32351, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

The United States Environmental Protection Agency ("EPA") provides this letter to potential buyers of the Limetree Bay Refinery in an attempt to provide a common base of information for all potential bidders and minimize the risk of misunderstanding or surprise. This letter is merely informational, and buyers should not interpret it as designed to either encourage or discourage a sale or any particular use of the facility. This letter is not intended to be nor should be read as an exhaustive list of environmental compliance, permitting, or liability issues related to the debtors or the refinery.

Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC (jointly, "Limetree Bay") are also subject to requirements contained in environmental permits issued by EPA and the Virgin Islands Department of Planning and Natural Resources ("VIDPNR"), including Prevention of Significant Deterioration permits issued by the EPA and a Clean Air Act Title V operating permit issued by VIDPNR. Any potential purchaser of the facility will have to perform its own environmental due diligence, and any entity that becomes an owner/operator of the refinery will have to employ environmental compliance staff who maintain familiarity with all applicable environmental requirements and ensure that the refinery is operated in compliance with applicable law.

I.    **Audit Reports**

The EPA issued an emergency order on May 14, 2021, requiring the refinery to cease operations for sixty days. This order also required the debtors to retain independent third-party auditors to conduct an environmental compliance audit and process area audits.

The debtors have obtained (a) an environmental compliance audit report, and (b) process area audits of (1) the flare system, (2) the amine unit and sulfur recovery unit system, and (3) the delayed coker system. The EPA sent a letter to the debtors on July 28, 2021, concerning the environmental compliance audit report, and therein referenced a letter the EPA had sent to the debtors on June 9, 2021.

These audits and letters detail compliance issues under environmental law of which potential buyers should be aware. The EPA recommends that any buyer review these documents.

## II.      2021 Complaint and Joint Stipulation

On July 12, 2021, the United States filed suit against Limetree Bay in the United States District Court for the Virgin Islands, for injunctive relief for compliance with environmental law.  Case No. 1:21-cv-264.  On the same day, the United States filed with the court a joint stipulation with Limetree Bay.

The joint stipulation requires Limetree Bay, among other things, to:

(a)      Submit a plan for purging hydrocarbons from the refinery to bring the refinery to an indefinite state of shutdown, including operation of ambient air monitors during the purging process;[1]

(b)      Conduct the purging process in accordance with the EPA-approved Hydrocarbon Purge Plan, subject to any modification necessary, and not begin purging without the EPA's approval;

(c)      Except as otherwise provided in the stipulation, at least ninety days before restarting the refinery or any refinery process unit:

(1)      Notify both the presiding court and the United States,
(2)      Submit the Corrective Action Plan required by the May 14 order to the EPA.  The plan must specify which measures must be completed before restarting the refinery or a refinery process unit, and
(3)      Submit an ambient air monitoring plan to the EPA that includes operation of hydrogen sulfide ($H_2S$) and sulfur dioxide ($SO_2$) monitors at nine EPA-identified monitoring sites;

(d)      Except as otherwise provided in the stipulation, at least thirty days before restarting the refinery or any refinery process unit, install and operate the nine ambient air monitoring sites plus a meteorological tower; and

(e)      Before restarting the refinery or any refinery process unit, complete all measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment.

## III.      2011 Consent Decree

On January 26, 2011, the United States and the United States Virgin Islands filed suit against HOVENSA in the United States District Court for the Virgin Islands seeking injunctive relief and civil penalties for alleged violations of the Clean Air Act, 42 U.S.C. §§ 7401-7671, and the Virgin Islands Air Pollution Control Act.  In conjunction with the filing of the complaint, the United States lodged a consent decree resolving the claims alleged in the complaint.  The court entered the consent decree on June 7, 2011. The claims addressed in the 2011 consent decree included alleged violations of the Clean Air Act and its

---

[1] Limetree has submitted to EPA, and EPA has approved, Phases 1 and 2 of the Hydrocarbon Purge Plan. Information about Phases 1 and 2 can be found on the EPA website at https://www.epa.gov/vi/limetree-bay-terminals-and-limetree-bay-refining-llc.  Limetree has indicated that it expects to provide at least one additional plan (Phase 3) to EPA for hydrocarbon purging, and that additional phases after Phase 3 may be necessary to fully complete the purging process.

implementing regulations, including prevention of significant deterioration provisions, the New Source Performance Standards ("NSPS"),  leak detection and repair ("LDAR") provisions for equipment leaks, and National Emission Standards for Hazardous Air Pollutants for benzene waste operations provisions. The 2011 consent decree required HOVENSA to: reduce nitrogen oxide ("$NO_x$") emissions and control $SO_2$, particulate matter ("PM"), and carbon monoxide ("CO") emissions from the refinery's fluid catalytic cracking unit; significantly reduce $NO_x$ emissions from the refinery's heaters, boilers, generating turbines, and compressor engines through the installation of pollution control equipment; reduce $SO_2$ emissions by burning lower sulfur fuel oil and complying with $H_2S$ limits for fuel gas combustion requirements for heaters, boilers, flares, and sulfur recovery plants; comply with regulatory requirements for acid gas and hydrocarbon flaring, and implement a program to investigate and correct the causes of flaring incidents and take preventive action; create a preventive maintenance and operation plan for minimizing $SO_2$ emissions from the sulfur recovery plant; reduce emissions of volatile organic compounds ("VOCs") through stricter LDAR requirements for equipment leaks and by replacing valves that are leaking above a specified level with low emissions valves or low emissions valve packing; and reduce emissions of benzene by improving management of benzene waste streams.  The 2011 consent decree also required HOVENSA to pay $5,375,000 in civil penalties and deposit $4,875,000 into an escrow account to be used to implement Territorial Supplemental Environmental Projects.

## IV.    Modification of 2011 Consent Decree

On August 25, 2020, the United States lodged the proposed First Modification of the Consent Decree with the court.  The first modification was subject to a thirty day public comment period.  After reviewing and responding to public comments, the United States filed a motion to enter the First Modification of the Consent Decree on April 26, 2021.  The motion to enter is still pending before the court.  A second, non-material modification of the consent decree that does not require court approval was also submitted to the court on April 26, 2021.

The First Modification adds Limetree Bay and the Environmental Response Trust ("ERT") as parties to the consent decree and transfers uncompleted or ongoing decree responsibilities to Limetree Bay and the ERT, such that Limetree Bay and the ERT effectively step into the shoes of HOVENSA, and HOVENSA is released from its decree obligations and liabilities as of the date of entry of the First Modification.  The First Modification also modifies the following deadlines and injunctive relief obligations to reflect the changed operational realities of the refinery: (1) briefly extends the deadline for Limetree Bay to install Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 3,663 tons per year of $NO_x$ emission reductions; (2) modifies the language to reflect the current configuration of the East Side sulfur recovery plant ("SRP") and extends the deadline for installing control technology to control the sulfur emissions from the East Side SRP and comply with NSPS Subparts A and Ja; (3) modifies the requirement to install and operate flare gas recovery systems ("FGRS") on certain flares in order to comply with NSPS Subpart Ja and potentially requires Limetree Bay to perform mitigation projects if emissions exceed a specified level.  Specifically, because the operational profile of the refinery is now significantly different as compared to when the consent decree was entered into in 2011, the First Modification conditions the installation of FGRS on the refinery's flaring emission levels after restart (as defined in the First Modification); providing that FGRS is not required if flaring emissions remain below specified gas flow rates, but requiring Limetree Bay to install and operate FGRS if the specified gas flow rates are exceeded[2], thereby ensuring the expected emission

---

[2] On April 13, 2021, Limetree Bay submitted a letter to EPA acknowledging that it had exceeded the specified gas flow rates, requiring Limetree Bay to install and operate FGRS on the FCCU Low Pressure Flare (Flare 8) by March 14, 2023.

reduction benefits that were required by the 2011 consent decree are obtained while taking into account the modified operating profile of the refinery; (4) modifies Section V.P (Benzene Waste NESHAP Program) to reflect that HOVENSA selected the 6 BQ compliance option set forth in 40 C.F.R. § 61.342(e), and that Limetree Bay has agreed to redo the one-time review and verification of the refinery's total annual benzene ("TAB") report following restart; (5) modifies Section V.R (LDAR Program) to make the terms consistent with the more recent LDAR regulations, including lower leak definitions, to ensure that a minimum of three audits will be conducted before the decree is terminated, and to update the Valve Preventative Leak Maintenance Program; (6) modifies Section VIII.B (NSPS Applicability: Boilers and Generating Turbines) to extend the deadline for demonstrating compliance with NSPS Subparts A and GG at GT-4, GT-7, and GT-8, and to reflect that Limetree Bay has installed combustion liner systems on GT-7 and GT-8 to reduce $NO_x$ emissions, and to operate at lower maximum load limits on GT-4, GT-7, and GT-8 until Limetree Bay demonstrates compliance with NSPS Subparts A and GG; (7) modifies Section IX.A (Territorial Supplemental Environmental Project) to reflect the transfer of HOVENSA's obligation to disburse monies for the Territorial Supplemental Environmental Project to the ERT; and (8) modifies Section IX.B (Additional Work) to reflect that HOVENSA's remaining obligations for the VIWAPA Emissions Monitoring Assistance Program were transferred to the ERT [First Modification ¶ 140A].

The consent decree conditions any transfer on the transferee executing a modification of the consent decree which makes the terms and conditions applicable to the transferee.

**V.     Prevention of Significant Deterioration Permit**

A prospective purchaser may also be required to obtain a Prevention of Significant Deterioration ("PSD") permit under the Clean Air Act to restart the refinery.  42 U.S.C. § 7475; 40 C.F.R. § 52.21.

A PSD permit is required to construct any new "major stationary source" of air pollutants, as defined by 40 C.F.R. § 52.21(b)(1), or to make a "major modification" to any existing major stationary source, as defined by 40 C.F.R. § 52.21(b)(2).  *See* 40 C.F.R. § 52.21(a)(2)(iii).  EPA has required PSD permits for restarting long-dormant facilities that qualify as major stationary sources because this action can qualify as either the construction of a new source or a major modification of an existing one.  PSD permits must include emission limits that constitute the Best Available Control Technology ("BACT") to minimize the emission of regulated pollutants.  42 U.S.C. §§ 7475(a)(4) and 7479(3); 40 C.F.R. § 52.21(b)(12), (j)(2)-(3).

PSD permitting is factually-driven.  If the refinery is required to obtain a PSD permit, the permit will require BACT to be installed and operational prior to restart of the refinery.

**VI.     Additional Clean Air Act Requirements**

As described in its complaint referenced in Section II, above, EPA has concerns about incidents of excess release of $H_2S$ and $SO_2$. The refinery must adhere to the $H_2S$ input gas concentration limit specified in 40 C.F.R. § 60.103a(h) and the refinery's Title V operating permit of (a) 162 parts per million volume, determined hourly on a 3-hour rolling average basis, for Flare #8 and the East Mix Drum Fuel Gas System, and (b) 75 parts per million volume at the Coker Mix Drum Fuel Gas System.  During incidents where emissions exceed the 500-lb. $SO_2$ threshold in a twenty-four hour period, the refinery is also subject to requirements in 40 C.F.R. Part 60, Subpart Ja.  Subpart Ja requires a regulated entity to conduct a root cause and corrective action analysis whenever $SO_2$ emissions from a flare exceed the 500-lb/day threshold.

The Environmental Compliance Audit Report and the Flare Systems Audit Report also identified a number of compliance issues related to Clean Air Act Risk Management Program (RMP) requirements, such as requirements relating to Process Safety Information, Process Hazard Analysis, Operating Procedures, and Training.  Potential issues in these RMP elements are intended to be captured during Prestartup Review, prior to introducing a regulated RMP substance to a process.  The recent release events at the refinery indicate potential failure of one or more RMP elements.  A new owner or operator would be responsible for ensuring that all RMP requirements are implemented and that the interconnections between the program elements have been characterized to ensure compliance. Attention to Process Safety Information and Mechanical Integrity program elements, especially as they pertain to the safe design and maintenance of process areas in accordance with recognized and generally accepted good engineering practices, will be important for any future owner/operator of the refinery as they evaluate conformance with Prestartup Review and other program elements.

Prospective purchasers should evaluate the need for modifications to the facility's Title V operating permit under the Clean Air Act.

Finally, the EPA's Petroleum Refinery Sector Rule, NESHAP Subpart CC, requires, among other things, that oil refineries conduct fence line monitoring for benzene and that the annual average benzene emissions stay below 9 $\mu g/m^3$.  Any purchaser will need to ensure compliance with this requirement.

## VII.    Resource Conservation and Recovery Act

The Environmental Response Trust is addressing legacy contamination at the facility, in part with funding from Limetree Bay Terminals.  The trust is remediating contamination from HOVENSA's operations pursuant to a federal permit issued by EPA under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, *et seq.*, under the oversight of EPA.  While the legacy contamination includes impacted groundwater subject to remediation under the permit, new contamination tied to refinery and/or terminal operations is not covered by the RCRA permit.  According to the ERT, new (non-legacy) contamination has been detected in the groundwater.  The ERT and Limetree Bay are working to gather and analyze data to determine whether the refinery, terminal, or both caused the release(s) resulting in the new contamination.  Any future refinery owner will be obligated under RCRA to remediate contamination on or migrating from the property it acquires.  A future owner subject to such obligations may seek contribution and/or cost recovery from any liable third party to the extent allowed by law, and may propose to reach an understanding, or enter into an agreement, with the federal and/or local government concerning such obligations.

## VIII.    Clean Water Act

On August 13, 2021, the EPA sent a letter to Limetree Bay notifying them of potential violations of Sections 301(a), 308, and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1318(a) and 1342, and providing them with a copy of EPA's inspection report.  A purchaser of the refinery will need to comply with the Clean Water Act, including by correcting any violations that are ongoing at the time of the transfer.

IX.    **Additional Matters**

As previously stated, any prospective purchaser should carry out its own due diligence concerning potential environmental liabilities and obligations.  EPA has not performed a comprehensive environmental compliance review of the refinery facility, and EPA does not represent that the information contained in this letter identifies all environmental violations that a new owner would have to address, nor all environmental obligations for which a new owner would be responsible.

Sincerely,

DORE LAPOSTA

Digitally signed by DORE
LAPOSTA
Date: 2021.09.24
17:02:31 -04'00'

Dore LaPosta, Director
Enforcement and Compliance Assurance Division