EXHIBIT 8

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| **LIMETREE BAY SERVICES, LLC, *et al.*,**[1] | **CASE NO.: 21-32351 (DRJ)** |
| **Debtors.** | **(Jointly Administered)** |

## DEBTORS' <u>EMERGENCY</u> MOTION TO (I) REOPEN AUCTION PURSUANT TO BIDDING PROCEDURES, (II) APPROVE SCHEDULE AND PROCEDURES FOR <u>CONTINUED AUCTION, AND (III) GRANT RELATED RELIEF</u>

**Emergency relief has been requested. A hearing will be conducted on this matter on December 6, 2021, at 4:30 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk St., Houston, Texas 77002. You may participate in the hearing by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long-distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**Relief is requested not later than December 6, 2021.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

Limetree Bay Services, LLC and its debtor affiliates (collectively, the "**Debtors**"), as debtors and debtors in possession in the above-captioned, jointly administered chapter 11 cases (collectively, the "**Chapter 11 Cases**"), respectfully represent as follows in support of this motion (the "**Motion**").

## Introduction

1. The Debtors devised and implemented the Bidding Procedures[2] (defined below) in an effort to provide the best opportunity to maximize the value of the assets of the Debtors' estates (collectively, the "**Estates**") for the benefit of creditors in satisfaction of its fiduciary duty. In so doing, the Debtors identified two potential going concern bidders—St. Croix Energy, LLLP ("**SCE**") and West Indies Petroleum Limited ("**WIPL**")—and worked diligently with these entities to qualify their bids prior to the Auction. Despite the Debtors' best efforts, the Debtors were unable to designate WIPL as a Qualified Bidder prior to the Auction principally due to the failure to pay the requisite deposit, which ultimately left SCE without a competing going concern bid. Notwithstanding, due to the Debtors severe liquidity issues, which necessitated an unusually expedited sale process, the Debtors proceeded with the Auction and, ultimately, designated SCE as the Winning Bidder. Although SCE has been designated the winning bidder, it should be noted that the SCE transaction is not finalized and the Transition Services Agreement (the "**SCE TSA**") has not been agreed upon, particularly with respect to the potential need for spending on health and safety in the event SCE is unsuccessful in its restart attempt.

2. The Debtors have learned that WIPL's initial failure to pay the requisite deposit before the Bid Deadline resulted from a sudden and unforeseen medical emergency that

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Bidding Procedures and *Order Granting Debtors' Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* [Docket No. 392] (the "**Bidding Procedures Order**"), as applicable.

incapacitated WIPL's CEO on the eve of the Bid Deadline—leaving WIPL unable to formally qualify as a bidder or participate in the Auction. The CEO was the only person at WIPL who had sufficient knowledge of the proposed refinery transaction and sale process and was the only person at WIPL who could authorize a deposit or execute an asset purchase agreement. WIPL's CEO is steadily recovering from his ordeal and, although he remains under doctors' care, is now able to resume business responsibilities. As such, WIPL approached the Debtors in the hopes of formally presenting their offer for the purchase of substantially all assets of the Estates on terms more favorable than those under the SCE bid. More precisely, WIPL proposes to acquire substantially all assets of the Estates for the sum of $30 million, cash at closing on December 22, 2021, without the need for an extended transition period or prolonged "designation" period for certain going-concern assets. As a sign of good faith, WIPL has delivered a fully-executed asset purchase agreement (the "**WIPL APA**") and paid a $3 million deposit (the "**WIPL Deposit**")—actions that cured the previous deficiencies of the WIPL bid and permit the qualification of WIPL under the Bidding Procedures. Due to the sudden and unforeseen medical emergency, which occurred just before the Bid Deadline, the initial failure of WIPL to provide a deposit and executed asset purchase agreement was clearly the result of extraordinary circumstances beyond the control of WIPL or the Debtors and, at worst, excusable neglect. The Debtors have a fiduciary obligation to maximize the value of the Estates for the benefit of creditors. The WIPL APA memorializes a transaction that is preferrable to the SCE bid in several respects, including, without limitation, an increase in the purchase price by $10 million to $30 million and the ability to acquire all assets at closing. Accordingly, in consultation

with the Notice Parties,[3] the Debtors wish to reopen the Auction in accordance with Section 24.h. of the Bidding Procedures to permit the consideration of the WIPL bid pursuant to the WIPL APA.[4]

4.      While Court authorization is not required to reopen the Auction, the Debtors bring this Motion due to the advanced stage of the sale process to inform and obtain guidance from the Court and to provide interested parties an opportunity to be heard in the hopes of resolving any objections to the reopening of the Auction in advance of the Sale Hearing and, in so doing, ensuring (to the extent possible) a streamlined closing by December 22, 2021 as provided for in the WIPL APA.  Alternatively, if reopening the Auction is not possible, or unreasonably delays or increases costs of the transaction, the Debtors are considering, and reserve the right, in consultation with the Notice Parties, to reject the bids received to date and terminate the bidding/sale process as being contrary to the best interests of the creditors in order to permit the transaction with WIPL to proceed pursuant to the WIPL APA.[5]  For myriad reasons, the Debtors and Notice Parties prefer proceeding via a reopened Auction in accordance with Section 24.h and the other provisions of the Bidding Procedures, as herein modified, and, thus, out of an abundance of caution, hereby seeks Court approval of the proposed course of action.

## Relief Requested

5.      Pursuant to the Bidding Procedures Order and Bidding Procedures, each as amended, Sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

---

[3] As used herein, "Notice Parties" refers to, collectively, the DIP Agent, the Prepetition Secured Parties, and Committee. "Notice Parties" previously included J. Aron; however, pursuant to the Stipulation by and among Debtors, Committee, J. Aron & Company LLC, and BP Products North America Inc. [*see* Docket No. 712], J. Aron no longer has any consultation rights with respect to the administration of the Chapter 11 Cases or the Estates.

[4] Bidding Procedures, Docket No. 392, at p. 26 ("the Debtors, in consultation with the Notice Parties, may … re-open the Auction at any time prior to the commencement of the Sale Hearing….").

[5] Bidding Procedures, Docket No. 392, at p. 26-27 ("[T]he Debtors reserve all rights to terminate the bidding process at any time if the Debtors, consistent with their fiduciary duties and business judgment, in consultation with the Notice Parties, determine that the bidding process will not maximize the value of the Assets. … [T]he Debtors, in consultation with the Notice Parties, may reject at any time before entry of a Sale Order approving such bid, any Bid that, in the Debtors' discretion, is … (iii) contrary to the best interests of the Debtors, their Estates and creditors.")

(the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure, and Section K of the Procedures for Complex Cases in the Southern District of Texas, the Debtors hereby move for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), approving the reopening of the Auction pursuant to Section 24.h of the Bidding Procedures, scheduling the reopened Auction as soon as practicable, in consultation with the bidders, and approving the procedures set forth herein for the reopened Auction. The declarations of Mark Shapiro and Michael O'Hara in support of the Motion are attached hereto, respectively, as **Exhibit B** and **Exhibit C** and incorporated herein by reference.

## Jurisdiction and Venue

6. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). This Court has constitutional authority to enter final orders with respect to the relief requested herein. The Debtors further confirm their consent to this Court's entry of final orders or judgments on this Motion, if it is later determined that, in the absence of the consent of the parties, this Court does not have constitutional authority to enter final orders or judgments.

## Background

7. On July 12, 2021 (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code—thereby commencing the above-captioned Chapter 11 Cases. The Debtors continue to operate their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases. On or about July

26, 2021, an Official Committee of Unsecured Creditors (the "**Committee**") was appointed [Docket No. 189].

8.       On July 13, 2021, the Court entered an order jointly administering the Chapter 11 Cases under Case No. 21-32351 (DRJ) (Doc. 20).

A.       **Approval of Bidding Procedures and Auction**

9.       On July 26, 2021, the Debtors filed the *Debtors' Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* [Docket No. 191] (the "**Bid Procedures Motion**"), seeking entry of an order, among other things, (a) approving procedures for the solicitation of bids in connection with a sale (the "**Sale**") of substantially all asset of the Debtors (the "**Assets**"), (b) approving the Sale of Assets as a going concern or liquidation via one or more transactions, subject to final approval, and (c) approving certain procedures for the assumption and assignment of executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code.  On August 11, 2021, the Court entered an order granting the Bid Procedures Motion [Docket No. 392] (the "**Bid Procedures Order**") and approving the bidding procedures appended thereto as Appendix A (as amended, the "**Bidding Procedures**").

10.      Following entry of the Bid Procedures Order, the Debtors, through their investment bankers Jefferies LLC ("**Jefferies**"), commenced an extensive "going-concern sale" marketing process.  The Debtors, through B. Riley Advisory Services ("**B. Riley**"), also simultaneously performed a liquidation sale process.  In connection with the Debtors' going-concern sale marketing process, the Debtors officially contacted 183 potential buyers.  The Debtors signed NDAs with 35 potentially interested parties who accessed the Debtors' data room and performed due diligence.

11.     In connection with the "going-concern sale" marketing process, the Debtors engaged in extensive discussions with WIPL regarding a potential transaction for the acquisition of the Assets—discussions that culminated in WIPL presenting a formal bid in accordance with the Bidding Procedures.  Pursuant to Section 4 of the Bidding Procedures, the Debtors worked with WIPL, as well as SCE, in an effort to cure technical issues and qualify WIPL as a bidder prior to the Auction.  Indeed, prior to the designation of SCE as the Stalking Horse Bid, the Debtors intended to designate WIPL as the lead bid for the Auction.  Unfortunately, despite the parties' best efforts, the Debtors were unable to qualify WIPL prior to the Auction due to the failure to provide an executed version of the WIPL APA and pay the requisite deposit.

12.     As such, the Debtors designated SCE as the Stalking Horse Bidder pursuant to the Bidding Procedures and, on November 14, 2021, filed a motion to approve certain modifications to the Bidding Procedures to approve the allowance and, if necessary, payment of certain bid protections (the "**SCE Bid Protections**") for SCE [Docket No. 760] (the "**Bid Protections Motion**").  Following a hearing on November 15, 2021, the Court granted the Bid Protections Motion and, in so doing, approved the SCE Bid Protections—namely, $1 million in expense reimbursement for SCE.

13.     On November 18, 2021, the Debtors commenced the Auction.  Due to WIPL's inability to qualify as a bidder, SCE's going concern bid was unchallenged and, as such, selected as the winning bid.  Thereafter, the Debtors held an auction among several liquidation bids to select a composite Back-up Bid comprised of a bid for the catalyst and a bid for the liquidation of the remaining hard assets of the Debtors.[6]  Ultimately, the Debtors selected Bay, Ltd. ("**Bay**") and

---

[6] It is worth noting that although provided an opportunity, the liquidation bids did not bid against the SCE bid during the Auction; rather, the liquidation bids, including the bids of Bay and Sabin, were only presented during the secondary auction following selection of SCE as the winning bid.

Sabin Metal Corporation ("**Sabin**") as the Back-up Bidders.  On November 30, 2021, the Debtors filed a Notice of (I) Designation of Winning Bid and Back-up Bids and (II) Sixth Notice of Extension of Milestones and Bid Procedures Deadlines [Docket No. 829] ("**Designation of Winning Bid**").[7]

B. **Presentment of the WIPL APA**

14. On December 1, 2021, WIPL contacted the Debtors to discuss circumstances surrounding the prior inability to qualify as a bidder in advance of the Auction and possible presentation of a bid pursuant to the terms of the WIPL APA, a true and correct copy of which is attached hereto as **Exhibit D**, albeit with a higher purchase price than previously discussed—namely, $30 million payable in full at closing.  Thereafter, on or about December 3, 2021, WIPL furnished a deposit for the proposed transaction in the amount of $3 million, which is presently on deposit with B. Riley.  On or about December 5, 2021, WIPL delivered an executed version of the WIPL APA along with evidence of the financial wherewithal to close the transaction and fund operations while planning a restart of the refinery.

15. Notwithstanding the presentment of the WIPL APA, the Debtors have continued to diligently work with SCE to finalize the Transaction Documents (as defined in the SCE asset purchase agreement ("**SCE APA**")), including, without limitation, the proposed SCE TSA.  The Debtors' willingness to render services during the transition period, as well as the lenders' support for such an arrangement, is predicated upon SCE paying for any and all expenses associated with such services and ensuring the maintenance of adequate health and safety services.  At present, the

---

[7] Although the Debtors' have designated and presented the SCE APA as the Winning Bid, the Debtors have not accepted the SCE APA and, as such, are not bound by the provisions thereof.  *See* Bidding Procedures, Docket No. 392, at p. 26 ("The Debtors' presentation of the Winning Bid to the Court for approval does not constitute the Debtors' acceptance of such Winning Bid.  The Debtors shall have accepted a Winning Bid only when the Court has entered an order approving such bid and the Sale of the Assets subject thereto.").

SCE TSA contains provisions that limit SCE's obligation to fund budgeted expenses, including health and safety service, during the transition period, which may render the Debtors unable to funds certain health and safety measures and, further, may diminish the value ascribed to SCE's financial commitments during the transition period for purposes of valuing the consideration under the SCE APA as compared to the Back-up Bids.

16.     The Debtors have consulted with the Notice Parties in accordance with the terms of the Bidding Procedures regarding the WIPL APA and proposed transaction. The Debtors also discussed with the Notice Parties the potential courses of action to enable the consideration of the WIPL APA under the Bidding Procedures—namely, (1) reopening the Auction pursuant to Section 24.h of the Bidding Procedures, (2) rejecting the existing bids and restarting the sale process, and/or (3) terminating the bidding process and proceeding with a private sale pursuant to the WIPL APA. The Debtors and Notice Parties prefer proceeding by reopening the Auction, qualifying WIPL on the terms of the WIPL APA, and permitting Qualified Bidders to present further bids for some or all of the Assets, as permitted under the Bidding Procedures.

17.     The Debtors bring this Motion due to the advanced stage of the sale process as a means of providing transparency and a venue for interested parties to address the proposed reopening of the Auction and consideration of the WIPL bid. Additionally, the Debtors seek approval of certain procedures for the continued Auction intended to ensure Qualified Bidders are not unduly prejudiced by the reopening of the Auction, which are set forth below.

**Basis for Relief Requested**

**A.     The Debtors are Authorized to Reopen the Auction**

18.     The Bidding Procedures Order provides that "[t]he Bidding Procedures ... , including, without limitation, the procedures for the Auction ... are hereby approved in all respects

….”  Bidding Procedures Order, Docket 392, at p. 2.  Pursuant to Section 24.h of the Bidding Procedures, “the Debtors, in consultation with the Notice Parties, may continue the Auction from time to time, adjourn the Auction at any time, and *re-open the Auction at any time prior to the commencement of the Sale Hearing*….”  *See* Bidding Procedures, Docket No. 392, at p. 26 (emphasis added).  The Court retains exclusive jurisdiction to interpret and enforce the provisions of the Bidding Procedures Order.  *See* Bidding Procedures Order, Docket 392, at p. 11 (“This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.”).

19.  The Bidding Procedures authorize the Debtors to reopen the Auction at any time prior to the commencement of the Sale Hearing.  *See* Bidding Procedures, Docket No. 392, at p. 26.  The Sale Hearing has not commenced and will not commence prior to the reopened Auction. Further, the Court has the authority to approve the reopening of the Auction independent of the enabling provisions of the Court-approved Bidding Procedures.  *See, e.g.*, *First Nat'l Bank v. M/V Lightning Power*, 776 F.2d 1258 (5th Cir. 1985); *In re Financial News Network, Inc.*, 980 F.2d 165, 169 (2d Cir. 1992) (opining that the sale process “is to secure for the benefit of creditors the best possible bid” and “in bankruptcy proceedings substance should not give way to form, and that a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed.”); *In re Bigler, LP*, 443 B.R. 101 (Bankr. S.D. Tex. 2010).  Under such authority, the Court possesses the authority to reopen the Auction and permit consideration of the WIPL APA as such relief presents a “reasonable degree of probability that a substantially better price will be obtained” at the reopened Auction.  *See First National Bank*, 776 F.2d at 1261.  Further, such relief is essential to advance the interests of the Estates and its creditors consistent with the fiduciary obligations of the Debtors in connection with

4871-9670-1701.5

the proposed Sale of the Assets.  *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources. Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

20.     Wherefore, the Debtors respectfully request that the Court affirm the Debtors' authority to reopen the Auction and designate the WIPL APA as a Qualified Bid.[8]

**B.      Court Should Approve the Proposed Procedures for the Reopened Auction**

21.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or auction.  Fed. R. Bankr. P. 6004(f)(1).  The paramount goal of any proposed sale of property of a debtor is to maximize the value received by the estate. *See, e.g., Integrated Resources. Inc.*, 147 B.R. at 659 ("It is a well-establish principal of bankruptcy law that the Debtors' duty with respect to [Section 363] sales is to obtain the highest price or greatest overall benefit possible for the estate"), *quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).

22.     To that end, debtors are granted significant latitude in devising and implementing bidding and sale procedures under Section 363 of the Bankruptcy Code.  Indeed, bankruptcy courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the bid procedures to be used in selling assets of the estate.  *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *See Asarco, Inc. v. Elliott Management (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."); *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) ("Great judicial

---

[8] If the Court grants the relief requested, the Debtors intend to file a notice of withdrawal for the Designation of Winning Bidder to permit the Auction to proceed pursuant to the proposed Continued Auction Procedures.

deference is given to the Trustee's exercise of business judgment."), (*citing In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 516 (Bankr. N.D. Ala.2002)); *see also In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836–37 (Bankr. E.D. Va. 1997) ("[G]reat deference is given to a business in determining its own best interests."); *see also In re Global Crossing, Ltd.*, 295 B.R. 726, 744 n. 58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors….").

23.     In connection with the reopened Auction, the Debtors proposed the following procedures in the exercise of their sound business judgment:

a.   The Bidding Procedures, including the Auction Procedures set forth therein, shall control unless contrary to the procedures proposed herein.

b.   As soon as practicable following entry of an order granting this Motion, the Debtors shall, upon consultation with the Notice Parties, WIPL and the bidders at the initial Auction, schedule the reopened Auction and, thereafter, provide notice of the reopened Auction to all parties entitled to the Notice Parties, WIPL, SCE, the Back-up Bidders, and all other parties notice under the Bidding Procedures.

c.   The Debtors may work with any Potential Bidder(s) in an effort to cure any defects in the Bid and to cause such Bid to become a Qualified Bid through the commencement of the reopened Auction.

d.   The Debtors may designate any Bid as a Qualified Bid through the commencement of the reopened Auction.

e.   The SCE bid shall serve as the opening bid for the reopened Auction.

f.   The Debtors, in their business judgment, shall select the order for the presentation of overbids as well as the initial minimum overbid.

g.   At the conclusion of the reopened Auction, the Debtors shall select Winning Bidder(s) and Back-up Bidder(s) in accordance with the Bidding Procedures and, no later than one (1) business day following the conclusion of the Auction, but in no event later than the commencement of the Sale Hearing, shall file a Designation of Winning Bidder based on the results of the reopened Auction.

24.     The Debtors respectfully request that the Court approve the Bidding Procedures, as herein amended, for the reopened Auction as fair and reasonable and supported by the sound business judgment of the Debtors.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

25.     Based on the foregoing, the Debtors respectfully submit that a waiver of the 14-day stay contained in Bankruptcy Rules 6004(h) and 6006(d) is warranted.

### Request for Emergency Relief

26.     Based on the foregoing, the Debtors respectfully submit that emergency consideration of this Motion is essential to permit the Debtors to close a Sale of Assets to one or more Qualified Bidders prior to the deadlines established in the applicable transaction documents, including, without limitation, the WIPL APA, which presently represents the highest and best bid for the Assets.  Further, emergency consideration of the Motion will not unduly prejudice any interested parties as such parties have been notified of the intention to reopen the Auction and the exigency of the relief sought herein.

### Certification of Accuracy

27.     Pursuant to Local Rule 9013-1(i), this Motion is verified as to its accuracy by Debtors' counsel.

### Notice

28.     Notice of this Motion will be provided to the Master Service List, including: (a) the U.S. Trustee; (b) all secured creditors; (c) the Offices of the Attorney General of the State of Texas and the United States Virgin Islands; (d) the thirty (30) largest consolidated unsecured creditors for the Debtors; (e) the Debtors' identified, interested taxing authorities, including the Internal Revenue Service; (f) the Debtors' identified, interested government and regulatory entities; (g)

13

other interested parties as identified by the Debtors; (h) the Committee members and their counsel, if known; (i) counsel to the Committee; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The method of service for each party will be described more fully in the certificate of service prepared by the Debtors' claims and noticing agent. The Debtors submit that no other or further notice is required.

*[remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request that the Court grant the Motion in its entirety and grant the Debtors such other relief as is appropriate.

Dated: December 6, 2021

**BAKER & HOSTETLER LLP**

*/s/ Elizabeth A. Green*
**Elizabeth A. Green, Esq.**
Fed ID No.: 903144
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Facsimile:  407.841.0168
Email: egreen@bakerlaw.com

**Jorian L. Rose, Esq.**
*Admitted Pro Hac Vice*
N.Y. Reg. No. 2901783
45 Rockefeller Plaza
New York, New York 10111
Telephone:  212.589.4200
Facsimile:  212.589.4201
Email: jrose@bakerlaw.com

**Michael T. Delaney, Esq.**
*Admitted Pro Hac Vice*
OH Bar No. 99790
Key Tower, 127 Public Sq.
Suite 2000
Cleveland, OH 44114
Telephone:  216.621.0200
Facsimile:  216.696.0740
Email: mdelaney@bakerlaw.com

*Counsel for the Debtors and Debtors in Possession*

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Elizabeth A. Green*
Elizabeth A. Green

## Certificate of Service

I certify that on December 6, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Elizabeth A. Green*
Elizabeth A. Green

**EXHIBIT D - ASSET PURCHASE AGREEMENT**
**(EXECUTED)**

ASSET PURCHASE AGREEMENT

by and among

**LIMETREE BAY SERVICES, LLC,
LIMETREE BAY REFINING HOLDINGS, LLC,
LIMETREE BAY REFINING HOLDINGS II, LLC,
LIMETREE BAY REFINING, LLC,
LIMETREE BAY REFINING OPERATING, LLC, AND
LIMETREE BAY REFINING MARKETING, LLC,**

as Sellers

and

**WEST INDIES PETROLEUM LIMITED, a Jamaican corporation, AND
ST. CROIX REFINING AND TRANSPORTATION, LLLP, a Virgin Islands limited
liability limited partnership,**

as Purchaser

Dated as of December [___], 2021

## TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF ASSETS ............................................................... 2
    1.1    Agreement to Purchase and Sell ............................................................... 2
    1.2    Description of Purchased Assets............................................................... 2
    1.3    Excluded Assets ............................................................................................ 3
    1.4    Assignment of Assigned Contracts ........................................................... 5

ARTICLE II ASSUMPTION OF LIABILITIES ............................................................... 5
    2.1    Agreement to Assume ................................................................................. 5
    2.2    Assumed Liabilities. ................................................................................... 5
    2.3    Excluded Liabilities ................................................................................... 6

ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT; CLOSING; DEPOSIT............ 6
    3.1    Purchase Price; Delivery of Funds............................................................ 6
    3.2    Good Faith Escrow Deposit ....................................................................... 6
    3.3    Time and Place of Closing ......................................................................... 7
    3.4    Closing Deliverables .................................................................................. 7
    3.5    Intentionally deleted................................................................................... 8

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS .............................. 8
    4.1    Due Organization, Good Standing and Limited Liability Company Power......... 8
    4.2    Authorization; Noncontravention ............................................................. 8
    4.3    Governmental Consents and Approvals................................................... 10
    4.4    Property.................................................................................................... 10
    4.5    Title to Purchased Assets ......................................................................... 11
    4.6    Affiliate Transactions............................................................................... 11
    4.7    Material Contracts.................................................................................... 11
    4.8    Intellectual Property Rights and Claims. ................................................. 12
    4.9    Tax Matters .............................................................................................. 13
    4.10    Employee Benefits ................................................................................... 13
    4.11    Compliance with Laws ............................................................................ 14
    4.12    Environmental Matters............................................................................. 14
    4.13    Permits .................................................................................................... 14
    4.14    Litigation................................................................................................. 14
    4.15    Finders; Brokers....................................................................................... 15
    4.16    Exclusivity of Representations; Projections, Etc. ................................... 15

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 15
    5.1    Due Organization, Good Standing and Power....................................... 16
    5.2    Authorization; Noncontravention ........................................................... 16
    5.3    Governmental Consents and Approvals................................................... 17
    5.4    Financing.................................................................................................. 17
    5.5    Solvency of Purchaser.............................................................................. 17
    5.6    Adequate Assurances ............................................................................... 17

5.7   Litigation............................................................................................................ 17
5.8   Finders; Brokers................................................................................................. 17
5.9   Intentionally deleted..............................................**Error! Bookmark not defined.**

ARTICLE VI COVENANTS ................................................................................................ 19
6.1   Intentionally deleted.......................................................................................... 19
6.2   Conduct Prior to the Closing Date .................................................................... 19
6.3   Efforts to Close ................................................................................................. 20
6.4   Public Announcements ...................................................................................... 21
6.5   Notification of Certain Matters......................................................................... 21
6.6   Supplements to Schedules.................................................................................. 21
6.7   Post-Closing Access to Records and Personnel; Litigation Support ................. 22
6.8   Tax Matters ....................................................................................................... 23
6.9   Bulk Sales Act................................................................................................... 23
6.10  Bankruptcy Action ............................................................................................ 24
6.11  Sale Order ......................................................................................................... 24
6.12  Intentionally deleted.......................................................................................... 25
6.13  Transfer of Permits ........................................................................................... 26
6.14  Expenses ........................................................................................................... 26
6.15  Confidentiality .................................................................................................. 26

ARTICLE VII CONDITIONS TO CLOSING ..................................................................... 26
7.1   Conditions to Sellers' Obligations..................................................................... 26
7.2   Conditions to Purchaser's Obligations............................................................... 27
7.3   Frustration of Closing Conditions..................................................................... 27

ARTICLE VIII COMPLIANCE WITH WARN, PLANT CLOSING ACT AND
SIMILAR STATUTES .................................................................................................. 28
8.1   Compliance with WARN, Plant Closing Act and Similar Statutes .................... 28

ARTICLE IX TERMINATION ............................................................................................ 28
9.1   Termination Events............................................................................................ 28
9.2   Effect of Termination......................................................................................... 29

ARTICLE X SURVIVAL AND RELEASE .......................................................................... 29
10.1  Survival; Certain Post-Closing Matters ............................................................ 29
10.2  Intentionally deleted.......................................................................................... 30

ARTICLE XI MISCELLANEOUS ....................................................................................... 30
11.1  Notices .............................................................................................................. 30
11.2  Entire Agreement .............................................................................................. 31
11.3  Severability ....................................................................................................... 31
11.4  Binding Effect; Benefit ..................................................................................... 32
11.5  Assignability ..................................................................................................... 32
11.6  Amendments ...................................................................................................... 32
11.7  Non-Waiver........................................................................................................ 32
11.8  Applicable Law.................................................................................................. 32

11.9   Consent to Jurisdiction .......................................................................... 32

11.10  WAIVER OF TRIAL BY JURY ........................................................ 33

11.11  Counterparts .......................................................................................... 33

11.12  Headings ............................................................................................... 33

11.13  Time of the Essence ............................................................................. 33

11.14  Rules of Construction ........................................................................... 33

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Appendix 1 | Defined Terms |
| Exhibit A | Form of Bill of Sale and Assignment and Assumption Agreement |
| Schedule 1.1(g) | Business Permits |
| Schedule 1.2(a) | Business Contracts |
| Schedule 1.2(b) | Purchased Real Property |
| Schedule 1.2(d) | Real Property Leases |
| Schedule 1.2(g) | Business Permits |
| Schedule 3.4 | Assignment, Transfer and Conveyance Instruments |
| Schedule 6.2 | Conduct Prior to the Closing Date |
| Sellers Disclosure Letter | |

**BH Draft of December 5, 2021**
*Confidential*

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is made as of December [__], 2021, by and among Limetree Bay Services, LLC, a Delaware limited liability company ("LBS"), Limetree Bay Refining Holdings, LLC, a United States Virgin Islands limited liability company ("LBRH"), Limetree Bay Refining Holdings II, LLC, a United States Virgin Islands limited liability company ("LBRH II"), Limetree Bay Refining, LLC, a United States Virgin Islands limited liability company ("LBR"), Limetree Bay Refining Operating, LLC, a United States Virgin Islands limited liability company ("LBRO"), Limetree Bay Refining Marketing, LLC, a United States Virgin Islands limited liability company ("LBRM", along with LBS, LBRH, LBRH II, LBR and LBRO, each a "Seller" and collectively, "Sellers"), and West Indies Petroleum Limited ("WIPL"), a Jamaican corporation, and St. Croix Refining and Transportation, LLLP, a Virgin Islands limited liability limited partnership, formed by West Indies Petroleum Limited pursuant to the laws of the United States Virgin Islands ("SCRT" and, together with WIPL, "Purchaser"; Purchaser and Sellers, each a "Party" and collectively, the "Parties"). Capitalized terms used but not otherwise defined in the text of this Agreement have the meanings set forth in Appendix 1 attached hereto, which is incorporated herein and made a part of this Agreement.

## R E C I T A L S

A. Sellers own an oil refinery located on the island of St. Croix in the United States Virgin Islands (collectively, the "Business").

B. On July 12, 2021 (the "Petition Date"), Sellers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which cases are jointly administered under *In re Limetree Bay Services, LLC*, Case No. 21-32351.

C. On the terms and subject to the conditions set forth in this Agreement, Purchaser desires to purchase from Sellers, and Sellers' desire to sell to Purchaser, the Purchased Assets (the "Purchase").

D. It is intended that the acquisition of the Purchased Assets will be accomplished through the sale, transfer and assignment of the Purchased Assets by Sellers to Purchaser in a sale undertaken pursuant to §363 of the Bankruptcy Code and that certain executory contracts and unexpired leases will be assumed by Sellers and assigned to Purchaser pursuant to §365 of the Bankruptcy Code in connection therewith.

## A G R E E M E N T S

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I

Purchase and Sale of Assets

1.1     Agreement to Purchase and Sell.  On the terms and subject to the conditions contained in this Agreement, Purchaser agrees to purchase from Sellers, and Sellers agree to sell, transfer and convey to Purchaser, with Purchaser taking title in the name of SCRT, all of Sellers' assets, properties, rights and interests as of the Closing Date, wherever situated or located, other than the Excluded Assets.  All of such assets, properties, rights and interests (other than the Excluded Assets) are collectively referred to in this Agreement as the "Purchased Assets".  The Purchased Assets shall be sold, transferred and conveyed to Purchaser as provided herein free and clear of any and all Liens, in each case to the extent resulting from the Sale Order.

1.2     Description of Purchased Assets.   Without limitation of Section 1.1, the Purchased Assets shall include the following assets owned by Sellers as of the Closing Date, except to the extent that any of the following are also enumerated in Section 1.3 as being Excluded Assets:

        (a)     each Contract listed or described on Schedule 1.2(a) (collectively, the "Business Contracts"); provided, however, that notwithstanding the generality of Section 1.1 or anything to the contrary in this Section 1.2, Purchaser shall not acquire any rights or interest under the NRI Consignment Agreement;

        (b)     the real property described on Schedule 1.2(b), together with all easements, appurtenances, rights and other hereditaments appurtenant to such real property (collectively, the "Purchased Real Property"), including Sellers' easements, use rights, or options to purchase, or such rights with respect to Purchased Real Property as are used or held for use in the Business; provided, that the agreements, if any, establishing such rights are assigned to Purchaser;

        (c)     all Improvements;

        (d)     Intentionally deleted;

        (e)     all Parts Inventory;

        (f)     the Files and Records, whether in hard copy or electronic format, except that, with respect to Files and Records that any Seller or any of its Affiliates is required by Law or Order to retain, the Purchased Assets shall include copies of such Files and Records to the extent permitted by any applicable Law or Order (and, with respect to any personnel records which a Seller or Affiliate is required to retain, to the extent permitted by any applicable Law or Order, copies of such personnel records for employees or consultants who, as of the Closing, will become employees or consultants of Purchaser); provided, that any Seller shall be permitted to retain a copy of any such Files and Records that such Seller requires, including any electronically stored information;

        (g)     all Permits (and any pending applications for Permits), other than the Excluded Permits, that are owned, utilized, held or maintained by or licensed to a Seller primarily in connection with such Sellers' ownership or operation of the Business to the

other Purchased Assets, including those Permits described on <u>Schedule 1.2(g)</u> (the "<u>Business Permits</u>");

      (h)    the Business Intellectual Property;

      (i)    the Business IT Assets;

      (j)    all Furniture and Equipment owned by Sellers that is located at the Sellers' Facilities or that is otherwise primarily used or held for use in the Business (other than the Excluded Furniture and Equipment);

      (k)    Intentionally deleted;

      (l)    all insurance recoveries under each Seller's or its Affiliates' insurance policies, in each case solely (i) to the extent Purchaser has paid all premiums and costs associated with such coverage from and after the Closing Date, (ii) with respect to any of the Purchased Assets set forth in <u>Sections 1.2(a)-(j)</u>, and (iii) to the extent first arising with respect to incidents, actions or omissions that occur on or after the Closing Date, and any rights to assert claims with respect to any such insurance recoveries (the "Purchased Insurance Recoveries"); and

      (m)    all assets specifically identified on <u>Schedule 1.2(m)</u>.

1.3    <u>Excluded Assets</u>. The "<u>Excluded Assets</u>" means the following items and assets (whether or not such assets are otherwise described in <u>Section 1.2</u>):

      (a)    all cash, certificates of deposit or other cash equivalents;

      (b)    any real property other than Purchased Real Property;

      (c)    all personal property, equipment and inventory not included in the Purchased Assets, including, without limitation, any such assets or Parts Inventory subject to the NRI Consignment Agreement;

      (d)    all rights, claims, defenses, causes of action, rights of offset and counterclaims (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) of each Seller against any Third Parties, including with respect to any of the Purchased Assets, the Excluded Assets or the Excluded Liabilities, including, without limitation, all Avoidance Actions, and any proceeds of the foregoing;

      (e)    Intentionally deleted;

      (f)    Intentionally deleted;

      (g)    general books of account and books of original entry that comprise a Sellers' permanent Tax records, corporate minute books, stock books and related organizational documents and the books and records that any Seller is required to retain

pursuant to any Law or Order and the books and records solely related to the Excluded Assets or Excluded Liabilities;

(h) personnel records that any Seller is required by Law or Order to retain (provided that the copies of any such personnel records shall be Purchased Assets to the extent permitted by any applicable Law or Order pursuant to Section 1.2(f)) and personnel records of employees, former employees or consultants of each Seller who do not, as of the Closing, become employees of Purchaser;

(i) all insurance recoveries under each Seller's or its Affiliates' insurance policies with respect to the Purchased Assets or the Business and any rights to assert claims with respect to any such insurance recoveries, *provided*, *however*, that the Purchased Insurance Recoveries shall not constitute Excluded Assets;

(j) all claims for refund or credit of (i) income Taxes of each Seller and its Affiliates for any taxable period and (ii) non-income Taxes of each Seller and its Affiliates with respect to a Pre-Closing Period;

(k) Intentionally deleted;

(l) Intentionally deleted;

(m) each Seller's or any of its Affiliates' rights under this Agreement or any Transaction Document or relating to the Excluded Assets or the Excluded Liabilities;

(n) all deposits (including security deposits, rent, electricity, telephone or otherwise and retainers held by attorneys, accountants, financial advisors and other professional advisors retained by any Seller or by any creditors' committee in the Bankruptcy Case) and other prepaid charges of each Seller, in each case other than with respect to any Purchased Assets;

(o) any assets of each Seller in a directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, retiree medical, stock option or other stock purchase plan or other Employee Benefit Plan;

(p) Intentionally deleted;

(q) all accounts receivable and pre-paid assets of each Seller, including, without limitation, any BP Receivables and NRI Receivables;

(r) Intentionally deleted;

(s) all attorney client privilege and attorney work product protection of each Seller or associated with the Business (as currently or formerly conducted) as a result of legal counsel representing a Seller or the Business (as currently or formerly conducted), and all Files and Records related thereto subject to such attorney client privilege or work product protection; provided that any privilege or work product that exclusively relates to the Purchased Assets or that is necessary to operate the Business (other than such

v.2

4

privileges, protections and related Files and Records related to or in connection with the transactions contemplated by this Agreement or any Transaction Document) shall not be deemed to be an Excluded Asset whether or not in connection with the transactions contemplated by this agreement or any Transaction Document; and

(t)     all shares of capital stock or other equity interests in any Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in any Seller or any Affiliate thereof.

For clarification purposes and without implication that the contrary would otherwise be true, it is understood and agreed that all rights and remedies with respect to the Excluded Assets or the Excluded Liabilities and which rights or remedies first arise after the Closing shall be retained by Sellers and shall not be transferred to Purchaser hereunder.

1.4     Assignment of Assigned Contracts . To the maximum extent permitted by the Bankruptcy Code, but subject to applicable Law and the other provisions of this Section 1.4, Sellers shall assume and transfer, sell and assign all Business Contracts and Business Permits to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Business Contract or Business Permit (or any right thereunder) if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (and is not provided for or satisfied by the Sale Order, the Bankruptcy Code or applicable Law), would constitute a breach or in any way adversely affect the rights of Purchaser or Sellers thereunder and the Parties acknowledge and agree that the Closing shall proceed with respect to the remining Business Contracts and Business Permits without any reduction in the Purchase Price; provided that the Sellers' acknowledge and agree that the Sellers shall employ its best efforts to secure any requisite consents to assume any Business Permits, or, if unable to secure such consent, shall use reasonable best efforts, at the cost of the Purchaser, to secure a new business permit in favor of the Purchaser from the issuing party prior to the Closing.

ARTICLE II
Assumption of Liabilities

2.1     Agreement to Assume. Purchaser shall not assume or agree to pay, perform and discharge when due, any liabilities or obligations of Sellers. As such, all liabilities and obligations of Sellers are collectively referred to herein as "Excluded Liabilities". Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible for, the Excluded Liabilities.

2.2     Assumed Liabilities. Purchaser shall not assume or agree to pay, perform and discharge when due, any liabilities or obligations of Sellers; provided, however, that Purchaser shall be obligated to pay Cure Amounts and provide any adequate assurance of performance in connection with the assumption and/or assignment of any Contracts, including, without limitation, any Business Contracts and Business Permit, pursuant to Section 1.4 of this Agreement or Section 365 of the Bankruptcy Code, which amounts shall be in addition to the

Purchase Price and shall be paid directly to the subject counterparty by Purchaser pursuant to the terms of the Sale Order.

    2.3    <u>Excluded Liabilities</u>.  Except as provided in <u>Section 2.2</u>, all liabilities and obligations of Sellers shall constitute Excluded Liabilities.

ARTICLE III
Purchase Price, Manner of Payment; Closing; Deposit

    3.1    <u>Purchase Price; Delivery of Funds</u>.  At the Closing, Purchaser shall in full consideration for the sale and transfer by Sellers of the Purchased Assets (a) pay to Sellers an amount (such amount, the "<u>Closing Payment</u>") equal to (i) the Purchase Price, less (ii) the Good Faith Deposit Amount, by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing to Purchaser at least three Business Days prior to the Closing; and (b) together with Sellers, execute and deliver a joint written instruction to the Escrow Agent instructing it to release from the Escrow Account to Sellers by wire transfer of immediately available funds to an account or accounts designated by Sellers, an amount equal to the Good Faith Deposit Amount.

    3.2    <u>Good Faith Escrow Deposit</u>.

    (a)    Purchaser has paid to the Escrow Agent the Good Faith Deposit Amount, which funds shall be held in the Escrow Account by the Escrow Agent and invested as provided for in the Escrow Agreement and released by the Escrow Agent only in accordance with the terms of this Agreement and the Escrow Agreement.

    (b)    If the Closing occurs, then the Good Faith Deposit Amount, shall be paid to Sellers and the applicable Parties shall submit joint written instructions to the Escrow Agent (in accordance with <u>Section 3.1</u>) to give effect to the same.

    (c)    If the Closing does not occur as a result of the termination of this Agreement pursuant to <u>Section 9.1(e)</u>, then within five Business Days of such termination, the Good Faith Deposit Amount shall be disbursed to Sellers by the Escrow Agent as liquidated damages and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

    (d)    If the Closing does not occur as a result of the termination of this Agreement for any reason other than as set forth in <u>Section 3.2(c)</u>, then the Good Faith Deposit Amount shall be returned to Purchaser by the Escrow Agent within five Business Days of such termination, and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

    (e)    The Parties acknowledge that the agreements contained in this <u>Section 3.2</u> are an integral part of the transactions contemplated by this Agreement and that without these agreements neither Sellers nor Purchaser would enter into this Agreement.

3.3    <u>Time and Place of Closing</u>.  Subject to the satisfaction or waiver of all of the conditions set forth in <u>Article VII</u>, the closing of the Purchase (the "<u>Closing</u>") shall take place at a time and location acceptable to both parties, as soon as practicable, but in any event within ten calendar days, after the last of the conditions set forth in <u>Article VII</u> is satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), or at such other time, date or place as the Parties shall agree in writing; provided, however, that the Closing Date (defined hereinafter) shall occur no later than December 22, 2021, at 5:00 p.m. (prevailing Central Time), unless extended by Sellers, with the consent of the DIP Agent and Prepetition Secured Parties. Such date of Closing is herein referred to as the "<u>Closing Date</u>".

3.4    <u>Closing Deliverables</u>.

(a)    At the Closing, Sellers shall deliver or cause to be delivered to Purchaser:

(i)    a certificate in a form reasonably satisfactory to Purchaser signed by an authorized officer of each Seller, dated as of the Closing Date, confirming the matters set forth in <u>Sections 7.2(a)</u> and <u>(b)</u> with respect to each Seller;

(ii)    counterparts to the assignment, transfer and conveyance instruments listed on <u>Schedule 3.4</u>, in each case, duly executed by each Seller (as applicable);

(iii)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by each Seller;

(iv)    a properly executed deed in recordable and customary form for conveyances of commercial real property in the United States Virgin Islands conveying the Purchased Real Property, which has the real property legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands, together with real property tax clearance letters from the Government of the Virgin Islands covering all the tax bills for all of the parcels of real property being conveyed by the deed, as well as a properly executed assignment in recordable and customary form in the United States Virgin Islands assigning any Sellers' easements, use rights or options to purchase or that such rights are used or held for use in the Business; provided, however, that if any such easements, use rights or options to purchase, or rights used or held for use in the Business, are premised upon any Business Contract, such Business Contract is assigned to Purchaser; and

(v)    written instructions from the Sellers and the Purchaser to the Escrow Agent to release the Good Faith Deposit Amount pursuant to <u>Section 3.1</u>.

(b)    At the Closing, Purchaser shall deliver or cause to be delivered to Sellers, and Sellers shall have received:

(i)    the Closing Payment by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing to Purchaser at least three Business Days prior to the Closing;

(ii)     a certificate in a form reasonably satisfactory to Sellers signed by an authorized officer of Purchaser, dated as of the Closing Date, confirming the matters set forth in Sections 7.1(a) and (b);

(iii)     counterparts to the assignment, transfer and conveyance instruments listed on Schedule 3.4, in each case, duly executed by Purchaser (as applicable);

(iv)     a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Purchaser; and

(v)     written instructions from the Sellers and the Purchaser to the Escrow Agent to release the Good Faith Deposit Amount pursuant to Section 3.1.

3.5     Intentionally deleted.

ARTICLE IV
Representations and Warranties of Sellers

Except as set forth in the disclosure letter delivered by Sellers to Purchaser (the "Sellers Disclosure Letter") concurrently with the execution of this Agreement (it being agreed that any matter disclosed pursuant to any section of the Sellers Disclosure Letter shall be deemed disclosed for purposes of any other section of the Sellers Disclosure Letter to the extent the applicability of the disclosure to such other section is reasonably apparent on the face of such disclosure), Sellers hereby represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

4.1     Due Organization, Good Standing and Limited Liability Company Power.  Each Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.  Each Seller has all requisite limited liability company power and authority to own, lease and operate its assets and properties and conduct its business as now being conducted. Each Seller is in good standing under the laws of each jurisdiction where the character of its assets or properties or the conduct of its business requires such qualification.

4.2     Authorization; Noncontravention.

(a)     Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, each Seller has the requisite limited liability company power and authority and has taken all limited liability company action necessary to execute and deliver this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Sellers as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution, delivery and performance by Sellers of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Sellers as contemplated hereby, the consummation by Sellers of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder have been, and in the case of documents required to be delivered at the Closing will be, duly authorized and approved

by all necessary limited liability company, member or other action. This Agreement has been, and the Transaction Documents and all other instruments and agreements to be executed and delivered by Sellers as contemplated hereby will be, duly executed and delivered by Sellers. Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, assuming that this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Purchaser and each other Person (other than any Sellers or any Affiliate thereof) party hereto and thereto, this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Sellers, enforceable against each applicable Seller in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).

(b)     Except as a result of the Bankruptcy Cases and, subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution and delivery by Sellers of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Sellers as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not:

(i)     conflict with any of the provisions of any Seller's certificate of formation or other formational documents;

(ii)     except as provided in Section 4.2(b)(ii) of the Sellers Disclosure Letter and subject to receipt of the Consents set forth in Section 4.3 of the Sellers Disclosure Letter, conflict with or result in a breach of, or constitute a default under or give rise to any right of termination, cancellation, modification or acceleration (including any right of first refusal or similar right) or the loss of a benefit under, or require the Consent of or giving of notice to any Person under any Business Contract, Real Property Lease or Business Permit (in each case, with or without notice or lapse or time or both); except, in the case of this clause (ii) for such conflicts or breaches or Consents or notices that (if not received) would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets, taken as a whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or the Transaction Documents;

(iii)     subject to the receipt of the Consents referred to in Section 4.3 of the Sellers Disclosure Letter, contravene any Law or any Order applicable to Sellers or by which any of their properties or assets are bound except such contraventions that would not reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or the Transaction Documents; or

(iv)     result in the creation or imposition of any Lien on any of the Purchased Assets.

4.3    <u>Governmental Consents and Approvals</u>. Except as a result of the Bankruptcy Cases and, subject to obtaining Bankruptcy Court approval pursuant to the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), as applicable, except as set forth in <u>Section 4.3</u> of the Sellers Disclosure Letter, no Consent of or filing with any Governmental Entity must be obtained or made by Sellers in connection with the execution and delivery of this Agreement or any Transaction Document by Sellers or the consummation by Sellers of the transactions contemplated by this Agreement or any Transaction Document, except for any Consents that, if not obtained or made, would not reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or the Transaction Documents.

4.4    <u>Property</u>.

(a)    Other than the Real Property, no Seller owns any other real property. One or more Sellers has good and valid title to the Purchased Real Property (other than any Excluded Asset). There are no outstanding options, rights of first offer or rights of first refusal to purchase any Purchased Real Property or any portion thereof or interest therein. No Seller has leased or otherwise granted to any Person the right to use or occupy the Purchased Real Property or any material portion thereof, except as set forth in <u>Section 4.4(a)</u> of the Sellers Disclosure Letter.

(b)    <u>Section 4.4(b)</u> of the Sellers Disclosure Letter contains an accurate and complete list as of the date hereof of all Real Property Leases and all other real property leases and subleases to which a Seller is a party. With respect to each Real Property Lease pursuant to which a Seller is a lessee or sublessee, such Seller has valid leasehold interests in all leased real property described in such Real Property Lease, free and clear of any and all Liens. Each Real Property Lease is a valid and binding obligation of the Sellers party thereto and, to the Knowledge of Sellers, is enforceable against the other parties thereto in accordance with the terms thereof, in each case, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law). Except as set forth in <u>Section 4.4(b)</u> of the Sellers Disclosure Letter, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Real Property Lease by a Seller or, to the Knowledge of Sellers, by any other party thereto, and no Seller has received or delivered any notice with respect to any alleged material default that has not been rescinded, completely cured, or will be cured on or before the Closing Date pursuant to §365 of the Bankruptcy Code or otherwise.

(c)    To the Knowledge of Sellers, there is no, and no Seller has received written notice of any, existing or threatened change in the zoning classification of any Business Real Property (or any portion thereof) from that in effect on the date of this Agreement, in each instance, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All water, sewer, gas, electric, telephone and drainage facilities and all other utilities and public or quasi-public improvements

related thereto required by Law with respect to, or required for the operation of, the Business at the Business Real Property, are installed and available to serve the Business Real Property. No condemnation proceeding, lawsuit or administrative action or other matter affecting and adversely impairing the current use or occupancy of the Business Real Property is pending or, to the Knowledge of Sellers, threatened in writing with respect to any Business Real Property which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the Knowledge of Sellers, there has been no material casualty damage at any of the Business Real Property that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.5     <u>Title to Purchased Assets</u>.  Except as set forth in <u>Section 4.5</u> of the Sellers Disclosure Letter, and excluding Purchased Real Property (which is governed by <u>Section 4.4(a)</u>), one or more Sellers own and has good and valid title to, or a valid leasehold interest in, all personal property included in the Purchased Assets, free and clear of all Liens.

4.6     <u>Affiliate Transactions</u>.  Except as disclosed in <u>Section 4.6</u> of the Sellers Disclosure Letter and except for employment and consultant relationships and compensation, benefits, travel advances and employee or consultant loans to any officer, director, employee or consultant of Sellers, in each case, in the ordinary course of business, there is no Contract or Liability relating primarily to the Business, or the Purchased Assets between (a) a Seller, on the one hand, and (b) any Affiliate, equity holder, option holder, officer, member, partner or director of a Seller (in each case that is not also a Seller), on the other hand, that remains in force and provides for obligations of any party from and after the Closing.

4.7     <u>Material Contracts</u>.

(a)     <u>Section 4.7(a)</u> of the Sellers Disclosure Letter sets forth an accurate, correct and complete list of the following Contracts which a Seller is a party and which are currently in effect as of the date hereof:

(i)     each Contract whereby a Seller has created a Lien in respect of any of the Purchased Assets;

(ii)     each Business Contract containing any covenant limiting the freedom of a Seller or any of its Affiliates (A) to compete with any Person, engage in any line of business or exploit the Purchased Assets, in each case, in any geographic territory, (B) which grants to any Person any exclusivity with respect to any geographic territory, any customer or any product or service, or (C) to solicit for employment, hire or employ any Person;

(iii)     each Business Contract that requires capital expenditures or other outstanding payments to be made by a Seller in excess of $100,000, in each case, following the date hereof;

(iv)     each Business Contract involving the sharing of profits, losses, costs or liabilities with any other Person relating to the Business, or the Purchased Assets;

(v)     each Business Contract that requires (or may require in certain circumstances) in accordance with its terms the provision of credit support, collateral, a guarantee or similar financial assurance in respect of the Business, or the Purchased Assets;

(vi)     each Business Contract that (A) provides services for a fixed price or maximum fee, or pursuant to any cap or similar provisions; (B) grants "most favored nation" status (or similar status) to a Person (whether in respect of pricing or otherwise); or (C) provides any performance guarantee, material rebates, discounts, incentive or volume credits; and

(vii)     each Contract with any Governmental Entity relating to the Business, or the Purchased Assets.

(b)     The Contracts required to be listed in Section 4.7(a), together with the Business Contracts and the Real Property Leases are referred to as "Material Contracts". True, correct and complete copies of each Material Contract have been made available to Purchaser prior to the date hereof.  Each Business Contract is a valid and binding obligation of a Seller (except for any breach or default that results from the insolvency of a Seller or the commencement of the Bankruptcy Cases and any breach or default to be cured through the payment of the Cure Amounts) and to the Knowledge of Sellers, enforceable against the other parties thereto in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).  Except as set forth in Section 4.7(b) of the Sellers Disclosure Letter and any breach or default that results from the insolvency of a Seller or the commencement of the Bankruptcy Cases and any breach or default to be cured through the payment of the Cure Amounts, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Business Contract by a Seller or, to the Knowledge of Sellers, by any other party thereto and no Seller has received or delivered any notice with respect to any alleged material default that has not been rescinded or cured.

4.8     Intellectual Property Rights and Claims.

(a)     Except as set forth in Section 4.8(a) of the Sellers Disclosure Letter, one or more Sellers owns all right, title, and interest to or is licensed to use the Business Intellectual Property, free and clear of any Liens.

(b)     No Seller has, within the last 12 months made any written claim of an infringement or misappropriation by any Third Party of its rights to any Business Intellectual Property, which claim is still pending.  To the Knowledge of Sellers, no Third Party is infringing or misappropriating any Business Intellectual Property.

(c)     Except for claims that have since been satisfactorily resolved or for which the statute of limitations has lapsed, no Seller has received any written notice from any Third Party challenging the right of such Seller to use any of the Business Intellectual

Property that would reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole.

(d)     There are no pending actions, suits or arbitrations by, or before any Governmental Entity for an infringement or misappropriation by any Seller of any Intellectual Property owned by any Third Party which would reasonably be expected to materially and adversely affect the Business, and the Purchased Assets, taken as a whole.

4.9     Tax Matters. Except as disclosed in Section 4.9 of the Sellers Disclosure Letter:

(a)     Sellers have timely filed or caused to be timely filed, taking into account any applicable extensions, with the appropriate taxing authorities all income Tax Returns and all material non-income Tax Returns with respect to the Business or the Purchased Assets. All such Returns are correct and complete in all material respects. No Seller is currently the beneficiary of any extension of time within which to file any material tax Return with respect to the Business or the Purchased Assets. Since January 1, 2017, no written claim has been made by a Governmental Entity in a jurisdiction in which a Seller does not file Returns that such Seller is or may be subject to taxation by that jurisdiction with respect to Taxes that would be the subject of such Returns.

(b)     All income Tax Liabilities and all material non-income Tax Liabilities of each Seller due and payable with respect to the Business or the Purchased Assets, in each instance for all Pre-Closing Periods, have been timely paid, taking into account any applicable extensions, to the extent the non-payment of such Taxes could reasonably be expected to result in a Lien on the Purchased Assets. There are no pending or, to the Knowledge of Sellers threatened in writing, audits, investigations, disputes, notices of deficiency, claims or other similar actions relating to Property Taxes or any other Taxes that are imposed on a periodic basis (which are not based on income) of a Seller with respect to the Business or the Purchased Assets. No Seller has waived any statute of limitations in respect of non-income Taxes or agreed to any extension of time with respect to a non-income Tax assessment or deficiency.

(c)     The representations and warranties contained in Section 4.9(a) and Section 4.9(b) shall only apply if and to the extent Purchaser would be held liable for the Taxes to which such representations and warranties relate or if the Purchased Assets would become subject to a Lien in respect of such Taxes and, for the avoidance of doubt, such representations and warranties shall not be considered inaccurate or breached to the extent the applicable representation or warranty does not apply as a result of this Section 4.9(c).

4.10     Employee Benefits. Set forth in Section 4.10 of the Sellers Disclosure Letter is, as of [_____,] 2021, a true and complete list of each material employee benefit plan, within the meaning of Section 3(3) of ERISA, and each material fringe benefit, deferred compensation, severance, stock option, stock appreciation rights, incentive and bonus plan maintained or contributed to, or required to be contributed to, by a Seller or its Affiliates, in each case for the benefit of any Sellers' employees as of such date, but excepting any such plan sponsored in

whole or in part by any government, Governmental Entity or union or employee organization or any other Person (collectively, the "Employee Benefit Plans").

4.11    Compliance with Laws.   Except as set forth in Section 4.11 of the Sellers Disclosure Letter, to the Knowledge of Seller, (a) no Seller is, and no Seller has been in the past three years, in material violation of any Law or Order applicable to the Business, or the Purchased Assets, and (b) no Seller has received any written notice alleging or, to the Knowledge of Seller, been subject to any investigation by any Governmental Entity concerning, any such material violation of a Law or Order.

4.12    Environmental Matters.   Except as disclosed in Section 4.12 of the Sellers Disclosure Letter, with respect to the Business:

> (a)    to the Knowledge of Sellers, each Seller is in material compliance with all applicable Environmental Laws;

> (b)    there are no Proceedings pending, or to the Knowledge of Sellers threatened in writing, against any Seller that alleges any material violation of Environmental Law and no Seller has received from any Governmental Entity any written notice of material violation or alleged material violation of Environmental Law;

> (c)    Sellers possess and are in material compliance with all Permits required under Environmental Laws to operate the Business as currently operated and as the Business is expected to be operated following the Closing as contemplated by the Transaction Documents ("Environmental Permits"), and there are no Proceedings pending, or to the Knowledge of Sellers threatened in writing, to modify, suspend, revoke or rescind any such Environmental Permits; and

> (d)    from and after December 1, 2015, to the Knowledge of Sellers, there have been no material releases of any Hazardous Materials (i) at, in, under, on, or from any Seller Facilities or (ii) at, in, under, on, or, from any third-party location for which a Seller has any material Liability under Environmental Law.

The representations and warranties in this Section 4.12 are the sole and exclusive representations and warranties of Sellers concerning any Environmental Law, Environmental Permits, Hazardous Material or other environmental matters.

4.13    Permits.   Except for matters that are the subject of the representations and warranties in Section 4.12 (Environmental Matters), which matters are covered solely by Section 4.12, Sellers possess all material Permits that are necessary for the lawful operation of the Business as currently conducted by Sellers in the ordinary course.  All such Permits are valid and have not lapsed, been cancelled, terminated or withdrawn.  To the Knowledge of Sellers, Sellers are in compliance in all material respects with all such Permits.

4.14    Litigation.   Except as set forth in Section 4.14 of the Sellers Disclosure Letter: (a) there is no Proceeding pending, or to the Knowledge of Sellers, threatened, against any Seller or its Affiliates in respect of the Business or the Purchased Assets that would, if determined adversely, materially and adversely affect the Business, and the Purchased Assets, taken as a

whole, or prevent or materially delay beyond the Termination Date Sellers' ability to consummate the transactions contemplated by this Agreement or any Transaction Document and (b) there are no material Orders outstanding applicable to the Business, or the Purchased Assets that have not been fully satisfied.

4.15    Finders; Brokers. Except for Jefferies LLC and GlassRatner Advisory & Capital LLC, doing business as B. Riley Advisory Services, (whose fees are payable by Sellers), no agent, broker, Person or firm acting on behalf of Sellers is, or shall be, entitled to any broker's fees, finder's fees or commissions from Purchaser in connection with this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby.

4.16    Exclusivity of Representations; Projections, Etc.. The representations and warranties expressly made by Sellers in this Article IV are the exclusive representations and warranties made by Sellers with respect to the Business, and the Purchased Assets. Except for any representations and warranties expressly set forth in this Article IV (as modified by the Sellers Disclosure Letter), (a) the Purchased Assets are sold "AS IS, WHERE IS," and Sellers expressly disclaim (on each of their own behalf and on behalf of each of their respective Affiliates) any other representations or warranties of any kind or nature, express or implied, as to Liabilities, operations of their businesses (as currently or formerly conducted), the title, condition, value or quality of assets of Sellers, or the prospects (financial and otherwise), risks and other incidents of Sellers and their businesses (as currently or formerly conducted), the Purchased Assets, (b) SELLERS SPECIFICALLY DISCLAIM (ON EACH OF THEIR OWN BEHALF AND ON BEHALF OF EACH OF THEIR RESPECTIVE AFFILIATES), AND PURCHASER HEREBY WAIVES, ANY REPRESENTATION OR WARRANTY OF QUALITY, VALUE, DESIGN, OPERATION, MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, ELIGIBILITY FOR A PARTICULAR TRADE, CONFORMITY TO SAMPLES, OR CONDITION OF THE ASSETS OF SELLERS (INCLUDING THE PURCHASED ASSETS) OR ANY PART THEREOF, WHETHER LATENT OR PATENT, (c) no material or information provided by or communications made by any Seller or any of its Affiliates, or by any advisor thereof, whether by use of a "data room," or in any information memorandum, or otherwise, or by any broker or investment banker, will cause or create any warranty, express or implied, as to or in respect of any Seller, any Affiliate of any Seller or the title, condition, value or quality of their businesses (as currently or formerly conducted), or the Purchased Assets, and no other Person shall be deemed to have made, or shall be deemed to make, any other express or implied representation or warranty, either written or oral, on behalf of any Seller or any Affiliate thereof with respect to the subject matter contained herein, and (d) no Seller makes any representation or warranty whatsoever with respect to any estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

ARTICLE V
Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

EXHIBIT 9

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| **LIMETREE BAY SERVICES, LLC,** *et al.*,[1] | **CASE NO.: 21-32351 (DRJ)** |
| **Debtors.** | **(Jointly Administered)** |

## NOTICE OF DESIGNATION OF WINNING BID AND BACK-UP BID

**PLEASE TAKE NOTICE** that pursuant to the *Order Granting Debtors' Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* and bidding procedures appended thereto as Appendix A (as amended, the "**Bidding Procedures**") [Doc. No. 392],[2] the Debtors hereby designate the Winning Bid and Back-up Bid following the conclusion of the Auction, as follows:

1. Winning Bid. The Debtors hereby designated West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP, jointly, as the Winning Bidder. Per the terms of the Winning Bid, as more fully stated on the record during the Auction, the Winning Bidder shall acquire substantially all assets of the Debtors' estates, including all real property of the Debtors, for the sum of $62 million, which sale shall close on or before January 21, 2022.

2. Back-up Bid. The Debtors hereby designated St. Croix Energy, LLLP as the Back-up Bidder. Per the terms of the Back-up Bid, as more fully stated on the record during the Auction, the Back-up Bidder shall acquire substantially all assets of the Debtors'

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222). The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Bid Procedures.

estates, including all real property of the Debtors, for the sum of $57 million, which

sale shall close on or before January 26, 2022, in the event the Winning Bidder fails to

close the transaction proposed in the Winning Bid on or before January 21, 2022.

The Debtors, Winning Bidder, and Back-up Bidder are working to finalize the transactional

documents to reflect the terms of their respective final bids at Auction.  The Debtors shall file

executed transaction documents and proposed sale order related to the Winning Bid as soon as

possible, but in no event later than the commencement of the Sale Hearing.

[*Signature Page Follows*]

Dated: December 18, 2021

**BAKER & HOSTETLER LLP**

*/s/ Elizabeth A. Green*
**Elizabeth A. Green, Esq.**
Fed ID No.: 903144
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407.649.4000
Facsimile: 407.841.0168
Email: egreen@bakerlaw.com

**Jorian L. Rose, Esq.**
*Admitted Pro Hac Vice*
N.Y. Reg. No. 2901783
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
Email: jrose@bakerlaw.com

**Michael T. Delaney, Esq.**
*Admitted Pro Hac Vice*
OH Bar No. 99790
Key Tower, 127 Public Sq.
Suite 2000
Cleveland, OH 44114
Telephone: 216.621.0200
Facsimile: 216.696.0740
Email: mdelaney@bakerlaw.com

*Counsel for the Debtors and Debtors in Possession*

### Certificate of Service

**I HEREBY CERTIFY** that on December 18, 2021, a true copy of the foregoing was filed with the Court using the CM/ECF System, which will provide notice of such filing to all parties requesting such service.

*/s/ Elizabeth A. Green*
Elizabeth A. Green

EXHIBIT 10

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-32351 |
| Limetree Bay Services, LLC, *et al.*, | § | |
| | § | Chapter 11 |
| Debtors. | § | |

## Limited Objection by the United States to Sale of Assets
### (Related to Doc. No. 191)

The United States makes this limited objection to the proposed sale.

## Summary

The United States wants to ensure that no one after the sale argues that an order from this Court in any way limits applicable environmental law.

## Background

The United States, through EPA, is charged with regulatory responsibility to oversee the protection of public health and the environment under several environmental statutes, including the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, Oil Pollution Act, 33 U.S.C. §§ 2701 *et seq.*, Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.*, Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*, and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*

On January 26, 2011, the United States filed suit against HOVENSA, L.L.C., seeking relief related to the refinery now owned by the Debtors. On June 7, 2011, the Court entered a Consent Decree which provided, among other things, that it would

1

bind successor owners of the refinery. Exhibit A, p. 11. The United States submitted a modification of the Consent Decree to the Court on August 25, 2020, Exhibit B, and the Court has set a hearing on December 29, 2021, to consider entry.

The United States filed suit against debtor Limetree Bay Refining LLC and non-debtor Limetree Bay Terminals LLC on July 12, 2021, seeking injunctive relief under the Clean Air Act that includes requiring the refinery to eliminate any imminent and substantial endangerment to human health, welfare, and the environment prior to restart of refinery operations. Case No. 1:21-cv-264, District Court of the Virgin Islands. The United States filed suit because the Limetree Bay refinery had, on more than one occasion, released hydrogen sulfide and sulfur dioxide into the air in sufficient amounts to affect the surrounding community. On at least one occasion, the refinery released flare rainout—oil particles small enough to travel by air—which fell in drinking water cisterns and vegetable gardens.

Also on July 12, 2021, the United States, Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC, filed a joint stipulation. Exhibit C.

On July 12, 2021, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. [Doc. No. 1]. On July 26, 2021, they moved to sell substantially all of their assets. [Doc. No. 191]. The Debtors have since conducted an auction and declared (a) West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP, jointly as the winning bidder, and (b) St. Croix Energy, LLLP, as the backup bidder. [Doc. No. 948].

## Limited Objection

The United States makes this limited objection to the proposed sale. The United States wants to ensure that this Court's order is not later construed to limit the application of nonbankruptcy law with respect to health and safety issues.

### A.     Applicable Authority

It is well-established that anyone who owns or operates property acquired from a debtor must comply with environmental law. No one is entitled to ignore hazards or disregard laws that protect the public and the environment. *See, e.g., Ohio v. Kovacs*, 469 U.S. 274, 285 (1985) ("[A]nyone in possession of [a] site . . . must comply with . . . environmental laws . . . Plainly that person . . . may not maintain a nuisance, pollute the waters . . . [,] or refuse to remove the source of such conditions."); *In re General Motors Corp.*, 407 B.R. 463, 508 (S.D.N.Y. 2009) (a free and clear purchaser "would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation as of that time, any such remediation would be the buyer's responsibility") (Gerber, J.); *cf. In re CMC Heartland Partners*, 966 F.2d 1143 (7th Cir. 1992) (a reorganized debtor that owns property that was contaminated prior to confirmation is liable to EPA as the present owner of the property).

A purchaser is subject to the same compliance obligations as all other owners of property. The law does not put a purchaser in a privileged position, by freeing it from obligations with which all other owners must comply. If a purchaser could contend that it is somehow exempt from obligations that apply to all other owners,

3

the public would be placed at risk. A purchaser cannot evade its environmental obligations, including with respect to hazards that exist even at the outset of its ownership. *See General Motors*, 407 B.R. at 508.

Thus, for example, if a purchaser owns or operates a contaminated facility, it must protect the public from hazards as required by law – regardless of whether the hazardous conditions derive in whole or part from actions of debtors. And, if a purchaser owns or operates equipment or a facility that has a defective condition, it is responsible to prevent and may have liability for the consequences of, for example, an explosion or release, notwithstanding that the explosion or release may have derived in whole or part from a defective condition caused prior to purchase.

Section 363(f) of the Bankruptcy Code, 11 U.S.C. § 363(f), does not allow purchasers to acquire a debtor's property free and clear of the obligation to comply with environmental law. Rather, section 363(f) permits property to be sold free and clear of an entity's "interest in such property"[1] only if at least one of the following five conditions is satisfied:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

---

[1] Moreover, future obligations to comply with environmental requirements are not interests that can be released in a section 363 sale. *See In re CMC Heartland Partners*, 966 F.2d 1143, 1147 (7th Cir. 1992) ("a statutory obligation attached to current ownership of the land survives bankruptcy"); *United States v Apex Oil Co.*, 579 F.3d 734, 737 (7th Cir. 2009); *In re Torwico Electronics, Inc.*, 8 F.3d 146, 151 (3d Cir. 1993); *Pension Benefit Guaranty Corp. v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009); *In re Grumman Olson Industries*, 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011); *In re General Motors Corp.*, 407 B.R. 463, 508 (S.D.N.Y. 2009).

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

None of these conditions is satisfied with respect to compliance obligations of an owner under environmental law. The United States does not consent to a transfer free and clear of such obligations (condition 2), the obligations are not a lien (condition 3), and the obligations of owners under environmental law are not in dispute (condition 4). Similarly, "applicable nonbankruptcy law" (condition 1) does not permit a sale free and clear of an owner's obligations under environmental law. Finally, the United States cannot be "compelled . . . to accept a money satisfaction" (condition 5) in lieu of the purchaser's compliance with environmental law. No provision of environmental law allows an owner to force the United States to accept money instead of action to protect the public. Likewise, bankruptcy law does not require the United States to elect a monetary remedy over compliance. *See In re Mark IV Indus., Inc.*, 438 B.R. 46, 470 (Bankr. S.D.N.Y. 2010), *aff'd*, 459 B.R. 173, 186 (S.D.N.Y. 2011) (the Bankruptcy Code does not require a governmental agency entitled to an equitable remedy to select a suboptimal remedy of money damages, citing *In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993)); *see also Gouveia v. Tazbir*, 37 F.3d 295, 299 (7th Cir. 1994) (a debtor could not force neighboring landowners to accept money in lieu of equitable relief). In sum, bankruptcy law cannot be used to place a buyer in a position above the law, leaving the public at risk without the protection of health and safety requirements. *See, e.g., Zerand-Bernal, Inc. v. Cox*, 23 F.3d 159, 163 (7th Cir. 1994)

("[N]o one believes . . . that a bankruptcy court enjoys a blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale [or] . . . immunize such buyer from all state and federal laws that might reduce the value of the assets bought from the bankrupt.").

## B.    United States Concerns

The United States believes it is near an agreement concerning sale order language with West Indies Petroleum, but it also does not believe it will reach an agreement by the sale objection deadline.  In the event the parties cannot reach an agreement before a sale hearing, then the United States requests that the Court make clear in a sale order that any obligations in the Consent Decree, as modified, and in the joint stipulation presented to the District Court for the Virgin Islands in the 2021 lawsuit are not adversely impacted by an order from this Court.

Dated:  December 19, 2021.

Respectfully submitted,

JENNIFER B. LOWERY,
Acting United States Attorney

By:    *s/ Richard A. Kincheloe*
Richard A. Kincheloe
Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
Texas Bar No. 24068107
S.D. Tex. ID No. 1132346
1000 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9422
Facsimile: (713) 718-3033
Email:  Richard.Kincheloe@usdoj.gov
**Attorney for the United States**

6

## Certificate of Service

The undersigned certifies that he served a true and correct copy of the foregoing Objection on the parties receiving ECF notification in this case on December 19, 2021, by ECF notice.

          *s/ Richard A. Kincheloe*
          Richard A. Kincheloe
          Assistant United States Attorney

EXHIBIT 11

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 21, 2021

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| IN RE: | Chapter 11 |
| **LIMETREE BAY SERVICES, LLC,** *et al.*,[1] | Case No.: 21-32351 (DRJ) |
| Debtors. | (Jointly Administered) |

## ORDER (I) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE DEBTORS TO PERFORM UNDER THE ASSET PURCHASE AGREEMENT, (III) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

### [Re:  Docket No. 191]

Upon the motion, dated July 26, 2021 [Docket No. 191] (the "Motion"),[2] of the above-caption debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Section K of the Procedures for Complex Cases in the Southern District of Texas (the "Complex Rules"), for entry of (a) an order (i) approving procedures (as amended, the "Bidding Procedures") for the solicitation of bids for the acquisition of substantially all assets of the Debtors (the "Sale"), (ii) scheduling an auction and final hearing for approval of the Sale, (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases of the Debtors (collectively, the "Executory

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222).  The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the APA (as defined herein), as applicable.

without the prior written consent of the Purchaser.

## VII.    **Transfer of the Purchased Assets Free and Clear.**

9.    Except as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be transferred to the Purchaser free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, excluding the Operating Agreement Assumed Liabilities.  For purposes of this Sale Order, "Liens," "Claims," and "Interests" shall mean:

a.    any and all charges, liens (statutory or otherwise), claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledge, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of setoff, successor liability, easements, servitudes, restrictive covenants, interests or rights under any operating agreement, encroachments, encumbrances, third-party interests, or any other restrictions or limitations of any kind with respect to the Purchased Assets including all the restrictions  or limitations set forth in Paragraph W above (collectively, "Liens");

b.    any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under any labor, employment, or pension laws, (ii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, and (iii) any and all other claims, causes of action, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third-party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, agents, successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and  bidding process with respect to the Purchased Assets, or the Sale contemplated by the APA including all the claims set forth in Paragraph W above (collectively, "Claims"); and

c.    any and all equity or other interests of any kind or nature whatsoever in or with respect to (x) any of the Debtors or their respective

affiliates, subsidiaries, successors, or assigns or (y) the Purchased Assets, including all the interests set forth in Paragraph W above (collectively, "Interests");

whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing.  Any and all such Liens, Claims, and Interests shall attach to the portion of the purchase price ultimately attributable to the Purchased Assets against or in which they claim an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Purchased Assets, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.  On the Closing, the Purchaser shall take title to and possession of the Purchased Assets in PHRT, subject only to the obligations under the APA and Transaction Documents, including Operating Agreement Assumed Liabilities.

10.     Nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any

defense asserted under this Order.

11.     Furthermore, notwithstanding anything in this Order or in the APA to the contrary, the Purchaser must become party to (i) the Consent Decree as modified by the First Modification and Second Modification in United States and the *United States Virgin Islands v. HOVENSA L.L.C.*, Civ. No. 1:11-cv-00006, in the United States District Court of the Virgin Islands, St. Croix Division (the "Consent Decree"), and (b) the Joint Stipulation in *United States v. Limetree Bay Refining, LLC, and Limetree Bay Terminals, LLC*, Civ. No. 1:21-cv-00264 (as each may be amended with the mutual consent of the parties); *provided*, that Purchaser shall not become liable for any obligations, other than air monitoring obligations, under such Consent Decree or Joint Stipulation that do not relate to property or units purchased or to be operated by Purchaser pursuant to this Sale Order by reason of so becoming a party to such Consent Decree or Joint Stipulation.   Nothing in this Order or the Sale Agreement (a) prevents the U.S. Environmental Protection Agency or other agency from issuing any order or taking other action under applicable nonbankruptcy law, or (b) modifies the Consent Decree, the Joint Stipulation, or any other applicable environmental, health and safety, or police and regulatory law.

## VIII.   Vesting of Assets in the Purchaser.

12.     The transfer of the Purchased Assets to the Purchaser with Purchaser taking title in PHRT pursuant to the APA shall constitute a legal, valid, and effective transfer of the Purchased Assets on the Closing, and shall vest the Purchaser with all of the Debtors' rights, title, and interests in the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the exception of the Operating Agreement Assumed Liabilities).

## IX.   Release of Liens.

13.     If any person or entity that has filed any financing statements, mortgages, mechanic's liens, *lis pendens*, or any other documents or agreements evidencing a Lien on the

*Automatic Stay Pursuant to 11 U.S.C. § 362(d) and for Waiver of the 14- Day Stay Pursuant to Fed. R. Bankr. P. 4001(a)(3)* [Docket No. 868]).

42.    <u>Harris County, Texas [Docket No. 869]</u>.  The Debtors agree that, to the extent the Debtors have any personal assets located in Harris County, Texas that constitute Purchased Assets under the APA (the "<u>Harris County Assets</u>"), the Harris County tax lien shall attach to the portion of the purchase price ultimately attributable to the Harris County Assets in the order of its priority, with the same validity, force, and effect, if any, which it now has against such Purchased Assets, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

**Signed:  December 21, 2021.**

**DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE**

EXHIBIT 12

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE



Julie R. Domike
Attorney at Law
T 202.853.3453
jdomike@babstcalland.com

CONTAINS CONFIDENTIAL BUSINESS INFORMATION ("CBI")

February 23, 2022

*Via Electronic Mail*

Myles E. Flint, II, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044

**Re: Response to Questions Regarding PHRT Purging and Restart Proposal**

Dear Mr. Flint,

On behalf of Port Hamilton Refining and Transportation, LLLP ("PHRT"), we provide the following response to your letter dated February 4, 2022 with respect to PHRT refinery purging and restart plans.

Note that we will provide updates and further information responsive to the questions in your letter as soon as it becomes available.

1.  Reports

We confirm that PHRT will continue to issue the Flare #8 continuous emissions monitoring system ("CEMS") data on a weekly basis, delivering by email the previous week's data each Friday. We also will continue to provide weekly Purge Plan progress reports each Monday. PHRT confirms that we will continue to provide EPA with real-time access to the monitoring data collected from the five monitoring stations.

We appreciate receiving the weekly summaries from EPA of the data at these monitoring stations and ask that EPA continue to provide these to me, Tom Eagan, Neil Morgan, and Fermin Rodriguez. With respect to any observed exceedance noted by EPA, we ask that EPA notify me, Tom Eagan, Neil Morgan, and Fermin Rodriguez of these. In the event there is a change in recipients of these reports or notifications, we will notify you and Ms. Villatora, Ms. Pierce, and Ms. Froikin.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION ("CBI")

2. Hydrocarbon (HC) and Amine Purging



CONTAINS CONFIDENTIAL BUSINESS INFORMATION ("CBI")



**Flare Gas Recovery System**:  A noted above, the following preparations for installation of the FGRS have been undertaken; Becht engineering was contracted to develop the process engineering design.  Once that is completed, Richard Engineering will develop the mechanical design of the system.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION ("CBI")

*Meeting dates*:  We propose meeting with DOJ and EPA for a follow up discussion on March 9 or 10, 2022.

Sincerely,

Julie R. Domike

Enclosures
cc:      Liliana Villatora
         Sara Froikin
         Jennifer Pierce
         Providence Spina
         Catherine Caballero

4

EXHIBIT 13

to

DECLARATION OF MYLES E. FLINT, II IN SUPPORT OF
THE UNITES STATES' OPPOSITION TO PORT HAMILTON'S
MOTION TO CLARIFY THE CONSENT DECREE

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP (PHRT)**
Phase 2 Activity Report
February 21, 2022

ITEM DESCRIPTION:        PROGRESS REPORT

GENERAL NOTES:
- Refinery De-Inventory Plan Phase 2 continues to be on hold
- De-inventory activities including the following items will not be executed at
  - ✓ Cold circulation
  - ✓ Hot circulation
  - ✓ Steam out
  - ✓ Purging
- The sequence of scheduled activities is expected to remain the same
- Operation and Maintenance personnel have been reduced, subject to additional reductions in the future
- PHRT will continue to monitor the units to ensure safety and stability
- The No. 8 Flare will remain blinded and flare KO drums isolation valves car seal/chain lock closed
- The overall units' Refinery de-inventory plan under the LBR – Phase 2 is being revised to prepare the Crude unit and corresponding process units (i.e, LPG Fract, Gas Recovery unit) for entry and internal inspection and repairs, if required.

**HIGHLIGHTS – WEEK ENDING  February 21, 2022**

**No. 8 Flare**
1. Period  February 15 to 21, 2022
   - All process unit de-inventory activities remain on hold
   - No. 8 Flare system remains blinded including the purge gas line
   - **No process units were opened to the flare**
   - The flare KO Drums were also isolated (block valves before the flare blind) and all-process units were kept with corresponding flare heaters blocked in (single isolation)
   - No. 7 vaporizer and fuel gas system remained isolated

2. Fuel Gas CEMS – Continuous Emissions Monitoring System
   - System continued to be isolated as the No. 7 vaporizer and fuel gas system were kept down while working at the No. 8 Flare CEMS and Panametric probes

3. Flare 8 CEMS and Panametrics flow meter
   - CEMS remains lined up and undergoing routine calibration / preventive maintenance
   - No. 8 Flare CEMS - CGA (calibration gas audit) was conducted in December 2021 because the flare was not in service; upon return of the flare to normal service a RADA will be conducted

   - No. 8 Flare Purging
     - Continued the nitrogen purge of the section of the flare header from the 48' blind to the flare tip maintaining 1-1.5 psig pressure
     - CEMS data sent to EPA for review

   - $H_2S$ Scavenger system continued to be fully functional

**IoMosaic Independent Observer**
- PHRT is working on a contract with IoMosaic representative to follow up on activities associated with Flare no. 8  upon re-initiation for Phase 2 of the restart plan

**EPA On-Scene Coordinator**
- EPA demobilized its equipment during the week of November 15, 2021

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**February 21, 2022**

**SO$_2$/H$_2$S Ambient Monitoring Stations Telemetry**

Monitoring stations remained activated during February 15 to 21, 2022

Station 1:
No Issues to report

Station 2:
No Issues to report

Station 3:
No Issues to report

Station 4:
No Issues to report

Station 5:
Continue to have Flow Warning (high) on the SO2 Monitor. (Honeywell Loaner)
Going to work with PHRTs Honeywell Rep for a Return Authorization Number for the SO2 Monitor, PHRT took offline due to high flow indication so it can be sent back for repair

- **Conducted the following activities not requiring the use of the flare system in OSBL piping appurtenant to process units.**
  Continued working with Debusk, Itech, and RTP to finalize the analysis, protocol and procedures to be submitted to EPA for review and approval to proceed with the amine neutralization.

**Process units remained the same as previous weeks**
- **No. 5 Crude Unit**
  Ready to start heat-up and warm circulation
- **No. 3 Vacuum**
  Ready to start heat-up and warm circulation
- **No. 4 Hydrobon**
  Pump out step – 90% completed
- **No. 4 Platformer Unit**
  Pump out step – 90% completed
- **No. 3 Hydrobon**
  Completed pump out
- **No. 6 DD – Distillate Desulfurizer**
  Pump out – 80% completed
- **No. 7 DD – Distillate Desulfurizer**
  Pump out – 90% completed
- **No. 9 DD – Distillate Desulfurizer**
  Pump out – 100% completed

**Other**
PHRT is continuing the process of reviewing all the environmental audit reports findings and recommendations for inclusion in the facility re-start plans under PHRT's Phase 1 – Crude Unit Topping operation
Coker, Amine unit and Sulfur Plant audits - resolution of the recommendations will be addressed prior to commissioning under PHRT's Phase 2 operation

PHRT finalized a contract with RTP Environmental.
PHRT continued the process of establishing service contracts with environmental companies such as IoMosaic, ESC Spectrum, Itech and others.

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**February 21, 2022**

**Flare Gas Recovery System**

- Process engineering data is being put together to establish the Front-End Loading (FEL), process design and detailed engineering for the FGRS.
- Becht Engineering was put under contract to develop the process design specifications; Becht earlier received a MOU to begin this scope while the contract was being formalized.
- Richard Engineering was put under contract to develop the detailed engineering and design packages. Once Becht Engineering completes the process design specifications, Richard will utilize this design specifications and develop the Front-End Loading.

**PROJECTION FOR THE PERIOD February 22 -28, 2022**

- PHASE 2 on hold
- **Overall schedule is being revised to address the purge plan**

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP (PHRT)**
Phase 2 Activity Report
May  30, 2022

ITEM DESCRIPTION:    PROGRESS REPORT

GENERAL NOTES:
- **Refinery De-Inventory Plan Phase 2 continues to be on hold**
- De-inventory activities including the following items will not be executed at
    - ✓ Cold circulation
    - ✓ Hot circulation
    - ✓ Steam out
    - ✓ Purging
- The sequence of scheduled activities is expected to remain the same.
- Operation and Maintenance personnel have been reduced.
- PHRT will continue to monitor the units to ensure safety and stability.
- The No. 8 Flare will remain blinded and flare KO drums isolation valves car seal/chain lock closed.
- The overall plan to de-inventory Refinery units that was known as LBR – Phase 2 is being revised to prepare the Crude unit and associated process units (i.e., LPG Fract, Gas Recovery unit) for entry and internal inspection and repairs, if required.


HIGHLIGHTS – WEEK ENDING May 30, No. 8 Flare
- Period of May 23 to 30, 2022
    - All process unit de-inventory activities remain on hold
    - No. 8 Flare system remains blinded including the purge gas line
    - No process units were opened to the flare
    - The flare KO Drums were also isolated (block valves before the flare blind) and all-process units were kept with corresponding flare heaters blocked in (single isolation)
    - No. 7 vaporizer and fuel gas system remained isolated

- Fuel Gas CEMS – Continuous Emissions Monitoring System
    - System continued to be isolated as the No. 7 vaporizer and fuel gas system were kept down while working on the No. 8 Flare CEMS and Panametric probes

- Flare 8 CEMS and Panametrics flow meter
    - CEMS remains lined up and undergoing routine calibration / preventive maintenance
    - No. 8 Flare CEMS - CGA (calibration gas audit) was conducted in December 2021 because the flare was not in service; upon return of the flare to normal service a RADA will be conducted

- No. 8 Flare Purging
    - Continued the nitrogen purge of the section of the flare header from the 48' blind to the flare tip maintaining 1-1.5 psig pressure
    - The Nitrogen  Plan  O2 control is being serviced as the oxygen  went to 2.5 -3.5 %  which will affect the Flare – CEMS O2 reading.
    - CEMS data sent to EPA for review

- $H_2S$ Scavenger system continued to be fully functional

- IoMosaic Independent Observer
    - Observer on standby, to be on site prior to re-initiating  Phase 2 of the restart plan

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**May 30, 2022**

- $SO_2/H_2S$ Ambient Monitoring Stations Telemetry

  Below is PHRT's weekly observations of the Ambient Monitoring Stations for week of May 20-27, 2022.

  Station 1:
  05/20 – Exceedances – H2S
        Tier 1 - 1:29
        Tier 2 - 1:39
  5/21 – 5/22 – No Exceedances
  5/23 – Exceedances – H2S
        Tier 1 – 3:50, 4:36
        Tier 2 – 4:48
  5/24 - No Exceedances
  5/25 – Exceedances – H2S
        Tier 1 – 3:20, 4:54, 6:16
  5/26 - No Exceedances
  5/27 - Exceedances – H2S
        Tier 1 – 4:40, 4:59, 5:30, 6:02

  No Technical Issues to report

  Station 2:
  05/20 - 05/27 – No Technical or exceedance issues

  Station 3:
  05/20 - 05/27 – No exceedance issues
  Technical issues - SO2 Flow High Alarm - Honeywell Tech support thinks the pump in the monitor is going out and recommends PHRT sends it back to the Vendor for repair. PHRT has Honeywell Case Number (07560734) and working with Vendor to get set in for repair. Received shipping label from Vendor and will get shipped back for repairs this week.
  Offline 5/22 – 16:55 – 5/23 10:34 – Had to restart gateway to reconnect Cellular Router
  Having to reset Gateway about everyday over the Holiday weekend - Working with Viya Rep and Safe Environmental Engineering on these issues

  Station 4:
  05/20 - 05/27 – No technical or exceedance issues

  Station 5:
  05/20 - 05/27 – No exceedance issues
  Technical issues - We continue to have Maintenance Fault: High Flow on the SO2 Monitor. (Honeywell Loaner) PHRT is working with Honeywell to get a case number.

  Note: PHRT is in the process of buying a completed SO2/ H2S station spare; expected delivery time end of August 2022

Process units remained the same as previous weeks
- No. 5 Crude Unit
  Ready to start heat-up and warm circulation
- No. 3 Vacuum
  Ready to start heat-up and warm circulation
- No. 4 Hydrobon
  Pump out step – 90% completed
- No. 4 Platformer Unit
  Pump out step – 90% completed
- No. 3 Hydrobon
  Completed pump out
- No. 6 DD – Distillate Desulfurizer
  Pump out – 80% completed
- No. 7 DD – Distillate Desulfurizer

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**May 30, 2022**

Pump out – 90% completed
- No. 9 DD – Distillate Desulfurizer
Pump out – 100% completed

**PROJECTION FOR THE PERIOD May 31 – June 6, 2022**
- PHASE 2 on hold
- Overall schedule is being revised to address the purge plan

**Other**

1. PHRT continues working with local counsel and real estate agent to secure the sites for 4 new Ambient Air monitoring (SO2/H2S) stations as per the 303 order and joint stipulation. Two locations are defined: working on developing site lease agreements.
   PHRT received EPA's siting criteria for selecting the location of the new (4) SO2/H2S stations; PHRT is reviewing; will submit its site recommendations to EPA.

2. Unchanged from last week's report:
   i. PHRT is continuing the process of reviewing all the environmental audit reports findings and recommendations for inclusion in the facility re-start plans under PHRT Phase 1 – Crude Unit – Topping operation.
   ii. Coker, Amine unit and Sulfur Plant audit - resolution of the recommendations will be addressed prior to commissioning under PHRT Phase 2 operation (same report as last week)
   iii. Becht Engineering is working on the following project (listing is not inclusive)
       - completed the computer simulation of the no 5 Crude unit tower; the same could meet product specification without modification at permit limits
       - Started developing the computer simulation based on 180,000 BPD permitted rate as the basis for:
           a. Relief valve (scenario analysis) in progress
           b. FGRU process design
           c. Caustic Scrubber process design – in progress
           d. Kero Merox process design – in progress

**Flare Gas Recovery System**

- Process engineering data are being put together to establish the process design for FEL and detailed engineering.
- Becht Engineering was issued a contract to develop the process design specifications.
- Richard Engineering was issued a contract to develop the FEL and detailed engineering and design packages; once Becht Engineering completes the process design specification, Richard will utilize this design specification and develop the FEL.

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP (PHRT)**
Phase 2 Activity Report
June 6, 2022

ITEM DESCRIPTION:     PROGRESS REPORT

GENERAL NOTES:
- **Refinery De-Inventory Plan Phase 2 continues to be on hold**
- De-inventory activities including the following items will not be executed at
  - ✓ Cold circulation
  - ✓ Hot circulation
  - ✓ Steam out
  - ✓ Purging
- The sequence of scheduled activities is expected to remain the same.
- Operation and Maintenance personnel have been reduced.
- PHRT will continue to monitor the units to ensure safety and stability.
- The No. 8 Flare will remain blinded and flare KO drums isolation valves car seal/chain lock closed.
- The overall plan to de-inventory Refinery units that was known as LBR – Phase 2 is being revised to prepare the Crude unit and associated process units (i.e., LPG Fract, Gas Recovery unit) for entry and internal inspection and repairs, if required.


HIGHLIGHTS – WEEK ENDING June 6, 2022, No. 8 Flare
- Period of May 31 to June 6, 2022
  - o All process unit de-inventory activities remain on hold
  - o No. 8 Flare system remains blinded including the purge gas line
  - o No process units were opened to the flare
  - o The flare KO Drums were also isolated (block valves before the flare blind) and all-process units were kept with corresponding flare heaters blocked in (single isolation)
  - o No. 7 vaporizer and fuel gas system remained isolated

- Fuel Gas CEMS – Continuous Emissions Monitoring System
  - o System continued to be isolated as the No. 7 vaporizer and fuel gas system were kept down while working on the No. 8 Flare CEMS and Panametric probes

- Flare 8 CEMS and Panametrics flow meter
  - o CEMS remains lined up and undergoing routine calibration / preventive maintenance
  - o No. 8 Flare CEMS - CGA (calibration gas audit) was conducted in December 2021 because the flare was not in service; upon return of the flare to normal service a RADA will be conducted

- No. 8 Flare Purging
  - o Continued the nitrogen purge of the section of the flare header from the 48' blind to the flare tip maintaining 1-1.5 psig pressure
  - o The Nitrogen Plan O2 control is being serviced as the oxygen went to 2.5 -3.5 % which will affect the Flare – CEMS O2 reading.
  - o CEMS data sent to EPA for review
  - o Preparations are being made to mechanically (water flush and hydro-blast) clean the piping from flare KO drum to the flare controls; this work is being defined without removing the 48 inch blind to the flare stack.

- $H_2S$ Scavenger system continued to be fully functional

- IoMosaic Independent Observer
  - o Observer on standby, to be on site prior to re-initiating Phase 2 of the restart plan

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**June 6, 2022**

- $SO_2/H_2S$ Ambient Monitoring Stations Telemetry

  Below are PHRT's weekly observations of the Ambient Monitoring Stations for week of May 27- June 03, 2022.

  **Station 1:**
  05/27 – Exceedances – H2S
      Tier 1 – 4:40, 4:59, 5:30, 6:02
  5/28 – 5/29 – No Exceedances
  5/30 – 5/31 – No Data due to Safe Environmental Monthly Archive, I have requested they send me those data and will pass on to the team once received and analyzed.
  06/01 - Exceedances – H2S
      Tier 1 – 21:42, 22:29
      Tier 2 - 22:00, 22:33, 22:53
  06/02 – Exceedances – H2S
      Tier 1 – 03:25, 03:41, 04:03, 04:49, 05:12, 05:32, 06:11, 6:35
      Tier 2 - 01:08, 01:27
  06/03 - Exceedances – H2S
      Tier 1 – 0:23, 01:55, 03:14, 03:55, 04:12, 05:04, 05:49, 06:25
      Tier 2 – 0:36, 05:25, 05:58,

  No Technical Issues to report

  **Station 2:**
  05/27 - 06/03 – No Technical or exceedance issues

  **Station 3:**
  05/27 - 06/03 – No exceedance issues
  - Technical issues - SO2 Flow High Alarm - Honeywell Tech support thinks the pump in the monitor is going out and recommends PHRT send it back to the Vendor for repair.
  - PHRT has Honeywell Case Number (07560734) and working with Vendor to have it repaired. **Monitor has been sent back for repair.**
  - Having to restart gateway to reconnect Cellular Router every day.
  - Working with Viya Team and Safe Environmental Engineering (SEE) on these issues. Worked until 10AST on Friday, June 3rd on the problem.  On Saturday, June 4th, we also had SEE program Viya (internet provider) APN in the gateway that Viya had requested in our Friday troubleshooting efforts. The issue is ongoing; PHRT and Teams are working on a solution.

  **Station 4:**
  05/27 - 06/03 – No technical or exceedance issues

  **Station 5:**
  05/27 - 06/03 – No exceedance issues
  - Technical issues - We continue to have Maintenance Fault: High Flow on the SO2 Monitor. (Honeywell Loaner) PHRT is working with Honeywell to get a case number.
  05/29
  - Power outage in the area and Site was down overnight. PHRT had to reset monitors and gateway 05/30 once power was restored by WAPA.

  Note: PHRT will coordinate a conference call with EPA to address the difference in accessing the SO2/H2S readings; there might be a combination of field maintenance, internet transmission and systems interface issues.

Process units remained the same as previous weeks
- No. 5 Crude Unit
  Ready to start heat-up and warm circulation
- No. 3 Vacuum
  Ready to start heat-up and warm circulation
- No. 4 Hydrobon
  Pump out step – 90% completed
- No. 4 Platformer Unit

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**June 6, 2022**

Pump out step – 90% completed
- No. 3 Hydrobon
  Completed pump out
- No. 6 DD – Distillate Desulfurizer
  Pump out – 80% completed
- No. 7 DD – Distillate Desulfurizer
  Pump out – 90% completed
- No. 9 DD – Distillate Desulfurizer
  Pump out – 100% completed

**PROJECTION FOR THE PERIOD June 7 – 13, 2022**
- PHASE 2 on hold
- Overall schedule is being revised to address the purge plan

**Other**

1. PHRT continues working with local counsel and real estate agent to secure the sites for 4 new Ambient Air monitoring (SO2/H2S) stations as per the 303 order and joint stipulation. Two locations are defined: working on developing site lease agreements.
   PHRT reviewed  EPA's siting criteria for selecting the location of the new (4) SO2/H2S stations; PHRT still  addressing  2 of the EPA's suggested  sites as one is located near a USVI lift station that will affect the monitor reading, and the other that is located on the grounds of the USVI vocational complex to which PHRT will not have access necessary to service the monitor.

2. Unchanged from last week's report:
   i. PHRT is continuing the process of reviewing all the environmental audit reports findings and recommendations for inclusion in the facility re-start plans under PHRT Phase 1 – Crude Unit – Topping operation.
   ii. Coker, Amine unit and Sulfur Plant audit - resolution of the recommendations will be addressed prior to commissioning under PHRT Phase 2 operation (same report as last week)
   iii. Becht Engineering is working on the following project (listing is not inclusive)
        - completed the computer simulation of the no 5 Crude unit tower; the same could meet product specification without modification at permit limits
   - Started developing the computer simulation based on 180,000 BPD permitted rate as the basis for:
     a. Relief valve (scenario analysis) in progress
     b. FGRU process design
     c. Caustic Scrubber process design – in progress
     d. Kero Merox process design – in progress

**Flare Gas Recovery System**

- Process engineering data are being put together to establish the process design for FEL and detailed engineering.
  o Process engineering data is based on LBR's CEMS report.
  o The CEMS data covers the period from January to May 12, 2021.
  o The periods were all the process units were in operations
  o Periods when the Platformer hydrogen was routed to flare and when it was routed to fuel gas system
  o PHRT will schedule a conference call with EPA during the week of June 13, 2022 to review  the FGRU process design basis.
- From previous weekly report
  o Becht Engineering was issued a contract to develop the process design specifications.
  o Richard Engineering was issued a contract to develop the FEL and detailed engineering and design packages; once Becht Engineering completes the process design specification, Richard will utilize this design specification and develop the FEL.

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP (PHRT)**
Phase 2 Activity Report
June 27, 2022

ITEM DESCRIPTION:     PROGRESS REPORT

GENERAL NOTES:
- **Refinery De-Inventory Plan Phase 2 continues to be on hold**
- De-inventory activities including the following items will not be executed at
  - ✓ Cold circulation
  - ✓ Hot circulation
  - ✓ Steam out
  - ✓ Purging
- The sequence of scheduled activities is expected to remain the same.
- Operation and Maintenance personnel have been reduced.
- PHRT will continue to monitor the units to ensure safety and stability.
- The No. 8 Flare will remain blinded and flare KO drums isolation valves car seal/chain lock closed.
- The overall plan to de-inventory Refinery units that was known as LBR – Phase 2 is being revised to prepare the Crude unit and associated process units (i.e., LPG Fract, Gas Recovery unit) for entry and internal inspection and repairs, if required.

HIGHLIGHTS – WEEK ENDING June 20, 2022, No. 8 Flare
- Period of June 21 to June 27, 2022
  - All process unit de-inventory activities remain on hold
  - No. 8 Flare system remains blinded including the purge gas line
  - No process units were opened to the flare
  - The flare KO Drums were also isolated (block valves before the flare blind) and all-process units were kept with corresponding flare heaters blocked in (single isolation)
  - No. 7 vaporizer and fuel gas system remained isolated

- Fuel Gas CEMS – Continuous Emissions Monitoring System
  - System continued to be isolated as the No. 7 vaporizer and fuel gas system were kept down while working on the No. 8 Flare CEMS and Panametric probes

- Flare 8 CEMS and Panametrics flow meter
  - CEMS remains lined up and undergoing routine calibration / preventive maintenance
  - No. 8 Flare CEMS - CGA (calibration gas audit) was conducted during the week of June 7, 2022 because the flare was not in service; upon return of the flare to normal service a RADA will be conducted

- No. 8 Flare Purging
  - Continued the nitrogen purge of the section of the flare header from the 48' blind to the flare tip maintaining 1-1.5 psig pressure
  - The Nitrogen Plan O2 control is being serviced as the oxygen went to 2.5 -3.5 % which will affect the Flare – CEMS O2 reading.
  - CEMS data sent to EPA for review
  - Preparations are being made to mechanically (water flush and hydro-blast) clean the piping from flare KO drum to the flare controls; this work is being defined without removing the 48-inch blind to the flare stack.

- H$_2$S Scavenger system continued to be fully functional

- IoMosaic Independent Observer
  - Observer on standby, to be on site prior to re-initiating Phase 2 of the restart plan

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**June 27, 2022**

- SO$_2$/H$_2$S Ambient Monitoring Stations Telemetry

**Replaced SO2 Chemcassettes in all 5 stations while making rounds Monday June 20th.**

**Station 1:**
06/17 – Exceedances – H2S
    Tier 1 – 0:38
06/18 – No Exceedances - Technical Issue – Lost Cellular Communication 03:14
06/19 – No Date - Lost Cellular Communication 6/18
06/20 - Exceedances H2S
    Tier 1 -21:43
    Technical Issue - Reset Gateway Communication 13:23
06/21 - Exceedances – H2S
    Tier 1 – 01:17, 01:45, 02:15, 04:58, 05:58
    Tier 2 – 02:21, 02:42, 03:00, 03:09, 04:00
    No Technical Issues to report
06/22 - Exceedances H2S
    Tier 1 -0:16, 0:33, 01:13, 01:30, 01:56, 02:16, 02:59, 03:18, 03:57, 04:23, 04:43, 05:09, 05:48, 22:24, 22:54, 23:30
    No Technical Issues to report
06/23 - Exceedances H2S
    Tier 1 -0:49, 01:48, 02:30, 03:23, 04:28, 04:47, 04:51, 05:33, 06:03, 21:24
    Tier 2 – 03:27
    No Technical Issues to report
06/24 - Exceedances H2S
    Tier 1 -23:17, 23:33, 23:54
    No Technical Issues to report

**Station 2:**
06/17 - 06/24 – No exceedances
Technical issues – Communication issues ongoing. PHRT met with our Cellular provider for service to the Stations (Viya) the morning of 06/20/22. Viya is analyzing the data and will provide results early this week.

**Station 3:**
06/17 - 06/24 – No exceedance issues
Technical issues - Continue to restart gateway to reconnect Cellular Router daily. Viya is analyzing the data and will provide results early this week.

**Station 4:**
06/17 - 06/24 – No technical or exceedance issues

**Station 5:**
06/17 - 06/24 – No exceedance issues
Technical issues – Error on Smart Gateway (windows didn't load correctly). PHRT purchased Two (2) new Smart Gateways from Safe Environment, the gateways arrived on island Friday and awaiting customs clearance.
PHRT continues to have Maintenance Fault: High Flow on the SO2 Monitor. (Honeywell Loaner) PHRT is working with Honeywell and has received a case number. PHRT is waiting on return of repaired SPM before shipping this one back.

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Phase 2 Activity Report**
**June 27, 2022**

Process units remained the same as previous weeks
- No. 5 Crude Unit
  Ready to start heat-up and warm circulation
- No. 3 Vacuum
  Ready to start heat-up and warm circulation
- No. 4 Hydrobon
  Pump out step – 90% completed
- No. 4 Platformer Unit
  Pump out step – 90% completed
- No. 3 Hydrobon
  Completed pump out
- No. 6 DD – Distillate Desulfurizer
  Pump out – 80% completed
- No. 7 DD – Distillate Desulfurizer
  Pump out – 90% completed
- No. 9 DD – Distillate Desulfurizer
  Pump out – 100% completed

**PROJECTION FOR THE PERIOD June 28 to July 4, 2022**
- PHASE 2 on hold
- Overall schedule is being revised to address the purge plan

**Other**
1. PHRT continues working with local counsel and real estate agent to secure the sites for 4 new Ambient Air monitoring (SO2/H2S) stations as per the 303 order and joint stipulation. Two locations are defined: working on developing site lease agreements.
   PHRT reviewed EPA's siting criteria for selecting the location of the new (4) SO2/H2S stations; PHRT still addressing 2 of the EPA's suggested sites as one is located near a USVI lift station that will affect the monitor reading, and the other that is located on the grounds of the USVI vocational complex to which PHRT will not have access necessary to service the monitor.

2. Unchanged from last week's report:
   i. PHRT is continuing the process of reviewing all the environmental audit reports findings and recommendations for inclusion in the facility re-start plans under PHRT Phase 1 – Crude Unit – Topping operation.
   ii. Coker, Amine unit and Sulfur Plant audit - resolution of the recommendations will be addressed prior to commissioning under PHRT Phase 2 operation (same report as last week)
   iii. Becht Engineering is working on the following project (listing is not inclusive)
      - completed the computer simulation of the no 5 Crude unit tower; the same could meet product specification without modification at permit limits
   - Started developing the computer simulation based on 180,000 BPD permitted rate as the basis for:
      a. Relief valve (scenario analysis) in progress
      b. FGRU process design
      c. Caustic Scrubber process design – in progress
      d. Kero Merox process design – in progress

Flare Gas Recovery System
- PHRT and EPA/DOJ met to address the FGRU design basis utilizing January 2021 to May 2021 Flare CEMS data
  - The periods during which all process units were in operation
  - Periods when the Platformer hydrogen was routed to the flare and when it was routed to fuel gas system
- From previous weekly report
  - Becht Engineering was issued a contract to develop the process design specifications.
  - Richard Engineering was issued a contract to develop the FEL and detailed engineering and design packages; once Becht Engineering completes the process design specification, Richard will utilize this design specification and develop the FEL.

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Weekly Activity Report**
**April 24, 2023**

ITEM DESCRIPTION:     PROGRESS REPORT

GENERAL NOTES:
- With the exception of the LPG and Amine removal under the AOC, which is discussed below, the Refinery De-Inventory Plan continues to be on hold. De-inventory activities including the following items will not be executed
    - ✓     Cold circulation
    - ✓     Hot circulation
    - ✓     Steam out
    - ✓     Purging
- PHRT will continue to monitor the units to ensure safety and stability.
- The No. 8 Flare will remain blinded and flare KO drums isolation valves car sealed/chain locked.

HIGHLIGHTS – WEEK ENDING April 24, 2023:
- No de-inventory activities were performed

**$SO_2$/$H_2S$ AMBIENT MONITORING STATIONS TELEMETRY**

Weekly Observations of the PHRT Ambient Monitoring Stations – April 15 through April 21, 2023.

Technical and Monitoring Report – $H_2S$ and $SO_2$

| | |
|---|---|
| Station Site 1: | Tier 1 readings: **4/17/23** 02:04; 03:11; 03:39; 04:30; 05:03; 06:28 - **4/20/23** 22:15; **4/21/23** 01:20; 02:01; 03:19; 03:57; 04:18 |
| | Tier 2 readings: **4/17/23** 03:33; **4/21/23** 04:08 |
| | Communication Failure: 4/16/23 21:11 - 4/18/23 09:42 (island power outage) |
| | |
| Station Site 2: | No Tier 1 or 2 readings |
| | Communication Failure 4/16/23 12:57 - 4/17/23 11:17 (island power outage) |
| | |
| Station Site 3: | No Tier 1 or 2 readings |
| | Communication Failure 4/16/23 19:07 - 4/17/23 12:30  (island power outage) |
| | |
| Station Site 4: | No Tier 1 or 2 readings |
| | Communication Failure 4/18/23 23:12 - 4/20/23 10:38 (island power outage) |
| | |
| Station Site 5: | No Tier 1 or 2 readings |
| | Communication Failure 4/17/23 1:07 - 4/18/23 9:01 (island power outage) |

PROJECTION FOR THE PERIOD April 25 to May 1, 2023

1. PHRT continues working with local counsel and real estate agent to secure the sites for 4 new Ambient Air monitoring ($SO_2$/$H_2S$) stations as per the 303 order, joint stipulation, and Section 114 request. Two locations are identified: working on developing site lease agreements.
    a. PHRT reviewed EPA's siting criteria for selecting the location of the new (4) $SO_2$/$H_2S$ stations; PHRT still addressing 2 of the EPA's suggested sites.  One is located at a school (Country Day) to which PHRT will not have access and is near a USVI lift station that could affect the monitor reading, and the other is located on the grounds of the USVI vocational complex to which PHRT will not have access necessary to service the monitor.

2. Flare Gas Recovery System
    a. PHRT and EPA/DOJ met to address the FGRU design basis utilizing January to May 2021 Flare CEMS data which included the periods during which all process units were in operation, when the Platformer hydrogen was routed to the flare, and when it was routed to fuel gas system
    b. Becht Engineering was issued a contract to develop the process design specifications.

**PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**
**Weekly Activity Report**
**April 24, 2023**

      c.   Richard Engineering was issued a contract to develop the FEL and detailed engineering and design packages; once Becht Engineering completes the process design specification, Richard will utilize this design specification and develop the FEL.

3.    EPA installed ambient air monitors inside the refinery units and along the PHRT and OPT fenceline; EPA representatives on site are checking them regularly.

4.    PHRT is preparing to dispose of the following substances left by the prior refinery owner in the facility:
- Coke – PHRT is inquiring with potential buyers
- Sulfur pellets – bagged to be sent off island as product
- Ammonia in storage – the ammonia will be safely removed in accordance with the 12/5/22 AOC.

5.    Permit applications for Authorities to Construct and Permits to Operate equipment required for LPG and Amine removal under the AOC were submitted to DPNR, and forwarded to U.S. EPA, on Friday, March 31, 2023.

6.    Clean Harbors arrived on site on March 13 and commenced detailed planning for Amine removal. Scaffold is being built and some lines are being blinded in preparation for connections. Removal of rich amine is scheduled to begin on April 25th , pending approval by EPA of HSE plan and Operational procedures.