IN DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL.<br><br>PLAINTIFFS,<br><br>v.<br><br>HOVENSA L.L.C.<br><br>DEFENDANT. | CASE NO. 1:11-CV-00006 |

**PORT HAMILTON'S REPLY MEMORANDUM IN SUPPORT OF ITS<br>MOTION TO CLARIFY THE CONSENT DECREE**

Port Hamilton Refining and Transportation LLLP ("Port Hamilton") is not required to install a flare gas recovery system ("FGRS") at the oil refinery on the south shore of St. Croix (the "Refinery") based on the unambiguous terms of the Consent Decree[1] and First Modification.[2] Despite clear language that the FGRS-related requirements of the First Modification did not begin or become effective until the date the First Modification was entered by the Court ("Date of Entry"), rather than when the First Modification was lodged with the Court ("Date of Lodging"),

---

[1] The "Consent Decree" is the consent decree, entered by this Court on June 7, 2011, between HOVENSA L.L.C. ("HOVENSA"), U.S. Environmental Protection Agency ("EPA"), and the government of the Virgin Islands to resolve HOVENSA's alleged violations of the Clean Air Act. Doc. No. 6.

[2] The "First Modification" is the modification of the Consent Decree, entered by this Court on December 30, 2021, between the EPA and Limetree Bay Terminals, LLC ("Limetree Bay Terminals"). Doc. No. 42. The First Modification made both Limetree Bay Terminals and a related company that had subsequently obtained title over the Refinery, Limetree Bay Refining, LLC ("Limetree Bay Refining"), "Parties to the Consent Decree." Limetree Bay Refining and Limetree Bay Terminals are together called "Limetree Bay."

EPA insists the FGRS installation obligation was somehow triggered prior to the Date of Entry. That position, which is belied by the text of the First Modification, is groundless.

EPA's mistaken position is based upon three flawed premises: (1) that extrinsic evidence determines the interpretation of the Consent Decree and First Modification; (2) that the Bankruptcy Court required Port Hamilton to be liable for Limetree Bay Refining's obligations under the Consent Decree when it clearly stated that Port Hamilton did not have any successor liability for any of Limetree Bay Refining's liabilities or obligations; and (3) that Port Hamilton is seeking a modification of the Consent Decree and First Modification. As explained more fully herein, none of these premises have any merit. Accordingly, Port Hamilton respectfully requests that the Court confirm that Port Hamilton currently does not have an obligation to install an FGRS pursuant to Paragraph 50B of the First Modification.

## ARGUMENT

**I.    THERE IS NO AMBIGUITY IN THE FIRST MODIFICATION: THE OBLIGATION TO INSTALL AN FGRS UNDER PARAGRAPH 50B WAS NOT IN EFFECT UNTIL THE DATE OF ENTRY.**

EPA does not refute Port Hamilton's argument that Paragraph 50B of the First Modification—the FGRS requirements—was not effective or applicable until the First Modification's Date of Entry. Indeed, EPA barely discusses this specific provision at all in the argument section of its response, let alone points to any other language to support its flawed argument that the First Modification's FGRS requirements went into effect prior to the Date of Entry. As explained in Port Hamilton's Memorandum of Law in Support of its Motion, the default under the First Modification is that all obligations take effect *post-entry*. Doc. No. 97, at 5-12.[3]

---

[3] *See also* Doc. No. 42, ¶5-5.a ("[E]ffective upon the Date of Entry of the First Modification: a. Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC shall be substituted for HOVENSA as the Defendant, for all provisions of the Consent Decree, including all rights, liabilities and obligations of HOVENSA, except as set forth in this First Modification.").

The select few obligations that *do* begin at the Date of Lodging are explicitly stated and designated as such.[4] When there is no explicit statement, obligations begin on the Date of Entry. If EPA wanted the FGRS provisions to be in effect upon lodging, it knew how to say so by using the defined phrase "Date of Lodging." For Paragraph 50B, the FGRS provision, EPA did not.

EPA's only textual response to Port Hamilton's argument is to cite Paragraph 221 of the First Modification, which states that "[o]bligations of Limetree Bay under this Consent Decree to perform duties after the Date of Lodging of the First Modification but prior to the Date of Entry of the First Modification shall be legally enforceable only on or after the Date of Entry of the First Modification." Doc. No. 98, at 8. But this provision only applies to those obligations that took effect upon lodging, as clarified by the use of the defined phrase "Date of Lodging."[5] Paragraph 221 has no relevance to the vast majority of obligations in the First Modification, including those in Paragraph 50B, that took effect upon the Date of Entry of the First Modification. Paragraph 221

---

[4] For example, ¶106(a) of the First Modification states that "[b]y no later than 270 Days after the Date of Lodging of the First Modification, Limetree Bay was required to conduct a refinery-wide third-party audit evaluating compliance with Leak Detection and Repair ("LDAR") Regulations. The reference to the "Date of Lodging" corresponds to a specific obligation agreed to by refinery operator. *See* Doc. No. 42 ¶106(a). *See also* Doc. No. 42, ¶12.GGG (defining "Date of Lodging of the First Modification").

[5] The provisions of the First Modification that are effective upon lodging, but not upon entry, include the following paragraphs: Doc. No. 42, ¶83 (requiring Limetree Bay to continue to use the facility's "management of change" procedures review process information and construction projects); ¶93 (inspecting water traps, segregating stormwater drains, and monitoring the oil/water separators); and ¶101 (deeming certain equipment to become affected facilities under the federal New Source Performance Standards ("NSPS") at 40 CFR Part 60, Subpart GGGa); ¶106(a) (completing an audit of its facilities based on EPA's LDAR regulations); ¶112 (implementing a Valve Preventative Leak Maintenance Program); ¶114 (storing LDAR data); ¶115 (monitoring and reporting LDAR data); ¶116 (developing and implementing quality control procedures for LDAR data); ¶117 (retaining LDAR personnel); 118 (adding or removing valves and pumps to LDAR program); ¶120 (conducting LDAR equipment calibration); ¶121 (reforming maintenance and repair procedures for LDAR); ¶136(b)(ii) (demonstrating compliance with NSPS provisions); ¶136(d) (complying with maximum load limits for generating turbines); and ¶136(e) (maintaining records of electric loads); *see also* ¶178A (stipulated penalties).

3

does not transform the effective date of Paragraph 50B from the Date of Entry to the Date of Lodging. In fact, Paragraph 221 reinforces Port Hamilton's position: there would be no need to clarify that provisions that impose a duty or duties on the "Date of Lodging" are not legally enforceable until the "Date of Entry," if it were presumed that all provisions become effective on the "Date of Lodging." EPA makes no effort to explain how Paragraph 221 supports its position, because it cannot.

## II. THE SALE ORDER UNAMBIGUOUSLY STATES THAT PORT HAMILTON DID NOT ASSUME ANY OF LIMETREE BAY REFINING'S LIABILITIES OR OBLIGATIONS AND THE REQUIREMENT THAT PORT HAMILTON JOIN THE CONSENT DECREE AS A "PARTY" DOES NOT CHANGE THAT.

Although EPA cites Section VII, ¶¶10-11 of the Bankruptcy Court's Sale Order, to support its argument (without explaining how it supports its argument),[6] EPA fails to include the portion of the Sale Order that is dispositive of the issue at hand: Section Y of the Bankruptcy Court's Findings of Fact and Conclusions of Law.[7] Section Y specifies:

> <u>No Successorship</u>. Neither the Purchaser nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Purchaser nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the [Asset Purchase Agreement].[8]

EPA cannot point to any portion of the Sale Order or the Asset Purchase Agreement ("APA") that modifies this clear statement that specifies that Purchaser (Port Hamilton) is not responsible for *any* of Limetree Bay Refining's liabilities or obligations. Indeed, Section VII, ¶10 of the Sale Order that EPA relies upon supports this concept, as it states that nothing in the Sale

---

[6] The status of Port Hamilton as a "party" rather than a "party defendant" is the subject of Port Hamilton's Objections to the Magistrate Judge's Order. *See* Doc. No. 86, at 1.

[7] The entire Sale Order is already a part of the record. *See* Doc. No. 68-1, Ex. 1.

[8] *Id.*

4

Order or the APA "releases, nullifies, precludes or enjoins" any "regulatory liability to a governmental unit that any entity would be subject to *as the post-sale owner or operator of the property after the date of entry of this Order.*" Doc. No. 68-1, at 24 (emphasis added). If Port Hamilton was to be responsible for Limetree Bay Refining's obligations under the Consent Decree, then one would expect this paragraph to make this clear. These provisions are consistent: Port Hamilton is responsible for its obligations and liabilities but not Limetree Bay Refining's. And EPA's practice has been consistent with Port Hamilton's interpretation, as it has never attempted to collect from Port Hamilton the penalties that Limetree Bay Refining was subject to under the Consent Decree.

### III. EXTRINSIC EVIDENCE DOES NOT AFFECT THE PLAIN MEANING OF THE FIRST MODIFICATION; MOREOVER, EVEN IF SUCH EVIDENCE WAS ADMISSIBLE, IT DOES NOT SUPPORT EPA'S POSITION.

This Court should ignore EPA's attempt to rely on extrinsic evidence because the Consent Decree's language is abundantly clear—the First Modification's obligations took effect on the Date of Entry, unless otherwise specified, and there was no such specification in Paragraph 50B. Courts do not look at extrinsic evidence to interpret a contract or agreement where, as here, the language is clear. *See Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148 (3d Cir. 1994) ("Where the contract or agreement is unambiguous, parol[] evidence of prior inconsistent terms or negotiations is inadmissible to demonstrate intent of the parties.") (*citing Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980)). EPA nevertheless attempts to argue that the words and actions of Limetree Bay and Port Hamilton should be used to change the interpretation of the Consent Decree obligations. But since the "four corners" of the Consent Decree remain unchanged and unequivocal, this Court should ignore EPA's attempts to introduce extrinsic evidence. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) ("It is to be recalled that the 'scope of a consent decree must be discerned within its four corners, and

not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.'") (*quoting United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)). Moreover, even if the Court were to consider such proffered extrinsic evidence, it fails to support EPA's arguments.

> A. **LIMETREE BAY'S AND PORT HAMILTON'S ACTIONS DO NOT SUPPORT EPA'S CONTENTION THAT PORT HAMILTON HAS AN OBLIGATION TO INSTALL AN FGRS.**

First, EPA argues that an April 13, 2021, letter from Limetree Bay suggests the First Modification was in effect during the emission exceedances and that the obligation to install an FGRS was triggered. Doc. No. 98-2, Declaration of Myles E. Flint, II, Ex. 5. In the letter, Limetree Bay stated its belief that it had triggered the obligation to install [an FGRS] because "[t]he total gas quantity specified in Subparagraph 50B.a.i was exceeded during the restart of operations." *Id.* But it provided this notice before the Consent Decree was entered and in effect. Consequently, this letter is nothing more than extrinsic evidence inappropriately offered by EPA to suggest another timeframe for the effective date of Paragraph 50B. Such use of extrinsic evidence of an otherwise unambiguous provision is impermissible. *See United States v. State of New Jersey,* 194 F.3d 426, 430 (3d Cir. 1999) (finding use of extrinsic evidence to only be permissible when a consent decree is ambiguous). Although EPA offers the letter as evidence that the FGRS obligation was triggered, Limetree Bay's belief is irrelevant here. It is neither the entity on which EPA seeks to enforce a supposed obligation nor the regulator enforcing the obligation. The views of such parties on obligations sought from Port Hamilton should be disregarded, even if they come from a previous party to the First Modification. *See id*. Further, as discussed herein, EPA *itself* did not indicate that it believed the obligation to install an FGRS had been triggered. And it is only recently—after Port Hamilton took ownership of the Refinery following the Bankruptcy Court-approved sale process and began working towards restarting it— that EPA made this an issue of concern. Consequently,

this letter is neither admissible nor relevant to interpreting Port Hamilton's current obligations under Paragraph 50B.

Second, EPA suggests Port Hamilton's actions indicate that Port Hamilton understood there to be a requirement to install an FGRS. Specifically, EPA argues that Port Hamilton's preliminary evaluation of the potential to install an FGRS in the future suggest that Port Hamilton "understood the obligation to install FGRS applied to the Refinery." Doc. No. 98, at 13. EPA asserts that because Port Hamilton was consulting with engineering firms on an FGRS, this indicates that Port Hamilton believed it was required to install such a system. That is inaccurate. As the current owner of the Refinery, Port Hamilton continues to plan for the restart of the Refinery and there are numerous different configurations under which the Refinery could be operated. One of the considerations in planning for a resumption of operations is an evaluation of several types of emission control systems. *See* Declaration of Fermin Rodriguez, ¶3 (hereinafter Rodriguez Dec.). An FGRS is merely one type of possible control systems that Port Hamilton could consider, depending upon the configuration it decides to use for operating the refinery,[9] irrespective of any obligation under the terms of the First Modification. *Id.* at ¶4. In fact, Port Hamilton's consideration of FGRS systems was only preliminary; although it gathered data that could be used to design an FGRS, Port Hamilton never completed any design work for such a system, and never obtained any bids for any particular system. *Id.* at ¶5.

---

[9] As EPA recognized when it drafted the First Modification, operating the Refinery at half of its prior capacity *should* not require an FGRS, and EPA would *never* have approved operating without an FGRS if that were not the case. *See* Doc. No. 98, at 6-7. It was only because Limetree Bay Refining could not figure out how to get the Refinery into a stable operating condition and had to repeatedly undergo transient restart conditions that it was apparently unable to remain within the emission limitations set forth in the First Modification.

7

Third and finally, EPA submits that Port Hamilton's statements to the Third Circuit that "any pre-start conditions in the Consent Decree must be satisfied before it resumes implementation of its phased restart plan" suggest an admission or acknowledgement that it must install an FGRS system. There is simply no basis for such a suggestion. Doc. No. 98, at 14. There are dozens of obligations in the Consent Decree and the First Modification that speak to the actions Port Hamilton must take to ensure compliance with those obligations, including maintaining obligations under Clean Air Act permits, LDAR procedures, valve upgrades and repairs, and other general measures to control emissions. *See* Rodriguez Dec. at ¶6. To suggest that FGRS installation was one of them places a disingenuous spin on Port Hamilton's general statement about its restart obligations.

In sum, while Port Hamilton's actions are extrinsic evidence that should not be considered by the Court to interpret the First Modification, even the evidence proffered fails to provide any indication that an obligation to install an FGRS had been triggered.

### B. EPA'S ACTIONS DO NOT SUPPORT ITS CONTENTION THAT PORT HAMILTON HAS AN OBLIGATION TO INSTALL AN FGRS.

Similarly, the inadmissible extrinsic evidence EPA offers regarding its *own actions* fails to support the contention that Port Hamilton is obligated to install an FGRS. In fact, these actions indicate the opposite is true.

First, EPA states that, on April 8, 2021, it filed a Motion to Enter the First Modification, followed by an August 31, 2021 Motion for a Hearing on the Motion to Enter the First Modification, and that the Motion for a Hearing conveyed EPA's view that entry of the First Modification would help refinery bidders in bankruptcy proceedings for Limetree Bay Refining "understand what is required" under the First Modification. Doc. No. 98, at 8-9. But conspicuously absent from this motion was any discussion of the obligation to install an FGRS. Moreover, the

emissions that EPA now argues triggered the FGRS installation requirement did not even take place until after the Motion to Enter was filed. And, even if there was mention of an obligation to install an FGRS in either of the motions—which there was not—it would still not change the language of the First Modification, including Paragraph 50B, or the effective date of that provision. If, as EPA argues, the obligation to install an FGRS had been triggered, surely such a significant obligation would have been included in the update EPA provided to the Court in its Motion for a Hearing. The absence of any mention of the need to design and install an FGRS system suggests EPA knew then what it now denies—that the FGRS obligation had not yet been triggered.

Second, the information EPA provided to bidders of the Refinery in the bankruptcy proceedings did not convey that the obligation to install an FGRS had been triggered. In the letter EPA Region 2 provided to parties interested in purchasing the Refinery following Limetree Bay Refining's filing for bankruptcy, EPA states that the First Modification "modifies the requirement to install and operate [FGRS] on certain flares . . . and ***potentially requires*** Limetree Bay to perform mitigation projects if emissions exceed a specified level." Doc. No. 98-2, Declaration of Myles E. Flint, II, Ex. 7 (emphasis added) (cleaned up). There is absolutely no indication that EPA felt that the FGRS obligation had been triggered. Moreover, even though this letter was posted after the emissions incidents in question, EPA states only that certain mitigation projects are "potentially require[d]," establishing that EPA did not yet find that this obligation had, in fact, been triggered.

Although EPA's earlier motion and letter, as extrinsic evidence, have no bearing on the interpretation of the obligations under the Consent Decree, neither EPA's words nor its actions support its current assertion that the FGRS obligation had been triggered.

9

### IV.   THE MOTION TO CLARIFY IS NOT A FED. R. CIV. P. 60(B) MOTION.

Port Hamilton's Motion is clear that it seeks to clarify, not modify, the terms of the First Modification to understand its obligations. *See United States v. Philip Morris USA, Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011) ("'The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend.'") (quoting *Resolution Trust Corp. v. KPMG Peat Marwick*, No. 92–1373, 1993 WL 211555, at *2 (E.D. Pa. June 8, 1993).[10] EPA's argument that the Court should treat Port Hamilton's motion as one to modify the First Modification is legally groundless and little more than a thinly veiled attempt for the Court to impose a higher standard on Port Hamilton's Motion to Clarify its obligations.

Port Hamilton is direct and unambiguous in its request for clarification—not modification—of its obligations under Paragraph 50B of the First Modification. Port Hamilton is seeking clarification in response to EPA notifying Port Hamilton that it was now interpreting the provision in a manner contrary to the plain language of the Consent Decree. Port Hamilton's Motion does not request modification of any of the terms of the Consent Decree or the First Modification and EPA fails to provide a single example of how these documents would be modified if Port Hamilton's Motion were granted.

EPA tenuously suggests that Port Hamilton was really intending a modification when Port Hamilton stated "it would be inappropriate and inequitable not to afford Port Hamilton the same two-year period in which to install a flare gas recovery system" that EPA afforded Limetree Bay. Doc. No. 97, at 2. Yet neither this sentence nor any sentence of Port Hamilton's Motion to Clarify

---

[10] This is not to suggest that Consent Decree itself is ambiguous. As Port Hamilton has shown, it is not. But when EPA insists upon denying what the plain language of the Consent Decree says, clarification is appropriate. Otherwise, Port Hamilton would be forced to proceed with a restart without installing an FGRS under pain of EPA commencing an enforcement action.

10

request a modification of the Consent Decree or the First Modification. And highlighting the inequities of EPA's approach to Limetree Bay and Port Hamilton does not change the relief sought under the Motion: to clarify the Consent Decree. On the contrary, it is EPA that is seeking to rewrite the First Modification to impose/change the effective date of Paragraph 50B from the "Date of Entry" to the "Date of Lodging." But such *post hoc* efforts are impermissible and futile. Consequently, EPA's arguments as to why a Rule 60(b) motion would fail are misplaced and irrelevant.

### A. THERE IS NO SCENARIO IN WHICH THE ORIGINAL CONSENT DECREE GOVERNS THE FGRS OBLIGATION.

In one of EPA's repeated efforts to offer any argument supposedly in its favor that distract from the actual language of the Consent Decree, EPA asserts that, if the First Modification does not govern the FGRS issue, then the original Consent Decree would apply. Doc. No. 98, at 19. And, under the original Consent Decree, an FGRS was required to be installed prior to restart, regardless of the emission levels. This is false. All parties agree that the First Modification is in effect and is binding on Port Hamilton; and the effect of the entry First Modification was to supersede specific provisions in the original Consent Decree that had been modified. *See* Doc. No. 42, at 95.

### B. PORT HAMILTON'S STRATEGIC DECISIONS HAVE NO BEARING UPON PORT HAMILTON'S OBLIGATIONS.

In another outlandish argument that EPA advances, EPA falsely claims that Port Hamilton's Motion to Clarify was submitted to the Court due to "strategic" decisions. Doc. No. 98, at 19. As a threshold matter, Port Hamilton's motivations for seeking clarification of a court order are irrelevant. Moreover, EPA knows that Port Hamilton filed this Motion after EPA recently indicated that Port Hamilton would have to install an FGRS prior to resuming operations at the Refinery.

11

Although EPA argues that Port Hamilton has had 26 months to install an FGRS, that assertion is disingenuous. EPA is very aware that Port Hamilton has been stymied from upgrading, modifying, and operating the Refinery due to EPA's assertion, and the resulting Third Circuit litigation, that Port Hamilton must obtain a Prevention of Significant Deterioration permit prior to resuming operations. *See Port Hamilton Refining & Transportation, LLLP v. U.S. Environmental Protection Agency,* 75 F.4th 166 (3d Cir. 2023), *reh'g granted*, 86 F.4th 1031 (3d Cir. 2023), *on reh'g*, 87 F.4th 188 (3d Cir. 2023). Until that issue was favorably resolved, Port Hamilton could not move forward with resuming operations at the Refinery. Consequently, EPA's argument that Port Hamilton could have installed an FGRS but chose not to for strategic purposes is baseless.

### C. AN FGRS IS NOT NECESSARY TO PROTECT PUBLIC HEALTH AND WELFARE GIVEN THAT PORT HAMILTON INTENDS TO OPERATE AT A LOWER CAPACITY THAN LBR PLANNED—AND EPA AGREED THAT LBR'S PROPOSED OPERATING CAPACITY DID NOT REQUIRE FGRS. IT WAS ONLY LBR'S INCOMPETENCE IN RESTARTING THE REFINERY THAT CAUSED IT TO EXCEED THE AUTHORIZED EMISSIONS LEVELS

Lastly, EPA claims that "[g]ranting Port Hamilton's request and allowing it to operate the Refinery without the installation of FGRS would result in higher emissions to the detriment of public health and welfare." Doc. No. 98, at 20. This is a red herring. Port Hamilton will ensure it operates the Refinery in accordance with all applicable federal and territorial emission standards, and it implemented a consent order with EPA to address its concerns about materials onsite. But more fundamentally, the environmental impact of Port Hamilton installing or not installing an FGRS is irrelevant if that installation was not required by the plain terms of the First Modification agreed to by the parties—and it was not.

EPA's concerns about potential emissions from operating without an FGRS are also inconsistent with the fact that EPA agreed in the First Modification to allow Limetree Bay to operate without such controls if certain conditions were met. Since Port Hamilton intends to

operate the refinery at or below the levels of output pursued by Limetree Bay (approximately 180,000 barrels per day), Port Hamilton's operation should be allowed the same flexibility. Rodriguez Dec. at ¶7. The public health and welfare impacts of operating without an FGRS are no different than that which EPA had previously found acceptable in the First Modification—and EPA would never have agreed to the First Modification if operating the Refinery at a lower capacity without FGRS presented any additional risk to the public or the environment.

## CONCLUSION

For the foregoing reasons, Port Hamilton hereby requests that the Court issue an Order clarifying the Consent Decree in accordance with the language of the Proposed Order attached to the Motion to Clarify the Consent Decree.

Respectfully submitted,

**ANDREW C. SIMPSON, P.C.**

Counsel for Port Hamilton Refining and Transportation, LLLP

Dated: April 19, 2024

/s/ Andrew C. Simpson
Andrew C. Simpson
VI Bar No. 451
ANDREW C. SIMPSON, P.C.
2191 Church Street, Suite 5
Christiansted, VI 00820
Tel: 340.719.3900
asimpson@coralbrief.com